# U.S. DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ROSE M. DEWS-MILLER** | ) | |
| **8507 Woodyard Road** | ) | |
| **Clinton, Maryland 20735** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO: 06-1764**$GK$ |
| | ) | |
| **CONDOLEEZA RICE,** | ) | |
| **Secretary, Department of State** | ) | |
| **Agency Defendant** | ) | |
| **Defendant** | ) | |

## FIRST AMENDED COMPLAINT
(Employment Discrimination, Retaliation and Breach of Settlement Agreement)

## INTRODUCTION

Plaintiff, Rose M. Dews-Miller, (hereinafter "Plaintiff"), pro se, hereby brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e *et seq.*, and as further amended by §102 of the Civil Rights Acts of 1991, 42 U.S.C. - 1981a, and to remedy acts of employment discrimination perpetrated against her by the Defendant on account of her participating in protected activity and in retaliation for her having filed EEO complaints against the Agency. Additionally, Plaintiff complains against Defendant for engaging in prohibited personnel practices outlined in Title 5 of the United States Code, §§§ 2302, 4302, 7513 culminating in the termination of Plaintiff's federal government employment after twenty-four (24) years of service and for Defendant materially breaching the Settlement Agreement entered into by the parties in January 1995. Plaintiff contends that the Defendant discriminated against her after she disclosed to the Office of Inspector

RECEIVED

MAY 1 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

General (OIG) that various OIG employees had misuse/and or abused their American

Express government issued credit cards. After Plaintiff's disclosure to the Inspector

General, Defendant gave Plaintiff two "minimally successful" ratings, placed Plaintiff on

AWOL status, denied Plaintiff a within grade increase and converted Plaintiff's career

appointment of more than twenty (20) years to a temporary appointment that ultimately

resulted in Plaintiff's termination of federal employment in December 1996.

## PARTIES

1.      Plaintiff is an adult resident of the State of Maryland residing in Clinton,

Maryland.

2.      Defendant, U.S. Information Agency ceased to exist as of 1999 and has been

merged into the U.S. Department of State.

3.      Defendant, Office of the Inspector General was a part of the U.S. Information

Agency and was merged into the U.S. Department of State in 1997.

4.      Defendant, U.S. Department of the State is a United States government agency.

Defendant's principal place of business is located in Washington, D.C.

5.      Defendant Condoleeza Rice is the current Secretary of the U.S. Department of

State. As such, Secretary Rice is here sued only in her official capacity as head of the

U.S. Department of State.

## JURISDICTION

6.      This Court has jurisdiction over the subject matter of this civil action pursuant to

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment

Opportunity Act of 1972, 42 U.S.C. - 2000e et seq., and as further amended by §102 of

the Civil Rights Act of 1991 (hereinafter "Title VII", plaintiff having exhausted her available administrative remedies on each of the claims made herein.

7.    Plaintiff timely filed a charge with the Equal Employment Commission (hereinafter "EEOC").

8.    Plaintiff received her Notice of Right to Sue Letter on or about July 18, 2006.

9.    Plaintiff timely filed a complaint in the U.S. District Court for the District of Columbia.

## FACTS

10.    On June 19, 1972, Plaintiff began her employment with the United States Information Agency (hereinafter "USIA") in the Office of Personnel. Plaintiff held a number of positions throughout the Agency including Payroll Clerk, Cashier, Accounting Technician, Personnel Assistant, Secretary, Administrative Assistant, Unit Manager and Administrative Officer working her way up from a GS-2 to a GS-11. Plaintiff maintained her various positions in the Agency while taking accounting classes after work to accomplish her goal of becoming an auditor. Plaintiff continued her employment with USIA in various offices throughout the Agency for the subsequent twenty-four (24) years.

11.    On March 25,1990, based on a merit selection process, Plaintiff was hired in the USIA's Office of the Inspector General (hereinafter "OIG") as an Administrative Officer GS-9. After working in the OIG for one year, in 1991, Plaintiff received a "highly successful" rating from Paul S. Johnson, Director of the Office of Administrative Management and reviewed by Louis J. Leporatti. In the comment section of the performance evaluation, Paul S. Johnson commented that Plaintiff was a valuable asset to OIG and that she was dependable, conscientious and a pleasure to work with. On the

3

same evaluation, reviewer Louis J. Leporatti commented that Plaintiff had excellent
interpersonal skills and her working relationships with others in the office and her
supervisor were outstanding and that she was a dedicated and competent employee who
is able to work with little guidance and is instrumental in providing the support OIG
needs for maintaining and managing its financial and personnel resources. During the
1990-1991 rating period, Plaintiff was promoted to a GS-11, Administrative Officer. The
1991 OIG performance rating was consistent with the "highly successful" ratings that
Plaintiff received in 1990, 1989, and 1988.

12.     In 1992, Plaintiff's immediate supervisor, Darwin Roberts completed Plaintiff's
performance evaluation and again Plaintiff was rated "highly successful" Darwin
Robert's commented that Plaintiff was a valuable asset to the OIG. Roberts further
commented that Plaintiff maintained a professional attitude and demeanor no matter what
task she was assigned and in performing the tasks, had demonstrated herself to be a loyal,
productive and experienced employee.

13.     In June 1993, Plaintiff filed an EEO action against USIA after not be being
selected for an auditor position despite the fact that she was qualified. After filing the
June 1993 EEO complaint, Plaintiff's performance was again evaluated by Darwin
Roberts who rated Plaintiff's work performance as "fully successful". This lower
performance appraisal rating prompted Plaintiff to file a second EEO complaint against
the Agency believing that she had been retaliated against for filing the first EEO
complaint.

14.     In August 1994, the USIA Comptroller, Stanley Silverman issued a memorandum
designating the Administrative Officers throughout the Agency as the American Express

(hereinafter "AMEX") government issued credit card coordinators for their respective offices. Since Plaintiff was the OIG Administrative Officer, she was responsible for receiving the credit card statements of the federal government issued AMEX cards of the employees in the OIG's office. In September 1994, Plaintiff opened and reviewed the credit card statements that were addressed to her as the AMEX Coordinator for the OIG and recognized misuse and/or abuse on the part of the various OIG employees. Based on this information, Plaintiff requested a meeting with the USIA Inspector General, Marian Bennett.

15.    On or about September 16, 1994, in a meeting with Plaintiff, Inspector General Bennett, Darwin Roberts, Plaintiff's immediate supervisor, Louis Leoporatti, Roberts's supervisor, and Renee DeVigne, Agency attorney, Plaintiff disclosed to Inspector General  Bennett that employees within the OIG were misusing and/or abusing AMEX government issued credit cards. At the September 16, 1994 meeting, Inspector General Bennett instructed Plaintiff to follow up with AMEX for more information. On September 19, 1994, Inspector General Bennett instructed Plaintiff not to discuss the matter with any OIG employees and if asked by an OIG employee, Plaintiff was to respond that the employee was to ask their supervisor. On September 20, 1994, Inspector General Bennett sent a memorandum to all OIG employees advising the employees of the AMEX credit card misuse and/or abuse.

16.    On or about September 27, 1994, Plaintiff had a pre-hearing scheduled with the EEOC in connection with the June 1993 complaint Plaintiff filed regarding not receiving an auditor position although qualified. At the pre-hearing Plaintiff was extended a settlement offer that she believed was not acceptable and consequently refused.

17.    On or about November 4, 1994, Plaintiff submitted a request for sick leave to Plaintiff's immediate supervisor, Darwin Roberts for the dates of November 10, 1994 and November 16, 1994. Darwin Roberts wrote and signed a note left on Plaintiff's desk that read, "Before I approve the sick leave requests, please provide me with some idea on how long this pattern of sick leave may go on. I thought that after you took the sick leave in October that everything was okay. Is this a long term situation." The request for sick leave was subsequently denied Plaintiff by Darwin Roberts although Plaintiff had accrued more than 700 hours of sick leave at the time of the request.

18.    On or about October 1, 1994, Darwin Roberts denied Plaintiff approval for overtime although the practice of the OIG was to approve requests for overtime made by its employees.

19.    On or about November 9, 1994, Plaintiff discovered a major accounting error and was reprimanded by her immediate supervisor, Darwin Roberts for discovering the error.

20.    On December 16, 1994, Plaintiff interviewed with the Office of Comptroller for a Systems Analyst GS-12 position. The Office of Comptroller was responsible for monitoring government credit card usage in the USIA. Plaintiff was qualified for the Systems Analyst GS-12 position and placed on the Agency's certification for the position. On January 4, 1995, Plaintiff was subsequently advised that Carol B. Epstein, Assistant General Counsel for USIA reported that Plaintiff was no longer qualified for the GS Systems Accountant GS 510-12/13. On January 13, 1995, Plaintiff applied for a Budget Analyst, GS-560-11/12/13 position.

21.    That on January 18, 1995, the hearing scheduled in connection with Plaintiff's three (3) EEO complaints was cancelled without notice by Administrative Law Judge

Tietleman and Plaintiff's witnesses were sent back to work in violation of the Code of Federal Regulations. Judge Tietleman advised the parties that he wanted a settlement in lieu of a hearing.

22.     That on January 27, 1995, Plaintiff with the advice of counsel entered into a Settlement Agreement (hereinafter "Agreement") with the OIG, Office of Comptroller, Office of Civil Rights and Office of General Counsel. (See Exhibit A). That pursuant to the Settlement Agreement, Plaintiff was to be "detailed" out of the OIG to the USIA Office of the Comptroller for a period of six (6) months. (Exhibit A, ¶3). Plaintiff never received a SF-50, official personnel action, authorizing the detail to the Office of the Comptroller from the OIG. Furthermore, the OIG did not request authorization to detail Plaintiff to another position pursuant to a SF-52 personnel action. Although Plaintiff was "detailed" to a position with very different responsibilities, Plaintiff was never provided with any training on how to succeed in her new position as a budget analyst. Additionally, the Agreement provided that the terms of the Agreement were to be kept confidential. (Exhibit A, ¶12).

23.     According to the Agreement, if Plaintiff did not receive a "minimally successful" rating from the Office of Comptroller, Plaintiff was to return to the OIG. (Exhibit A, ¶3). If Plaintiff did not receive a "minimally successful" rating from the OIG, Plaintiff was to be transferred to a temporary position and required to resign her career position with Defendant. (Exhibit A, ¶6). During Plaintiff's "detail" to the Office of the Comptroller, in March 1995, Plaintiff's supervisor was Carol Keith who advised Plaintiff to fill out leave slips for the remainder of the year as Plaintiff was going to remain in the Office of the Comptroller and Keith told Plaintiff that Plaintiff was doing a good job in the Office

of the Comptroller. Pursuant to the Agreement, the Office of Comptroller agreed to recommend any training that would enhance Plaintiff's ability to succeed in the temporary position. (Exhibit A, ¶2).

24.    On May 26, 1995, Plaintiff met with FBI Special Agent, Linda McKetney to participate in the FBI's investigation of the USIA OIG employees abuse of AMEX government issued credit cards. On June 8, 1995, Ann Young of the OIG contacted Plaintiff to request a meeting with Plaintiff to discuss the AMEX credit card usage of OIG employees. Plaintiff declined to meet with Ann Young as the FBI investigation was ongoing. On June 12, 1995, Plaintiff met a second time with FBI Special Agent, Linda McKetney in connection with the FBI investigation in the AMEX credit card abuse.

25.    In June 1995, Plaintiff worked overtime in the Office of Comptroller in order to complete an office project. On June 20, 1995, Ann Young of OIG advised Eva Diekmann of the Office of the Comptroller that Plaintiff had not been approved by OIG to work overtime and required that the overtime be deducted from Plaintiff's next pay check although the Settlement Agreement was silent on the issue of overtime.

26.    On June 23, 1995, John Sinclair, Assistant Inspector General for Inspection of the USIA OIG requested that Plaintiff meet with OIG to discuss OIG management issues. Plaintiff agreed to a meeting and was accompanied to the meeting by American Federation of Government Employees (AFGE) Vice President, John Andregg. At the meeting Plaintiff participated in yet another investigation and was questioned under oath about the misuse/and or abuse of AMEX government issued credit cards by OIG employees.

27.    On July 10, 1995, Plaintiff sustained an on the job injury to her back, neck and

shoulder while working in the Office of Comptroller. As Plaintiff's injury was continually aggravated in severity, Plaintiff went out on sick leave in connection with this injury on August 21, 1995 and was released from the doctor's care to go back to work on November 24, 1995.

28.    On July 20, 1995, Plaintiff received a copy of the performance evaluation completed by Darwin Roberts of OIG for Plaintiff for the period of May 1, 1994 to January 24, 1995. Darwin Roberts rated Plaintiff "minimally successful" without providing Plaintiff any notice of any alleged deficiencies, did not offer Plaintiff any assistance to resolve the alleged deficiencies and provided Plaintiff with no opportunity to correct the alleged deficiencies. No comments were made on the performance evaluation by Darwin Roberts despite the extensive comments Roberts had made on Plaintiff's previous performance evaluations. Roberts only checked the boxes "minimally successful" on Plaintiff's performance evaluation.

29.    That on or about August 17, 1995, Plaintiff's supervisor in the Office of Comptroller, Carol Keith gave Plaintiff the performance evaluation completed for Plaintiff for the period of February 1, 1995 to July 31, 2005. Carol Keith rated Plaintiff "minimally successful" without providing Plaintiff any notice of the any alleged deficiencies, did not offer Plaintiff any assistance to resolve the alleged deficiencies and provided Plaintiff with no opportunity to correct the alleged deficiencies. No comments were made on the performance evaluation by Carol Keith despite her representations that Plaintiff had performed well in the Office of the Comptroller. Keith only checked the boxes "minimally successful" on Plaintiff's performance evaluation.

30.    On September 2, 1995, Plaintiff received a letter from Jenni Mallios of the USIA

Office of Personnel advising Plaintiff to report to Ann Young in the OIG effective

September 1, 1995. On September 6, 1995, Ann Young called Plaintiff at home inquiring

as to when Plaintiff would be reporting to work in the OIG. Plaintiff advised Ann Young

that she would report to the OIG once Plaintiff had been released by the doctor. Plaintiff

provided Ann Young with the medical documentation authorizing time off from work in

connection with the work related injury. Nevertheless, Ann Young placed Plaintiff on

AWOL (Absent without leave) status effective September 5, 1995 until November 24,

1995 for a total of 472 hours although Plaintiff had accrued well over 600 hours of sick

leave at the time Ann Young placed Plaintiff on AWOL. Plaintiff was not given notice

of the AWOL although it was an adverse personnel action. On September 29, 1995,

Plaintiff received a letter from the Office of Worker's Compensation (hereinafter

"OWC") advising that OWC had accepted Plaintiff's July 10, 1995 injury as an on the

job injury. On January 27, 1997, the OWC sent a letter to the Defendant USIA stating

that USIA's records needed to be changed to reflect the continuation of pay (COP) to

which Plaintiff was entitled in connection with her on the job injury. Despite the OWC

finding, USIA refused to pay Plaintiff for the time she was placed on AWOL status.

31.    On November 13, Plaintiff received a letter from Ann Young advising that

Plaintiff was being denied a With In Grade (WIG) increase to the GS-11, Step 5 effective

October 29, 1995. The denial of the WIG was done without notice of the adverse

personnel action to Plaintiff.

32.    On November 28, 1995, Plaintiff returned to work after being released from the

doctor's care. On the same day, Plaintiff went to the Office of Civil Rights to complain

about the AWOL, the "minimally successful" ratings, and the denial of the WIG. On

November 29, 1995, Ann Young insisted that Plaintiff meet with her without Plaintiff's representative to discuss Plaintiff's performance standards. At that time, Ann Young advised that Plaintiff's last day in the OIG was November 30, 1995.

33.     On December 1, 1995, Plaintiff reported to the Office of Personnel for work and on December 5, 1995, Plaintiff met with Jenni Mallios and Blanche Twardowski of the Office of Personnel and Stacey Rose-Blass of the employee union. The subject of the meeting was whether Plaintiff would return to the OIG to complete the 90 days pursuant to the Settlement Agreement. Plaintiff advised the meeting participants that she would go wherever the Agency decided. From December 1, 1995 to February 27, 1995, Plaintiff was sent by the Agency to the Career Center without an office assignment, telephone, desk or personnel action.

34.     On February 1, 1995, Plaintiff received a SF-50, official personnel action dated December 10, 1995 converting Plaintiff's career appointment to a temporary position in the OIG not to exceed December 9, 1996. This action was taken by USIA without notice to Plaintiff of the pending adverse personnel action.

35.     On March 28, 1996, Plaintiff filed a formal EEO complaint with the Office of Civil Rights alleging reprisal by USIA for the adverse personnel actions that had resulted from Plaintiff's disclosure of the OIG employee's misuse of the AMEX credit cards.

36.     On April 27, 1996, Plaintiff's appointment with USIA's OIG was terminated via a SF-50, personnel action as the OIG had been absorbed by the U.S. Department of State (hereinafter "State"). Plaintiff's health insurance was cancelled. Plaintiff received no notice of the pending adverse personnel action. As a result of the personnel action, Plaintiff's employment was terminated and she was longer getting paid. Plaintiff

contacted the Office of Special Counsel (hereinafter "OSC") to complain about the personnel action terminating her employment.

37.    On June 12, 1996, Plaintiff received a call from Delia Johnson of the Office of Civil Rights (hereinafter "OCR") advising Plaintiff that she was to report to the Office of General Counsel (hereinafter "OGC") on the next day, June 13, 1996. Plaintiff received no notice of this personnel action and there was no SF-50, official personnel action, generated permitting this assignment to the OGC. Plaintiff attempted to report to OGC by being escorted by Ms. Johnson of OCR. OGC was not prepared for Plaintiff's arrival and had Plaintiff sit in a person's office who was out of the office for the day. During Plaintiff's time in the OGC, Plaintiff was forced to work in unacceptable working conditions that included an office that had to be accessed through someone else's office and the temperature in the office was close to 95 degrees daily.

38.    On September 12, 1996, Plaintiff was contacted by Mr. Peterson of the OSC requesting that Plaintiff participating in yet another investigation of the USIA's OIG employees AMEX credit card misuse. For the third time, Plaintiff participated in an investigation of the OIG AMEX credit card misuse.

39.    That Plaintiff filed a complaint with the OSC regarding the AWOL, denial of WIG, and minimally successful ratings. OSC determined that it did not have jurisdiction and referred the matter to the Merit Systems Protection Board (hereinafter "MSPB"). In early 1997, MSPB instructed USIA to settle with Plaintiff within 30 days. USIA did not comply with the MSPB directive and MSPB subsequently determined that it did not have jurisdiction in the matter.

40.    That Plaintiff timely filed complaints with the EEOC. On June 23, 1999, the

former USIA, now U.S. Department of State was ordered by the EEOC to pay Plaintiff

for the AWOL. To date, the Defendant has not complied with the Order of the EEOC to

pay Plaintiff for the AWOL. On or about June 24, 1999, the EEOC in Appeal #01983674

directed Defendant USIA to take correction action regarding Plaintiff's complaint and

that the Agency was to submit documentation of its compliance with the decision of the

EEOC. Defendant USIA has failed to comply with the directive of the EEOC.

41.    That Plaintiff has exhausted her administrative remedies with the EEOC. Plaintiff

obtained her Right to Sue Letter from the EEOC on or about July 18, 1006. Plaintiff

timely filed a complaint with this Court on or about October 2006.

## COUNT I (RETALIATION/REPRISAL)
### (Violation of Title VII and 5 U.S.C. §2302)

42.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41. That

Plaintiff was an "employee" and Defendant was an "agency" within the meaning of Title

5 U.S.C. §2301. The agency was obligated pursuant to Title 5 U.S.C. §2302(b)(8) not to

take a personnel action with respect to Plaintiff in retaliation for a disclosure of

information made to the Inspector General of OIG employees misusing AMEX

government issued credit cards.

43.    As set forth above, Plaintiff engaged in a statutorily protected activity by

disclosing to the Inspector General on September 16, 1994, the misuse of government

issued credit cards by employees in the Office of the Inspector General. After Plaintiff

engaged in this protected activity, adverse personnel actions were initiated against

Plaintiff that included receiving "minimally successful" ratings, placed on an AWOL

status, denied a With In Grade Increase and terminating Plaintiff's federal employment.
The Defendant had knowledge of Plaintiff's protected activity and the adverse personnel
actions are causally linked to Plaintiff's disclosure.

44.     Defendant's failure to ultimately terminate Plaintiff's federal employment after
twenty-four (24) years of service was in violation of Title VII's provision against reprisal
of Title VII of the Civil Rights Act of 1964, as amended and also in violation of Title 5
U.S.C. §2302.

45.     As a direct and proximate result of the unlawful retaliation/reprisal actions taken
against her, Plaintiff's career has been irrevocably damaged, quite apart from lost pay,
denied increases, and termination of her employment.  In addition, Plaintiff has suffered
and continued to suffer emotional distress and personal and professional humiliation and
embarrassment which have severely diminished her enjoyment of life and caused her
other pain and suffering.  Further, as a consequence of the unlawful retaliation/reprisal,
Plaintiff suffered and continues to suffer economic loss in the form of lost pay, denied
increases, termination of employment that have limited her employment opportunities
and thus adversely affected the amount she will be paid ultimately in Civil Service
retirement benefits.  Plaintiff has suffered significant damages as a consequence
therefrom.

### COUNT II (FAILURE TO COMPLY WITH PROCEDURAL PREREQUISITES FOR PERFORMANCE APPRAISALS PERIOD MAY 1, 1994 TO JANUARY 24, 1995) (Violation of Title 5 U.S.C. §4302)

46.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41. That
Plaintiff was an "employee" and Defendant was an "agency" within the meaning of Title
5 U.S.C. §4301.  The agency was obligated pursuant to Title 5 U.S.C. §4302(b) to assist

employees in improving unacceptable performance and when reassigning, reducing in grade, or removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance. Furthermore, pursuant to the Agency's Manual of Operations & Administration ("MOA"), Part V-A, Section 453.2(c)(1),(2), and (3), If at any time an employee's performance on one or more critical requirements (or 2 or more non critical requirements) is identified as "minimally successful", the rating officer MUST assist the employee in improving performance, after consulting with the Office of Personnel. The rating officer must: (1) counsel the employee that his or her performance is minimally successful; (2) explain the deficiencies in performance, citing examples; (3) explain the steps the rating officer will take to assist the employee to resolve the deficiencies such as formal or on the job training, counseling, and or closer supervision; and (4) provide the performance standards at the fully successful level.

47.    As set forth above, Plaintiff was given a "minimally successful" rating for the period of May 1, 1994 to January 24, 1995 by Darwin Roberts of the OIG. Darwin Roberts failed to counsel Plaintiff that her performance was minimally successful, failed to explain the deficiencies in Plaintiff's performance, citing examples, failed to explain the steps the rating officer would take to assist the employee to resolve the deficiencies such as formal or on the job training, counseling, and or closer supervision, and failed to provide the performance standards at the fully successful level.

.

48.    Defendant's rating of Plaintiff without the procedural prerequisites constitutes a

violation of the cited rules and regulations regarding "minimally successful" performance ratings.

49.     As a direct and proximate result of the failure of Defendant to perform the procedural prerequisites for a "minimally successful" performance appraisal has caused irrevocable damage to Plaintiff's, quite apart from lost pay, denied increases, and termination of her employment.  In addition, Plaintiff has suffered and continued to suffer emotional distress and personal and professional humiliation and embarrassment which have severely diminished her enjoyment of life and caused her other pain and suffering. Further, the failure of Defendant to perform the procedural prerequisites for a "minimally successful" performance appraisal has caused irrevocable damage to Plaintiff's career, quite apart from lost pay, denied increases, and termination of her employment.  Plaintiff suffered and continues to suffer economic loss in the form of lost pay, denied increases, termination of employment that have limited her employment opportunities and thus adversely affected the amount she will be paid ultimately in Civil Service retirement benefits.  Plaintiff has suffered significant damages as a consequence therefrom.

## COUNT III (FAILURE TO COMPLY WITH PROCEDURAL PREREQUISITES FOR PERFORMANCE APPRAISAL PERIOD FEBRUARY 1, 1995 TO JULY 31, 1995) (Violation of Title 5 U.S.C. §4302)

50.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.  That Plaintiff was an "employee" and Defendant was an "agency" within the meaning of Title 5 U.S.C. §4301.  The agency was obligated pursuant to Title 5 U.S.C. §4302(b) to assist employees in improving unacceptable performance  and when reassigning, reducing in

grade, or removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance. Furthermore, pursuant to the Agency's Manual of Operations & Administration ("MOA"), Part V-A, Section 453.2(c)(1),(2), and (3), If at any time an employee's performance on one or more critical requirements (or 2 or more non critical requirements) is identified as "minimally successful", the rating officer MUST assist the employee in improving performance, after consulting with the Office of Personnel. The rating officer must: (1) counsel the employee that his or her performance is minimally successful; (2) explain the deficiencies in performance, citing examples; (3) explain the steps the rating officer will take to assist the employee to resolve the deficiencies such as formal or on the job training, counseling, and or closer supervision; and (4) provide the performance standards at the fully successful level.

51.    As set forth above, Plaintiff was given a "minimally successful" rating for the period of February 1, 1995 to July 31, 1995 by Carol Keith of the Office of Comptroller. Carol Keith failed to counsel Plaintiff that her performance was minimally successful, failed to explain the deficiencies in Plaintiff's performance, citing examples, failed to explain the steps the rating officer would take to assist the employee to resolve the deficiencies such as formal or on the job training, counseling, and or closer supervision, and failed to provide the performance standards at the fully successful level.

52.    Defendant's rating of Plaintiff without the procedural prerequisites constitutes a violation of the cited rules and regulations regarding "minimally successful" performance ratings.

53.     As a direct and proximate result of the failure of Defendant to perform the

procedural prerequisites for a "minimally successful" performance appraisal has caused

irrevocable damage to Plaintiff's, quite apart from lost pay, denied increases, and

termination of her employment. In addition, Plaintiff has suffered and continued to suffer

emotional distress and personal and professional humiliation and embarrassment which

have severely diminished her enjoyment of life and caused her other pain and suffering.

Further, the failure of Defendant to perform the procedural prerequisites for a "minimally

successful" performance appraisal has caused irrevocable damage to Plaintiff's career,

quite apart from lost pay, denied increases, and termination of her employment. Plaintiff

suffered and continues to suffer economic loss in the form of lost pay, denied increases,

termination of employment that have limited her employment opportunities and thus

adversely affected the amount she will be paid ultimately in Civil Service retirement

benefits. Plaintiff has suffered significant damages as a consequence therefrom.

### COUNT IV (VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS)

54.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

55.     The complained of acts and omissions by Defendant USIA in terminating

Plaintiff's federal employment with notice and an opportunity to be heard were done

under color of federal law at all times pertinent hereto. Government employees with a for

cause protection are said to have a reasonable expectation of continued employment, and

therefore a property interest in their job that can only be taken away with due process.

That right also entitles them to procedural fundamental fairness before they may be

terminated.

56.    The complained of acts and omissions by Defendant USIA have been willful, malicious or with deliberate indifference to the clearly established rights of Plaintiff under the First and Fifth Amendments to the Constitution of the United States.

57.    The complained of acts and omissions by Defendant USIA have interfered with and/or deprived Plaintiff of her rights to speech and association, liberty, procedural due process, substantive due process, equal protection, and privacy under the First and Fifth Amendments to the Constitution of the United States.  Consequently, Plaintiff has suffered damages.

### COUNT V (NO NOTICE PRIOR TO ADVERSE ACTION-PLAINTIFF'S TERMINATION OF FEDERAL EMPLOYMENT)
**(Violation of Title 5 U.S.C. §7513)**

58.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

59.    That pursuant to Title 5 U.S.C. §7513, an agency may only take an adverse action against an employee in connection with a removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less if the employee has at least 30 days advance written notice of the adverse action and an opportunity to respond to the proposed action.

60.    Defendant USIA failed to provide Plaintiff with at least a 30 day written notice prior to her termination.  Consequently, Plaintiff was caused to suffer significant damages.

### COUNT VI (NO NOTICE PRIOR TO ADVERSE ACTION-DENIAL OF WITHIN GRADE INCREASE)
**(Violation of Title 5 U.S.C. §7513)**

61.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

62.    That pursuant to Title 5 U.S.C. §7513, an agency may only take an adverse action against an employee in connection with a removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less if the employee has at least 30 days advance written notice of the adverse action and an opportunity to respond to the proposed action.

63.    Defendant USIA failed to provide Plaintiff with at least a 30 day written notice prior to denying Plaintiff's within grade increase.  Consequently, Plaintiff was caused to suffer significant damages.

## COUNT VII (NO NOTICE PRIOR TO ADVERSE ACTION-TERMINATION OF APPOINTMENT WITH OIG)
### (Violation of Title 5 U.S.C. §7513)

64.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

65.    That pursuant to Title 5 U.S.C. §7513, an agency may only take an adverse action against an employee in connection with a removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less if the employee has at least 30 days advance written notice of the adverse action and an opportunity to respond to the proposed action.

66.    Defendant USIA failed to provide Plaintiff with at least a 30 day written notice prior to her position being terminated in the OIG.  Consequently, Plaintiff was caused to suffer significant damages.

## COUNT VIII (NO NOTICE PRIOR TO ADVERSE ACTION-CONVERTING PLAINTIFF'S CAREER APPOINTMENT TO A TEMPORARY APPOINTMENT)
### (Violation of Title 5 U.S.C. §7513)

67.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

68.     That pursuant to Title 5 U.S.C. §7513, an agency may only take an adverse action

against an employee in connection with a removal, suspension for more than 14 days,

reduction in grade or pay, or furlough for 30 days or less if the employee has at least 30

days advance written notice of the adverse action and an opportunity to respond to the

proposed action.

69.     Defendant USIA failed to provide Plaintiff with at least a 30 day written notice

prior to her position being terminated in the OIG.  Consequently, Plaintiff was caused to

suffer significant damages.

## COUNT IX (NO NOTICE PRIOR TO ADVERSE ACTION-PLACEMENT OF PLAINTIFF ON AWOL)
### (Violation of Title 5 U.S.C. §7513)

70.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

71.     That pursuant to Title 5 U.S.C. §7513, an agency may only take an adverse action

against an employee in connection with a removal, suspension for more than 14 days,

reduction in grade or pay, or furlough for 30 days or less if the employee has at least 30

days advance written notice of the adverse action and an opportunity to respond to the

proposed action.

72.     Defendant USIA failed to provide Plaintiff with at least a 30 day written notice

prior to placing Plaintiff on absent without leave status (AWOL).  Consequently, Plaintiff

was caused to suffer significant damages.

## COUNT X (FAILURE TO COMPLY WITH EEOC DECISION)

73.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

74.     That on June 23, 1989, the EEOC directed Defendant USIA to pay Plaintiff for

the time Plaintiff was placed on AWOL pursuant to 29 C.F.R. §1614.108.

75.    To date, Defendant has failed to comply with the decision of the EEOC and consequently has failed to submit documentation to the EEOC that it has complied with the EEOC decision. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XI (BREACH OF SETTLEMENT AGREEMENT-FAILURE TO DETAIL PLAINTIFF)
### (Violation of 29 C.F.R. §1614)

76.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

77.    That ¶1 of the Agreement provides that the Agency will detail Plaintiff out of the OIG to the Office of the Comptroller as a Budget Analyst, GS-560-11/4, for a period of six months starting February 1, 995. That Plaintiff would have the duties described in PDM-40-95, and Plaintiff's salary was to be paid by the OIG.

78.    That Defendant USIA breached the Agreement by not generating a SF-50, official personnel notification, detailing Plaintiff from the position of Administrative Officer to the position of Budget Analyst. Furthermore, pursuant to Agency's Manual of Operations & Administration ("MOA"), Part V-A, Section 461.5, the detail of an employee for a period in excess of 30 calendar days to a different position or to duties and responsibilities substantially different than those in the employees' official personnel description require a request for prior approval, submitted by the operating official on SF-52 to the appropriate personnel office. The Agency did not request a SF52 approving Plaintiff's detail to the Office of Comptroller. Additionally, the detail is required to be for a period of 120 days.

79.    That Plaintiff was detailed to the Budget Analyst position for a period of six months in violation of the personnel regulations. Defendant USIA's failure to detail

Plaintiff to the position caused irreparable harm to Plaintiff's career as Plaintiff remained

in a non bargaining unit position as an OIG employee and therefore was not entitled to

union representation. Additionally, Plaintiff's employment opportunities were limited as

she had no official personnel documentation that she was legitimately employed as a

Budget Analyst. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XII (BREACH OF SETTLEMENT AGREEMENT-FAILURE TO PAY PLAINTIFF'S OVERTIME)
### (Violation of 29 C.F.R. §1614)

80.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

81.    That ¶1 of the Agreement provides that the Plaintiff would have the duties

described in PDM-40-95, and Plaintiff's salary was to be paid by the OIG.

82.    That in June 1995, Plaintiff worked overtime in the Office of Comptroller in order

to complete an office project. On June 20, 1995, Ann Young of OIG advised Eva

Diekmann of the Office of the Comptroller that Plaintiff had not been approved by OIG

to work overtime and required that the overtime be deducted from Plaintiff's next pay

check although the Settlement Agreement was silent on the issue of overtime.

83.    That Defendant USIA's failure to pay Plaintiff overtime that Plaintif had already

worked was a breach of the Agreement as ¶1 provides that OIG would paid Plaintiff's

salary. The Agreement does not state that Plaintiff must first get approval to work

overtime. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XIII (BREACH OF SETTLEMENT AGREEMENT-FAILURE TO PROMOTE PLAINTIFF IN THE DETAIL)
### (Violation of 29 C.F.R. §1614)

84.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

85.    That ¶1 of the Agreement provides that the Agency will detail Plaintiff out of the

OIG to the Office of the Comptroller as a Budget Analyst, GS-560-11/4, for a period of six months starting February 1, 995. That Plaintiff would have the duties described in PDM-40-95, and Plaintiff's salary was to be paid by the OIG.

86.     That pursuant to Agency's Manual of Operations & Administration ("MOA"), Part V-A, Section 461.5, A detail of more than 60 calendar days to a position with a higher classification or to a position with known promotion potential is made under competitive promotion procedures. This requirement is not be circumvented by a series of temporary assignments. Therefore, competitive promotion procedures must be used if the employee has spent more than 60 calendar days (prior service under both previous details and temporary promotions included) in positions with higher classification or in positions with known promotion potential during the preceding year.

87.     That the position to which Plaintiff was detailed was a position with known promotion potential as it was a GS-560-11/12/13. Defendant USIA breached the Agreement by not promoting Plaintiff after she had been in the detail more than 60 calendar. Consequently, Plaintiff was caused to suffer significant damages.

### COUNT XIV (BREACH OF SETTLEMENT AGREEMENT- VOID FOR VAGUENESS) (Violation of 29 C.F.R. §1614)

88.     That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

89.     That ¶1 of the Agreement provides that the Plaintiff would have the duties described in PDM-40-95, and Plaintiff's salary was to be paid by the OIG.

90.     That PDM-40-95 is a vacancy announcement and not an official employment description.

91.     That Defendant USIA's failure to provide a clear standard of Plaintiff's duties in

the detail was a breach of the Agreement. The Agreement must direct Plaintiff to an official employment description and not merely a vacancy announcement. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XV (BREACH OF SETTLEMENT AGREEMENT-DEFENDANT FAILED TO PROVIDE TRAINING FOR NEW POSITION) (Violation of 29 C.F.R. §1614)

92.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

93.    That ¶2 of the Agreement provides that the OIG will pay for any training course/seminar(s) that M/C [Office of Comptroller] recommends to enhance Plaintiff's ability to succeed in the temporary position.

94.    That Plaintiff was detailed from the position of Administrative Officer to a Budget Analyst position with significantly different responsibilities. Although the detail was a new position for Plaintiff, M/C failed to recommend any training and consequently OIG failed to pay for any training for Plaintiff. Nevertheless, M/C rated Plaintiff "minimally successful", the very rating needed to end Plaintiff's detail in M/C, without providing Plaintiff with any training in her new position.

95.    That Defendant USIA's failure to provide Plaintiff with training in her new position was a breach of the Agreement as M/C agreed to recommend any training that would enhance Plaintiff's ability to succeed in the position. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XVI (BREACH OF SETTLEMENT AGREEMENT-DEFENDANT OBLIGATED PERFORMANCE OF THE OFFICE OF PERSONNEL WHO DID NOT SIGN THE AGREEMENT) (Violation of 29 C.F.R. §1614)

96.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

97.    That ¶3 of the Agreement provides that the Office of Personnel will attempt to place Plaintiff in an appropriate position in a non-OIG unit with three months probation.

98.    That this provision is void as the Office of Personnel did not sign the Agreement and therefore did not obligate itself to perform under the conditions of the Agreement.

99.    That Defendant USIA's failure to require a representative from the Office of Personnel to sign the Agreement renders the stated responsibility of the Office of Personnel unenforceable.  Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XVII(BREACH OF SETTLEMENT AGREEMENT-DEFENDANT OIG DID NOT EVALUATE PLAINTIFF PURSUANT TO THE AGREEMENT)
### (Violation of 29 C.F.R. §1614)

100.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

101.    That ¶5 of the Agreement provides that If Plaintiff returns to OIG after the detail, she will be on probation for three months.  Within the three months, OIG will evaluate Plaintiff's performance after the first six weeks, and again at the end of the three-month period.

102.    That Defendant USIA breached the Agreement by the OIG failing to evaluate Plaintiff's performance after the first six weeks, and again at the end of the three-month period.  Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XVIII (BREACH OF SETTLEMENT AGREEMENT-DEFENDANT OIG FAILED TO PROVIDE PLAINTIFF WITH A PERFORMANCE RATING AFTER PLAINTIFF RETURNED FROM HER DETAIL PURSUANT TO THE AGREEMENT)
### (Violation of 29 C.F.R. §1614)

103.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

104.    That ¶6 of the Agreement provides that If Plaintiff earns the rating of at least "fully successful" after three months at OIG, Plaintiff will be retained at OIG. If Plaintiff does not earn a rating of a least fully successful at the end of the three-month period, Plaintiff will be transferred out of OIG to a temporary position, during which Plaintiff will receive USIA outplacement assistance.

105.    That Defendant USIA breached the Agreement by failing to rate Plaintiff's performance after three months. Therefore, since the OIG did not rate Plaintiff's performance, the conversion of Plaintiff's career appointment to a temporary position was a prohibited personnel practice as Plaintiff did not receive written notice from the Defendant 30 days prior to the adverse action. Consequently, Plaintiff was caused to suffer significant damages.

## COUNT XIX (BREACH OF SETTLEMENT AGREEMENT-GOOD FAITH EFFORTS REQUIRED OF PLAINTIFF BUT NOT OF DEFENDANT)
### (Violation of 29 C.F.R. §1614)

106.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

107.    That ¶7 of the Agreement provides that Plaintiff will make a good faith effort to succeed in the position at M/C or in any other USIA position, including active participation in training.

108.    That Defendant USIA breached the Agreement by failing to require in the Agreement that Defendant at in good faith in performing on the subject Agreement. Defendant's failure to act in good faith as outlined in this complaint has caused Plaintiff to suffer significant damages.

## COUNT XXI (BREACH OF SETTLEMENT AGREEMENT-
## DEFENDANT FAILED TO EVALUATE PLAINTIFF'S PERFORMANCE
## PURSUANT TO FEDERAL LAW
### (Violation of 29 C.F.R. §1614)

109.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

110.    That ¶8 of the Agreement provides that M/C will evaluate Plaintiff's performance

informally every six weeks until a formal evaluation is performed at the end of six

months.  The evaluations will be based on clearly defined criteria.

111.    That Defendant USIA breached the Agreement by failing to counsel Plaintiff that

her performance was "minimally successful", failed to explain the deficiencies in

Plaintiff's performance, citing examples, failed to explain the steps the rating officer

would take to assist the employee to resolve the deficiencies such as formal or on the job

training, counseling, and or closer supervision, and failed to provide the performance

standards at the fully successful level.  According to 5 U.S.C. Section 4302, the above is

required before giving an employee a "minimally successful" rating.  Consequently,

Plaintiff was caused to suffer significant damages.

## COUNT XXII (BREACH OF SETTLEMENT AGREEMENT-
## DEFENDANT BREACHED CONFIDENTIALITY AGREEMENT
### (Violation of 29 C.F.R. §1614)

112.    That Plaintiff incorporates and re-alleges all allegations set forth in ¶¶1-41.

113.    That ¶12 of the Agreement provides that the parties agree that the terms of this

Agreement will be kept confidential from current and former USIA employees, except

for authorized purposes of the federal government.  Any breach of confidentiality shall be

a matter subject to appropriate disciplinary action.

114.    That when Plaintiff met with Ann Young of the OIG in November 1995, Young

had a copy of the Agreement on her desk. Young was not a signatory of the Agreement and should not have been privy to the terms of the Agreement.

115.    That Defendant USIA breached the Agreement by failing to keep the terms of the settlement agreement confidential. Because Plaintiff's rating officers had knowledge of the requirement pursuant to the Agreement that Plaintiff obtain at least a "fully successful" rating.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

(a)    Grant judgment for Plaintiff against Defendant;

(b)    Order Defendant to pay Plaintiff damages in the form of back pay, prejudgment interest, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the violations described above, these amounts to be determined at trial;

(c)    Order Defendant to pay Plaintiff compensatory damages in amounts to be determined at trial;

(d)    Compel Defendant to reinstate Plaintiff with the Defendant;

(e)    Order that the Settlement Agreement be vacated;

(f)    Order Defendant to pay Plaintiff's reasonable attorney's fees and costs; and

(g)    Order any other relief the Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby requests a jury trial on all issues of fact in this subject complaint.

Respectfully submitted,

*Rose M. Dews Miller*

Rose M. Dews Miller, pro se
8507 Woodyard Road
Clinton, Maryland 20735
(301) 868-9436

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this *15th* day of *May*, 2007, a

copy of the Plaintiff's First Amended Complaint was ( ) Mailed first class postage

prepaid; ( ) faxed; (X) Hand Delivered to:

Marian L. Borum, Esquire
Assistant United States Attorney
U.S. Department of Justice
Judiciary Center Building
555 Fourth Street, N.W., Civil Division
Washington, D.C.  20530
*Attorney for Defendant*

*Rose M. Dews Miller*

Rose M. Dews-Miller

## SETTLEMENT AGREEMENT

This Agreement, between the employee, Rose Mary Dews Miller, and the U.S. Information Agency (USIA), is in settlement of Complaints of Discrimination filed by the employee on June 4, 1993, and September 7, 1993, as well as all other EEO complaints against the Agency pending at an informal stage.

**This Agreement is based on the following facts:**

Ms. Miller filed formal Complaints of Discrimination against the Agency on June 4, 1993, and September 7, 1993, which were fully investigated and scheduled to be heard by an EEOC Administrative Judge on January 18 and 19, 1995. Ms. Miller subsequently filed at least one more complaint, dated October 21, 1994, with USIA's Office of Civil Rights, still at an informal stage. Prior to commencing the hearing, the parties entered into settlement negotiations with the assistance of the Administrative Judge.

**THEREFORE IT IS AGREED AS FOLLOWS:**

1. The Agency will detail Ms. Miller out of the Office of Inspector General (OIG) to the Office of the Comptroller (M/C) as a Budget Analyst, GS-560-11/4, for a period of six months starting February 1, 1995. She will have the duties described in PDM-40-95, and her salary will be paid by OIG.

2. OIG will pay for any training course/seminar(s) that M/C recommends to enhance Ms. Miller's ability to succeed in the temporary position. Ms. Miller agrees that any extended formal training, exceeding five days, will take place during nonduty hours.

3. If at the end of six months Ms. Miller achieves a rating of at least fully successful, she will be retained at M/C in the PDM-40-95 or comparable position. If at the end of six months Ms. Miller's performance is not rated at least fully successful, the Agency agrees that a) the Office of Personnel will attempt to place Ms. Miller in an appropriate position in a non-OIG unit with three months probation; or b) if no such non-OIG placement is available, OIG will retain Ms. Miller for a three-month probationary period as specified in paragraph 5 below.

4. OIG reserves the right to redefine the requirements and standards of Ms. Miller's existing GS-11 position, so long as the duties remain within the scope of her current position description.

Attachment 20
Page 1 of 3 Pages

Exhibit A

5.  If Ms. Miller returns to OIG after the detail, she will be on probation for three months.  Within the three months, OIG will evaluate Ms. Miller's performance after the first six weeks, and again at the end of the three-month period.

6.  If Ms. Miller earns the rating of at least "fully successful" after three months at OIG, she will be retained at OIG.  If Ms. Miller does not earn a rating of at least fully successful at the end of the three-month period, she will be transferred out of OIG to a temporary position, not to exceed one year.  Ms. Miller agrees to resign from USIA not later than the end of that temporary position, during which she will receive USIA's outplacement assistance.

7.  Ms. Miller will make a good faith effort to succeed in the position at M/C or in any other USIA position, including active participation in training.

8.  M/C will evaluate Ms. Miller's performance informally every six weeks until a formal evaluation is performed at the end of six months.  The evaluations will be based on clearly defined criteria.

9.  Ms. Miller voluntarily withdraws all Complaints of Discrimination, formal and informal, with prejudice and waives all rights to pursue further, either administratively or judicially, any claims contained in any files of complaints pending as of the date of this Agreement.  By signing this Agreement, Ms. Miller serves notice that she is withdrawing these complaints and hereby does discharge and release the Agency and OIG, their officers and employees, of any and all liabilities, obligations, claims, and demands whatsoever connected with or arising from the facts, circumstances, and actions of said Complaints.

10.  This Agreement is entered into voluntarily by the Agency and Ms. Miller to avoid potential litigation which could be costly and time-consuming for both sides.  Accordingly, this settlement cannot be construed to be an admission by the Agency that the alleged discrimination occurred or that Ms. Miller substantially prevailed in her Complaints.  It is also understood that this Agreement does not constitute an acknowledgment by the Complainant that the alleged discrimination did not occur.

11.  Ms. Miller agrees not to seek, nor to have sought on her behalf, any payment for her attorney fees in these matters.

12.  The parties agree that the terms of this Agreement will be kept confidential from current and former USIA employees, except for authorized purposes of the federal government.  Any breach of confidentiality shall be a matter subject to appropriate disciplinary action.

F___ 2 - 3

Exhibit A

13. If for any reason not attributable to Ms. Miller's conduct the terms of this Agreement are not carried out, provisions found at 29 C.F.R 1614 shall apply, and Ms. Miller shall retain other rights she may have, either statutory or at common law, for breach of Agreement.

Notwithstanding any other provision of the Agreement, the parties agree that this Agreement may be used as evidence in any subsequent proceeding in which either party alleges a breach of Agreement.

_Rose M. Dews Miller_                          1/27/95
**Rose Mary Dews-Miller**                       Date
**Complainant**

_Bruce M Cooper_                               1/27/95
**Bruce M. Cooper, Esq.**                       Date
**Attorney for Complainant**

_Stanley M. Silverman_                         1/27/95
**Stanley M. Silverman**                        Date
**Comptroller, USIA**

_Marian C. Bennett_                            1/30/95
**Marian C. Bennett**                           Date
**Inspector General, USIA**

_Richard Silverman for_                        1/27/95
**Carol B. Epstein, Esq.**                      Date
**Assistant General Counsel, USIA**

_Hattie P. Baldwin_                            1/31/95
**Hattie P. Baldwin, Director**                 Date
**Office of Civil Rights, USIA**

PAGE 3 - 3

Exhibit A



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Office of Federal Operations
### P. O. Box 19848
### Washington, D.C. 20036

Rose M. Dews-Miller,
Complainant,

v.

Condoleezza Rice,
Secretary,
Department of State,
Agency.

Request No. 05A60716

Appeal No. 01A44926

Hearing No. 100-A2-7576X; 100-A2-7576X

Agency No. 0019

## DENIAL

Complainant timely requested reconsideration of the decision in *Rose M. Dews-Miller v. Department of State*, EEOC Appeal No. 01A44926 (April 11, 2006). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. *See* 29 C.F.R. § 1614.405(b).

Complainant alleged that she was retaliated against by the agency with regard to numerous claims. Complainant requested a hearing before an EEOC Administrative Judge (AJ). After a hearing was held, the AJ issued a decision finding that complainant failed to prove that she was retaliated as alleged. Complainant appealed the AJ's decision to the Commission. In the underlying decision, the Commission determined that the EEOC Administrative Judge's ultimate finding of no retaliation was supported by substantial evidence in the record.

After reconsidering the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 01A44926 remains the

2                                                    05A60716

Commission's final decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*
_____
Carlton M. Hadden, Director
Office of Federal Operations

JUL 1 3 2006
_____
Date

Exhibit
Page _2_ of _4_ Pages

3                                                          05A60716

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.** I certify that this decision was mailed to the following recipients on the date below:

Rose M. Dews-Miller
P.O.B.863
Clinton, MD  20735-0863

Barbara S. Pope, Asst. Secretary EEO
Department of State
2201 C St., NW  Rm. 4216
Washington, DC  20520-7310

JUL 1 3 2006
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Date

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Equal Opportunity Assistant

Exhibit B
Page 3 of 4 Pages

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
P.O. BOX 19648
WASHINGTON, D.C. 20036

**OFFICIAL BUSINESS**
Penalty for private use $300

Reference #: 05A60716
Rose M. Dews-Miller
P.O.B. 863
Clinton, MD 20735-0863

20735*0863 B009



UNITED STATES POSTAGE
02 1A      **$ 00.39⁰**
0004601824    JUL 13 2006
MAILED FROM ZIP CODE 10004

Rec'd 9/18/06
Pemorm

Exhibit B
Page 4 of 4 Pages