## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ROSE M. DEWS-MILLER     )
            )
   Plaintiff,     )
            )
   v.         )   Civil Action No. 06-1764 (GK)
            )
CONDOLEEZZA RICE,     )
Secretary of State,      )
            )
   Defendant.    )
            )

---

## DEFENDANT'S MOTION TO DISMISS, OR
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant Condoleezza Rice, Secretary of State, by and through the undersigned counsel, respectfully moves this Court pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiff's claims in this Amended Complaint on the grounds that the Court lacks jurisdiction over certain of Plaintiff's claims, and that all of Plaintiff's claims fail to state a claim upon which relief can be granted. In the alternative, Defendant moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting Defendant summary judgment on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law. In support of this motion, Defendant respectfully refers the Court to the accompanying Statement of Material Facts As To Which There Is No Genuine Dispute, Memorandum of Points and Authorities, and Exhibits. A proposed order is also attached.

Plaintiff, *pro se*, should take notice that any factual assertions contained in the attachments in support of Defendant's motion will be accepted by the Court as true unless the Plaintiff submits her own affidavit or other documentary evidence contradicting the assertions in

Defendant's materials.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992); see also Local Rule

7(h); Fed. R. Civ. P. 56(e).  Rule 56(e) provides:

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in
> evidence, and shall show affirmatively that the affiant is competent
> to testify to the matters stated therein.  Sworn or certified copies of
> all papers or parts thereof referred to in an affidavit shall be
> attached thereto or served therewith.  The court may permit
> affidavits to be supplemented or opposed by depositions, answers
> to interrogatories, or further affidavits.  When a motion for
> summary judgment is made and supported as provided in this rule,
> an adverse party may not rest upon the mere allegations or denials
> of the adverse party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set forth
> specific facts showing that there is a genuine issue for trial.  If the
> adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

      Dated: August 8, 2007

                                                Respectfully submitted,


                                           __/s/_____
                                           JEFFREY A. TAYLOR, D.C. BAR # 498610
                                         United States Attorney


                                           __/s/_____
                                         RUDOLPH CONTRERAS, D.C. BAR # 434122
                                         Assistant United States Attorney

___/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROSE M. DEWS-MILLER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1764 (GK) |
| | ) | |
| CONDOLEEZZA RICE, | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendant Condoleeza Rice, Secretary of State, by and through the undersigned counsel, respectfully moves this Court for dismissal of this matter pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the alternative, for summary judgment under Fed. R. Civ. P. 56(c).

Plaintiff makes five major types of allegations in the above-captioned action. First, she claims that the Defendant engaged in unlawful acts in retaliation for her prior EEO activity and her disclosure of information to the Office of Inspector General ("OIG") concerning the purported misuse of government-issued credit cards by USIA employees, in violation of both the Whistleblower Protection Act, 5 U.S.C. § 2302, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Equal Opportunity Act of 1972, 42 U.S.C. § 2000e *et. seq.*, and as further amended by § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("Title VII"). See First Amended Complaint ("Compl.") at 1-2 (introduction); id. at ¶¶ 42-45 (count one). Second, Plaintiff contends that Defendant "engag[ed] in prohibited personnel practices" in violation of various provisions of the Civil Service Reform Act, namely 5 U.S.C. §§ 2302, 4302, and 7513. See Compl. at 1 (introduction); id. at ¶¶ 46-52 (counts II and III), ¶¶ 58-72 (counts V-IX). Third, Plaintiff asserts that the Defendant violated her rights to speech and association, liberty, procedural due process, substantive due process, equal protection, and privacy under the First and Fifth Amendments to the U.S. Constitution. See id. at ¶¶ 54-57 (count IV). Fourth, Plaintiff argues that Defendant failed to comply with a 1989 EEOC decision. See id. ¶¶ 73-75 (count X). Finally, Plaintiff alleges that Defendant "materially breach[ed]" a settlement agreement "entered into by the parties in January 1995" in various ways. See Compl. at 1 (introduction); id. at ¶¶ 76-115 (counts XI-XXII).

For the reasons set forth below, this suit should be dismissed for lack of subject matter

jurisdiction and failure to state a claim upon which relief can be granted.  In the alternative, summary judgment should be granted for Defendant because there are no genuine issues in dispute and Defendant is entitled to judgment as a matter of law.

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

The pertinent facts are set forth in the accompanying Statement of Material Facts and in the attached Declaration of Jacqueline Canton.  <u>See</u> SMF ¶¶ 1-35; Exhibit ("Ex") 23, ¶¶ 3-19.

## ARGUMENT

As is explained in greater detail below, Plaintiff's allegations of reprisal based on whistleblowing (count I), violations of the Civil Service Reform Act ("CSRA") (counts V-IX) and breaches of the January 1995 settlement agreement (count XI-XXII), along with arguably the rest of this action, are barred by the doctrines of *res judicata* and *collateral estoppel*.  Moreover, Plaintiff's allegations of reprisal based on whistleblowing (in count I) are cognizable under the Whistleblower Protection Act, but not Title VII, and the Federal Circuit (but not this Court) has subject matter jurisdiction over those claims.  Counts II-III, and V-IX should also be dismissed because Plaintiff failed to properly exhaust under the CSRA.  Her constitutional claims (in count IV) are unavailing because Title VII and the CSRA provide the exclusive remedies for these alleged constitutional violations, and in any event, fail on the merits.  Counts V-IX fail to state a claim upon which relief can be granted under the CSRA.  Because counts XI-XXII make contractual claims and seek over $10,000 in relief, they should have been brought in the Court of Federal Claims, and this Court lacks subject matter jurisdiction over them.  In any event, those claims are untimely, and thus a transfer to that court would be futile.

To the extent that any remaining claims are cognizable under Title VII, most are improperly exhausted and all fail on the merits.  Specifically, Plaintiff has failed to satisfy Title VII's exhaustion requirements with respect to Counts V, VII, and VIII (to the extent that they are construed as allegations of reprisal based on prior EEO activity and not violations of the CSRA), and Counts X and XI-XXII.  Furthermore, Counts II, III, VI, and IX all fail to state a claim for reprisal under Title VII.  Accordingly, Plaintiff's action should be dismissed.  In the alternative, summary judgment should be granted for Defendant because there are no genuine issues in dispute and Defendant is entitled to judgment as a matter of law.

## I.    STANDARD OF REVIEW

### A.    Motion to Dismiss (Fed. R. Civ. P. 12(b)(1) and 12(b)(6))

Defendant moves for dismissal under Rule 12(b)(1), as the Court lacks jurisdiction over several of Plaintiff's claims, and Rule 12(b)(6), as Plaintiff fails to state any claim upon which relief can be granted.  Plaintiff bears the burden of establishing subject matter jurisdiction.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); Oppermann v. U.S., 2007 W.L. 1748920, *2 (D.D.C. 2007); A.N.S.W.E.R. Coal. v. Kempthorne, 2007 W.L. 1703431, *4 (D.D.C. 2007); Brady Campaign to Prevent Gun Violence v. Ashcroft, 339 F.Supp.2d 68, 72 (D.D.C. 2004); Rann v. Chao, 154 F. Supp.2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003); Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (observing that "[on] a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuasion to establish subject-matter jurisdiction by a preponderance of the evidence.")

A court may resolve a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) in

either of two ways.  First, the court may determine the motion based solely on the complaint. See, e.g., Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine the existence of jurisdiction, it may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  Id.; Rann, 154 F. Supp.2d at 64 ("[t]he court is not required . . . to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations.")

Furthermore, a motion to dismiss brought pursuant to Rule 12(b)(6) should be granted if it is beyond doubt that a plaintiff can demonstrate no set of facts that supports his claim entitling him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1117 (D.C. Cir. 2000).  Although the plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint, the court need not accept inferences that are not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the form of factual allegations.  See , e.g., Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); Holman v. Williams, 436 F.Supp. 2d 68, 73 (D.D.C. 2006).

It is well established that the burden of establishing a prima facie case "is not great," McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984), and that at the motion to dismiss stage the Plaintiff need only allege facts rather than establish them, since this Court will assume the alleged facts to be true.  See, e.g., Mobil Exploration v. Babbit, 913 F. Supp. 5, 9 (D.D.C. 1995).  However, without an allegation of facts that meets all elements of a cause of action, a claim should be dismissed. Cf. Saltz v. Lehman, 672 F.2d 207, 209 (D.C. Cir. 1982) (plaintiff's failure to allege elements of equitable tolling required dismissal of complaint).

### B.    Motion for Summary Judgment (Fed. R. Civ. P. 56)

If matters outside the pleadings are considered, generally the motion shall be treated as one for summary judgment under Rule 56.  Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587.  The mere existence of a factual dispute, however, will not defeat summary judgment.  The non-moving party must show that the dispute is genuine and material to the case.  That is, the factual dispute must be capable of affecting the substantive outcome of the case and supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party.  Anderson, 477 U.S. at 247-48; Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  If the evidence favoring the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  Celotex, 477 U.S. at 323.

Moreover, Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact.  Id. at 323.  Rather, when the movant files a properly supported summary judgment motion, the burden shifts to the nonmoving party

5

to show "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall design of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action. See Celotex, 477 U.S. at 327.

II.    **Most, if Not All, of Plaintiff's Claims Should be Dismissed Based on the Pleadings**

A.    **Counts I-III, V-IX, XI-XXII, and Arguably the Other Remaining Counts, Are All Barred by the Doctrines of *Res Judicata* and *Collateral Estoppel***

In Count I of her Amended Complaint, Plaintiff alleges that she disclosed "to the Inspector General" information concerning "the misuse of credit cards by employees in the Office of Inspector General" and that certain specified adverse personnel actions were initiated against her after she engaged in this "statutorily protected activity." She argues that these supposed acts of reprisal violated both Title VII and the Whistleblower Protection Act of 1989 ("WPA"), which is found at 5 U.S.C. § 2302(b)(8). See Compl. ¶¶ 42-45 (count one). In seven other counts, Plaintiff alleges that Defendant violated provisions of the Civil Service Reform Act, 5 U.S.C. § 1101 *et. seq*. ("CSRA"). See Compl. ¶¶ 46-53 (Counts II and III, alleging violations of 5 U.S.C. § 4302); see also Compl. ¶¶ 58-69 (Counts V-IX, alleging violations of 5 U.S.C. § 7513). In counts XI-XXII, Plaintiff alleges that the USIA breached the January 31, 1995 Settlement Agreement. See Compl. ¶¶ 76-115. All these counts, as well as arguably the rest of the Amended Complaint, are barred by the doctrines of *res judicata* and *collateral*

6

*estoppel* as: (1) many of them were raised by Plaintiff and rejected by the Federal Circuit in Rose Mary Dews-Miller v. USIA, 194 F. 3d 1330, 1999 W.L. 129642 (Fed. Cir. 1999) (unpublished), (2) others could have been presented to the Federal Circuit during the pendency of that litigation, and (3) they all arise out of the same "nucleus" of facts as did that other earlier case.

Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were <u>or could have been</u> raised in that action." <u>See</u> <u>San Remo Hotel, L.P. v. City and County of San Francisco, Cal.</u>, 545 U.S. 323, 336, n. 16 (2005) (internal citation omitted and emphasis added).[1] The doctrine of res judicata describes two discrete effects: (1) "claim preclusion," the fact that "a valid final adjudication of a claim precludes a second action on that claim or any part of it" and (2) "issue preclusion, long called 'collateral estoppel,'" that is that "an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim." <u>See</u> <u>Baker v. Gen. Motors Corp.</u>, 522 U.S. 222, 233, n. 5 (1998) (internal citation omitted); <u>San Remo</u>, 545 U.S. at 336, n. 16 (explaining that under the doctrine of <u>collateral estoppel</u>, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."); <u>Parklane</u>, 439 U.S. at 326, n. 5; <u>Montana</u>, 440 U.S. at 153.

The doctrines of *res judicata* and *collateral estoppel* are both designed to "'preclude

---

[1] <u>See also</u> <u>Rivet v. Regions Bank of Louisiana</u>, 522 U.S. 470, 476 (1998); <u>Nevada v. United States</u>, 463 U.S. 110, 129-130 (1983); <u>Federated Dep't Stores, Inc. v. Moitie</u>, 452 U.S. 394, 398 (1981); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326, n. 5 (1979); <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979); <u>Smalls v. United States</u>, 471 F. 3d 186, 192 (D.C. Cir. 2006); <u>Tutt v. Doby</u>, 459 F.2d 1195, 1197 (D.C. Cir. 1972).

parties from contesting matters that they have had a full opportunity to litigate.'" See Montana, 440 U.S. at 153-154; Carter v. Rubin, 14 F. Supp.2d 22, 33 (D.D.C. 1998). "These doctrines protect parties from the expense and burdens associated with multiple lawsuits, conserve judicial resources, and reduce the possibility of inconsistent decisions." Id. at 33-34 (citing United States v. Mendoza, 464 U.S. 154, 158-59 (1984)); Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981) (noting that the purpose of *res judicata* is to "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and to prevent serial forum-shopping and piecemeal litigation"); Westgate-Sun Harbor Co. v. Watson, 206 F.2d 458, 462 (D.C. Cir. 1953) (noting that "there must some time be an end to litigation, not only in the interest of the adverse party who should not be vexed twice or thrice or even more times for the same cause, but also in the interest of the state in settled law and legal relations and that of courts and litigants in an orderly judicial process which would be seriously jeopardized by unnecessary overcrowding of already crowded dockets").

Determining whether a claim or lawsuit should be precluded under the doctrine of res judicata requires considering whether the prior litigation (1) involved the same claims or cause of action, (2) between the same parties or parties in privity with them, and (3) there has been a final valid judgment on the merits, (4) by a court of competent jurisdiction. See, e.g., Blonder-Tongue Lab., Inc. v. Univ. of Ill. Foundation, 402 U.S. 313, 323-24 (1971); Smalls, 471 F. 3d at 192; Moment v. Reardon, 2007 W.L. 1556651, *1 (D.D.C. 2007); Hafezi v. Constr. & Dev., Inc., 2006 W.L. 1100339, *6 (D.D.C. 2006).

*Res judicata* forecloses a cause of action that is based on the same "nucleus of facts," Page v. United States, 729 F.2d 818, 820 (D.C. Cir. 1984), and which comprises "any part of the

transaction, or series of connected transactions, out of which [a prior] action arose." Stanton v. Dist. of Columbia Court of Appeals, 127 F.3d 72, 78 (D.C. Cir. 1997). For *res judicata* purposes, "it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." Page, 729 F.2d at 820. To determine whether or not two suits involve the same cause of action, this Circuit has adopted the "transactional" approach under which a claim, or cause of action, consists of "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." See Stanton, 127 F.3d at 78 (internal citations and quotations omitted). In assessing whether facts constitute a "transaction" or "series of transactions" the court must consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Id. at 78.

When these tests are applied to this case, it becomes clear that *res judicata* bars all or most of Plaintiff's action. First, there is an identity of parties in the two actions: the Plaintiff is the same in both cases, and the Defendant here (the U.S. Department of State) is the successor agency to the USIA, the Defendant in the Federal Circuit action.[2] Plaintiff's action in this Court arises from the same underlying series of transactions or "nucleus of facts" as did her action in

---

[2] See, e.g., 1999 W.L. 790037 (Oct. 6, 1999) (Public Notice, explaining that "[u]nder the Foreign Affairs Agencies Consolidation Act of 1998, Public Law 105-277, USIA and the Department of State will be consolidated on October 1, 1999"); FTC v. Texaco Inc., 555 F.2d 862, 924 (D.C. Cir. 1977) (en banc) (noting that "agencies of the same government are in privity with one another."); Hafezi, 2006 W.L. at *6 ("[a] privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case" and that among the "orthodox categories" of privies are "those whose interests are represented by a party to the action" and "successors in interest.").

the Federal Circuit: Plaintiff's pre-1995 EEOC complaints, the January 1995 "last chance"

settlement agreement which resolved those complaints, Plaintiff's subsequent failure to obtain

"fully satisfactory" performance ratings during the period of her detail at the OC,  her placement

in a temporary position and ultimate termination from employment pursuant to that agreement, as

well as her credit card-related whistleblower allegations, placement on AWOL status, and denial

of within grade increase.  Compare Rose Mary Dews-Miller v. USIA, 1999 W.L. 129642, *1-*2

(Fed. Cir. 1999) (referencing all of these events) with Compl. at 1-2 (introduction), ¶¶ 10-39.

Moreover, Plaintiff made many of the same legal arguments and claims in the Federal

Circuit litigation as she does today in this Court.[3]  The Federal Circuit rejected those arguments,

and reached legal and factual conclusions which are inconsistent with many of the factual

representations and legal arguments which Plaintiff now advances in this Court.[4]  During the

---

[3]  Compare, e.g., Dews-Miller, 1999 W.L. 129642 at *2 (noting that "[o]n appeal, Plaintiff argues that she was terminated as a reprisal for her asserted whistle blower activities" and that "to establish the [Merit System Protection Board or MSPB]'s jurisdiction over her . . . appeal, Ms. Dews Miller had to show" among other things that "she engaged in whistleblowing activity . . . as defined in 5 U.S.C. § 2302(b)(8)") with Compl. at 1-2 (introduction), ¶¶ 42-45 (count I) (alleging reprisal for those same whistleblower activities); Compare Dews-Miller, 1999 W.L. at *2 (noting that the MSPB found that it lacked jurisdiction because Plaintiff had failed to "show that USIA had taken a 'personnel action' with regard to her employment, as defined in 5 U.S.C. § 2302(a)(2) . . .") with Compl.¶¶ 46-53 (Counts II and III) and id. at ¶¶ 58-69 (Counts V-IX) (claiming that Defendant has taken many personnel actions which violate the CSRA); Compare Dews-Miller, 1999 W.L. at *2 (noting that, before the MSPB, "Ms. Dews-Miller asserted that USIA had breached the agreement and that the agreement was invalid") with Compl. ¶¶ 76-115 (counts XI-XXII) (alleging breaches by the Defendant of that agreement and challenging its validity).

[4]  See, e.g., Dews-Miller, 1999 W.L. at *2 (noting that "[w]e are not persuaded" by Plaintiff's argument that "she was terminated as a reprisal for her whistleblowing activities" and finding instead that "the administrative judge was correct in concluding that Ms. Dews-Miller was terminated pursuant to a valid settlement agreement") (emphasis added); id. at *3 (approving the administrative judge's finding that the January 1995 agreement "appears on its face to be valid and lawful" and was voluntarily and knowingly entered into, and stating that "we conclude

pendency of her MSPB appeal and her Federal Circuit case, Plaintiff could have (but failed to) raise some of the CSRA claims which she now asserts in this Court, including her claims that she did not receive adequate counseling in connection with her performance evaluations, that the denial of her within grade increase and the absent without leave finding were improper, and that Defendant has failed to comply with an EEOC decision.  See, e.g., Dews-Miller, 1999 W.L. at *2, n. 1 (noting that "[i]n her . . . [administrative] appeal, Ms. Rose-Dews Miller did not argue that the OSC's conclusions concerning her [within grade increase] and [absence without leave]-based allegations were incorrect"); id. at *3 (noting that "Ms. Dews-Miller does not dispute . . . that the 'minimally successful' rating she received at the conclusion was improper.")  Lastly, as is explained below, in sections II.B, II.C., and II.E., the Federal Circuit was a court of competent jurisdiction to hear Plaintiff's whistleblowing allegations, claims under the CSRA, and her breach claims.  See infra at 13-16, 16-20, 24-29 & n. 26.  Thus, counts I-III, V-IX, and XI-XXII are barred by the doctrines of res judicata and collateral estoppel as: (1) the Federal Circuit has already considered and rejected many of those allegations, (2) Plaintiff had an opportunity to raise the remaining ones, and (3) they arise from the same "nucleus" of facts as that prior action.[5]

---

that the settlement agreement is valid"); id. at *3 ("[w]e agree" with the administrative judge's conclusion that Plaintiff was terminated "pursuant to the settlement agreement" and not "as reprisal for her asserted whistleblower activities"); id. at *3 (finding that "her placement in the three month probationary position in OIG was proper"); id. at *3 (finding that "when Ms. Dews-Miller refused to resign after one year in the temporary position, it was she, not OIG who was in breach of the agreement, and USIA was justified in terminating her") (emphasis added); id. at *4 ("[g]iven the undisputed facts, we conclude that Ms. Dews-Miller was terminated in compliance with the terms of settlement agreement, and not in reprisal for her asserted whistleblowing activities") (emphasis added); id. at *4 (finding that "this termination is not a 'personnel action' as defined in the relevant statute")

[5]  See, e.g., Ward v. Kennard, 133 F.Supp.2d 54, 60 (D.D.C. 2000) (concluding that "if the plaintiff is asking this court to review the CSRA claims that the MSPB dismissed and that the

Arguably the rest of Plaintiff's complaint, including all of her Title VII allegations, are also barred by *res judicata* and *collateral estoppel* as they arise from the same "nucleus" of facts as did the Federal Circuit action.  See Page, 729 F.2d at 820; Stanton, 127 F.3d at 78; cf. Coleman v. Potomac Elec. Power Co., 310 F.Supp.2d 154, 160 (D.D.C. 2004) (finding that a discharge "cannot be re-litigated under a Title VII . . . theory when it has already been tried, and formally dismissed, as an alleged violation of the FMLA").  Her Title VII claims are also barred by those doctrines because Plaintiff had an opportunity to raise them in a so-called mixed case appeal before the MSPB[6], but failed to do so and instead improperly split her case.[7]

---

Court of Appeals affirmed, then the court would dismiss the instant CSRA claims since the Federal Circuit, which possesses unique expertise in CSRA claims and MSPB appeals, is the court of final appeal regarding MSPB decisions" and that "if the plaintiff is not seeking review of the Court of Appeals' decision, but rather is attempting to re-litigate his CSRA claims in this court, then the doctrine of res judicata would preclude his efforts"); Stanek v. Fed. Highway Admin., 1989 W.L. 19200, *3 (D.D.C. 1989) (finding that "[c]ollateral estoppel applies to Stanek's CSRA claim because he has already litigated this precise claim against the same defendant before the Court of Appeals for the Federal Circuit, which is a court of competent jurisdiction"); Smith v. Horner, 635 F.Supp. 323 (D.D.C. 1986) ("it is clear that the Federal Circuit already has reviewed many aspects of this same case" and "[c]onsequently, this Court must take the Federal Circuit's decision on those aspects as res judicata in this action.")

[6]  A mixed case appeal is an appeal filed with the MSPB that alleges an appealable agency action was effected, in whole or in part, because of discrimination on the basis of race, color, religion, sex, national origin, handicap or age."  29 C.F.R. § 1614.302(a)(2).  Mixed cases are reviewed in federal district court.  See, e.g., Vickers v. Powell, 2007 W.L. 1952369, *3 (D.C. Cir. 2007); Ikossi v. England, 406 F. Supp. 2d 23, 29 (D.D.C. 2005); see also Butler v. West, 164 F. 3d 634, 637-39 (D.C. Cir. 1999) (explaining how such cases are handled)

[7]  See, e.g., Smith v. Horner, 846 F.2d 1521, 1524 & n. 3 (D.C. Cir. 1988) (noting that "Smith could also be held precluded from litigating his Title VII claim because he 'split' his two claims" as he "chose to litigate his disability claim in a court (the Federal Circuit) that could hear less than his entire claim instead of going to the district court, which was competent to entertain both his disability and Title VII claims," and noting that, for claim preclusion purposes, "[a]ll that matters is that plaintiff Smith had the opportunity to litigate both claims in a court of competent jurisdiction (here, the district court), but instead chose to split them"); Scalese v. Babbitt, 1999 W.L. 962467, *3 (9th Cir. 1999) (concluding that "res judicata may be applied to

**B.**    **Count I Is An Allegation for Reprisal Based On Whistleblowing that Should Be Dismissed for Lack of Subject Matter Jurisdiction, as Only the Federal Circuit had Jurisdiction Over that Claim, and It has Already Disposed of It**

In Count I of her Amended Complaint, Plaintiff alleges she disclosed "to the Inspector General" information concerning "the misuse of credit cards by employees in the Office of Inspector General"and that certain specified adverse personnel actions were initiated against her after she engaged in this "statutorily protected activity," in violation of both Title VII and the Whistleblower Protection Act of 1989 ("WPA"), which is found at 5 U.S.C. § 2302(b)(8).  See Compl. ¶¶ 42-45 (count one).  Count I should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  This Court lacks jurisdiction with respect to the contentions in Count I, whether Plaintiff seeks to pursue the claim pursuant to the WPA or Title VII.

The WPA, which amended the Civil Service Reform Act of 1978 ("CSRA"), provides most federal agency employees with protection against agency reprisals for whistleblowing activity.  It is a "prohibited personnel practice" for a government agency to take a "personnel action" against an employee because of his disclosure of illegal conduct, "gross mismanagement, a gross wasting of funds, . . . or [actions presenting] a substantial and specific danger to public health or safety."  See 5 U.S.C. § 2302(b)(8); Weber v. United States, 209 F.3d 756, 757-58 (D.C. Cir. 2000)  An employee who believes that he or she is the victim of an unlawful reprisal under the WPA must first bring his or her claim to the United States Office of Special Counsel

---

MSPB proceedings reviewed and affirmed by [the Federal Circuit] . . . where [a party] could have raised his [Title VII] discrimination claims . . . in his original MSPB appeal" but failed to do so); Spears v. Merit Sys. Prot. Bd., 766 F.2d 520, 523 (Fed. Cir. 1985) ("[h]aving previously appealed her removal to the Merit Systems Protection Board on nondiscrimination grounds and lost, Spears is barred by res judicata from subsequently challenging her termination on the allegation of discrimination.").

("OSC"), an independent investigative and prosecutorial agency created by the CSRA, which is required to investigate the complaint "to the extent necessary to determine whether there are reasonable grounds to believe that [such] a prohibited personnel practice has occurred." See 5 U.S.C. §§ 1211, 1214; Weber, 209 F.3d at 758 (describing whistleblower protection procedures under Title 5). If the OSC finds that there was a prohibited personnel action, it reports its findings to the Merit Systems Protection Board ("MSPB"), and it can petition the MSPB on the employee's behalf. See id. at 758. Even if the OSC finds no agency wrongdoing, the employee may still bring an action before the MSPB. See 5 U.S.C. §§ 1214(a)(3), 1221; Weber, 209 F.3d at 758. In either event, the MSPB's decision is appealable to the United States Court of Appeals for the Federal Circuit. Id.; 5 U.S.C. § 7703.

"Under no circumstances . . . does the Whistleblower Protection Act grant the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance." See Stella v. Mineta, 284 F.3d 135, 142 (D.C. Cir. 2002) (emphasis added, also noting that "[t]he MSPB's decision [on a whistleblower matter] is appealable to the Federal Circuit"); Nichols v. Truscott, 424 F.Supp.2d 124, 144, n. 23 (D.D.C. 2006) (observing, in the context of a whistleblowing allegation, that "[a]ny decision of the MSPB is appealable to the United States Court of Appeals for the Federal Circuit"); Koch v. Block, 2006 W.L. 2460725, *5 (D.D.C. 2006) (same); Runkle v. Gonzales, 391 F.Supp.2d 210, 231 (D.D.C. 2005) (same); Altimus v. Aspin, 1993 W.L. 491612, *1 (D.D.C. 1993) ("[t]o the extent that the complaint seeks relief under the [WPA], the Court must grant defendant's motion to dismiss" because "[t]he [CSRA], to which the [WPA] is an amendment, . . . deprives the district court of jurisdiction to review prohibited personnel practices; more serious infractions are appealable to the Merit

14

Systems Protection Board, with further review in the Courts of Appeal").[8]

Nor does Title VII provide an independent basis for jurisdiction with respect to allegations of reprisal in response to whistleblowing unrelated to claims of discrimination. To state a *prima facie* case of reprisal, a plaintiff must show that (1) she engaged in protected EEO activity; (2) that a reasonable employee would have found the challenged action so materially adverse that she would have been dissuaded from engaging in the protected EEO activity; and (3) that there was a causal connection between the protected activity and the challenged retaliatory action. See, e.g., Rochon v. Gonzalez, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). For Title VII purposes, the term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination, and reprisal for other forms of whistleblowing are outside of the scope of Title VII. See, e.g., 42 U.S.C. § 2000e-3 (defining the scope of protected activities under Title VII).[9]

_____

[8] Defendant additionally notes that the WPA does not independently create a waiver of sovereign immunity. Because a suit against an executive department of the United States is a suit against the United States, it is therefore, subject to the defense of sovereign immunity. See, e.g., Hawaii v. Gordon, 373 U.S. 57, 58 (1963). In the absence of a waiver of sovereign immunity, a district court lacks jurisdiction over claims against the United States. See United States v. Mitchell, 463 U.S. 206, 212 (1983). The provisions under 42 U.S.C. § 2000e pertain to violations of rights protected under Title 42 and civil actions brought under that title, and do not confer jurisdiction on the district court over plaintiff's whistleblower claims.

[9] See also Nichols, 424 F.Supp.2d at 144 (noting that "Title VII . . . was enacted to redress discrimination . . . in employment, rather than to ensure that the American workplace would remain free from poor management or harassment . . ."); id. at 144, n. 23 (finding that "[t]o the extent that plaintiff has legal redress for the facts set forth in her complaint, it may fall not under Title VII but under the Whistleblower Protection Act."); Robinson v. Bank of Am., 2006 W.L. 2830854, *10 (D.D.C. 2006) (observing that "[a]n employee's allegation of workplace discrimination constitutes a statutorily protected activity where she alleges 'discrimination based on race, color, religion, sex, or national origin.'") (internal citation omitted); Jones v. Billington, 12 F.Supp.2d 1, *13 (D.D.C. 1997) (concluding that "the grievance filed by the Plaintiff with the Library's Dispute Resolution Center . . . is not protected activity [under Title VII] because he fails

In this case, Plaintiff twice brought two whistleblowing complaints to the OSC that overlapped substantially with the allegations contained in Count I. Neither of them were "mixed case" administrative appeals: they only contained allegations of reprisal for her credit card-related whistleblowing and did not allege discrimination under Title VII. See, e.g., Ex. 24-30, Ex. 31-39. In each case, OSC denied relief to Plaintiff and the MSPB rejected her appeal. Id.[10] The second of those two appeals culminated in the aforementioned decision of Rose Mary Dews-Miller v. USIA, 194 F. 3d 1330 (Fed. Cir. 1999), in which the Federal Circuit rejected Plaintiff's whistleblowing claims. Because her MSPB appeals were not "mixed" cases, the Federal Circuit was a court of competent jurisdiction as to those claims and this Court is bound by its findings on them. Thus, the Court lacks jurisdiction to hear any whistleblower claim which Plaintiff may be asserting and should dismiss count I for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(1), 12(b)(6).

### C. The Court Lacks Jurisdiction Over Counts II, III, and V-IX, Which Claim Violations of the CSRA, as Plaintiff Failed to Exhaust Under that Act

In counts II, III, and V-IX of her amended Complaint, Plaintiff alleges that Defendant

---

to allege any discrimination based on race, color, religion, sex, or national origin"); Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 n. 4 (3rd Cir. 1997); Barber v. CSX Distribution Servs., 68 F.3d 694, 701 (3rd Cir. 1995); Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134-35 (2nd Cir. 1999); Adeniji v. Admin. for Children Servs., NYC, 43 F.Supp.2d 407, 421 (S.D.N.Y.1999); Jamil v. Sec'y, Dep't of Defense, 910 F.2d 1203, 1207 (4th Cir. 1990); Simmons v. Shalala, 946 F.Supp. 415, 420 (D.Md.1996).

[10] One of those complaints, which was designated OSC File No. MA-96-0449, was first denied by the OSC on the merits and then on May 2, 1997 and November 14, 1997 was dismissed by the MSPB for untimeliness. See Ex. 24-30. The other, which was designated OSC File No. MA-97-0571, was first denied by the OSC on the merits and then ultimately was denied by the MSPB on the merits, on March 3, 1998 and September 4, 1998. See Ex. 31-39.

violated provisions of the Civil Service Reform Act, 5 U.S.C. § 1101 *et. seq.*.[11]  These counts

should be dismissed as Plaintiff failed to properly exhaust under the CSRA and they should have

then been brought in the Federal Circuit, not this Court.  See Fed. R. Civ. P. 12(b)(1), 12(b)(6).

   The CSRA replaced the preexisting "patchwork system with an integrated scheme of

administrative and judicial review, designed to balance the legitimate interests of various

categories of federal employees with the needs of sound and efficient administration."  See

United States v. Fausto, 484 U.S. 439, 445 (1988).  The Supreme Court has noted that the CSRA

consists of "comprehensive procedural and substantive provisions giving meaningful remedies

against the United States."  See Bush v. Lucas, 462 U.S. 367, 368 (1983); see also Steadman v.

Governor, U.S. Soldiers and Airmen's Home, 393 F. 2d 963, 967 (D.C. Cir. 1990) (noting that

the CSRA is "an enormously complicated and subtle scheme to govern employee relations in the

federal sector").  One of the fundamental "structural elements" of this comprehensive and

integrated scheme of review "is the primacy of the MSPB [Merit Systems Protection Board] for

administrative resolution" of personnel disputes, and "the primacy of the United States Court of

Appeals for the Federal Circuit for judicial review."  See Fausto, 484 U.S. at 449.  Likewise, this

court has explained that the CSRA "provides a detailed administrative scheme for resolution of

_____

   [11]  See Compl.¶¶ 46-53 (Counts II and III, alleging that USIA failed to comply with
alleged "procedural prerequisites" found at 5 U.S.C. § 4302(b) in connection with two minimally
successful performance ratings that Plaintiff received); Compl. ¶¶ 58-69 (Counts V-IX, alleging
violations of 5 U.S.C. § 7513 by: (1) purportedly failing to give thirty-day notice with respect to
"termination" from federal employment in the case of Count V, (2) the denial of a within-grade
increase in the case of Count VI, (3) the "termination" of Plaintiff's appointment with USIA's
OIG in the case of Count VII, (4) the conversion of her career appointment to a temporary
appointment in the case of Count VIII, and (5) the placement of Plaintiff in absence without
leave ("AWOL") status  in Count IX.)

complaints arising under the Act, see generally §§ 7501-7703" and it "specifically creates the . . . MSPB, and vests judicial review of MSPB decisions in either the Court of Claims or a Court of Appeals."  See Dearsman v. Kurtz, 516 F.Supp. 1255, 1259 (D.D.C. 1981) (dismissing allegations of CSRA violations for lack of subject matter jurisdiction).  The CSRA generally precludes district courts from taking jurisdiction over CSRA-related claims.[12]

The CSRA "creates remedies generally considered to be exclusive."[13]  Thus, federal employees "may not bypass the CSRA exhaustion requirements by submitting their personnel-related claims to a federal court under other statutes."  See Convertino, 393 F.Supp.2d at 47. Section 7513, for example, explicitly provides that an employee against whom an action is taken under that section may appeal to the MSPB under 5 U.S.C. § 7701 .  See 5 U.S.C. § 7513.  An employee may in turn obtain judicial review of an MSPB decision in the Federal Circuit.  See 5 U.S.C. § 7703; Fausto, 484 U.S. at 446 (noting that "Chapter 43 gives only competitive service employees and preference eligible members of the excepted service the right to appeal the agency's decision to the MSPB and then to the Federal Circuit."); see also 5 U.S.C. § 4303(e).

_____

[12]  See, e.g., Gillet v. King, 1997 W.L. 702536, n. 3 (D.C. Cir. 1997) (noting that "the proper forum for [the appellant's] Civil Service Reform Act claim is the Federal Circuit"); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506, n. 1 (D.C. Cir. 1995) (referencing "decisions finding that the Civil Service Reform Act deprives the federal courts of jurisdiction over claims for which those statutes provide a remedy"); Steadman, 918 F.2d at 967 (observing that "the Court has consistently held that the congressional scheme precludes district courts from taking jurisdiction over CSRA-related claims").

[13]  See Convertino v. Dep't of Justice, 393 F.Supp.2d 42, 47 (D.D.C. 2005); see also Am. Postal Workers Union, AFL-CIO v. U.S. Postal Service, 940 F.2d 704, 709 (D.C. Cir. 1991) ("[t]he CSRA provides an exclusive framework for judicial review of adverse disciplinary actions taken by federal agencies."); Spagnola v. Mathis, 809 F.2d 16, 30 (D.C. Cir. 1987) ("the CSRA precludes resort to other statutory schemes for aggrieved federal employees raising nonconstitutional claims against their employers"), aff'd en banc, 859 F.2d 223 (D.C. Cir. 1988).

18

Thus, a party who wishes to allege violations of 5 U.S.C. §§ 4302(b) and 7513 must exhaust in the manner set forth under the CSRA, through the MSPB, before seeking judicial review.  See, e.g., Gardner v. U.S., 213 F.3d 735, 738, n. 1 (D.C. Cir. 2000); Weaver v. U.S. Information Agency, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (noting that "[u]nder the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit"); Hubbard v. EPA, 809 F.2d 1, 5 (D.C. Cir. 1987); Carducci v. Regan, 714 F.2d 171, 174-75 (D.C. Cir. 1983).  This is true, even where a mixed case appeal (a case alleging an adverse personnel action under the CRSA and discrimination) is concerned.  See, e.g., Butler, 164 F.3d at 638.  In this case, Plaintiff has never, to Defendant's knowledge, presented the CSRA claims set forth in counts II-III and V-IX to the MSPB, much less obtained a final decision from it concerning those claims, although she certainly had an opportunity to do so.  See, e.g., Ex. 24-39 (concerning the only claims she filed with the MSPB, her whistleblower claim); see also Ex. 2-23 (documents summarizing Plaintiff's other administrative appeals); Dews-Miller, 1999 W.L. 129642, *2, n. 1 (Fed. Cir. 1999) (noting that Plaintiff "did not argue that the OSC's conclusions concerning her WGI- and AWOL-based allegations were incorrect").

The fact that Plaintiff has also alleged Title VII violations in her complaint does not excuse her from failure to adhere to the CSRA's exhaustion requirements.  The D.C. Circuit has observed that "[w]hen the discrimination is alleged as a violation of Title VII, the federal employee must negotiate and exhaust the complex administrative regime that governs Title VII public employment cases in addition to the usual procedures for challenging an adverse personnel action under the CSRA."  Butler, 164 F.3d at 638 (emphasis added) (citing Brown v. GSA, 425 U.S. 820, 832-33 (1976)).  To the extent that Plaintiff is attempting to challenge

19

various personnel actions which are the subject of the CSRA, she has deprived the MSPB and

USIA of the chance to reach the merits of the allegations before she has proceeded into court.

Exhaustion of administrative remedies is a prerequisite to judicial relief precisely because

conciliation and internal agency resolution, rather than litigation, are the objectives of the civil

rights statutes.  See Bayer v. U.S. Dep't of Treasury, 956 F.2d. 330, 332 (D.C. Cir. 1992); Seigel

v. Kreps, 654 F.2d 773, 776-77 (D.C. Cir. 1981).

Nor does the fact that Plaintiff has plead constitutional claims which appear to relate to

her CSRA claims excuse her failure to exhaust under that Act.  Compare Compl. ¶¶ 54-57 (count

IV, complaining that Plaintiff was terminated without "notice and an opportunity to be heard")

with Compl. ¶¶ 58-72 (counts V-IX, claiming that Defendant violated the CSRA by not giving

her 30 days notice and an opportunity to respond to various personnel actions).  When, as here, a

constitutional claim is intertwined with a statutory one and Congress has provided machinery for

the resolution of the latter, a plaintiff must first pursue the administrative machinery.[14]  In light of

Plaintiff's failure to exhaust these claims, they should be dismissed for lack of subject matter

jurisdiction and for failure to state a claim.  See Fed. R. Civ. P. 12(b)(1), 12(b)(6).

---

[14]  See, e.g., Weaver, 87 F. 3d at 1433-34 (observing that "[t]he exhaustion requirement
generally applies as well to claims arising directly under the Constitution . . . when such claims
are "'premised on the same facts'" as the plaintiff's CSRA claims and "the CSRA remedy 'would
have been fully effective in remedying the constitutional violation.'") (internal citation omitted);
Steadman, 918 F. 2d at 967); Andrade v. Lauer, 729 F. 2d 1475, 1493 (D.C. Cir. 1984); Wallace
v. Lynn, 507 F.2d 1186, 1189-91 (D.C. Cir. 1974); Sampson v. Murray, 415 U.S. 61, 83, 89-92
(1974).  Only in the "unusual" case where the constitutional claim raises issues totally unrelated
to the CSRA procedures can a party come directly to district court.  See Steadman, 918 F.2d at
967; Andrade, 729 F. 2d at 1492.  Otherwise, an individual may not bring a constitutional claim
arising out of the federal employment relationship.

### D.     Plaintiff's Constitutional Claims in Count IV Are Unavailing

Plaintiff claims that Defendant terminated her federal employment "without notice and an opportunity to be heard . . . under color of federal law" and alleges violations of her "rights to speech and association, liberty, procedural due process, substantive due process, equal protection, and privacy under the First and Fifth Amendments to the Constitution." See Compl. ¶¶ 54-57 (count IV).  Plaintiff's attempt to boostrap constitutional claims to her Title VII and CSRA claims should be rejected by this Court.  Title VII and the CSRA provide the exclusive remedies for the alleged constitutional violations about which Plaintiff complains.[15]

In any event, Plaintiff's due process claims fail to state a claim upon which relief can be granted.  To succeed on a substantive due process claim, plaintiff must prove "egregious government misconduct" in depriving him of his property interest.  See, e.g., George Wash. Univ. v. Dist. of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003); Medina v. Dist. of Columbia, 2007 W.L. 1656281, *6 (D.D.C. 2007).  Substantive due process "prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests."  See Washington Teachers' Union v. Bd. of Educ. of the Dist. of Columbia, 109

---

[15]  See, e.g., Brown v. GSA, 425 U.S. 820 (1976) (Title VII is the sole remedy for federal employees complaining of job discrimination on account of sex or race); Lewis v. Cohen, 1997 W.L. 362754, *1 (D.C. Cir. 1997) (finding that "[w]ith respect to appellant's due process and equal protection claims, both of which relate to the same core allegations of racial discrimination that support his Title VII claim, appellant's exclusive remedy lies under Title VII."); Spagnola v. Mathis, 859 F.2d 223, 229-30 (D.C. Cir. 1988) (en banc) (recognizing the exclusivity of the CSRA's remedies); Dearsman, 516 F. Supp. at 1259-60 (CSRA and Title VII constituted exclusive remedies for adverse actions and discrimination in the federal workplace, precluding plaintiff's due process claims).

F.3d 774, 781 (D.C. Cir. 1997) (internal quotation marks and citations omitted); Medina, 2007

W.L. at *6. A "mere violation of law does not give rise to a due process claim. See AFGE,

AFL-CIO, Local 446 v. Nicholson, 475 F.3d 341, 353 (D.C. Cir. 2007); Medina, 2007 W.L. at

*6. None of the facts plead in Plaintiff's Complaint even comes close to this standard.

　　Nor was any due process property interest implicated here. Plaintiff admits (and the

record shows) that, on the advice of counsel, she signed a settlement agreement in January 1995

which made her continued employment contingent on her meeting certain performance

benchmarks, and that she failed to meet those benchmarks. See Ex. 1; Compl. ¶¶ 22-23, 28-29.

As such, she had no legitimate expectation of continued employment when she failed to meet

those benchmarks and thus no due process property right to continued employment.[16]

　　To establish that her due process liberty interest was implicated, Plaintiff would have

needed to plead facts suggesting that the actions on the part of Defendant which she complains,

including her termination, seriously damaged her reputation in her community or made it

impossible to obtain new employment.[17] Plaintiff has not however plead any facts that support

---

　　[16] As the D.C. Circuit has noted, "[m]ost [due process] cases involving government employees fall into one of two categories: terminable at will or terminable only for cause," and that "[t]hose terminable only for cause . . . can expect to remain employed unless they do something warranting their termination," whereas "[t]hose who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely." See Hall v. Ford, 856 F.2d 255, 265-267 (D.C. Cir. 1988.); Lyons v. Barrett, 851 F.2d 406, 410 (D.C. Cir. 1988) (employee who "served at the pleasure" of his superior lacked property interest in continued employment).

　　[17] This Court has ruled that a due process "liberty" interest is only implicated where the government negatively alters the employment status of a government employee and, in so doing, so stigmatizes the employee or impugns his reputation so as to either (1) seriously damage his standing and associations in his community, or (2) foreclose his freedom to take advantage of other employment opportunities by either (a) automatically excluding him from a definite range

such a conclusion. She merely has asserted, without any elaboration or explanation, in three

nearly identical, conclusory passages that she suffered "personal and professional humiliation,"

limitations on her "employment opportunities," and "irrevocable damage to her career." See

Compl. at ¶¶ 45, 49, 53 (using this boilerplate language). Consequently, her due process claim

should be dismissed for failure to state a claim.[18]

While Plaintiff makes a passing reference to the First Amendment, she has not in any way

substantiated her claim that the USIA violated the First Amendment. Perhaps the "speech" she

has in mind was her report to the OIG alleging the "misuse" of credit cards, which Plaintiff

claims without substantiation prompted numerous acts of retaliation by her former employer.

See Compl. at 1-2 (introduction); id. at ¶¶ 14-16, 26, 43. If so, Plaintiff's First Amendment

claims are subject to dismissal given the recent Supreme Court holding in Garcetti v. Ceballos,

126 S.Ct. 1951 (2006), even if it were true that the USIA retaliated against her for those acts

(which Defendant emphatically denies).[19] Because Plaintiff was a public employee making those

---

of employment opportunities with the government or (b) broadly precluding him from continuing
his chosen career. See, e.g., M.K. v. Tenet, 196 F.Supp.2d 8 (D.D.C. 2001); Sierzega v.
Ashcroft, 358 F.Supp.2d 3 (D.D.C. 2005); O'Donnell v. Barry, 148 F.3d 1126, 1140-42 (D.C.
Cir. 1998) (noting that "[a] loss of rank, status and pay alone is not actionable under the Due
Process Clause.").

[18] While a complaint is to be construed liberally, the Court need not accept factual
inferences drawn by plaintiff if those inferences are not supported by facts alleged in the
complaint, nor must the Court accept the plaintiff's legal conclusions. See National Treasury
Employees Union, 101 F.3d at 1430; Kowal, 16 F.3d at 1276; Holman, 436 F.Supp.2d at 73.

[19] In Garcetti, the Supreme Court held that when public employees make statements
pursuant to their official duties, they are not speaking as citizens for First Amendment purposes,
and the Constitution does not insulate their communications from employer discipline. See
Garcetti, 126 S.Ct. at 1959 (observing that "[u]nderlying our cases has been the premise that
while the First Amendment invests public employees with certain rights, it does not empower

23

disclosures pursuant to what she believed were her official duties[20], she was not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate her communications from employer discipline even if the Court accepts her claim that she was retaliated against for her credit card disclosures.  See Garcetti, 126 S.Ct. at 1959-61.  Lastly, Plaintiff does not explain how her rights to "association," "privacy," and "equal protection" were violated, and it is hard to see how they could have been under the circumstances described in her complaint.  See Compl. ¶ 57; Compl. *generally.*  Accordingly, Count IV should be dismissed for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

### E.    Because Counts XI-XXII Make Contractual Claims and Seek Over $10,000 in Relief, the Court of Federal Claims has Exclusive Jurisdiction Over Them

In Counts XI-XXII of her Amended Complaint, Plaintiff alleges that the USIA took various actions that breached the January 31, 1995 Settlement Agreement.  See Compl. ¶¶ 76-115 (counts XI-XXII).  To whatever extent they were not disposed of by the Federal Circuit's finding in Rose Mary Dews-Miller v. USIA, 194 F. 3d 1330 (Fed Cir. 1999) that the USIA did not breach that agreement, Plaintiff's breach allegations must be dismissed for lack of jurisdiction.  As this Circuit has recognized, when a federal employee sues a federal agency

---

them to "constitutionalize the employee grievance."); id. at 1961 ("[p]roper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.")

[20]  See, e.g., Compl. ¶ 14 (indicating that "[i]n August 1994, the USIA Comptroller . . . issued a memorandum designating the Administrative Officers throughout the Agency as the American Express . . . government issued credit card coordinators for their respective office" and that "[s]ince Plaintiff was the OIG Administrative Officer, she was responsible for receiving the credit card statements of the federal government issued AMEX cards of the employees in the OIG's office").

challenging the lawfulness of or alleging a breach of a Title VII settlement agreement, and asserts

additional Title VII claims, the Court of Federal Claims maintains exclusive jurisdiction over the

breach-of-contract claims if the value of the claims exceed $10,000.[21]  The Court of Federal

Claims has recognized this as well.[22]

The "Little" Tucker Act gives district courts original jurisdiction concurrent with the

Federal Court of Claims only for contractual claims against the United States which are either

worth less than $10,000 or when the Plaintiff has waived any claim in excess of that amount.

---

[21]  See, e.g., 28 U.S.C. § 1491(a)(1) (providing, in relevant part, that the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon . . .  any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort") (emphasis added); Greenhill v. Spellings, 482 F.3d 569, 575 (D.C. Cir. 2007) (observing that "[w]e have held that even though Title VII might have been the basis of a settlement agreement, a breach claim is a straightforward contract dispute") (internal citations omitted); Hansson v. Norton, 411 F.3d 231, 232 (D.C. Cir. 2005) (noting that "[t]his court generally treats settlement agreements as contracts subject to the exclusive jurisdiction of the Court of Federal Claims ...."); Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir. 2004) (holding that a breach of settlement claim should have been brought in the Court of Federal Claims pursuant to the Tucker Act); Frahm v. U.S., 2007 W.L. 1829176, *3 (4th Cir. 2007) (holding that the statutory waiver of sovereign immunity for Title VII suits against the government "does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute").

[22]  See, e.g., Taylor v. U.S., 73 Fed. Cl. 532, 542 (Fed.Cl. 2006) (finding that "Title VII's 'precisely drawn, comprehensive and detailed scheme of review' does not preclude this court's enforcement of settlement agreements arising from Title VII disputes") (internal citations omitted); id. at 544 (observing that "there is no case law from the Federal Circuit addressing whether the Court of Federal Claims can exercise jurisdiction over Title VII settlement agreements, and, if so, under what circumstances" but that "the court is persuaded . . . that the Court of Federal Claims can entertain actions to enforce Title VII settlement agreements."); Westover v. U.S., 71 Fed. Cl. 635, 638-40 (Fed. Cl. 2006) (holding that the Court of Federal Claims has jurisdiction over claims that the government has breached an agreement settling Title VII discrimination claims, and it is not necessary for such jurisdiction that the agreement be money mandating); id. at 639 (noting that "Title VII itself does not provide a remedy for a breach of contract that occurs incident to settlement of a Title VII claim, nor does it prescribe the proper forum for litigating such a breach of contract").

See 28 U.S.C. § 1346(a)(2); Waters v. Rumsfeld, 320 F.3d 265, 270 (D.C. Cir. 2003); Goble v.

Marsh 684 F.2d 12, 15 (D.C. Cir. 1982); Stone v. United States, 683 F.2d 449, 452 (D.C. Cir.

1982); Greenhill, 482 F.3d at 572.  Any such claim which exceeds the $10,000 jurisdictional

ceiling however is within the *exclusive* jurisdiction of the Court of Federal Claims.  See 28

U.S.C. § 1491(a)(1); Greenhill, 482 F.3d at 572; Sharp v. Weinberger, 798 F.2d 1521, 1523

(D.C. Cir. 1986); Goble, 684 F.2d at 15.

    The plain language of a complaint does not necessarily settle the question of Tucker Act

jurisdiction.  See Kidwell v. Dep't of the Army, Bd. for Corr. of Military Records, 56 F.3d 279,

284 (D.C. Cir. 1995) (internal citation omitted).  "This is because plaintiffs can bypass Tucker

Act jurisdiction by converting complaints which 'at their essence' seek money damages from the

government into complaints requesting injunctive relief or declaratory actions."  See Kidwell, 56

F.3d at 284 (internal citation omitted).  Because this forum shopping circumvents a primary

purpose of the Act-to ensure that a central judicial body adjudicates most claims against the

United States Treasury, the Court of Appeals has stated that "'[j]urisdiction under theTucker Act

cannot be avoided by . . . disguising a money claim' as a claim requesting a form of equitable

relief."  See Kidwell, 56 F.3d at 284 (internal citations omitted).[23]

---

    [23]  See also Heller, Ehrman, White & MacAuliffe v. Babbitt, 992 F.2d 360, 363 (D.C. Cir.
1993) (Plaintiffs "may not, by creatively framing their complaint, circumvent a congressional
grant of exclusive jurisdiction."); Vietnam Veterans of Am. v. Sec'y of the Navy, 843 F.2d 528,
534 (D.C. Cir. 1988) (recognizing the Tucker Act's interest in uniformity); United States v.
Hohri, 482 U.S. 64, 71-73 (1987) (describing goal of uniformity behind creation of Federal
Circuit); Van Drasek v. Lehman, 762 F.2d 1065, 1071 n. 11 (D.C. Cir. 1985) (finding that district
court jurisdiction cannot be manufactured by "disguising a money claim "as an equitable one");
Olympic Fed. Sav. and Loan Ass'n v. Director, Office of Thrift Supervision, 1990 W.L. 134841,
*7 (D.D.C. 1990) ("Plaintiff cannot avoid the Tucker Act merely by alleging that damages will
be inadequate or by requesting specific relief").

To enforce this prohibition on the creative drafting of complaints, the Court of Appeals has instructed that courts are to look to the complaint's substance, not merely its form.  See, e.g., Kidwell, 56 F.3d at 284.  Absent other grounds for district court jurisdiction, if a Plaintiff "explicitly or in essence seeks money damages in excess of $10,000, jurisdiction rests exclusively with the Court of Federal Claims" under the Tucker Act.  See, e.g., Greenhill, 482 F. 3d at 573 (emphasis added and internal citations omitted); Kidwell, 56 F.3d at 284; Rochon v. Gonzales, 438 F.3d 1211, 1214 (D.C. Cir. 2006) (observing that "the combination of a claim for equitable relief brought under Title VII and a related claim for breach of contract does not give the district court jurisdiction over the contract claim that, if brought separately, would be exclusively in the Court of Federal Claims."); Daniels v. U.S. Dep't of Interior, 56 F.3d 1531 (D.C. Cir. 1995); Van Drasek, 762 F.2d at 1071 n. 11.  Similarly, the Federal Circuit has held that it is "well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the . . . jurisdiction of the Court of Federal Claims" See Awad v. United States, 301 F.3d 1367 (Fed. Cir. 2002).

In this case, twelve counts of Plaintiff's Complaint explicitly allege breaches of contract on the part of the USIA.  See Compl. ¶¶ 22, 76-115 (counts XI-XXII).  She explicitly seeks an order form the Court vacating the January 31, 1995 Settlement Agreement.  See Id. at 29 (prayer for relief (e)).  Although Plaintiff does not explicitly specify an amount in controversy in her Complaint, she seeks forms of relief whose value clearly would greatly exceed $10,000, and she has not restricted the relief she is seeking to under this threshold.[24]  Plaintiff has clearly  not

_____

[24]  See, e.g., Compl. at 29, Prayer for Relief (which asks the Court to "[o]rder Defendant to pay Plaintiff damages in the form of back pay, prejudgment interest, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate her for the violations

waived claims in excess of $10,000.  See Compl. *generally*.  Thus, counts XI-XXII of Plaintiff's

Amended Complaint are subject to the Tucker Act and its jurisdictional consequences as they "in

essence" seek more than $10,000 in monetary relief from the federal government and allege a

contractual breach.  See Greenhill, 482 F. 3d at 573; Kidwell, 56 F.3d at 284; Heller, 992 F.2d at

363; Taylor, 73 Fed.Cl. at 542; Westover, 71 Fed. Cl. at 638-40; Wood, 961 F.2d at 198.  Thus,

to whatever extent that they were not disposed of by the Federal Circuit's ruling in Dews-Miller,

194 F. 3d 1330 (Fed Cir. 1999), the Court of Federal Claims maintains exclusive jurisdiction

over Plaintiff's claims that USIA breached the January 31, 1995 agreement.

In any event, any of Plaintiff's remaining contractual claims should be dismissed because

these claims are untimely in this Court, and would be just as untimely were they presented at this

late date to the Court of Federal Claims.  See 28 U.S.C. §§ 2401(a) (stating, with one exception,

that "every civil action commenced against the United States shall be barred unless the complaint

is filed within six years after the right of action first accrues."), 2501 ("[e]very claim of which the

United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon

is filed within six years after such claim first accrues.").  The six year statutes of limitations

under sections 2401(a) and 2501 have passed for each and every one of Plaintiff's contractual

claims.[25]  Thus, it would be futile and improper for this Court to transfer Counts XI-XXII to the

---

described above" with "those amounts to be determined at trial," to "[c]ompel Defendant to
reinstate Plaintiff with the Defendant," to "[o]rder Defendant to pay Plaintiff's reasonable
attorney's fees and costs" and to "[o]rder any other relief the Court deems just and equitable.").

[25]  All of the facts that Plaintiff cites in support of her breach allegations arose prior to her
separation from USIA in 1996, over ten years ago.  See, e.g., Compl. ¶¶ 77-79 (count XI,
referring to events which allegedly transpired during the six month period following  February 1,
1995), 81-83 (count XII, referencing events which supposedly occurred in the June of 1995), 85-
87 (count XIII, complaining about the fact that Defendant did not promote her within 60 days of

Court of Federal Claims, particularly given the Federal Circuit's finding in <u>Dews-Miller v. USIA</u>,

194 F. 3d 1330 (Fed. Cir. 1999) that USIA complied with the January 1995 agreement.[26]

Accordingly, regardless of the amount of damages that Plaintiff seeks in connection with breach

claims, these counts should be dismissed for lack of subject matter jurisdiction and/or for failure

to state a claim upon which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

### III.    To the Extent that They are Cognizable as Title VII Claims, Most of Plaintiff's Allegations Were Improperly Exhausted and All Fail on the Merits

In the Introduction to her First Amended Complaint, Plaintiff alleges that Defendant

engaged in acts of retaliation against her for prior EEO activity.  <u>See</u> Compl. at 1.  Plaintiff also

alleges that "[t]his Court has jurisdiction over the subject matter of this civil action pursuant to

[Title VII]."  <u>See</u> Compl. ¶ 6.  However, while Plaintiff references "Title VII" in connection with

---

February 1, 1995), 89-91 (count XIV, complaining about vagueness in the agreement which
Plaintiff signed in January 1995), 93-95 (count XV, regarding USIA's alleged failure to  train her
for her detail at the Office of the Comptroller which had been completed by September 1, 1995),
97-99 (count XVI, complaining that certain persons did not sign the settlement agreement in
January 1995), 101-05 (counts XVII and count XVIII, concerning events which supposedly
transpired during the three month period following her return to OIG in November 1995), 107-08
(count XIX, concerning language allegedly omitted from the January 1995 agreement), 110-11
(count XXI, regarding USIA's alleged failure to take certain actions during her detail at the
Office of the Comptroller which had been completed by September 1, 1995), 113-14 (count
XXII, concerning events which occurred in or prior to November 1995).

[26]  Decisions of the United States Claims Court under the Big Tucker Act (those worth
more than $10,000) are appealable only to the Federal Circuit.  <u>See</u> 28 U.S.C. § 1291.  Likewise,
breach claims for less than $10,000 ( i.e., Little Tucker Act claims), so long as they are not
related to federal taxes, are appealable only to the Federal Circuit.  <u>See</u> 27 U.S.C. § 1295(a)(2),
(3).  "A conspicuous feature of these judicial arrangements is the creation of exclusive Federal
Circuit jurisdiction over every appeal from a Tucker Act or nontax Little Tucker Act claim."  <u>See</u>
<u>Hohri</u>, 482 U.S. at 72-73.  Thus, for res judicata purposes, the Federal Circuit is a court of
competent jurisdiction to decide breach claims under the Tucker Act.

the first count of her amended complaint, <u>see</u> Compl. at 13, none of her other counts allege a

violation of Title VII or even  reference Title VII.  <u>See</u> Compl. at 14-29, ¶¶ 46-115 (counts II-

XXII).  Thus, it is unclear which, if any, of Counts II-XXII she believes constituted violations of

Title VII.  Nevertheless, in view of the liberal pleading requirements applicable to <u>pro se</u>

plaintiffs, Defendant will consider the possibility that Plaintiff's general allegation of reprisal for

prior EEO activity was intended to apply to the facts alleged in Counts II, III, and V-IX.

### A.    Plaintiff has Failed to Satisfy Title VII's Exhaustion Requirements With Respect to the Overwhelming Majority of Her Claims

A federal employee may file a civil action under Title VII only after exhausting

administrative remedies before the relevant agency.  <u>See</u> 42 U.S.C. § 2000e-16(c).  Under

rulemaking authority delegated by Title VII, <u>see</u> 42 U.S.C. § 2000e-16(b), the EEOC has

"established detailed procedures for the administrative resolution of discrimination complaints,

including a series of time limits for seeking informal adjustment of complaints, filing formal

charges, and appealing agency decisions to the Commission."  <u>See</u> <u>Bowden v. United States</u>, 106

F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614.  Specifically, the EEOC's regulations

provide that "aggrieved" employees or applicants for employment who allege they have been

discriminated against must first consult an agency EEO counselor before filing a complaint of

discrimination and must do so within 45 days of the effective date of the action".  29 C.F.R. §

1614.105(a)(1); <u>see  also</u> <u>Brown.</u>, 425 U.S. at 832; <u>Bowden</u>, 106 F .3d at 437-38 (a plaintiff will

run afoul of exhaustion requirements if he or she fails to bring a complaint to the attention of an

EEO counselor within the time limits prescribed by 29 C.F R. § 1613. 105 (a)(1), <u>ie</u>, within 45

days of the alleged discriminatory action); <u>Smith v. Dalton</u>, 971 F. Supp. 1, 4 (D.D.C. 1997).  If

the matter is not resolved through informal counseling, the aggrieved employee must, within 15

days, file a written complaint with in the agency that allegedly discriminated against her.  29

C.F.R. § 1614.106(a)-(c).  The agency must investigate the matter within 180 days or reject the

complaint and issue a final dismissal.  Id. at § 1614.106(d)(2).  At the conclusion of the agency's

investigation, the complainant may request a hearing before an EEOC administrative judge or an

immediate final decision by the agency.  Id. at § 1614.108(f).  If the employee chooses the

former, the EEOC administrative judge will conduct a hearing and make factual and legal

finding, which will be transmitted to the agency as a recommended decision.  The agency then

issues a final decision.  Id. at §§ 1614.109(g) and 1614.110.  A complainant who receives a final

adverse decision from her agency may appeal that decision to the EEOC within 30 days, or may

file a civil action within 90 days.  See 29 C.F.R. § 1614.408; Wilson v. Pena,  79 F .3d 154 (D.C.

Cir. 1996); Holly v. Sec'y of Veterans Affairs, 165 F .3d 244, 246 (3d Cir. 1999).  A complainant

also may file a civil action at any time after her complaint has been pending before the agency or

the EEOC for at least 180 days.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408.

Compliance with these procedures and timeliness is mandatory.  "Complainants must

timely exhaust these administrative remedies before bringing their claims to court."  Bowden,

106 F. 3d at 437; Battle v. Rubin, 121 F. Supp. 2d 4, 7 (D.D.C.2000) ("a party must timely file

all applicable administrative complaints and appeals in order to bring a claim in federal court"):

Williams v. Munoz, 106 F .Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative change is

prerequisite to initiation of a Title VII action"); Williamson v. Shalala, 992 F .Supp.  454, 457

(D.D.C. 1998) ("non-compliance with administrative deadlines will bar a plaintiff from litigating

his claims in court'), aff'd, 1998 W.L. 545420 (D.C. Cir. July 20, 1998), cert. denied, 525 U.S.

31

915 (1998).  As the U.S. Supreme Court reiterated in <u>National R.R. Passenger Corp.</u>, 536 U.S. 101, 108 (2000), "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."  <u>Id.</u> at 108 (<u>quoting</u> <u>Mohasco Corp v. Silver</u>, 447 U.S. 807, 826 (1980)).  Accordingly, the U.S. Supreme Court has explicitly required that all discrete discriminatory and retaliatory acts be fully exhausted as a prerequisite to suit.  <u>See</u> <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 108.  Under Title VII, courts have authority only to hear claims that are (1) contained in the plaintiff's administrative complaint or claims "like or reasonably related" thereto, and (2) claims for which the plaintiff exhausted administrative remedies.  <u>See</u> <u>Powell v. Castaneda</u>, 390 F. Supp.2d 1, 8 (D.D.C. 2005) (<u>quoting</u> <u>Park v. Howard Univ.</u>, 71 F.3d 904, 907 (D.C. Cir. 1995)).

Plaintiff filed administrative complaints in various fora, both before and after her termination in 1996.  <u>See</u> Ex. 23 (Declaration of Jacqueline Canton); Ex. 1-22.  Notably, Plaintiff brought a claim against USIA, originally captioned  USIA Complaint No. OCR-96-15 and later redesignated Department of State Complaint No. 00-19.  <u>See</u> Ex. 6; Ex. 23 at ¶ 7.  That Complaint gave rise to two hearings before EEOC Administrative Judges.  <u>See</u> Ex. 23 at ¶¶ 7-17 (describing the procedural history of this appeal); Ex. 6-17.  On April 29, 2004, an EEOC Administrative Judge ("AJ") rendered a decision in which he held that Plaintiff "failed to establish by a preponderance of evidence that the Agency discriminated against her" and found for the Department on all counts.  <u>See</u> Ex. 18; Ex. 23 at ¶¶ 16-17.  The EEOC's Office of Federal Operations ("OFO") affirmed the AJ's decision on April 11, 2006.  <u>See</u> Ex. 23 at ¶ 18; Ex. 19.  OFO denied Plaintiff's motion for reconsideration on July 13, 2006.  <u>See</u> Ex. 23 at ¶ 18; Ex. 20.

This most recent EEOC administrative proceeding provides the only conceivable basis for

32

the Plaintiff to demonstrate that she has exhausted administrative remedies under Title VII and is

filing a timely complaint.  See Ex. 2-22; Ex. 23 (Declaration of Canton) at ¶ 15 (explaining that

all of Plaintiff's outstanding claims were consolidated in Complaint 00-19); id. *generally*.

> **1.     To the Extent that They Are Treated as Title VII Violations and Not Violations of the CSRA, Counts V, VII, and VIII Must Be Dismissed for Failure to Exhaust Administrative Remedies**

In counts V, VII, and VIII, Plaintiff complains about an alleged failure of notice with

respect to her "termination" (Count V), her "termination" from OIG (Count VII), and her

conversion from a career appointment to a temporary appointment (Count VIII).  To the extent

that these claims are intended to allege violations of Title VII in addition to alleging violations of

the CSRA, Plaintiff failed to exhaust her administrative remedies under Title VII with respect to

them.  Her administrative Claims did not challenge any of these alleged personnel actions (all

taken in implementation of the Settlement Agreement).  See Ex. 23, Ex.1-22.  Nor is there is any

basis for her to now claim that her allegations of lack of notice with respect to each such action

were "like or reasonably related to" or "growing out of" her administrative allegations.  See Park,

71 F.3d at 907.  As such, these claims should be dismissed.  See Fed. Civ. P. 12(b)(6).

> **2.     Plaintiff Failed to Properly Exhaust Her Claims in Count X, Which Allege that Defendant Failed to Comply with a 1989 EEOC decision**

In Count X, Plaintiff alleges that USIA violated a 1989 EEOC decision.  See Compl.

§§ 73-75.  Regulations issued under Title VII provide that relief ordered by the EEOC is binding

on an agency.  See 29 CFR 1614.502. They further specify the administrative steps that must be

followed by a complainant in order to enforce an EEOC decision.  Specifically, the regulations

specify that an EEOC determination of agency noncompliance (or of agency failure to

demonstrate compliance) is a precondition to judicial review.  <u>See</u> 29 CFR 1614.503(g).  Plaintiff

does not allege that she exhausted these administrative requirements, nor does the matter appear

in the various summaries of the claims considered by Defendant or the EEOC as to which the

EEOC denied reconsideration in July 2006.  <u>See</u> Ex. 1-22, Ex. 23 (Declaration of Canton).

> **3.      Plaintiff Has Failed To Satisfy Title VII's Exhaustion Requirements With Respect to Her Claim that USIA Breached the January 1995 Agreement Under Title VII (Counts XI-XXII)**

The portions of Plaintiff's complaint which allege breaches of the January 1995

agreement were untimely under both the EEOC's regulations and the terms of the settlement

agreement, and thus those portions of her Complaint should be dismissed on that basis.  <u>See</u>

Compl. ¶¶ 76-115 (counts XI-XXII).  Title VII's implementing regulations provide that when a

complainant believes that an agency has failed to comply with the terms of the agreement, he or

she must "notify the agency's EEO Director, in writing, of the alleged noncompliance within 30

days of when the complainant knew or should have known of the alleged noncompliance."  <u>See</u>

29 C.F.R. § 1614.504(a).  The agency shall resolve the matter and respond in writing.  <u>See</u> 29

C.F.R. § 1614.504(b).  If the complainant is not satisfied with the agency's writing or the agency

has failed to respond, the complainant may appeal to the EEOC for a determination of whether

the agency has complied with the settlement agreement, but must do so within 30 days of his or

her receipt of the agency's determination.  <u>See</u> <u>id.</u>; <u>see also</u> 29 C.F.R. § 1614.402(b).  Moreover,

the regulations governing compliance with settlement agreements provide that a complainant

may request that "the terms of settlement agreement be specifically implemented or,

alternatively, that the complaint be reinstated for further processing from the point processing

ceased." See 29 C.F.R. § 1614.504(a). However, 29 C.F.R. § 1614.504 does not authorize a

complainant to file a Title VII action in district court. See Hansson v. Norton, 411 F. 3d 231,

234 (D.C. Cir. 2005). Thus, to the extent that Plaintiff seeks to initiate a Title VII action based

on the alleged breaches, under the applicable regulations, her claims must be dismissed.

On January 27, 1995, Plaintiff signed the settlement agreement, and it was finalized on

January 31, 1995. See Ex. 1. Thus, Plaintiff was on notice of the provisions of the agreement by

January 27, 1995, if not earlier. In an October 10, 1995 letter to USIA, Plaintiff alleged that

USIA breached the Settlement Agreement and asked that her EEO case be reopened. See Ex. 2.

In a December 11, 1995 letter, USIA advised her that it had concluded that it had carried out all

of the terms of the Settlement Agreement. See Ex. 3. The letter also told her that she could

appeal to the EEOC within 30 days of her receipt of this determination. Id. Plaintiff did

eventually bring such an appeal to the EEOC, but her appeal was untimely. See Ex. 4; Ex. 5; Ex.

23, ¶¶ 4-6. Thus, Plaintiff did not properly exhaust these allegations before proceeding to federal

court. Counts XI-XXII should be dismissed on this basis. See Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**B.      Even If Counts II, III, and VI, and IX Are Treated as Title VII Claims and Were Properly Exhausted Under Title VII, They All Still Fail on the Merits**

**1.      Counts II and III**

In Counts II and III of her amended complaint, Plaintiff alleges that her USIA supervisors

failed to counsel her sufficiently regarding the "minimally successful" ratings she received in two

separate rating periods, and claims that this purported failure was in violation of 5 U.S.C.

§§ 4302(b) and Agency's Manual of Operations and Administration ("MOA"), Part V-A,

§ 453.2(c)(1)-(3).  See Compl. ¶¶ 46-53.  Count II relates to the performance rating for the period

May 1, 1994 to January 24, 1995.  Id. at ¶¶ 46-49.  Count III relates to the interim performance

rating for the period February 1, 1995 to July 31, 1995.  Id. at ¶¶ 50-53.  Counts II and III contain

identical assertions regarding the allegedly applicable legal authorities and alleged damage to

Plaintiff with respect to each of two performance ratings that Plaintiff received.  Id. at ¶¶ 46-53.

For purposes of this section, Defendant assumes that counts II and III contend that the alleged

failure to follow procedures under 5 U.S.C. §§ 4302(b) and MOA , Part V-A, § 453.2(c)(1)-(3)

was done in reprisal for prior EEO activity in violation of Title VII.

Under the familiar test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), it is the plaintiff's burden to initially establish a prima facie case of discrimination by a

preponderance of the evidence.  Id.  If the plaintiff establishes a prima facie case, the employer

must then articulate a legitimate, nondiscriminatory reason for its actions.  Id. The plaintiff must

then demonstrate that the employer's stated reason was pretextual and that the true reason was

discriminatory.  Id.; Weber v. Battista, 2007 W.L. 2033254 (D.C. Cir. 2007); Texas Dep't of

Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133,(2000); St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 519 (1993).

To state a prima facie case of reprisal, a plaintiff must show that (1) she engaged in

protected EEO activity; (2) that a reasonable employee would have found the challenged action

so materially adverse that she would have been dissuaded from engaging in the protected EEO

activity; and (3) that there was a causal connection between the protected activity and the

challenged retaliatory action.  See, e.g., Rochon v. Gonzalez, 438 F.3d 1211, 1219-20 (D.C. Cir.

2006).  The "anti-retaliation provision [of Title VII] protects an individual not from all

36

retaliation, but from retaliation that produces an injury or harm." See Burlington N. & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2414 (2006). Thus, to prevail, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" See Burlington, 126 S.Ct. at 2415 (emphasis added) (citations to lower court decisions omitted). (Emphasis added).

Defendant asks this Court to dismiss any Title VII allegation in Counts II and III. Even if Plaintiff had exhausted her administrative remedies (which she did not), any allegation of retaliatory animus and causation as to alleged failures to discuss performance appraisals with her would fail because an alleged failure to discuss a performance appraisal is not the sort of "materially adverse" action that is cognizable in a Title VII reprisal claim as it is not the sort of harm which would " have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" See Burlington, 126 S.Ct. at 2415 (also explaining that "[w]e speak of material adversity because we believe it is important to separate significant from trivial harms" and that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.") Thus, dismissal of these counts is proper as they fail to state a claim upon which relief can be granted under Title VII. See Fed. R. Civ. P. 12(b)(6).

Moreover, Defendant is entitled to summary judgment with respect to these claims, because it is clear that her supervisors did in fact counsel and provide feedback to Plaintiff regarding her performance. Plaintiff received a "minimally successful" rating for the period May 1, 1994 to January 24, 1995. See Comp. ¶¶ 28, 47; Ex. 43 (Affidavit of Darwin Roberts) at 2,

37

Ex. 44 (Performance Appraisal); Ex. 18 at 2. Her rating official was Darwin Roberts of USIA's

OIG. See Comp. ¶ 47; Ex. 43 (Affidavit of Darwin Roberts) at 2. Mr. Roberts sought to meet

with Plaintiff to discuss her mid-term review on December 21, 1994. See Ex. 43 (Affidavit of

Darwin Roberts) at 3. Plaintiff herself admitted that she failed to appear for that scheduled

meeting and failed to schedule another date for that meeting. See id. at 3; see also Ex. 42

(transcript of December 9, 2003 EEOC hearing) at 119-20 (testimony of Plaintiff to this same

effect); id. at 181-82 (testimony of Darwin Roberts to this same effect). Mr. Roberts met with

the Plaintiff and gave her feedback on her performance during the rating period. See Ex. 42,

transcript of December 9, 2003 EEOC hearing at 181 (testimony of Darwin Roberts); Ex. 43

(Affidavit of Darwin Roberts) at 3. Plaintiff also refused Mr. Roberts' offer to meet with him to

discuss the completed interim rating. See, e.g., Ex. 45 (Affidavit of Plaintiff) at 5; Ex. 42,

transcript of December 9, 2003 EEOC hearing at 122 (Plaintiff's own testimony confirming that

she "never took Roberts up on his offer to meet with him to discuss the appraisal").[27]

Plaintiff received a "minimally successful" rating for the period February 1, 1995 to July

31, 1995. See Comp. ¶ 51. Carol Keith of USIA's Office of the Comptroller was her rating

official during this period. See Comp. ¶ 51; Ex. 46, (Affidavit of Carol Keith) at 2. Ms. Keith

---

[27] In connection with the May 1, 1994-January 24, 1995 rating period, Plaintiff's
reviewing official was Louis Leporatti. See, e.g., Ex. 53 (Affidavit of Louis Leporatti) at 3; Ex.
43 (Affidavit of Darwin Roberts) at 2. There was no USIA requirement that the reviewing
official counsel an employee with respect to a rating. See, e.g.; Ex. 42, transcript of December 9,
2003 EEOC hearing at 120-21 (Plaintiff's concession in testimony that her reviewing official did
"[n]ot necessarily" have an obligation to meet with her to discuss her performance, but that
"[n]ormally" in her view the rating officer did.)

offered to speak with Plaintiff about her rating, but Plaintiff declined the offer.[28]  Ms. Keith

discussed Plaintiff's performance with her during the rating period and gave her oral and written

feedback on her work.[29]

    This is all that the manual provisions at MOA Part V-A required.  See Ex. 49.  The

Manual contained the procedures to be followed by supervisors in rating employees.  Id.  In

relevant part, it provided that rating officers were responsible for "discussing performance with

the Rated Employee on a periodic basis (at least one mid-year progress review is required)

throughout the appraisal period" Id. at 11.  It is clear that Plaintiff's rating officials did so.[30]

---

    [28]  See, e.g., Ex. 42, transcript of December 9, 2003 EEOC hearing at 127-29 (Plaintiff's
testimony acknowledging that Carol Keith told her, in connection with her February 1, 1995 to
July 31, 1995 performance evaluation, "Rose Mary, if you ever want to discuss anything with
me, you can" but that Plaintiff never did so); Id. at 221-22 (testimony of Carol Keith that "I gave
the rating to Rose Mary and told her here was her rating, that she could look over it, if she needed
to discuss it–if there were some things that she didn't agree with, that she could bring them to me
and we could then discuss them" and that Plaintiff never took her up on this offer to discuss her
rating); Ex. 46 (Affidavit of Carol Keith) at 4 (indicating that "I most definitely remember that
when I gave her the evaluation I offered to discuss the rating with her," but "[s]he never said
anything to me," that she did not do any other work for the rest of the day, left work at the end of
the day, called in sick the day after she received her evaluation, and never returned to complete
her six month detail with the Office of the Comptroller)

    [29]  See, e.g., Ex. 42, transcript of December 9, 2003 EEOC hearing at 214-17 (testimony
of Ms. Keith that, during the period of Plaintiff's detail, she gave Plaintiff "feedback" on her
progress, orally and in writing, that included markups of her work product and discussions about
what was wrong with those documents),  Ex 47-48 (two examples of written feedback which Ms.
Keith provided for Plaintiff); Ex. 46 (Affidavit of Carol Keith) at 2 (indicating that "[o]n many
occasions when [Plainiff] was given work to do the work would sit for three (3) or four (4) days,"
that "I would follow up with [her] . . . and I found out that she would have questions about the
assignment but she had not taken the initiative to get the questions answered or to get the job
done," that "I had to repeatedly explain the daily operation of the office and the procedures that
were required to complete the tasks given to her"); id. at 4.

    [30]  There was no USIA requirement that the reviewing official, Eva Diekman, counsel
Plaintiff regarding her rating.  See Ex. 42, transcript of December 9, 2003 EEOC hearing at 120-
21 (Plaintiff's testimony that the reviewing official did "[n]ot necessarily" have such an

Moreover, although Plaintiff does not challenge the ratings themselves in counts II and III, it is

clear that Defendant also had legitimate, non discriminatory reasons for giving Plaintiff

minimally successful ratings during those two periods, namely the inadequate quality of her work

and her repeated failure to comply with deadlines, as was made clear through sworn testimony

and numerous affidavits offered by the agency during the EEOC proceedings.[31]  Plaintiff has

offered no evidence to show pretext or a retaliatory motive.  <u>See</u> Compl. *generally*.  Accordingly,

to the extent that Counts II and III allege a Title VII violation, this Court should either dismiss

them for failure to state a claim or grant summary judgment to the Defendant as to them.  <u>See</u>

Fed. R. Civ. P. 12(b)(6), 56.

### 2.    Count VI:  No Notice Prior to Denial of Within-Grade Increase ("WGI")

In Count VI, Plaintiff states that 5 U.S.C. § 7513 required USIA to give her thirty-day

---

obligation).  USIA regulations did not mention a midway performance discussion requirement
for interim ratings.  <u>See</u> Ex. 42, transcript of December 9, 2003 EEOC hearing at 287-88
(testimony of Jenny Mallios, who was a personnel management specialist at the USIA between
1995 and the date USIA in merged into the State Department, that the regulations do not require
a performance discussion midway through the rating period.)

[31]  <u>See</u>, <u>e.g.</u>, Ex. 42, transcript of December 9, 2003 EEOC hearing at 179 (testimony of
Darwin Roberts, with regard to the May 1, 1994-January 24, 1995 rating, that "this was pretty
much the bottom of the scale as far as her performance since I had arrived in the office in
November of '91"); <u>id.</u> at 175, 180-81 (testimony by Roberts, citing specific examples of
inadequacies in Plaintiff's work product during the May 1, 1994-January 24, 1995 period and
how it caused problems and crises in the office during that rating period), 198 (testimony by
Leopratti that her response time during the May 1, 1994-January 24, 1995 period was just slow"
and that it "wasn't accurate, satisfactory"); <u>id.</u> at 220-21 (testimony of Carol Keith that during the
February 1, 1995-July 31, 1995 period, Plaintiff did not meet "the fully successful standard in
term of factors like quality, quantity, timeliness, and extent of supervision required" and that
despite supervision "on a daily basis" and regular feedback, Plaintiff did not "improve to the
level you would expect for a GS-11"); Ex. 46 (Declaration of Carole Keith); Ex. 50 (Declaration
of Alice Adams); Ex. 51 (Declaration of Elaine John); Ex. 52 (Declaration of Dolores Bulles)

notice prior to denial of WGI.  See Compl. ¶¶ 61-63.  Count VI should be dismissed to the extent

that it alleges a violation of § 7513 of the CSRA, as a denial of a within-grade increase is not

within the scope of 5 U.S.C. § 7512.[32]  Even assuming that Plaintiff alleged retaliatory animus

and causation (which she does not), the alleged failure to give thirty-day notice of a denial of a

WGI – notice that was not required by the agency's procedures[33] -- and is not the sort of

"materially adverse" action that is cognizable as a reprisal claim under Title VII.  See Burlington,

126 S. Ct. at 2414.  In any event,  Plaintiff was clearly put on notice of the denial[34], and of the

inadequacies in her performance which led to her minimally successful ratings and in turn to the

denial of a WGI.  See supra at 35-40.[35]  Accordingly, to the extent that it alleges a Title VII

violation, this Court should dismiss Count VI for failure to state a claim or grant summary

judgment to the Defendant as to it.

### 3.    Count IX: No notice prior to placement on AWOL Status

In Count IX, Plaintiff states that 5 U.S.C. § 7513 required USIA to give her thirty-day

---

[32]  See 5 U.S.C. § 7512 (identifying  personnel actions to which "[t]his subchapter applies"); Miller v. Merit Sys. Prot. Bd., 2006 W.L. 1308354, (Fed. Cir. 2006) ("non-selection for promotion is not an independently appealable action.") (citing 5 U.S.C. § 7512); Sherwood v. Merit Sys. Prot. Bd., 2002 W.L. 31477752, **1 (Fed. Cir. 2002) (same).

[33]  See Ex. 57 at 9 (manual provision requiring supervisors to send the employee a notice of a negative WGI determination outlining the reasons for it and the procedure for seeking reconsideration, but not requiring issuance of the notice 30 days in advance of the decision).

[34]  See Compl. ¶ 31; Ex. 42 transcript of EEOC hearing at 99-100 (testimony of Plaintiff); Ex. 56 (letter advising Plaintiff of WGI denial).

[35]  Moreover, the denial itself was consistent with USIA's manual provisions which clearly provide that, to be eligible for a WGI, an employee's performance must be at least "[f]ully [s]uccessful." See Ex. 57 at 3, § 235.4a;

notice prior to her being placed on AWOL status.  See Compl. ¶¶ 70-72.  Count IX should be

dismissed to the extent that it alleges a violation of § 7513 of the CSRA, as placement on AWOL

status is not within the scope of 5 U.S.C. § 7512.[36]  Even assuming that Plaintiff alleged

retaliatory animus and causation (which she does not), the alleged failure to give her notice of her

placement on AWOL status is not the sort of "materially adverse" action that is cognizable as a

reprisal claim under Title VII.  See Burlington, 126 S. Ct. at 2414.  Although Count IX

challenges only the Plaintiff's purported lack of notice of her placement on AWOL status and not

the AWOL determination itself, Defendant clearly had a legitimate non-discriminatory reason for

giving her that designation.  Plaintiff claims that she sustained an on the job injury on July 10,

1995, while she was assigned to the OC.  See, e.g., Compl. ¶ 27.  On Saturday, August 26, 1995,

Plaintiff left a note for Eva Diekmann, the Chief of the OC's Budget Operations Division, in

which she claimed that she had sustained this injury on July 10, 1995, claimed that she had

"since been experiencing complications with that injury," and requested the use of

"compensatory time" with a "continuation of pay for an indefinite period beginning on August

21, 1995."  See Ex. 40.  Shortly thereafter, on or about August 31,1995, Plaintiff was advised

that she needed to submit documentation to support her request and that until she did so she

would not receive permission to go on leave with a continuation of pay.  See id. (handwritten

response dated August 31, 1995).  Between September 5, 1995 and November 24, 1995, Plaintiff

failed to report to work at the OC.  See Compl. ¶ 27.  Because Plaintiff failed to submit medical

documentation that she had sustained an injury on the job and that this injury required her to not

---

[36]  See Compl. ¶¶ 70-72; Sherwood v. Merit Sys. Prot. Bd., 2002 W.L. 31477752, **1
(Fed. Cir. 2002) (finding that it "has no statutory jurisdiction over the denial of leave requested
pursuant to the FMLA" because it is not an agency action under 5 U.S.C. § 7512).

come into the office for his protracted period, Plaintiff was placed on AWOL status during this period and her pay was suspended.  See, e.g., Ex. 41 (September 7, 1995 memorandum); see also Compl. ¶¶ 30, 32; Ex. 18, Apr. 29, 2004 AJ Decision at 7; Ex. 42, transcript of EEOC hearing at 254, 256-57 (testimony of Jenny Mallios, a Personnel Management Specialist at the OC, that Plaintiff "fail[ed] to submit documentation supporting her absence" and that, based on Plaintiff's submissions, she had "no way of assessing . . . whether or not she was injured at work'" and that Plaintiff failed to demonstrate "a connection to the accident and a diagnosis and some sort of indication that the doctor believes that this was related to work, and why its related to work."). Plaintiff was advised of this policy on at least two occasions: in August 1995 and on September 1995.  See, e.g. Ex. 40; Ex. 41; Compl. ¶¶ 30, 32.  Accordingly, to the extent that it alleges a Title VII violation, this Court should either dismiss Count IX for failure to state a claim or grant summary judgment to the Defendant as to it.  See Fed. R. Civ. P. 12(b)(6), 56.[37]

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Plaintiff's action, or in the alternative, grant summary judgment to the Defendant.

---

[37]  In addition, Count V is not an action within the scope of 5 U.S.C. § 7513 as Plaintiff, by her own admission, was a temporary employee on the day that she was terminated from federal employment.  See, e.g., Ex. 54 (notice, making position temporary); Compl. ¶¶ 34 (claiming that in February 1995 Plaintiff received a notice which made her a temporary employee), id. at 2 (claiming she was terminated in December 1996); Ex. 58 (December 1996 notice); Wheeler v. Dep't of Commerce, 2002 W.L. 31998772, **2 (Fed. Cir. 2002) ("[t]ermination from a temporary position is not an action appealable to the Board"); 5 U.S.C. § 7511(a)(1)(A) (excluding probationary employees from the definition of "employee" in 5 U.S.C. § 7513(d) (2000)); Anderson v. Merit Sys. Prot. Bd., 12 F.3d 1069, 1070-72 (Fed. Cir. 1993) (finding no jurisdiction over appeals by temporary employees challenging termination.)

Respectfully submitted,


\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


\_\_/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

Of Counsel:

Joan E. Donoghue
Attorney-Adviser
Office the Legal Adviser
U.S. Department of State
Washington, D.C. 20520-6419

44

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROSE M. DEWS-MILLER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 06-1764 (GK) |
| | ) |
| CONDOLEEZZA RICE, | ) |
| Secretary of State, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rule 7(h), Defendant submits this statement of material facts as to which there is no genuine issue:

**I.     Prior to 1995, Plaintiff Filed Three EEO Complaints Alleging Discrimination**

1.    Plaintiff *pro se* Rose M. Dews-Miller, was an employee of the United States Information Agency ("USIA") beginning in 1972 until she was terminated in 1996.  See First Amended Complaint ("Compl.") ¶¶ 10, 36.  She became an employee of USIA's OIG in 1990.  See Compl. ¶ 11.  On October 1, 1999, USIA was abolished and merged into the Department of State ("DOS" or "the Department").  See, e.g., 1999 W.L. 790037 (Oct. 6, 1999).

2.    On June 4, 1993, Plaintiff filed an EEO complaint, in which she alleged that various USIA employees (including one of her supervisors, Darwin Roberts, and a George Murphy) had retaliated against her for reporting the misuse of credit cards by OIG employees by not selecting her for an auditor position.  See, e.g., Compl. ¶ 13; Exhibit ("Ex.") 18, April 29, 2004 Decision in Dews-Miller v. Powell, EEOC Nos. 100-A2-7521X and 100-A2-7576X, Agency Nos. 00-19

and 96-15 ("Apr. 29, 2004 AJ Decision") at 3 (referencing this earlier administrative complaint).

On September 7, 1993 and October 21, 1994, Plaintiff filed her second and third EEO

complaints, in which she challenged the decision of her then rater Darwin Roberts and her then

reviewer Louis Leporatti to rate her work as "fully satisfactory."  See Compl. ¶ 13; see also Ex.

18, Apr. 29, 2004 AJ Decision at 3.

**II.     Plaintiff Entered into a Comprehensive "Last Chance" Settlement Agreement with the USIA in January 1995, while she was Represented by Counsel and under the Supervision of an Administrative Judge**

3.  On January 31, 1995, Plaintiff entered into a settlement agreement with USIA (the

"Settlement Agreement") that was "in settlement of Complaints of Discrimination filed by the

employee on June 4, 1993, and September 7, 1993, as well as all other EEO complaints against

the Agency pending at an informal stage."  See, e.g., Compl. ¶ 22; Ex. 18, Apr. 29, 2004 AJ

Decision at 3; Ex. 1, Settlement Agreement [appears as exhibit 9-1 in Report of Investigation or

"ROI" 00-19]; Ex. 23, ¶ 4.  Plaintiff was represented by counsel during the settlement

negotiations and when she signed the agreement, and an EEOC administrative judge supervised

these negotiations and approved the agreement that the parties reached.  See, e.g., Compl. ¶ 22;

Ex. 18, Apr. 29, 2004 AJ Decision at 3; Ex. 1, Settlement Agreement [appears as exhibit 9-1 in

ROI 00-19].

4.  The settlement agreement established a "last chance" arrangement which afforded

Plaintiff several opportunities to work and demonstrate her abilities in different offices and

receive training, but held her accountable through certain identified appraisal requirements, and

required that she resign from the Agency in the event that she failed to meet those benchmarks.

*See*, *e.g.*, Compl. ¶¶ 22-23; *see also* Ex. 18, Apr. 29, 2004 AJ Decision at 3; Ex. 1, Settlement

Agreement [appears as exhibit 9-1 in ROI 00-19]; Ex. 23, ¶ 4.

     5. The agreement provided first that "the USIA [would] detail Ms. Miller out of the

Office of Inspector General" ("OIG") "to the Office of Comptroller" ("OC") "as a Budget

Analyst, GS-560-11/4, for a period of six months starting February 1, 1995." *See* Ex. 1,

Settlement Agreement [appears as exhibit 9-1 in ROI 00-19] ¶ 1; Compl. ¶ 22; Ex. 23, ¶ 4.

During the period of that detail, Plaintiff would "have the duties described in PDM-40-95, and

her salary [would] be paid by OIG." *See* Ex. 1, Settlement Agreement [appears as exhibit 9-1 in

ROI 00-19] ¶ 1.

     6. The agreement further provided that "[i]f at the end of [her] six months [as a detailee

at the Office of the Comptroller] Ms. Miller achieves a rating of at least fully successful, she will

be retained at [the Office of the Comptroller] in the PDM-40-95 or comparable position." *See*

Ex. 1, Settlement Agreement [appears as exhibit 9-1 in ROI 00-19] ¶ 3. On the other hand, "[i]f

at the end of six months Ms. Miller's performance [was] not rated at least fully successful," one

of two things would happen: either: "a) the Office of Personnel [would] attempt to place Ms.

Miller in an appropriate position in a non-OIG placement unit with three months probation[,]" or,

"b) if no such non-OIG placement is available, OIG [would] retain Ms. Miller for a three-month

probationary period. . . . ." *See* Ex. 1, Settlement Agreement [appears as exhibit 9-1 in ROI 00-

19] ¶¶ 3, 5; Compl. ¶ 23.

     7. In the event that Plaintiff was returned to OIG after the detail, the agreement provided

that OIG would evaluate her performance twice during the ensuing three month probationary

period, once after the first six weeks and then again at the end of a three-month period.  <u>See</u> Ex.

1, Settlement Agreement [appears as exhibit 9-1 in ROI 00-19] ¶ 5.  If she "earn[ed] the rating of

at least 'fully successful' after three months at OIG, she [would] be retained at OIG."  <u>Id</u>. ¶ 6.  If

however Plaintiff "[did] not earn a rating of at least fully successful at the end of the three-month

period, she [would] be transferred out of OIG to a temporary position, not to exceed one year,"

and she "agree[d] to resign from USIA not later than the end of that temporary position, during

which she [would] receive USIA's outplacement assistance."   <u>Id</u>. ¶ 6; Compl. ¶ 23; Ex. 23, ¶ 4.

8.  The agreement was intended to resolve all of Plaintiff's pending discrimination and

retaliation claims, and to preclude the filing of any future ones concerning the same underlying

events and claims.  <u>See</u> Ex. 1, Settlement Agreement at ¶ 9, ¶ 10 (noting that "[t]his [a]greement

is entered into voluntarily by the Agency and Ms. Miller to avoid potential litigation which could

be costly and time-consuming for both sides.")  The agreement explained that, "[i]f for any

reason not attributable to Ms. Miller's conduct the terms of this [a]greement are not carried out,

provisions found at 29 C.F.R. [Part] 1614 shall apply, and Ms. Miller shall retain other rights she

may have, either statutory or at common law, for breach of [a]greement."  <u>See</u> Ex. 1, Settlement

Agreement [appears as exhibit 9-1 in ROI 00-19] ¶ 13.

**III.    The Implementation of the January 1995 Settlement Agreement and Plaintiff's
          Failure to Perform at the Minimum Level Required for her to Retain Her Position**

**A.    Plaintiff's Absence Without Leave ("AWOL")**

9.  On Saturday, August 26, 1995, Plaintiff left a note for Eva Diekmann, the Chief of the

OC's Budget Operations Division, in which she claimed that she had sustained an injury on July

10, 1995, claimed that she had "since been experiencing complications with that injury," and requested the use of "compensatory time" with a "continuation of pay for an indefinite period beginning on August 21, 1995."  See Ex. 40 (exhibit 25 to ROI for OCR 96-15); see also Compl. ¶ 27.  Shortly thereafter, on or about August 31,1995, Plaintiff was advised that she needed to submit documentation to support her request and that until she did so she would not receive permission to go on leave with a continuation of pay.  See id. (handwritten response dated August 31, 1995).  Between September 5, 1994 and November 24, 1995, Plaintiff failed to report to work at the OC.  See Compl. ¶ 27.  Because Plaintiff failed to submit medical documentation that she had sustained an injury on the job and that this injury required her to not come into the office for this protracted period, Plaintiff was placed on AWOL status during this period.  See, e.g., Ex. 41, September 7, 1995 memorandum (appears as Exhibit 27 to ROI for OCR-96-15); see also Compl. ¶¶ 30, 32; Ex. 18, Apr. 29, 2004 AJ Decision at 7; Ex. 42, transcript of EEOC hearing at 254, 256-57 (testimony of Jenny Mallios, a Personnel Management Specialist at the OC, that Plaintiff "fail[ed] to submit documentation supporting her absence" and that, based on Plaintiff's submissions, she had "no way of assessing . . . whether or not she was injured at work'" and that Plaintiff failed to demonstrate "a connection to the accident and a diagnosis and some sort of indication that the doctor believes that this was related to work, and why its related to work.").  Plaintiff was advised of this policy on at least two occasions: in August 1995 and on September 6, 1995.  See, e.g.,  See Ex. 40 (exhibit 25 to ROI for OCR 96-15); Ex. 41, September 7, 1995 memorandum (appears as Exhibit 27 to ROI for OCR-96-15); Compl. ¶¶ 30, 32.

**B.    Plaintiff's Performance Evaluations**

10.  Plaintiff did not receive a fully successful rating as required by the January 1995 settlement agreement in any of the offices she was assigned.  See, e.g., Ex. 1; Compl. ¶¶ 28-29, 46-53 (counts II and III); Ex. 18, AJ's Apr. 29, 2004 decision at 2, 6-7; Ex. 43 (ROI 96-15, Exh 10, Affidavit of Darwin Roberts) at 2, Ex. 44 (ROI 96-15 Exh. 50, Performance Appraisal).

11.  Plaintiff received a "minimally successful" rating for the period May 1, 1994 to January 24, 1995.  See Comp. ¶¶ 28, 47; Ex. 43 (ROI 96-15, Exh 10, Affidavit of Darwin Roberts) at 2, Ex. 44 (ROI 96-15 Exh. 50, Performance Appraisal); Ex. 18, AJ's Apr. 29, 2004 decision at 2, 10; Ex. 19.

12.  Her rating official during the period from May 1, 1994 to January 24, 1995 was Darwin Roberts of USIA's OIG.  See Comp. ¶ 47; Ex. 43 (ROI 96-15, Exh 10, Affidavit of Darwin Roberts) at 2.  Mr. Roberts sought to meet with Plaintiff to discuss her mid-term review on December 21, 1994.  See Ex. 43 (ROI 96-15, Exh 10, Affidavit of Darwin Roberts) at 3.  Plaintiff herself admitted that she failed to appear for that scheduled meeting and failed to schedule another date for that meeting.  See id. at 3; see also Ex. 42, transcript of December 9, 2003 EEOC hearing at 119-20 (testimony of Plaintiff to this same effect); id. at 181-82 (testimony of Darwin Roberts to this same effect).  Mr. Roberts met with the Plaintiff and gave her feedback on her performance during the rating period.  See Ex. 42, transcript of December 9, 2003 EEOC hearing at 181 (testimony of Darwin Roberts); Ex. 43 (ROI 96-15, Exh 10, Affidavit of Darwin Roberts) at 3.  Plaintiff also refused Mr. Roberts' offer to meet with him to discuss the completed interim rating.  See, e.g., Ex. 45, Affidavit of Plaintiff (ROI 96-15, Exh. 7) at 5; Ex.

6

42, transcript of December 9, 2003 EEOC hearing at 122 (Plaintiff's own testimony confirming that she "never took Roberts up on his offer to meet with him to discuss the appraisal").

12.  Plaintiff received a "minimally successful" rating for the period February 1, 1995 to July 31, 1995.  See Compl. ¶¶ 29, 51; Ex. 18; Ex. 19.

13.  Carol Keith of USIA's Office of the Comptroller was Plaintiff's rating official during the period from February 1, 1995 to July 31, 1995.  See Comp. ¶ 51; Ex. 46, (ROI 96-15, Exh 8, Affidavit of Carol Keith) at  2.  Ms. Keith offered to speak with Plaintiff about her rating, but Plaintiff declined the offer.  See, e.g.,  Ex. 42, transcript of December 9, 2003 EEOC hearing at 127-29 (Plaintiff's testimony acknowledging that Carol Keith told her, in connection with her February 1, 1995 to July 31, 1995 performance evaluation, "Rose Mary, if you ever want to discuss anything with me, you can" but that Plaintiff never did so); Id. at 221-22 (testimony of Carol Keith that "I gave the rating to Rose Mary and told her here was her rating, that she could look over it, if she needed to discuss it–if there were some things that she didn't agree with, that she could bring them to me and we could then discuss them" and that Plaintiff never took her up on this offer to discuss her rating); Ex. 46 (ROI 96-15, Exh 8, Affidavit of Carol Keith) at 4 (indicating that "I most definitely remember that when I gave her the evaluation I offered to discuss the rating with her," but "[s]he never said anything to me," that she did not do any other work for the rest of the day, left work at the end of the day, called in sick the day after she received her evaluation, and never returned to complete her six month detail with the Office of the Comptroller).

14.  Ms. Keith discussed Plaintiff's performance with her during the rating period and

7

gave her oral and written feedback on her work.    See, e.g., Ex. 42, transcript of December 9,

2003 EEOC hearing at 214-17 (testimony of Ms. Keith that during the period of Plaintiff's detail,

she gave Plaintiff "feedback" on her progress, orally and in writing, that included markups of her

work product and discussions about what was wrong with those documents), Ex 47 (ROI 96-15,

Exh 22); Ex. 48 (ROI 96-15, Exh. 23) (two examples of written feedback which Ms. Keith

provided for Plaintiff); Ex. 46, (ROI 96-15, Exh 8, Affidavit of Carol Keith) at 2 (indicating that

"[o]n many occasions when [Plaintiff] was given work to do the work would sit for three (3) or

four (4) days," that "I would follow up with [her] . . . and I found out that she would have

questions about the assignment but she had not taken the initiative to get the questions answered

or to get the job done," that "I had to repeatedly explain the daily operation of the office and the

procedures that were required to complete the tasks given to her"); id. at 4.

15.    The manual provisions at MOA Part V-A contained the procedures to be followed by

supervisors in rating employees.   See Ex. 49 (copy of MOA, Part V-A, found in  ROI 96-15, Exh.

53).  Id.  In relevant part, it provided that rating officers were responsible for "discussing

performance with the Rated Employee on a periodic basis (at least one mid-year progress review

is required) throughout the appraisal period"  Id. at 11.

16.    There was no USIA requirement that the reviewing official counsel Plaintiff

regarding her rating.  See Ex. 42, transcript of December 9, 2003 EEOC hearing at 120-21

(Plaintiff's testimony that the reviewing official did "[n]ot necessarily" have such an obligation).

USIA regulations did not mention a midway performance discussion requirement for interim

ratings.  See Ex. 42, transcript of December 9, 2003 EEOC hearing at 287-88 (testimony of Jenny

Mallios, who was a personnel management specialist at the USIA between 1995 and the date

USIA merged into the State Department, that the regulations do not require a performance discussion midway through the rating period.)

17.  Defendant gave Plaintiff minimally successful ratings during the periods from May 1, 1994 to January 24, 1995 and from February 1, 1995 to July 31, 1995 because of the inadequate quality of her work and her repeated failure to comply with deadlines, as was made clear through sworn testimony and numerous affidavits offered by the agency during the EEOC proceedings. See, e.g., Ex. 42, transcript of December 9, 2003 EEOC hearing at 179 (testimony of Darwin Roberts, with regard to the May 1, 1994-January 24, 1995 rating, that "this was pretty much the bottom of the scale as far as her performance since I had arrived in the office in November of '91"); id. at 175, 180-81 (testimony by Roberts, citing specific examples of inadequacies in Plaintiff's work product during the May 1, 1994-January 24, 1995 period and how it caused problems and crises in the office during that rating period), 198 (testimony by Leopratti that her response time during the May 1, 1994-January 24, 1995 period was just slow" and that it "wasn't accurate, satisfactory"); id. at 220-21 (testimony of Carol Keith that during the February 1, 1995-July 31, 1995 period, Plaintiff did not meet "the fully successful standard in term of factors like quality, quantity, timeliness, and extent of supervision required" and that despite supervision "on a daily basis" and regular feedback, Plaintiff did not "improve to the level you would expect for a GS-11"); Ex. 46, Declaration of Carole Keith; Ex. 50, Declaration of Alice Adams, Ex. 51, Declaration of Elaine John; Ex. 52, Declaration of Dolores Bulles [respectively Ex. 8, 17-19 to ROI 96-15].

C.     **The Denial of Plaintiff's Within Grade Increase, the Conversion of Her Position into a Temporary One, and Plaintiff's Termination**

18.   Pursuant to the Settlement Agreement, USIA issued a Notification of Personnel Action (SF-50) providing that Plaintiff's appointment was being converted to a temporary appointment, not to exceed ("NTE") December 9, 1996.  See Compl. ¶ 34; Ex. 54 [this doc appears in 2000 ROI, Exh. 21.]

19.   In an August 31, 1995 letter, the USIA's office of personnel formally advised Plaintiff that as she had failed to achieve an overall appraisal rating of fully successful, her detail at the OC had ended, and she was to return to the OIG.  See Ex. 55, August 31, 1995 letter (appears as exhibit 9-2 to ROI 00-19).  In that letter, the USIA offered assistance to Plaintiff in finding another position outside of OIG.  Id.

20   On November 9, 1995, Plaintiff was notified that she would be denied a within-grade increase because her performance had been at the minimally successful level in each of her last two ratings.  See Ex. 56; Compl. ¶ 31; Ex. 18, AJ's Apr. 29, 2004 decision at 2; 13; Ex. 42 transcript of EEOC hearing at 99-100 (testimony of Plaintiff).  Plaintiff requested reconsideration of that decision and the USIA denied her request for reconsideration on April 2, 1996.  See Ex. 56 [ROI 00-19, Exh. 9-4]

21.   USIA's Manual of Operations and Administration ("the Manual") contains provisions governing the grant or denial of within-grade increases ("WGIs").  See Ex. 57 [this appears in ROI 00-19, Exh 24].  The Manual provides that, to be eligible for a WGI, an employee's performance must be at least "Fully Successful."  Id. at § 235.4a.  It sets forth the procedures to be followed by a supervisor when an employee's performance is not at an

acceptable level.  "  Id. at § 235.8(d).  It requires the supervisor to give the employee a "Notice of

Negative Within-Grade Determination" that sets forth the reasons for the determination and

informs the employee of the procedure for seeking reconsideration.  Id.  The Manual does not

require that the Notice be issued thirty days in advance of the decision.  Id.

22.   After being assigned to several offices within the USIA, Plaintiff was terminated

from employment with the agency in December 1996.  See, e.g., Ex. 58; Ex. 19 (EEOC's Office

of Federal Operations ("OFO")'s April 11, 2006 decision in Appeal No. 01A44926) at *1;

Compl. at 2 (introduction).  On December 6, 1996, USIA issued a Notification of Personnel

Action (SF-50) providing that Plaintiff's temporary appointment would expire, effective

December 9, 1996.  See Ex. 58 [this doc appears in 2000 ROI, Exh. 22.]

IV.     **Plaintiff's Administrative Appeal Concerning Her Allegation that the USIA
        Breached the January 1995 Settlement Agreement**

23.   Plaintiff filed administrative complaints in various fora subsequent to the January

1995 agreement, both before and after her termination in 1996.  See, e.g., Ex. 23 (Declaration of

Jacqueline Canton, summarizing some of her relevant appeals); Ex. 1-22 (documents related to

some of Plaintiff's EEOC appeals); Ex. 24-39 (documents related to her whistleblower appeals).

24.   Plaintiff sent the USIA a letter dated October 10, 1995 in which she alleged that

USIA had breached the January 1995 Settlement Agreement.  See Ex. 2; Ex. 23 at ¶ 5.  The

USIA responded in a letter dated December 11, 1995 that addressed Plaintiff's breach allegations

and advised her that the USIA had concluded that it has carried out all of the terms of the

Settlement Agreement.  See Ex. 3; Ex. 23 at ¶ 5.  The letter also told Plaintiff that she could

appeal to the Equal Employment Opportunity Commission ("EEOC") within 30 days of her

11

receipt of this determination.  See Ex. 3; Ex. 23 at ¶ 5.

25.  In a letter dated February 26, 1996, the EEOC informed USIA that it had received an

appeal by Ms. Dews-Miller in Agency Nos. OCR086349 and OCR0863491, EEOC Docket No.

01962642, alleging a breach of the 1995 settlement agreement.  See Ex. 4; Ex. 23 at ¶ 6.  On

September 25, 1997, the EEOC, issued a decision with respect to OCR086349 and

OCR0863491, EEOC Docket No. 0962642.  See Ex. 5; Ex. 23 at ¶ 6.  In that decision, the EEOC

noted that the issue on appeal is whether the agency breached the January 31, 1995 settlement

agreement and dismissed the appeal, finding that it was untimely.  See Ex. 5; Ex. 23 at ¶ 6.

## V.    USIA Complaint No. OCR-96-15 (later redesignated Department of State Complaint No. 00-19)

26.  Plaintiff also brought a claim against USIA, originally captioned  USIA Complaint

No. OCR-96-15 and later redesignated Department of State Complaint No. 00-19.  See Ex. 6; Ex.

23 at ¶ 7.  All of Plaintiff's outstanding EEO claims were eventually consolidated for joint

processing in Complaint 00-19.  See Ex. 16; Ex. 23 (Declaration of Jacqueline Canton) at ¶ 15;

id. generally. That Complaint gave rise to two hearings before EEOC Administrative Judges.

See Ex. 23 at ¶¶ 7-16; Ex. 6-17.

27.  On November 26, 2001, the USIA notified Plaintiff that it had completed its

investigation and advised her of her procedural rights, including the right to request a hearing

before the EEOC.  See Ex. 17; Ex. 23, ¶¶ 16.

28.  After a hearing, an Administrative Judge ("AJ") of the EEOC issued a decision on

April 29, 2004.  See Ex. 18, Decision of Administrative Law Judge, April 29, 2004, EEOC Nos.

100-A2-7521X and 100-A2-7576X ("AJ Decision"), aff'd by Office of Federal Operations, April

11, 2006, *reh. denied*, July 13, 2006; Ex. 23, ¶ 16. The Administrative Judge stated that these

were the issues in the case:

> Whether Complainant was discriminated against based on reprisal for prior
> EEO activity when she was subjected to:
>
> 1. Continued and continuous harassment by an employee in the Office of Human
> Resources and others, who participated in creating a hostile work environment in
> personnel actions, benefits and entitlements for her after she filed prior EEO
> complaints;
>
> 2. Invasion of Complainant's personal medical records obtained from OWCP and
> then communicated to others in USIA who had no right to their contents;
>
> 3. Withholding essential records from OWCP from November 1995 to January
> 1997, which caused an unwarranted delay processing her claims;
>
> 4. An employee's illegal and unethical discussion of her medical records with
> other unqualified persons in USIA;
>
> 5. Non-accommodation under the Rehabilitation Act, which requires federal
> agencies to develop and implement plans for hiring, placement, promotion and
> retention of persons with disabilities;
>
> 6. From September 5, 1994 through November 24, 1995, Complainant was
> placed on AWOL for a work injury. She reported the work injury to her
> immediate supervisors, the rating and reviewing officials, pursuant to the Manual
> of Operations and Administration (MOA), P 5-A, section 506.3 (c)(1). However,
> the management official who placed her on AWOL, was not her supervisor at the
> time of the work injury;
>
> 7. When she alleged that for the May 1, 1994 to January 24, 1995 performance
> appraisal report she received a minimally successful rating. The rating and
> reviewing officials failed to discuss the minimally successful rating or to explain
> her deficiencies to her before issuing the rating pursuant to the MOA, Part 5-A,
> Section 453.2(c)(1), (2) and (3);
>
> 8. For the February 1, 1995 to July 31, 1995 performance appraisal report she
> received a minimally successful performance rating. The rating and reviewing
> officials failed to discuss the minimally successful rating or to explain her
> deficiencies to her before issuing the rating pursuant to MOA, Part 5-A, Section
> 453.2(c)(1), (2) and (3);
>
> 9. On November 9, 1995, Complainant was denied a within-grade increase. The
> rating and reviewing officials failed to discuss the deficiencies in performance that
> resulted in denial of the within-grade increase pursuant to MOA, Part 5-A, Section
> 453.2(c)(1), (2) and (3).

<u>See</u> Ex. 18 at 1-2; Ex. 23, ¶ 16.

29.  In considering Issue 1, the Administrative Judge concluded that these claims are "not properly raised as a harassment claim." He concluded that each incident complained of "constituted a discrete adverse action and stated that:

> The adverse actions at issue consist of the following:  (1) termination from service in December 1996; (2) denial of the with-in grade increase (WGI) in the fall of 1995; (3) placement on AWOL from September 5, 1995 through November 24, 1995; and (4) denial of end-of-service payments in December 1996.

<u>See</u> Ex. 18 at 5; Ex. 23, ¶ 17.

30.  The Administrative Judge concluded that the Plaintiff "failed to establish by a preponderance of evidence that the Agency discriminated against her" and found for the Department on all counts.  <u>See</u> Ex. 18 at 14-15; Ex. 23 at ¶¶ 16-17.

31.  On April 11, 2006, the EEOC's Office of Federal Operations ("OFO") affirmed the AJ's decision.  <u>See</u> Ex. 23 at ¶ 18; Ex. 19.  On July 13, 2006, OFO denied Plaintiff's motion for reconsideration.  <u>See</u> Ex. 23 at ¶ 18; Ex. 20.  The July 13, 2006 decision advised Plaintiff that "[t]he decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision."  <u>See</u> Ex. 20 at 2.  It further explained that "[y]ou have the right to file a civil action in an appropriate District Court <u>within ninety (90) days</u> from the date you receive this decision."  <u>Id</u>. at 2 (emphasis in original.)

**VI.    Plaintiff's Administrative Appeals Concerning Her Whistleblowing Allegations Before the Office of Special Counsel and the Merit Systems Protection Board**

    **A.    Office of Special Counsel File No. MA-96-0449**

32.    On October 31, 1996, the United States Office of Special Counsel ("OSC") wrote to Plaintiff regarding whistleblowing allegations, OSC File No. MA-96-0449. <u>See</u> Ex. 24. The letter noted that Plaintiff had identified her whistleblowing activity as a report to USIA's Inspector General that employees in that office had misused their American Express Cards. <u>Id</u>. It stated that Plaintiff had alleged that, as a result of her whistleblowing, she had been denied a within-grade increase ("WGI"); had been placed in absence without leave ("AWOL") status and had undergone changes in her duties and responsibilities. <u>Id</u>. OSC stated that it had found no statements suggesting animus towards Plaintiff by the responsible officials. <u>Id</u>. OSC concluded that the officials responsible for the actions about which Plaintiff complained were not the subject of Plaintiff's disclosure and suffered no adverse impact. <u>Id</u>. OSC was unable to establish any connection between Plaintiff's protected activity and management's actions. <u>Id</u>.

33.    On November 20, 1996, OSC wrote to Plaintiff again, stating that is was closing her file for OSC File No. MA-96-0449 and informing her of her right to seek corrective action before the Merit Systems Protection Board ("MSPB"). <u>See</u> Ex. 25. OSC denied Plaintiff's request for reconsideration on December 12, 1996. <u>See</u> Ex. 26. An Individual Right of Action ("IRA") was aubsequently filed with the MSPB on Plaintiff's behalf concerning OSC File No. MA-96-0449. <u>See</u> Ex. 27. On May 2, 1997, the MSPB dismissed Plaintiff's appeal as untimely filed. <u>See</u> Ex. 28. The May 2, 1997 decision became final on November 14, 1997, when the MSPB denied Plaintiff's petition for review of the decision. <u>See</u> Ex. 29-30.

15

**B.**    **OSC File No. 97-0571**

34.  In letters dated January 14, 1997 and August 25, 1997, OSC acknowledged receipt of a complaint designated OSC File No. MA-97-0571.  See Ex. 31; Ex. 32.  In its August 25, 1997 letter, OSC noted Plaintiff's contention that USIA's decision to terminate her employment on December 9, 1996, constituted reprisal based on whistleblowing.  See Ex. 32.  The letter referred to disclosures and allegations contained in OSC File No. MA-96-0449.  Id. at 2.  OSC stated that it had found no statements suggesting animus towards Plaintiff by the responsible officials.  Id. at 2.  OSC concluded that the officials responsible for Plaintiff's termination were not the subject of Plaintiff's disclosure and suffered no adverse impact.  Id. at 2.  OSC was unable to establish any connection between Plaintiff's protected activity and management's actions.  Id. at 2.

35.  On September 23 1997, OSC informed Plaintiff of her right to seek corrective action from the MSPB.  See Ex. 33.  An IRA was aubsequently filed with the MSPB on Plaintiff's behalf concerning OSC File No. MA-96-0449.  See Ex. 34.  The USIA submitted a response on December 22, 1997.  See Ex. 35.  On March 3, 1998, the MSPB issued a decision in which it dismissed Plaintiff's appeal.  See Ex. 36.  On April 6, 1998, a petition for review was filed with the MSPB on Plaintiff's behalf.  See Ex. 37.  The USIA filed a response to this petition.  See Ex. 38.  On September 4, 1998, the MSPB denied the petition for review of the March 1998 decision. See Ex. 39.

Respectfully submitted,


__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney



__/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)

17

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of August, 2007 that the foregoing Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment, Defendant's Memorandum in Support of its Motion to Dismiss, or in the Alternative for Summary Judgment, and Defendant's Statement of Material Facts Not in Dispute were served on *pro se* Plaintiff, postage prepaid, addressed as follows:

> ROSE M. DEWS-MILLER
> 8507 Woodyard Road
> Clinton, MD 20735

___/s/_____
JONATHAN C. BRUMER, D.C. BAR # 463328
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E4815
Washington, D.C. 20530
(202) 514-7431
(202) 514-8780 (facsimile)