# EXHIBIT   34

*John D. Pratt*
*6713 Harwood Place*
*Springfield, VA  22152-2419*

November 21, 1997

U.S. Merit Systems Protection Board
Washington Regional Office
5203 Leesburg Pike, Suite 1109
Falls Church, VA  22041-3473

Subject:  Individual Right of Action

Reference:  O.S.C. File No. MA-97-0571

     This I.R.A. is filed on behalf of Rose Mary Dews-Miller, former employee of

the United States Information Agency, (USIA) under the provisions of 5 U.S.C. Part

II, Section 1221.  Ms. Dews-Miller asked Senator Barbara Mikulski, Maryland, for

assistance in charging certain U.S.I.A. officials with violating  5 U.S.C., Part II,

Section 2302(b)(8).  (Attachment 1).  Senator Mikulski's  letter was received at the

Office of Special Counsel, (O.S.C.) on January 14, 1997.  O.S.C. acknowledged its

receipt and assigned O.S.C. File No. MA-97-0571 to the complaint.  (Attachment 2)

     On April 22, 1997, O.S.C. Complaints Examiner, J. Sandra Thomas, notified

complainant and me, hereinafter, us, we or our, she had been assigned this case.

Ms. Thomas stated this was the "within ninety days" status report on File MA-97-

0571.  (Attachment 3)  This "form letter" suggested "I may be contacting you in the

near future to discuss your complaint with you in detail."  As expected, the

operative word <u>MAY</u>, was dominant here, as we were never contacted by Ms.

Thomas.

On June 18, 1997, we received a second "form letter" from Ms. Thomas advising us this matter is still under active consideration. (Attachment 4)

I noted with some amusement that the second paragraphs of both are identically worded through "complaint with you". In the April 22, 1997, letter the paragraph closed with "in detail" while the June 18, 1997, letter closes with "if I need additional information."

The third paragraphs of both letters were identical.

It must be noted here that as of June 18, 1997, Ms. Thomas had failed to contact the complainant or me. In our "trusting" way, we waited for questions from Ms. Thomas to which we could reply.

On July 10, 1997, Senator Mikulski provided complainant a copy of her contact letter to O.S.C. regarding the charges against certain U.S.I.A. officials. (Attachment 5)

On July 23, 1997, Louis A. Vega, informed Senator Mikulski that Ms. Dews-Miller's complaint was "currently under review by O.S.C." (Attachment 6)

On July 24, 1997, Senator Mikulski forwarded a copy of the July 23, 1997, O.S.C. letter to complainant. (Attachment 7)

On August 14, 1997, Complaints Examiner, J. Sandra Thomas sent me a third "form" letter. (Attachment 8) In this letter paragraphs two was identical to paragraph two of the June 18, 1997, letter.

Paragraph three was the same in all three letters.

I have noticed that most form letters, particularly those from Federal Agencies, indicate a lack of progress, an indifferent attitude toward the "customer",

a "stall" hoping the complainant will terminate the complaint, one way or another, or express the fervent hope the writer will get transferred/promoted and won't have to do anything more, assuming they did anything in the first place.

On August 25, 1997, J. Sandra Thomas wrote a "new" letter informing us "we O.S.C.?, have made a preliminary determination to close the investigation into this matter." (Attachment 9)

On page two of the August 25, 1997, letter Ms. Thomas refers to a sequence of events and a collection of information that was not collected as part of MA-97-0571 because Ms. Thomas made no effort to gather any information on this case.

Although, we had expected O.S.C. to conduct an investigation and gather facts, in accordance with the law, we were not too surprised when this did not happen.

My September 8, 1997, letter, (Attachment 10), charged Ms. Thomas, specifically, and O.S.C. generally, with failing to do their job, concluding with a request that we be provided the O.S.C. file number she had apparently been reading.

Needless to say, we have yet to be provided the case number so we do not know where Ms. Thomas got the information in page two.

I apologize for letting my frustration with Ms. Thomas and the Office of Special Counsel surface in my September 8, 1997, letter. However, I am tired of O.S.C. inaction leading to a continuation of the denial of protection to whistleblowers O.S.C. and M.S.P.B. are supposed to provide to government employees.

We fail to see how anyone who had read any GAO or MSPB survey's of federal employees can arrive at the conclusions voiced by Ms. Thomas.

On September 23, 1997, a new player, Pernell Caple, informed us the O.S.C. was closing File MA-97-0571, without identifying the "file" to which Ms. Thomas referred.  (Attachment 11)

In my September 26, 1997, letter (Attachment 12), I again asked for the "other" file number as well as what part Pernell Caple was going to play in this charade.

Expecting nothing from O.S.C., I was not surprised when both Pernell Caple and J. Sandra Thomas failed to provide such a simple thing as a reference case number.

Let us return to Ms. Thomas' letter of August 25, 1997, and look at her convoluted view of the original complaint filed with Senator Mikulski.

While it is true that Inspector General Marian C. Bennett was not one of the "offenders".  Complainant did report to I.G. Bennett that a number of the Office of Inspector General, (OIG) employees had been abusing the AMEX government credit cards issued for "official use only."

I.G. Bennett was "in-charge" and resented the reported violations.  Rather than punish ALL the violators while correcting the problem, she chose to attack the "whistleblowers", Rose Mary Dews-Miller and Brian Dowling.

I.G. Bennett also attacked and tried to discredit Mr. Brian Dowling, who was assigned to her office in January, 1995, just a few months after Dews-Miller had reported the "AMEX Problem" on September 16, 1994.

George Archibald, a Washington Times Reporter, described in a February 16, 1995, article Mr. Brian Dowling's situation in some detail, including the fact that I.G. Bennett had failed to address her in-house AMEX Card Problem along with other abuses he, Dowling, had found.  (Attachment 13)

I.G. Bennett tried to send Dowling overseas in retaliation for his complaints about her failure to properly address the AMEX Card Problem.

Dowling was a senior SES employee with over thirty years of service, yet I.G. Bennett attempted to punish him.  Therefore, why did Ms. Thomas say no connection existed between I.G. Bennett and what happened to complainant Dews-Miller?  Was Ms. Thomas so naive, she failed to recognize what Bennett was orchestrating?

Obviously, Ms. Thomas has <u>never</u> looked at the relationship between the parties to the January, 1995, settlement agreement she so casually references.  If she had, she would have seen:

- The Comptrollers' office had been responsible for monitoring AMEX card accounts before responsibility was transferred to individual offices, including the Office of Inspector General.

- The O.I.G. AMEX Card Problem existed before it was transferred to O.I.G. and assigned to Dews-Miller.

- Dews-Miller's position had to report the AMEX Card problem to I.G. Bennett, or she could have been reprimanded for <u>not</u> reporting.  The Comptroller was aware USIA employees, including OIG employees were misusing the AMEX Government Credit Cards, and decided to pass the

monitoring over to individual offices because his office had lost control and accountability.

- The Comptroller's office, specifically Tyrone Lumpkins, had been responsible for monitoring the program, however he had failed to report or take corrective action.

- There was an opportunity to further cover-up the overall Agency AMEX Card Problem by assigning Dews-Miller to the Office of Comptroller, and setting her up to "fail" to meet one of the terms of the settlement _ agreement.

- Dews-Miller had many years of financial work experience in U.S.I.A. and had previously worked for the Comptroller in a similar position.

- The constant cast of characters who were always involved in any personnel action involving Dews-Miller, regardless of where she worked.

- A further transfer to the Office of General Counsel, Les Jin after he told Dews-Miller's Maryland Congressional Representatives her Workers' Compensation claim for the July 10, 1995, on-the-job injury had been denied by Office of Workers' Compensation Program, (OWCP). This statement by General Counsel Jin was based upon disinformation furnished by Jenni Mallios to Carol Epstein, both of whom are charged parties in this complaint. Attachment 14, is a copy of a recent OWCP check issued to Dews-Miller clearly showing date of injury as 07/10/95.

- With the issuance of other checks to complainant or in her behalf and specific instructions from OWCP to U.S.I.A. to place Dews-Miller on Continuance of Pay, (COP), instead of AWOL, another reason for dismissal of the January, 1995, settlement agreement was forged.

- The statement in the settlement agreement where Dews-Miller would <u>not</u> ask for reimbursement for her legal expenses. What kind of attorney, supposedly representing his client's best interests, would leave such a statement in a settlement agreement, unless he was throwing away Dews-Miller in exchange for another of his clients?

Leaving Ms. Thomas' blindside, I call your attention to the many newspaper articles, GAO Reports, Government Accountability Project, (GAP), and even MSPB Annual and special reports such as "Whistleblowing in the Federal Governments An Update dated October 1993", (Attachment 15) prepared by MSPB.

These reports all describe, as retaliatory acts against whistleblowers, everything Dews-Miller has charged and proven, happened to her after she told I.G. Bennett about the AMEX Card Problem.

These same reports comment on the reluctance of employees to report waste, fraud and mismanagement because neither O.S.C. nor M.S.P.B. provide <u>ANY</u> protection to "whistleblowers."

I find it hard to believe Ms. Thomas and others in O.S.C. and M.S.P.B. are not aware of the grilling House and Senate Committee's have subjected their representatives during re-authorization hearings.

Hearings that <u>always</u> have a large number of "victims of the system" present to describe how they were left hanging when O.S.C. and M.S.P.B. failed to "see" obvious connections between whistleblowing actions and the pain and suffering visited on those who foolishly reported waste, fraud and mismanagement by Federal officials.

I have enclosed  the following items as examples of what is going on in the Federal workplace concerning the lack of protection for whistleblowers and the AMEX Card problem.

- MSPB News Clip, for July 1994, (Attachment 16)

- WASHINGTON POST article of 10-14-97, (Attachment 17)

- FEDERAL EMPLOYEES NEWS DIGEST, March 3, !997, (Attachment 18)

- First Page, GAP "A Whistleblower's Checklist", (Attachment 19)

- Internet Page, Re: Employee Retaliation, (Attachment 20)

- AFGE 1812 Announcement, March, 1988, (Attachment 21)

- Dews-Miller to Baldwin; OCR letter dated October 10, 1995, (Attachment 22)

- Cover and Executive Summary, USIA OIG Report 95-A-001/ARR-97-17 on AMEX Card Problem, (Attachment 23)

- GAO Report GAO/GGD-92-120FS, 4 pages, (Attachment 24)

- GAO Report GAO/T-GGD-93-19, 5 pages, (Attachment 25)

- GAO Report GAO/GGD-94-21, 9 pages, (Attachment 26)

- WASHINGTON TIMES article dated June 9, 1995, (Attachment 27)

- Undated WASHINGTON TIMES article RE: AMEX CARD, (Attachment 28)

- WASHINGTON TIMES article, "FBI Probes Card Cover-up", dated June 16, 1995, (Attachment 29)

- Dews-Miller Note to Bruce Cooper dated February 16, 1995, (Attachment 30)

- WASHINGTON TIMES article RE: Card Cover-up dated February 15, 1995, (Attachment 31)

I most sincerely hope you will take positive action to fully investigate Dews-Miller's charges to insure <u>ALL</u> aspects of her complaint are fully covered.

Complainant respectfully requests the Board to effect the following actions pending its decision in this complaint.

- Reinstatement as a Full Time Employee at U.S.I.A. retroactive to December 10, 1996.

- Reimbursement for all attorney/representative expenses.

- Restoration of all annual and sick leave related to July 10, 1995, work related injury.

May I remind you that throughout this whole process, to date, Dews-Miller has been unemployed and has incurred considerable financial obligations and legal/representational expenses, while those government officials she charged have continued to be paid while other federal employees have defended their illegal actions at no personal cost to them.

I must remember to bring this point to the various congressional committees BEFORE and DURING your next funding hearings.

I look forward to a prompt, and positive, reply to this appeal.

Sincerely,

John D. Pratt, Representative

Enclosures:  As stated



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

January 14, 1997

*Rec'd 1/18/97*

Ms. Rose M. Dews-Miller
8507 Woodyard Road
Clinton, MD 20735

Re:  OSC File No. MA-97-0571

Dear Ms. Dews-Miller:

This will acknowledge receipt of the above-referenced complaint which was referred to us by Senator Barbara A. Mikulski. In the near future, a member of our staff may contact you to discuss this matter if any additional information is needed to consider this case. Please provide the telephone number where you wish to be contacted, if you have not already done so. For overseas telephone numbers, please include country codes; we do not have access to Autovon.

If you wish to write to us again concerning this matter, please include the file number listed above. We can also be reached by telephone at 202-653-7188 or on our toll-free number at 1-800-872-9855. Your contact at the Office of Special Counsel is J. Sandra Thomas. Enclosed is OSC's policy statement concerning the disclosure of information, which includes a disclosure consent form. If you do not sign and return one of the three consent statement options on the consent form to OSC within 20 days of the date of this letter, it will be assumed that you agree to Consent Statement I.

If this complaint alleges a violation of the prohibited personnel practice described in 5 U.S.C. § 2302(b)(8), commonly called reprisal for whistleblowing a separate information sheet is included with this letter which includes answers to commonly asked questions and discusses the right to file a request for corrective action with the Merit Systems Protection Board. The Board's regulations concerning rights to file a corrective action case can be found at 5 C.F.R. Parts 1201-1205 and 1209.

Please bear in mind that each year OSC receives a large number of complaints concerning prohibited personnel practices. While we attempt to handle all cases as expeditiously as is possible, we generally process them in the order received.

Sincerely,

Debyn R. Brown
Docket Clerk

*11·21·97 MSPB*
*Attachment 2*



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

April 22, 1997

Ms. Rose Dews-Miller
c/o John D. Pratt, Representative
6713 Harwood Place
Springfield, VA 22152-2419

Re: OSC File No. MA-97-0571

Dear Ms. Miller:

In accordance with 5 U.S.C. §1214(a)(1)(C)(I) the Office of Special Counsel is required to advise you of the status of your complaint within 90 days after our initial notice to you that we had received your complaint.

This letter is to advise you that this matter has been assigned to me for review. The Office of Special Counsel receives a large number of complaints and it is our general practice to review such matters in the order in which they are received. If I have not already done so, I may be contacting you in the near future to discuss your complaint with you in detail.

If you have any questions concerning this matter please call me at (202) 653-7188 or on our toll-free number at 1-800-872-9855.

Sincerely,

J. Sandra Thomas
Complaints Examiner

11.21.97 MSPB
Attachment 3



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

*revd 6.19.97*

June 18, 1997

Ms. Rose Dews-Miller
c/o John D. Pratt, Representative
6713 Harwood Place
Springfield, VA 22152-2419

    Re:  <u>OSC File No. MA-97-0571</u>

Dear Ms. Miller:

    This is a 60 day status update, i.e., 60 days since the last status notice was sent to you concerning your complaint to this office. In accordance with 5 U.S.C. § 1214(a)(1)(C)(i) the Office of Special Counsel is required to advise you of the status of your complaint within 90 days after our initial notice to you that we had received your complaint. We are also required to update that notice every 60 days thereafter. 5 U.S.C. § 1214(a)(1)(C)(ii).

    This letter is to advise you that this matter is under active consideration in the Complaints Examining Unit and has been assigned to me for review. The Office of Special Counsel receives a large number of complaints and it is our general practice to review such matters in the order in which they are received. If I have not already done so, I may be contacting you in the near future to discuss your complaint with you if I need additional information.

    If you have any questions concerning this matter please call me at (202)653-7188 or toll free on 1-800-872-9855.

                 Sincerely,

                 J. Sandra Thomas
                 Complaints Examiner
                 Complaints Examining Unit

JST:jst

*A-21.97 MSPB*
*attachment 4*

BARBARA A. MIKULSKI
MARYLAND

COMMITTEES
APPROPRIATIONS
LABOR AND HUMAN RESOURCES

# United States Senate
WASHINGTON, DC 20510-2003

w PA

July 10, 1997

Ms. Rose M. Dews Miller
8507 Woodyard Road
Clinton, Maryland 20735

Dear Ms. Miller:

Thank you for contacting my office about the status of your case. I am happy to be of assistance to you.

In response to your concern, I have been in touch with the Office of Special Counsel. As soon as I have received and reviewed the agency's response, I will be back in touch with you.

In the meantime, if there are further developments in your case, please contact my assistant, Helene Braver, at the number indicated.

Sincerely,

Barbara A. Mikulski
United States Senator

BAM:hcb

11·21·97 MSPB

Attachment 5



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

July 23, 1997

The Honorable Barbara A. Mikulski
World Trade Center, Suite 253
401 E. Pratt Street
Baltimore, MD 21202-3099
  Attn: Helene Braver

          Re:    OSC File Number MA-97-0571

Dear Senator Mikulski:

        This is in response to your correspondence on behalf of Ms. Rose Dews-Miller who is seeking assistance from the U.S. Office of Special Counsel (OSC). As you know, a file has been created and the above referenced control number assigned to this case.

        The matter is currently under review by OSC. Please be assured that OSC is endeavoring to complete its analysis in an efficient and thorough manner. Because the matter is still under review by this agency, I am unable to provide any specific details of possible OSC action at this time. I will, however, notify your office when OSC evaluation of this case has been completed.

        Thank you for contacting the U.S. Office of Special Counsel. If I may be of further assistance, please contact me at (202) 653-9001.

                                        Sincerely,

                                        Louis A. Vega
                                        Acting Director, Congressional
                                          & Public Affairs

11.21.97
Attachment 6



BARBARA A. MIKULSKI
MARYLAND

COMMITTEES:

APPROPRIATIONS

LABOR AND HUMAN RESOURCES

# United States Senate
WASHINGTON, DC 20510-2003

IN REPLY PLEASE REFER
TO OFFICE INDICATED

WORLD TRADE CENTER, SUITE 253
40-5 PRATT STREET
BALTIMORE, MD 31202-3009
(410) 962-4510
VOICE/TDD (410) 962-4512

60 WEST STREET, SUITE 202
ANNAPOLIS, MD 21401-2448
(410) 263-1805
BALTIMORE (410) 269-1250

9435 BALTIMORE AVENUE, SUITE 208
COLLEGE PARK, MD 20740-3366
(301) 345-5517

82 WEST WASHINGTON STREET, SUITE 301
HAGERSTOWN, MD 21740-4804
(301) 797-2826

SUITE 1E, BUILDING B
1201 PEMBERTON DRIVE
SALISBURY, MD 21801-2403
(410) 546-7711

Rec'd 7/30/97
per Dw

July 24, 1997

Ms. Rose M. Dews Miller
8507 Woodyard Road
Clinton, Maryland 20735

Dear Ms. Miller:

I am enclosing a copy of an interim reply I received from the U.S. Office of Special Counsel which I contacted on your behalf. As you will note, this matter has not been resolved and it will take some additional time before I receive a final response.

I have asked my staff to monitor your case closely and I will get back to you as soon as I have any additional information from the agency.

In the meantime, if you have any questions or additional information please contact my staff assistant, Helene Braver.

Sincerely,

Barbara A. Mikulski
United States Senator

BAM:hcb

Enclosure

11.21.97
Attachment 7





**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

August 14, 1997

*revd 8.15.97*

Ms. Rose Dews-Miller
c/o John D. Pratt, Representative
6713 Harwood Place
Springfield, VA 22152-2419

     Re:  <u>OSC File No. MA-97-0571</u>

Dear Ms. Dews-Miller:

     This is a 60 day status update, i.e., 60 days since the last status notice was sent to you concerning your complaint to this office. In accordance with 5 U.S.C. § 1214(a)(1)(C)(i) the Office of Special Counsel is required to advise you of the status of your complaint within 90 days after our initial notice to you that we had received your complaint. We are also required to update that notice every 60 days thereafter. 5 U.S.C. § 1214(a)(1)(C)(ii).

     This letter is to advise you that this matter is under active consideration in the Complaints Examining Unit and has been assigned to me for review. The Office of Special Counsel receives a large number of complaints and it is our general practice to review such matters in the order in which they are received. If I have not already done so, I may be contacting you in the near future to discuss your complaint with you if I need additional information.

     If you have any questions concerning this matter please call me at (202)653-7188 or toll free on 1-800-872-9855.

                     Sincerely,

                     J. Sandra Thomas
                     J. Sandra Thomas
                     Complaints Examiner
                     Complaints Examining Unit

*11.21.97 MSPB*

*Attachment B*

JST:jst



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

**August 25, 1997**

Ms. Rose Dews-Miller
c/o John D. Pratt, Representative
6713 Harwood Place
Springfield, VA 22152-2419

     Re: <u>OSC File No. MA-97-0571</u>

Dear Ms. Dews-Miller:

This is in response to your request for assistance against officials of the U.S. Information Agency. You alleged that the agency's decision to terminate your employment on December 9, 1996, constituted reprisal because of whistleblowing. The Office of Special Counsel is authorized to investigate allegations of prohibited personnel practices and activities prohibited by civil service law, rule, or regulation. 5 U.S.C. §§ 1214(a)(1)(A), 1216(a) and 2302(b). Based on our evaluation of the facts and law applicable to your circumstances, as detailed in this status report, we have made a preliminary determination to close the investigation into this matter. Our factual and legal determinations are described below.

It is a prohibited personnel practice to take or fail to take, or to threaten to take or fail to take, a personnel action with respect to any employee because of any disclosure of information by an employee which the employee reasonably believes evidences a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8). You identified your whistleblowing activity as a September 1994 report to the agency's Inspector General that employees in the Office misused their American Express cards.

The Special Counsel presents allegations of prohibited personnel practices to the Merit Systems Protection Board (the Board) which has the authority to hear and adjudicate such claims. The Board has determined that the elements of proof necessary to establish a violation of (b)(8) are: (1) a protected disclosure of information was made; (2) the accused official(s) (e.g., the proposing or deciding official) had knowledge of the disclosure and of the identity of the employee making the disclosure; and (3) the protected disclosure was a contributing factor in the personnel action or threat of a personnel action. <u>Gergick v. General Services Administration</u>, Merit Systems Protection Board, 43 M.S.P.R. 651 (1990).

1/21/97 MSPB
Pg 1 of 2
~ + 9

U.S. Office of Special Counsel

Ms. Rose M. Dews-Miller
Page 2

With respect to the termination of your employment, we note that during
January 1995, you entered into a settlement agreement with the agency under which
you agreed to be converted to a temporary appointment not to exceed December 1996
to resolve certain issues between you and the agency. During December 1995, you
submitted a complaint to this Office in which you alleged that you were denied your
within-grade increase (WGI), placed in an absence without leave (AWOL) status, and
suffered a significant change in your duties and responsibilities because of the same
whistleblowing activity. By letter dated October 31, 1996, we advised you that while
your report would constitute a protected disclosure. we were unable to establish a
connection between your claimed whistleblowing activity and the actions you
complained about. Specifically, we advised you that the officials responsible for the
actions you complained about were not the subject of your disclosure and suffered no
adverse impact based on those disclosures. Moreover, we found no statements or
other evidence reflecting animus against you by the officials responsible for the
matters you complain about because of your protected activity. From the information
provided, it does not appear that the officials responsible for the decision to terminate
your temporary appointment were the subject of your disclosures or were adversely
affected by your disclosures. We also found no statements suggesting animus against
you for your disclosure by these officials. Therefore, we would be unable to establish
that the official's actions were other than a legitimate attempt to enforce the
requirements of the settlement agreement. Thus, we have no basis for further inquiry
into the matter you complain about as a possible violation of 5 U.S.C. § 2302(b)(8),
or any other prohibited activity.

While we understand your dismay with your employment situation, we have no
legal basis for further inquiry into this matter. You have 16 days from the date of
this letter to comment in writing on this report. We will consider your comments and
respond to them as soon as possible after receipt. If we do not receive any comments
by the end of the sixteen day period, we anticipate closing the file and will send you a
letter terminating the investigation and advising you of any additional rights you may
have.

Sincerely,

J. Sandra Thomas
Complaints Examiner
Complaints Examining Unit

11:21:97 MSPB
Attachment 9
Pg 2 of 2



*John D. Pratt*
*6713 Harwood Pla*
*Springfield, VA   221!*

P 287 682 795

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

Sent to
*OSC · J. Sandra Thomas*
Street & Number
*1730  M ST N.W. Suite 300*
Post Office, State, & Zip Code
*WASHINGTON D.C. 20036-*

| | |
|---|---|
| Postage | $ 0·32 |
| Certified Fee | 1.35 |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | 1.10 |
| Return Receipt Showing to Whom, Date, & Address of Delivery | |
| TOTAL Postage & Fees | $ 2.77 |
| Postmark or Date | |

September 8, 1997

U.S. Office of Special Counsel
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

**Attention:**     J Sandra Thomas,
                Complaints Examiner

**Reference:**     OSC File No MA-97-057!
                Rose M Dews-Miller, Complaint vs. USIA

Dear Ms. Thomas

    This letter responds to your letter of August 25, 1997, and is a protest of your conclusions as outlined on page 2.

    •     We find that you have failed to investigate the charges furnished OSC through the good offices of Senator Barbara A Mikulski on behalf of complainant, Rose Mary Dews-Miller

    •     We find that you have failed to contact the complainant or me to see if we had any relevant information not previously available.

    •     We find that your June 18, 1997, letter is a lie, in that you have never made any active effort to contact complainant or me and based on your August 25, 1997, letter you never intended to contact either of us on this matter.

    •     We find your entire involvement with this investigation has been a shameful abuse of position and authority as well as a total lack of honorable actions by your superiors.

    •     We find that your actions duplicate similar acts of commission and omission that brought forth justifiable criticism of O S C during each reauthorization hearing held since OSC and MSPB were created by the Civil Service Reform Act of 1978, as amended

11·21·97 MSPB
Attachment 10
Pg 1 of 2

OSC Thomas Letter
September 8, 1997
Page Two

Had you contacted us, as required by law and regulation, we would have provided copies of pertinent U.S.I.A. Audit Reports, State Department I.G. report extracts and an internal U.S.I.A. Announcement outlining previous AMEX card problems and efforts to correct them since complainant brought them to I.G. Bennett's attention in September 1994.

We would also have provided you correspondence from Office of Workers' Compensation that put a stamp of "Big Lie" on management's actions charging complainant with being AWOL.

In the early days of television, William Bandix starred in a show titled, "Life of Riley". Riley's favorite verbal escape was "Don't confuse my mind with facts, my head's made up."

Applying the old show to you and O.S.C., it reads the same. Rose Mary and I, both feel that not only are you wearing blinders, have cotton in your ears, but have your head in a bucket.

Now, are you ready to do your job, in O.S.C., according to the laws and regulations, or are you going to continue to be a "Riley"?

A prompt, logical, in accordance with the laws, decision, to really open your eyes, remove the bucket and cotton and "Investigate" this complaint, as you should have in the first place, would be appreciated.

You might have had the courtesy to mention the other complaint, you so handily rejected, by OSC File Number, to see if you got something right for a change.

I expect a "frothing-at-the-mouth" style letter from your Mr. Ruckauf, Senior Legal Advisor, rejecting this appeal, but we may be surprised; Ms Koch might even sign it.

Who knows?

Sincerely,

John D. Pratt
Representative

11.21.97 MSPB
Attachment 10
Pg 2 of 2



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 300
Washington, D.C. 20036-4505

September 23, 1997

Ms. Rose Dews-Miller
c/o John D. Pratt, Representative
6713 Harwood Place
Springfield, VA 22152-2419

Re:  OSC File No. MA-97-0571

Dear Ms. Dews-Miller:

We have received and reviewed the comments which you sent in response to our status report of August 25, 1997.  While we understand your dismay, your comments provided no additional evidence or a legal basis which would reverse our preliminary determination.  Accordingly, for the reasons stated in our status report of August 25, 1997, we are closing the file.

Because you alleged reprisal for whistleblowing, you may have a right to seek corrective action from the Merit Systems Protection Board under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221.  You may file a request for corrective action with the Board within 65 days after the date of this letter.  The Merit Systems Protection Board regulations concerning rights to file a corrective action case with the Board can be found at 5 C.F.R. Parts 1201-1206 and 1209.  Should you wish to discuss this matter, you may contact me on (202) 653-7188.

Sincerely,

Pernell Caple
Complaints Examiner
Complaints Examining Unit

11.21.97 MSPB

Attachment 11

John D. Pratt
6713 Harwood Place
Springfield, VA   22152-2419

September 26, 1997

U S Office of Special Counsel
1730 M Street N W , Suite 300
Washington, D C   20036-4505

**Attention:**   Pernell Caple
Complaints Examiner

**Reference:**   OSC File No MA-97-057 ;
Rose M  Dews-Miller, Complainant vs USPA

Dear Pernell Caple

Welcome to the Game of Ignored Questions, let us see you try to top your predecessors.

- What part have you played in this case?

- When did you become involved?

- What files have you reviewed related to this case?

- What case was J. Sandra Thomas referencing in her August 25, 1997 letter?

Now these are simple questions requiring only a modicum of courtesy and common sense.

Surely, you can and will, do better than J  Sandra Thomas, and provide answers to these simple questions.

Sincerely.

John D. Pratt
Representative

11/21/97 MSPB

ATTACHMENT 12

P 287 682 788

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

Sent to  OSC  Suite 300
Street & Number  1730  M St. N.W.
Post Office, State, & ZIP Code  WASHINGTON D.C. 20036-4505

Postage  $
Certified Fee
Special Delivery Fee
Restricted Delivery Fee
Return Receipt Showing to Whom & Date Delivered
Return Receipt Showing to Whom, Date, & Address of Delivery
TOTAL Postage & Fees  $

PS Form 3800, April 1995

● THURSDAY, FEBRUARY 16, 1995 / PAG

# Man who revealed USIA credit abuse seeks protection

## Official faces overseas assignment

By George Archibald
THE WASHINGTON TIMES

The U.S. Information Agency's deputy inspector general, who accused his boss of covering up her staff's misuse of government-issued American Express cards for personal use, has sought "whistleblower" protection from the federal Office of Special Counsel, USIA officials disclosed yesterday.

Michael G. Lawrence, spokesman for Special Counsel Kathleen Day Koch, said he would "not confirm or deny that we have an investigation" or whether Bernard C. Dowling, the IG office's No. 2 official, has been given protection against reprisals because of his accusations against USIA Inspector General Marian C. Bennett.

Mr. Dowling was removed six weeks ago as USIA's worldwide security director — a position he had held for 12 years — because he had been in the same job for too long and needed "new challenges," Henry Howard Jr., USIA's associate director for management, said yesterday.

Mr. Howard denied reports from several of Mr. Dowling's longtime USIA colleagues that he was transferred after insisting on a tougher stance to deny security clearances to USIA employees with histories of drug involvement, not filing federal income tax returns and other wrongdoing.

Mr. Dowling's transfer to USIA's inspector general's office was decided because of his "particular skills" as a 33-year veteran federal investigator, Mr. Howard said. "From a management viewpoint, it was something I thought was important to do."

However, before agreeing to a new deputy IG position for Mr. Dowling, Ms. Bennett tried instead to send him to Prague to oversee USIA's consolidation of Radio Liberty with Voice of America, officials said.

Mr. Howard said he was "not privy to the discussions with Ms. Bennett." He said there were "various discussions over a period of time" about a new assignment for Mr. Dowling after he decided to remove him as security director.

Yesterday, agency and congressional sources said the Senate Foreign Relations Committee intervened and insisted that USIA scrap the apparent effort to exile Mr. Dowling to Prague after Brian Connor, the USIA's existing IG in Prague, and Mr. Dowling himself objected to the foreign assignment on grounds he lacked the required broadcasting expertise.

In letters to Ms. Bennett Jan. 23 and Feb. 2, Mr. Dowling said he spent his first three weeks as deputy IG interviewing her staff

and was "deeply troubled" by an apparent coverup of in-house credit-card misuse and other abuses he discovered.

Mr. Dowling accused Ms. Bennett of failing to properly investigate or discipline her senior criminal investigator and other aides for charging thousands of dollars of personal expenditures on government American Express cards issued for official travel.

"The dollar amount of alleged credit card abuse approaches up to at least $8,000 in one instance," Mr. Dowling wrote.

Copies of Mr. Dowling's letters went to the Special Counsel and the Office of Management and Budget, which oversees the President's Council on Integrity and Efficiency (PCIE), said government officials familiar with the case.

The presidential council, which includes Ms. Bennett and other independent statutory IGs from each Cabinet-level federal agency, has an integrity committee headed by William J. Esposito, the FBI's deputy assistant director for criminal investigations.

The committee was formed to investigate complaints of wrongdoing in federal IG offices and, under a draft working procedure agreed to by the IGs, complaints against IGs and their senior staff must be referred to the PCIE.

It could not be determined whether Ms. Bennett complied with the requirement by seeking an investigation of her own staff's reported credit-card abuses, which "were revealed around September 1994 or earlier," according to Mr. Dowling's Jan. 23 letter.

At her Senate confirmation hearing Sept. 29, 1993, Ms. Bennett promised "immediate information if we come across problems that require immediate attention." She testified before the Senate Foreign Relations Committee that "the primary function of the office of inspector general is to prevent fraud, waste and abuse among the operations and programs of the agency."

Ms. Bennett has declined to comment on Mr. Dowling's allegations or respond to questions since Tuesday. Mr. Dowling, who is traveling, could not be reached.

Yesterday, after The Washington Times' disclosure of Mr. Dowling's accusations of wrongdoing in the IG's office, USIA spokeswoman Kimberly Marteau said Director Joseph D. Duffey "has every confidence" in Ms. Bennett.

Mr. Duffey is aware of "issues raised by Mr. Dowling but will have no further comment because "there is an ongoing investigation" by Ms. Marteau said.

● Sophia Digel contributed report.

11·21·97 MSPB

Attachment 13

PAGE 02

11.21.97 MSPB
ATTACHMENT 14



**United States Treasury** 15-51/000    P 026,602,268

Check No.

10 31 97  10  PHILADELPHIA, PA  -  2038 52431999

011250470961  M1  OWCP ACPS  1125103197  16150002

Pay to the order of

ROSE M DEWS MILLER
PO BOX 863
CLINTON MD  20735

$***9533*70

VOID AFTER ONE YEAR

COMPENSATION FROM 06/08/97 TO 09/29 

⑈20383⑈  ⑆000000518⑆  524319994⑈ 011097





U.S. Merit Systems Protection Boar

11.21.97 MSPB
Attachment 15
page 1 of 5

# Executive Summary

*As demands for service grow while resources shrink, Federal agencies must examine every aspect of their operations in order to achieve new heights of efficiency and effectiveness. Agency management cannot accomplish this goal alone—every employee also plays or should play a role. In this regard, Federal employees have long been encouraged to "blow the whistle" on illegal or wasteful activities in the Government and offered protection against reprisal for doing so. The extent to which this is occurring is the focus of this report by the U.S. Merit Systems Protection Board (MSPB or The Board).*

*The data discussed in this report are based largely on responses to a recent MSPB survey received from over 13,000 employees. Where applicable, we have contrasted these findings with those from MSPB's 1983 study of whistleblowing in the Federal Government. We also examined the actions taken by Federal agencies to encourage greater employee involvement in this regard. The results show that some progress has been made toward the goal of encouraging employees to report illegal or wasteful activities. Unfortunately, the percentage of employees who claimed they had been the victims of reprisal because of their disclosures has also increased. The report concludes with recommendations for improvement.*

In order to encourage more Federal employee involvement in the identification and resolution of problems, statutory protections for Federal employees who "blow the whistle" on fraud, waste, and abuse were provided by the Civil Service Reform Act of 1978 (CSRA). That Act prohibits the taking of reprisal against any Federal employee who legitimately discloses illegal or wasteful activities and provides for legal sanctions against Federal officials found guilty of violating those prohibitions. These protections were expanded upon through further legislative action in the form of the Whistleblower Protection Act of 1989.

The CSRA also established the U.S. Merit Systems Protection Board and assigned to it some special responsibilities in this regard. Among those responsibilities was the requirement that the Board conduct periodic studies of the Federal civil service system and report to the President and Congress on whether the "public interest in a civil service free of prohibited personnel practices is being adequately protected."

In keeping with its mandate, the Board first examined employees' experiences in reporting illegal or wasteful activities in 1980 and again in 1983. Those studies uncovered some disturbing information. A large percentage of Federal employees were reluctant to report instances of illegal or wasteful activities they had observed. Further, among those who did report such activities, a significant percentage felt they experienced some form of reprisal as a result.

In the decade since the Board last studied this issue, much has happened. Not only have employees' statutory protections been expanded, but there has been an upsurge of emphasis on the value of employee involvement in identifying and resolving work-related problems, including

11.21.97 MSPB
Attachment 15
page 2 of 5 —

**Executive Summary**

problems involving fraud, waste, and abuse. Given these changes, the Board decided to update its 1983 study. To do this, in late 1992, we sent a questionnaire survey to a large Governmentwide cross-section of Federal employees and sent written interrogatories to agency personnel directors and Inspectors General.

# Findings

- **Slightly less that 1 out of every 5 Federal employees surveyed (18 percent) claimed they had personally observed or obtained direct evidence of one or more activities which they believed were illegal or wasteful.** In 1992, 18 percent of the survey respondents said they had seen or had obtained direct evidence of an illegal or wasteful activity, compared with 23 percent in 1983. Waste caused by either a badly managed program or unnecessary or deficient goods or services continued to be the types of activities most frequently observed.

- **In 1992, half of the employees who had observed a perceived illegal or wasteful activity said they had reported it, which is a significant increase compared to just 9 years ago.** Half of the employees surveyed in 1992 (50 percent) who had witnessed an illegal or wasteful activity also said they had reported that activity. This figure contrasts sharply with the 30 percent of employees in our 1983 survey who indicated they had reported such activities.

- **Although a belief that nothing would be done to correct reported fraud, waste, or abuse remained the predominant reason given for not reporting such activity, fear of reprisal was a reason given by least a third (33 percent) of those choosing not to report.** Fifty-nine percent of the 1992 respondents who had observed illegal or wasteful activities and had not reported them chose not to do so because they felt nothing would be done to correct the activities. This was also the predominant reason given for not reporting by our 1983 survey respondents.

The second most frequently cited reason for not reporting, both in 1992 and in 1983, concerned the risks taken for reporting.

- **Over a third (37 percent) of employees who had reported an illegal or wasteful activity in 1992 said that they had experienced or had been threatened with some sort of reprisal as a result.** This is significantly higher than the 24 percent of employees in the Board's 1983 survey who said they had experienced or had been threatened with reprisal after reporting an illegal or wasteful activity.

- **The most commonly experienced types of perceived reprisal included poor performance appraisal, shunning by coworkers or managers, and verbal harassment or intimidation.** Of the employees who said they had reported an illegal or wasteful activity and had experienced a reprisal action as a result, 47 percent said the reprisal took the form of a poor performance appraisal. Shunning by coworkers or managers was reported by 49 percent of these employees, while verbal harassment or intimidation was experienced by 47 percent of these employees.

- **The most common employee response to a reprisal or threat of reprisal was no response.** In response to a reprisal or the threat of a reprisal, the largest percentage of employees took no action (43 percent). The most frequently cited actions taken by employees who did respond were to complain to a higher level of agency management and to complain to some other office within the agency, such as the Personnel office or the Equal Employment Opportunity office. Among those who took action, however, fewer than 10 percent reported that their situations improved as a result of that action.

- **Agencies reported they are making efforts to encourage more employees to report illegal or wasteful activities.** Most of the agency personnel directors and Inspectors General responding to our interrogatories reported the existence of

11.21.97 MSPB
AttACh moNT 19
PAge 3 of 5

A Report by the U.S. Merit Systems Protection Board

agency initiatives or programs to educate and encourage employees to report fraud, waste, and abuse. Although there is some indication these efforts may be having a positive effect, employees still report little knowledge of their rights and responsibilities in this regard and little confidence in the protections offered.

## Conclusions

Unless employees are willing to bring problems in the workplace out into the open and are encouraged to work to resolve them, and managers become more receptive to the disclosure of such information, the Government cannot hope to achieve its goals of greater efficiency and effectiveness. Based on the findings from this study, it is encouraging to note that some improvement in this regard has occurred. Federal employees are more willing to report illegal or wasteful activities now than they were in 1983.

Unfortunately, the rise in the percentage of employees who said they had experienced reprisal or were threatened with reprisal suggests that the value to the organization of sharing information about wasteful or illegal activities has not yet been fully accepted by all employees and managers. To further encourage employees to share such information in a constructive manner, agencies must create non-threatening climates in their organizations in which such a practice is valued and rewarded (i.e., rewarded through positive encouragement, candid feedback, and problem resolution). Further, those who take reprisal action against employees making legitimate disclosures must be identified and punished. The following recommendations should help accomplish these goals:

## Recommendations

1. **Agencies should emphasize organizational change and improvement through efforts such as reengineering, employee involvement, and Total Quality Management.** Initiatives such as

these emphasize active employee participation in order to promote efficiency in the workplace. Through the use of these programs, employees and managers alike can learn to identify and resolve problems in a non-threatening manner. When all members of the organization value the disclosure of problems, there is less likelihood that those reporting the problems will be retaliated against.

2. **Agencies should examine their programs for selecting supervisors and managers to ensure that they are selecting a management team with whom employees will feel comfortable sharing information concerning illegal or wasteful activities.** Supervisors and managers need to be proficient in interpersonal and communication skills in order to be receptive to the concerns employees raise regarding illegal or wasteful activities. Unless selection programs incorporate the assessment of these skills, supervisors and managers may be ill-equipped to handle employee disclosures, and instead may try to discourage such disclosures by taking (or threatening) reprisal actions against employees making the disclosures.

3. **Agencies should ensure that employees understand the kinds of problems about which they should share information, how the information is handled, and what the safeguards are against reprisal.** Employees need to be told what they can realistically expect from sharing information about illegal or wasteful activities. By giving employees a complete understanding of the participation process, employees can become more comfortable reporting problems. Laws enacted to protect employees from reprisal will not encourage employees to share information unless employees know about them and agencies demonstrate commitment to the spirit as well as the letter of the law.

4. **Agencies should actively solicit employees' views and give employees feedback concerning those views.** The active solicitation of employees' views (whether through surveys

11.21.97 MSPB
Attachment 15 Page 4 of 5

**Executive Summary**

or other means) helps to demonstrate that agency management believes employees have something worthwhile to say and that the information employees provide can improve the organization. If employees' views are solicited on a regular basis and agency management demonstrates serious consideration of their views, employees should become more comfortable with (and less threatened by) the entire process of disclosing information about illegal or wasteful activities.

11.21.97 MSPB
attachment 15
page 5 of 5

MSPB NEWS CLIP
July 1994

## MSPB SURVEY OF FEDERAL EMPLOYEES REVEALS
## MIXED VIEWS ON THE WORKPLACE

A new report, Working for America: An Update, published on July
20, 1994 by the U.S. Merit Systems Protection Board (MSPB)
details some of the significant findings from a survey of 13,432
Federal employees regarding work-related issues. Discussed in
the report are employee opinions about the quality of their
coworkers, job satisfaction, pay, supervisors, and the whether or
not they feel treated fairly. Perceptions of discrimination and
views about other work-related issues are also explored.

Among some of the more significant findings are the following:

--  Employees and supervisors believe that the quality of the
    Federal workforce is improving.

--  The image of the Government improved significantly between
    1989 and the end of 1992. The percentage of employees who
    would recommend the Government as a place to work increased
    from 49 to 67 percent.

--  Substantial proportions of employees feel they are not being
    treated fairly on the job. This is particularly true among
    minority group members.

--  Employees in 1992 are more willing to report illegal or
    wasteful activities than in 1983, even though there was an
    increase in percentage of employees who said they experienced
    reprisals for their reporting.

--  Overall, individual job satisfaction remains high with 72
    percent of employees saying they are satisfied with their job.
    Employees were less satisfied, however, with various aspects
    of the work environment. For example, almost half of the
    employees (48 percent) thought their work unit did not have
    enough employees to accomplish its mission.

--  The report makes several recommendations and encourages
    policymakers and managers to consider the survey findings as
    they seek to implement the recommendations of the Vice
    President's National Performance Review.

For a copy of the report or additional information, please
contact MSPB's Office of Policy and Evaluation on voice-mail
(202) 653-8900 or fax (202) 653-7211.

11.21.97 MSPB
ATTachment 16

# Whistleblowers Sound Alarm On Their Superiors' Reprisals

## Survey Finds Incidence of Retaliation, Threats Up 50% in Decade

By Stephen Barr
Washington Post Staff Writer

More than a third of federal employees who blow the whistle on waste, fraud and abuse say their superiors retaliate or threaten them with reprisals, according to a survey conducted by the government.

The proportion of federal employees citing threats or reprisals is almost 50 percent higher than a decade ago and suggests that laws to protect "whistleblowers" have not been entirely successful.

The survey also indicates that federal management may have done little or nothing to develop viable forms of retaliation against those who report illegal acts or waste.

Employees who registered accounts of illegal or wasteful activity said they had received poor performance appraisals, were shunned by co-workers and managers and had been verbally harassed or intimidated.

"As a manager was very careful not to do anything favorable to him," one federal employee said in the evaluation. "I was a whistleblower and was hounded to another work area because of it. Management did not want to hear it then and does not want to hear it now."

They can and do punish you in a more subtle manner now than in years past," another survey participant said.

They can and do punish you in a more subtle manner now than in years past, said the government employee who made the complaint to the Merit Systems Protection Board, an independent quasi-judicial agency that rules on personnel cases. The board conducted survey responses from 13,432 federal workers in the fall of 1992 to update a 1983 whistleblowing survey.

The survey does not identify whistleblowers or their agencies. But unpublished data gathered by the board show that employees at the Interior Department, Housing and Urban Development and the Navy observed evidence of waste, fraud and abuse at a higher rate than NASA and the Office of Personnel Management, reported the lowest incidence.

The survey found that while fewer employees were encountering waste, fraud and abuse, the percentage of people willing to blow the whistle rose, as did the incidence of retaliation. Of those who reported reprisals or observed or obtained evidence of one or more activities that they believe were illegal or wasteful, compared to those who believe were illegal or wasteful, compared to 33 percent in 1983.

A 50 percent who had witnessed an illegal or wasteful act also said they blew the whistle on the wrongdoing, compared to 30 percent in 1983.

■ 37 percent who reported an illegal or wasteful activity said they experienced or had been threatened with reprisals. That was significantly higher than the 24 percent recorded in the 1983 survey.

The chairman of the Merit Systems Protection Board, Ben L. Erdreich, urged agency heads to review the report, saying that whistleblower protection would be a serious step during his chairmanship. He was sworn in as "Agencies should hold their managers accountable for how they are treating whistleblowers," he said in an

"They can and do punish you in a more subtle manner now than in years past."
— survey participant

interview, and agency heads were whistle-blowers in employees own words." The report said, "A survey of federal whistleblowers is important to the workplace and seek to serve taxpayer dollars.

"To the extent that these problems are ignored, and persist in a department's environment or culture, a whistleblower is a more potentially productive workplace and one that leads to discrimination. Erdreich said.

He added, however, that generalizations about whistleblowers were difficult to make and that the treatment of whistleblowers could vary from agency to agency."

The report also observed that the percentage of employees who saw wrongdoing "does not necessarily equate to the amount of illegal or wasteful activity that occurred in the government during the survey period. Additionally, it is also important to note that "fraud, waste and abuse" is largely defined by the person observing it."

In the 1992 survey, 35 percent of respondents cited body managed programs as the most frequent illegal or wasteful activity while 18 percent said they saw waste caused by unnecessary or deficient goods or services.

When asked about the effect of their whistleblowing activities, there was little change, but they had actual credit from management. In the report, 37 percent said nothing happened to them; 33 percent and their supervisors became unhappy with them, and 38 percent reported higher management became unhappy with them.

The survey found that whistleblowers reported by employees included shunning by co-workers, 40 percent; verbal harassment, 47 percent; and poor performance appraisals, 47 percent.

The report pointed out that such reprisals could be carried out by managers without the knowledge of other agency officials as extensive documentation. In

1983, for example, poor performance appraisals were experienced by 21 percent of whistleblowers, compared to the 47 percent in 1992.

"This increase appears to be the result of a rise in the more subtle forms of reprisal, which is disturbing from an enforcement standpoint. Whistleblowers experience a move in the insidious strategy for retaliating by not discussing the whistleblower, but revealing choice information about illegal or wasteful acts," the report said.

"As public outcry against acts of reprisal grows, perhaps those who choose to take reprisal against others have just made their actions less obvious—taking actions that they believe they can get away with."

## WASTE, FRAUD, ABUSE

TYPES OF ILLEGAL OR WASTEFUL ACTIVITIES OBSERVERS CITED AS THE MOST SERIOUS IN 1983 AND 1992

|  | 1983 | 1992 |
|---|---|---|
| Waste caused by a badly managed program or services | | 35% |
| Waste caused by unnecessary or deficient goods or services | 13% | |
| Other serious violation of law or regulation | 16% | |
| | 13 | |
| Use of official position for personal benefit | 10% | |
| | 12 | |
| Stealing federal property | 1% | 2% |
| Accepting bribes or kickbacks | 1% | |

SOURCE: U.S. Merit Systems Protection Board

# Federal Employees
# News Digest

Don Mace, Editor
Eric Yoder, Assistant Editor

Copyright © 1997 by Federal Employees News Digest, Inc.
$2/Copy Newsstand

ISSN: 10650970)

Vol. 46, No. 29

3, 1997

## WHISTLEBLOWER WINS!

❏ **Whistleblower Wins** — A Federal Mediation and Conciliation Service arbitrator has ordered the reinstatement with back pay and benefits of a federal employee who was put on a performance improvement plan, locked out of her office and later removed after she became suspicious that several million dollars may have been misspent and reported her suspicions to numerous program officials and the agency inspector general. The arbitrator, noting her prior high performance ratings, said her whistleblowing contributed to her removal and "that unlawful reason for removal infected the removal itself." *(FMCS Case No. 96-16053-7, February 5, 1997)*

11.21.97
Attachment 18



# A Whistleblower's Checklist



---

*By Tom Devine, Legal Director, Government Accountability Project*

*Edited by Suzanne Shelley*

Like a referee blowing the whistle in the presence of a foul, the whistleblower in the corporate or federal arena believes he or she has credible evidence of wrongdoing that bears exposure. Such wrongdoing may be illegality or fraud, gross mismanagement or waste, or a specific danger to the health or safety of the public or the environment. Whistleblowers are almost always endorsed by politicians as champions of justice, but their message is not always welcomed by those challenged by the disclosure.

The decision to blow the whistle in the public sector is an intensely personal one, and brings into focus the conflict between loyalty to the employer and far-reaching consequences that could result from remaining silent. Clearly, any doubt about the alleged wrongdoings should be carefully examined. Public disclosure must be decided on a case-by-case basis, preferably with the advice of your attorney.

Despite our society's embrace of freedom of speech, those who have the courage to voice dissent often end up martyrs. When this happens, there are no winners: The dissenter may lose his or her career by taking on the system, and , by silencing the messenger, the organization often covers up what could be the first warning signal of a subsequent disaster. The result may also discourage others from speaking up about the problem.

## Who takes these risks?

Whistleblowers cannot be stereotyped as either role models or vengeful, disgruntled employees. Motivation can range from the most altruistic to the most self serving. Some whistleblowers are conservative, others are liberal; some are braggarts, others self effacing; some are gregarious, others are painfully shy.

Their jobs range from maintenance positions to seats in high management. What they have in common is that they have learned something that they are unwilling to keep to themselves, and they have chosen to act on that knowledge.

Deciding whether or not to expose suspected fraud or wrongdoing at work is difficult, and brings to light a slate of seemingly contradictory values. We don't like cynical troublemakers and naysayers, but we also have contempt for busybodies, squealers and tattletales, we condemn just as strongly those who "don't

11.21.97 MSPB

Attachment 19

PAGE 82                    RESE DEWS MILLER

You'll go **plum** crazy.

washingtonpost.com | home page | site index | search | help |

On washingtonpost.com
Supreme Court Report

Go to Today's Top News

Go to National Section

Go to Home Page

# Employer Retaliation:
### *Robinson v. Shell Oil Co.*

**Argued:** Nov 6, 1996    **Decided:** Feb 18, 1997

**Vote:** 9 to 0

| At Issue: Whether a company may be sued, under Title VII of the Civil Rights Act of 1964, for retaliating against a former employee after the employee has left the company. | Decision: The Court ruled that federal anti-discrimination law prohibits employers from writing bad job references or otherwise retaliating against former employees to punish them for filing claims. |
|---|---|

Read the full text of the **Robinson v. Shell Oil Co.** decision at the FindLaw Internet Legal Resources Web site

## Background from The Post:

Court Protects Ex-Employees From Retaliation
*Feb. 19, 1997*

© Copyright 1997 Digital Ink Company

Back to the top

11.21.97 MSPB

Attachment 20

9



**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES** LOCAL 1812
AFL-CIO
U.S. INFORMATION AGENCY
301 4th STREET, S.W. WASHINGTON, D.C. 20547        (202) 485-7759

**March 1988**

## AGENCY INSISTS EMPLOYEES FREE TO TALK TO INVESTIGATORS

AFGE Local 1812 told USIA employees, in a December 1987 announce-
ment, that the ongoing investigation by the General Accounting
Office (GAO) is "a rare opportunity to win relief from the
excessive coercion which our employees have suffered until now."

AFGE still believes GAO is running a good-faith investigation
but, contrary to our earlier announcement, it extends only to the
Voice of America and Radio Marti. If you are in another part of
USIA and have information about managers abusing employees, talk
to AFGE. If the evidence warrants, we will ask Congress for a
wider investigation.

Two other problems, both more serious, have inhibited some
employees who wanted to help the present investigation along.

First, callers to the GAO number (647-3297) found a recording,
and many were reluctant to leave their names on a tape. Here's
the solution: Call **485-6877** instead. That is another direct
line to Paul Atkins, the GAO Investigative Officer, in his office
at VOA. He is there "about 75% of the time." You may also visit
him in Room G-060, HHS-N.

The most serious problem was USIA Announcement No. 17 of January
20, 1988 concerning "CONGRESSIONAL LIAISON." It told employees
that "contacts with Congress...must be coordinated with CL, and
CL must be advised of the results of such contacts." AFGE
objected, requesting the Agency to "clarify the purpose of
Announcement No. 17 and assure employees of their right to speak
to the GAO investigator...without fear of Agency intervention or
reprisal."

Management refused to issue a clarification. They did assure the
Union in writing, and AFGE hereby passes on the assurance, "that
individual employees are free, as they have always been, to con-
tact the GAO or the Congress to voice complaints or employment
concerns without restraint or 'intervention' by the Agency."

AFGE therefore continues to urge VOA and Radio Marti employees
with legitimate complaints about management practices to tell
them to the GAO, and do it soon. The number again is **485-6877**.

But be careful. If you put your complaints in writing, don't
leave copies in your office or your computer. Confidentiality
starts at home!

---------------------------------------------- 1/12/97 MSPB

Distribution X:  All Employees in Washington

ptt Adm at 2/1

# Audit Report

**AUDIT OF
MANAGEMENT CONTROLS OVER THE
AMERICAN EXPRESS GOVERNMENT TRAVEL
PAYMENT PROGRAM**

**REPORT NO:     95-A-001/ARR-95-1**
**DATE ISSUED:   September 29, 1995**

IG IG IG IG IG IG IG
IG IG IG IG IG IG IG
IG IG IG IG IG IG
IG IG **IG** IG IG

1.21.97 MSPB

Attachment 23
Page 1 of 3

# EXECUTIVE SUMMARY

The United States Information Agency (USIA) Office of Inspector General (OIG) conducted an audit of management controls over the American Express Government Travel Payment Program. The Bureau of Management, Office of the Comptroller, implemented the American Express program in November 1993.

The program includes individually billed employee accounts and centrally billed accounts. For individually billed accounts, American Express issues employees a Government charge card, and employees pay American Express directly for their charges. By accepting the American Express cards, employees agree to use the cards only for official travel-related expenses, and to pay their accounts in full when due. Centrally billed account-holders are not issued charge cards. USIA's travel management contractor uses these accounts to charge airline and rail transportation expenses for USIA and its grantees. American Express bills USIA monthly, and USIA pays all centrally billed charges. During 1994, charges to individually billed accounts totaled about $3,134,088, and charges to centrally billed accounts totaled about $12,060,000.

## MONITORING PROCEDURES DID NOT PREVENT USIA EMPLOYEES FROM MISUSING OR MAKING UNTIMELY PAYMENT ON AMERICAN EXPRESS GOVERNMENT CARD ACCOUNTS

OIG found that Government charge card abuses were generally undetected and uncorrected because of inadequate monitoring of the accounts. For example, during the 9-month period from May 1994 through January 1995, USIA employees used their American Express Government cards to charge about $116,000 in retail purchases. Based on OIG's review of the December 1994 and January 1995 charges, OIG concluded that the majority of retail purchases were for personal purposes. In addition, as of January 1995, about $240,000 in employee accounts were delinquent. OIG found that the unit coordinators responsible for the American Express individually billed accounts performed some monitoring of employee accounts. However, the degree of monitoring varied widely.

OIG recommended that USIA improve its policies and procedures for controlling and monitoring the use of American Express Government charge cards. OIG also recommended that USIA improve its policies and procedures for dealing with employees who misuse the cards.

i

11.21.97 MSPB

ATT Admont 23
Pg 2 of 3

## DELINQUENCIES IN PAYING AMERICAN EXPRESS CENTRALLY BILLED ACCOUNTS RESULTED IN LIABILITY FOR INTEREST PENALTIES AND LOST REFUNDS

As of June 1995, the total outstanding balance for the centrally billed accounts was about $2,200,000. About $780,500 or 35.5 percent of the $2,200,000 was delinquent for more than 30 days. Late payments of centrally billed accounts are subject to interest penalties under the Prompt Payment Act of 1982. American Express calculated that interest penalties from November 1993 through December 1994 totaled $19,915. In addition, the Agency can earn refunds from American Express by making faster payments. OIG recommended that USIA revise its payment procedures for centrally billed accounts to ensure payment within 30 days.

## ACTIONS TAKEN BY USIA

USIA officials generally concurred with OIG's recommendations. See Appendix C for USIA's written comments. In addition, based in part on OIG's discussions with Agency officials during the audit, USIA took several steps to improve its management of the American Express Government travel payment program. For example, beginning in October 1994, the comptroller placed messages on the employees' earnings and leave statements to remind employees that the Government cards are to be used only for official travel related expenses. Also, in April 1995, the Agency authorized American Express to block use of the cards for retail charges above a certain amount per month for all American Express Government cardholders. Further, to reduce delinquencies in May 1995, the Agency assigned responsibility to the Agency program coordinator for monitoring all accounts delinquent over 60 days. USIA has also made progress in reducing the processing time for centrally billed accounts.

USIA's Associate Director for Management agreed with OIG's recommendation that he ensure that each bureau and office review past American Express activity reports for evidence of abuse. However, the Associate Director disagreed with the draft recommendation's suggested guidelines for disciplinary actions. OIG intended that the guidelines be used to ensure equity and uniformity in applying USIA's general table of penalties to Government travel card abuse. The Associate Director stated he was troubled by the narrowness of the proposed guidelines and would oppose the guidelines on those grounds as a matter of policy. In the final recommendation, we removed the proposed guidelines. Nevertheless, OIG continues to urge the Agency to consider the guidelines or to develop its own to address our concerns.

ii

11.21.97 MSP ⊖

ATT Admont 23
pg 3 of 3

# GAO

United States General Accounting Office

Fact Sheet for the Chairman,
Subcommittee on the Civil Service,
Committee on Post Office and Civil
Service, House of Representatives

July 1992

# WHISTLEBLOWER PROTECTION

## Survey of Federal Employees on Misconduct and Protection From Reprisal





11/26/97 MSPB

Attachment 24
Pg 1 of 5



**United States
General Accounting Office
Washington, D.C. 20548**

**General Government Division**

**B-249141**

**July 14, 1992**

The Honorable Gerry Sikorski
Chairman, Subcommittee on
  the Civil Service
Committee on Post Office
  and Civil Service
House of Representatives

Dear Mr. Chairman:

This fact sheet is a partial response to your request
that we review the federal government's processing of
whistleblower reprisal complaints and the Office of
Special Counsel's (OSC)[1] effectiveness in protecting
whistleblowers from reprisals.  As part of our review, we
surveyed a sample of randomly selected federal employees
governmentwide to determine their awareness of
whistleblower protection and their willingness to report
misconduct.[2]

As agreed with the Subcommittee, we are providing the
survey results now to assist Congress in its
deliberations on the reauthorization of OSC.  The
agency's authorization expires at the end of fiscal year
1992.  In addition to our survey of federal employees, we
are requesting and will be reporting information from 19
departments and agencies with 6,000 or more employees on
their implementation of and views on the whistleblower
statute.

---

[1]The Whistleblower Protection Act of 1989 separated OSC
from the Merit Systems Protection Board and established
OSC as an independent agency.  OSC's mission is to
protect federal employees, especially whistleblowers,
from prohibited personnel practices and to act in the
interest of employees seeking assistance.

[2]Misconduct is a summary term we use to define a
protected disclosure under law (5 U.S.C. 2302 (b)(8)(A)).
It is a violation of any law, rule, or regulation; gross
mismanagement; gross waste of funds; abuse of authority;
or acts of substantial and specific danger to public
health and safety.

11.21.97 MSPB
Pg 2 of 5
Attachment 2G

B-249141

We received responses to our questionnaire from 1,055 employees (78 percent of those surveyed). The results of our survey are representative of all employees covered by the whistleblower statute (at the 95-percent confidence level, plus or minus 5 percent). Our sample size was not large enough to report the results for individual departments or agencies. Appendix I provides the details of our objectives, scope, and methodology.

## BACKGROUND

Congress first provided statutory protection for whistleblowers in the Civil Service Reform Act of 1978 (P. L. 95-454). The act was designed to encourage the disclosure of misconduct by protecting whistleblowers. In the years following passage of the act, Congress found that it had little impact on encouraging federal employees to blow the whistle and did not protect them from reprisals.

One source of information to Congress on the failure of the 1978 act regarding whistleblowers was an October 1984 report of the Merit Systems Protection Board (MSPB).[3] The report summarized the results of two employee surveys conducted in the early 1980s.[4] On the basis of the MSPB report and information from other sources, Congress considered changes to the law in the years following 1984 and did so with the passage of the Whistleblower Protection Act of 1989 (P. L. 101-12). The 1989 act was designed to strengthen and improve protection for whistleblowers. Besides making OSC independent of MSPB, the 1989 act lowered the burden of proof for employees who allege that reprisal had been taken against them for whistleblowing and expanded employees' rights to go before MSPB for an independent hearing if they could not obtain relief through OSC for an alleged reprisal.

The 1984 MSPB report showed that between 1980 and 1983 no measurable progress was made in overcoming employee resistance to reporting misconduct. MSPB found in 1983 that 69 percent of employees with knowledge of misconduct did not report it. The main reason given by employees (53 percent) for not reporting was that nothing would be done to correct the problem. Fear of

---

[3] Blowing the Whistle in the Federal Government: A Comparative Analysis of 1980 and 1983 Survey Findings, U.S. Merit Systems Protection Board, Washington, D.C., 1984.

[4] Under 5 U.S.C. 1205 (a)(3), MSPB is responsible for doing special studies relating to the federal merit system.

11/21/97 MSPB

Attachment 2
Pg 3 of 5

B-249141

reprisal was cited (37 percent) second most frequently as the
reason for not reporting.

RESULTS

Although most federal employees said that they would be willing
to report misconduct, a sizeable number said they were either
undecided about reporting or unwilling to report misconduct if
they become aware of it. Fear of reprisal for reporting
misconduct continues to be a concern for many federal employees.
Furthermore, many employees did not know whether their agencies
would support whistleblowers and most had minimal knowledge about
their right to protection from reprisal.

More specifically, the results of our survey showed the
following:

-- Most employees, while generally aware of a law to protect them
   from reprisals, lacked knowledge about their right to
   protection. About 83 percent of the respondents told us that
   they were at least somewhat aware that there is a law to
   protect federal employees who "blow the whistle" by reporting
   misconduct. However, about 73 percent of the respondents said
   that they had some or no knowledge about how the law protects
   them, and about 70 percent said they believe that they did not
   have enough information about where to report misconduct.

-- Most employees who had knowledge said that the source of
   information about their right to protection was not their
   agency. About 76 percent said they had not received, or did
   not know if they had received, such information from their
   agency. About 46 percent of the respondents said they
   received information from other sources such as newspapers,
   radio, TV, and word of mouth.

-- Many employees lacked knowledge about their agency's
   commitment to protect whistleblowers from reprisal. About 49
   percent said they did not know or had no basis to judge the
   extent to which their agency supported whistleblower
   protection. Further, about 33 percent said they either did
   not know or had no basis to judge how their agency would
   respond if they reported misconduct. Only about 15 percent of
   the respondents thought their agency supported to a great
   extent the federal policy of protecting employees from
   reprisal who report misconduct.

-- About 93 percent of the respondents said they supported from a
   moderate to very great extent the idea of employees in their
   agency reporting misconduct. Although about 26 percent said

3

11/21/97 MSPB
Pg 4 of 5
Attachment 24

B-249141

they believed misconduct was a moderate to serious problem at their agency, about 38 percent said they were undecided about whether to report, or would be unwilling to report, misconduct if they were to become aware of it. Fifty-seven percent said they would be willing to report misconduct.

-- Fear of reprisal was a concern to many employees. About 36 percent of the respondents believed protection for federal employees against reprisal was inadequate while only about 13 percent thought it was adequate. Another 43 percent said they did not know or had no basis to judge the adequacy of protection for federal employees. About 25 percent believed their agency would take reprisals against them if they reported misconduct while about 24 percent believed they would be supported. And 33 percent did not know or had no basis to judge their agency's likely action.

-- More encouragement could help in reporting misconduct. Most respondents believed there were four factors of great to very great importance that would encourage them to report misconduct: (1) that something would be done to correct the problem reported--90 percent stated this belief, (2) the problem was very serious--88 percent, (3) the employee would be protected from reprisal--84 percent, and (4) the employee would remain anonymous--68 percent.

Detailed questionnaire responses are presented in appendix II.

— — — — —

As agreed with the Subcommittee, we plan no further distribution of this report until 30 days after its issue date, unless you publicly announce its contents earlier. At that time, we will send copies to OSC, MSPB, the departments and agencies that participated in the survey, and other interested parties. We will also make copies available to others upon request.

The major contributors to this report are listed in appendix III. If you have any questions about this report, please contact me on (202) 275-5074.

Sincerely yours,

Bernard L. Ungar

Bernard L. Ungar
Director, Federal Human Resource
 Management Issues

4

11.21.97 MSPB

Attachment 2E
Pg 5 of 5

United States General Accounting Office

# GAO

**Testimony**
Before the Subcommittee on the Civil Service
Committee on Post Office and Civil Service
House of Representatives

For Release on Delivery
Expected at
10:00 a.m. EST
Wednesday
March 31, 1993

# WHISTLEBLOWER PROTECTION

## Employees' Awareness and Impact of the Whistleblower Protection Act of 1989

Statement of
Nancy R. Kingsbury, Director
Federal Human Resource Management Issues
General Government Division



11.21.97 MSPB

Attachment 25
pg 1 of 5

Mr. Chairman and Members of the Subcommittee:

We are pleased to be here today to take part in the Subcommittee's hearing on whistleblower protection and the Office of Special Counsel (OSC). You asked us to summarize our recent work on whistleblower protection and OSC. Since July 1992, we have issued reports dealing with federal employees' awareness of whistleblower protection, the effectiveness of the Whistleblower Protection Act of 1989, and agencies' implementation of the whistleblower statutes.

Overall, our work has shown that despite the intent of the 1989 act to strengthen and improve whistleblower protection, employees are still having difficulty proving their cases. Employees are not aware of their right to protection, and agencies are not informing them of this right.

## THE PURPOSE OF THE WHISTLEBLOWER PROTECTION ACT OF 1989 WAS TO STRENGTHEN PROTECTION OF EMPLOYEES

Statutory protection for whistleblowers was first introduced by the Civil Service Reform Act of 1978 (P.L. 95-454). However, on the basis of reports by the Merit Systems Protection Board (MSPB) and GAO, as well as OSC's data, Congress subsequently found that the 1978 act was having little impact on encouraging federal employees to blow the whistle and protecting whistleblowers. In 1984, for example, MSPB reported that between 1980 and 1983 there was no measurable progress in overcoming employee reluctance to reporting fraud, waste, and abuse.[1] And we reported that, in fiscal year 1984, OSC closed 99 percent of the whistleblower reprisal complaints without seeking corrective or disciplinary action.[2]

In an attempt to deal with such reported problems, Congress enacted the Whistleblower Protection Act of 1989 (P.L. 101-12) to strengthen and improve protection for whistleblowers. The act, among other changes, separated OSC from MSPB and established OSC as an independent agency. The act expanded OSC's role in protecting federal employees, especially whistleblowers, from prohibited personnel practices.

---

[1]Blowing the Whistle in the Federal Government: A Comparative Analysis of 1980 and 1983 Survey Findings, U.S. Merit Systems Protection Board (Washington, D.C.: Oct. 1984).

[2]Whistleblower Complainants Rarely Qualify for Office of the Special Counsel Protection (GAO/GGD-85-53, May 10, 1985).

1

11.21.97 MSPB

Attachment 25
Pg 2 of 5

Other changes in the act to help whistleblowers included

-- easing the employee's burden of proof that reprisal for
   whistleblowing had occurred, and

-- allowing employees to file appeals with MSPB if they did
   not obtain relief through OSC.

## EMPLOYEES CONTINUE TO HAVE
## DIFFICULTY PROVING REPRISAL

In October 1992, we reported that even though the 1989 act was
intended to strengthen and improve protection for whistleblowers,
employees claiming reprisal for whistleblowing at OSC were
finding that proving their cases was as difficult then as it was
before the act was passed.[3]  The principal reason remained the
lack of sufficient evidence to establish the link between the
employee's whistleblowing and the reprisal.

OSC disagreed with our conclusion that proving reprisal remained
difficult, indicating that employees claiming reprisal under the
1989 act were having greater success than our analysis of OSC's
data indicated.  However, we found that although the number of
whistleblower reprisal complaints, corrective and disciplinary
actions, and stays (postponed action) had increased under the
1989 act, the increases were generally proportionate to the
increases in the volume of complaints that had been filed.  We
also found that before and after the 1989 act's passage, about
the same percentage (5.8 percent versus 6.3 percent) of reprisal
complaints filed with OSC resulted in some form of corrective
action.

On the positive side, we found that allowing employees to file
appeals with MSPB was having a measurable impact on whistleblower
reprisal cases.  About one-third of those employees appealing to
MSPB after going through OSC for assistance were getting relief,
usually through settlements and sometimes through reversals of
adverse personnel actions.

## MOST EMPLOYEES DO NOT KNOW HOW THE WHISTLEBLOWER STATUTES
## PROTECT THEM, AND AGENCIES ARE NOT INFORMING THEM

In July 1992, we reported on the results of a governmentwide
survey of federal employees.[4]  The survey indicated that most

---

[3]Whistleblower Protection:  Determining Whether Reprisal Occurred
Remains Difficult (GAO/GGD-93-3, Oct. 27, 1992).

[4]Whistleblower Protection:  Survey of Federal Employees on
Misconduct and Protection From Reprisal (GAO/GGD-92-120FS, July
14, 1992).

2

*11.21.97 MSPB*

*Attachment 25*

*Pg 3 of 5*

federal employees would be willing to report misconduct.
However, the majority of employees said that they had little
knowledge about where to report misconduct or about their right
to protection under the law from whistleblower reprisal.  Also,
many employees said fear of reprisal for reporting misconduct was
a concern.

On a related issue, in March 1993 we reported that there were
wide disparities in how the 19 agencies we reviewed had
implemented the whistleblower statutes.[5]  Some agencies had
informed employees about their whistleblower protection rights,
but most agencies had neither informed their employees nor
developed policies and procedures for implementing the 1989 act.

Under 5 U.S.C. 2302(c), the head of each department and agency is
responsible for preventing prohibited personnel practices,
including whistleblower reprisal.  However, no explicit
requirement exists in the whistleblower statutes (5 U.S.C. 1201
et seq.) for OSC or the agencies to inform employees about their
right to protection from reprisal or where to report misconduct.
OSC, to its credit, has attempted to spread the word about
employees' right to be protected from reprisal.  However, as OSC
officials acknowledge, they have had limited success in eliciting
the support of the agencies to inform employees of what their
rights are under the law and how to go about exercising them.

The lack of agency commitment appears to us to be a major problem
in the whistleblower program.  If the program is to be
successful, agencies' support for the program is critical.
Employees should be encouraged to call improprieties to the
attention of management and be assured that such actions will not
result in reprisal.  All too often in the past, such assurances
have been absent and employees did not know how much agency
support they would receive.

## ALL EMPLOYEES ARE NOT COVERED
## UNDER THE WHISTLEBLOWER STATUTES

Our March 1993 report also observed that not all federal
employees were protected against reprisal by the whistleblower
statutes.  Congress specifically excluded certain agencies and
employees from certain civil service provisions of Title 5 of the
U.S. Code with the passage of the Civil Service Reform Act of
1978.  One of the specific exclusions under Title 5 was
protection against prohibited personnel practices, including
whistleblower reprisal.  Additionally, some agencies' enabling
legislation has been interpreted to exclude all or some of their

---

[5]Whistleblower Protection:  Agencies' Implementation of the
Whistleblower Statutes Has Been Mixed (GAO/GGD-93-66, Mar. 5,
1993).

3

11.21.97 MSPB

Attachment 25
Pg 4 of 5

employees from the civil service provisions of Title 5; as a result, the employees are not covered under the whistleblower statutes.

The 19 agencies in our review identified over 220,000 employees, most of them in the Departments of Defense and Veterans Affairs, in positions not covered by the whistleblower statutes.  While some exempt agencies, such as the Federal Deposit Insurance Corporation and the Resolution Trust Corporation, offer limited whistleblower protection, further analysis may be necessary to clearly identify employees not covered by the whistleblower statutes and to assess whether further coverage is warranted.

<u>RECOMMENDATIONS TO CONGRESS AND THE SPECIAL COUNSEL</u>

To address these problems, we recommended in our recently issued reports that Congress consider amending the whistleblower statutes (5 U.S.C. 1201 et seq.) to require agencies, with OSC's guidance, to develop policies and procedures for carrying out the provisions of the whistleblower statutes and to inform employees periodically on their right to protection from reprisal and where to report misconduct.

We also recommended that the Special Counsel, with agencies' assistance, assess whether whistleblower protection coverage needs to be extended to those positions currently not covered by the whistleblower statutes and recommend any coverage changes to Congress.  OSC officials were in general agreement with our recommendations to Congress and the Special Counsel.


Mr. Chairman, this concludes my statement on the work we have done to date.  In the future, we will be reporting to the Subcommittee on the results of an ongoing survey of federal employees who have sought whistleblower protection from OSC.

I will be pleased to answer any questions you or the members of the Subcommittee may have.


(966591)

4

11.21.97 MSPB

Attachment 25
79 5 of 5

United States General Accounting Office

# GAO

Report to the Chairman, Subcommittee on the Civil Service, Committee on Post Office and Civil Service, House of Representatives

November 1993

# WHISTLEBLOWER PROTECTION

# Reasons for Whistleblower Complainants' Dissatisfaction Need To Be Explored



11.21.97 MSPB

Attachment 6
pg 1 of 9


# GAO

**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**General Government Division**

B-249141

November 15, 1993

The Honorable Frank McCloskey
Chairman, Subcommittee on
    the Civil Service
Committee on Post Office
    and Civil Service
House of Representatives

Dear Mr. Chairman:

This report discusses how federal employees who have sought whistleblower reprisal protection from the Office of Special Counsel (OSC) viewed OSC's handling of their cases. We surveyed 945 employees who sought protection from OSC under the provisions of the Whistleblower Protection Act of 1989 and whose cases were closed by OSC as of September 30, 1992. We received responses from 662—a response rate of 70 percent. Additional details on our objective, scope, and methodology are contained in appendix I.

## Background

Congress enacted the Whistleblower Protection Act of 1989 (P.L. 101-12) to strengthen and improve the level of protection for whistleblowers originally offered under the Civil Service Reform Act of 1978 (P.L. 95-454). Although the 1978 act was designed to encourage the disclosure of fraud, waste, and abuse and protect employees from reprisals when they made such disclosures, Congress found that the law was not satisfactorily achieving these objectives.

The 1989 act separated OSC from the Merit Systems Protection Board (MSPB) and established OSC as an independent agency. OSC's primary role became to protect federal employees, especially whistleblowers, from prohibited personnel practices. In fulfilling this role, OSC is supposed to act in the interests of federal employees seeking assistance by investigating their complaints of whistleblower reprisal and initiating stays (postponed actions), corrective actions, and disciplinary actions, where appropriate. In addition, the 1989 act allowed employees to file appeals with MSPB if they did not obtain relief through OSC.

## The Whistleblower Reprisal Complaint Process at OSC

In order to successfully pursue a whistleblower reprisal case, OSC said that it must develop sufficient evidence to show that the following four elements exist:

*11.21.97 MSPB*
*Pg 2 of 9*
*Attachment 2 6*

B-249141

- a protected disclosure[1] was made by a covered federal employee;
- a personnel action was taken, not taken, or threatened after the protected disclosure;
- the employer had knowledge of the protected disclosure; and
- a causal connection existed between the personnel action and the protected disclosure.

Complaints of whistleblower reprisals are to be initially analyzed by OSC's Complaints Examining Unit (CEU). Examiners may contact the complainant to get more information to ensure that the complaint is clearly understood. If CEU determines that one or more of the four elements is missing, it may close the case. Complaints that are not closed by CEU are to be referred to the Investigation Division for more extensive examination.

After the Investigation Division completes its examination, the Prosecution Division is required to review the information to determine whether any violation of laws, rules, or regulations has occurred and whether the matter warrants corrective and/or disciplinary action. OSC officials may discuss the matter with agency officials to obtain an early resolution, or the Special Counsel may write to the agency head with a recommendation for action. If the agency declines to take action, OSC may bring the matter before MSPB to order the corrective and/or disciplinary action.

At any time during an investigation, OSC may seek a stay of a personnel action if there are reasonable grounds to believe that the action is a result of whistleblower reprisal. OSC may obtain the stay of action by requesting the agency involved to voluntarily provide the stay or by filing a request with the MSPB for a formal order.

## Prior GAO Reports on Whistleblower Protection

This is our fourth report in response to a request by Mr. Gerry Sikorski, the former Chairman of the Subcommittee on the Civil Service, House Committee on Post Office and Civil Service, that we review the federal government's processing of whistleblower reprisal complaints and OSC's effectiveness in protecting whistleblowers from reprisals under the 1989 act. The three reports and one testimony we provided earlier this year are listed at the end of this report.

11,21,97  MSPB
Attachmat 9 6
Pg 3 of 9

---

[1]A protected disclosure is the reporting of information that the individual reasonably believes shows violation of any federal law, rule, or regulation; gross mismanagement; gross waste of funds; abuse of authority; or acts that are a substantial and specific danger to public health and safety.

B-249141

Our work has shown that despite the intent of the 1989 act to strengthen and improve whistleblower protection, whistleblower complainants are still having difficulty proving their cases. Also, federal employees are generally unaware of their right to whistleblower protection, and agencies are not informing them of this right.

The lack of agency commitment appears to us to be a major problem in the whistleblower program. There is no explicit requirement in the whistleblower statutes (5 U.S.C. 1201 et seq.) for agencies to inform employees about their right to protection from reprisals or where to report misconduct. If the program is to be successful, agencies' support is critical. Employees should be encouraged to bring improprieties to the attention of management and be assured that such actions will not result in reprisals. All too often in the past, such assurances were absent, and employees did not know how much agency support they would receive.

To address this problem, we recommended that Congress consider amending the whistleblower statutes (5 U.S.C. 1201 et seq.) to require that agencies, with OSC's guidance, develop policies and procedures for carrying out the provisions of the whistleblower statutes and inform employees periodically of their right to protection from reprisals and where to report misconduct.

## Results in Brief

The vast majority of our survey respondents gave OSC low marks for overall performance in the whistleblower complaint process. The small percentage of respondents whose cases reportedly resulted in corrective actions were generally more satisfied with OSC's performance, but over a third of them also gave OSC low marks.

Most respondents were frustrated with the process. They believed that OSC did not act on their behalf and that they needed to obtain the services of a lawyer to protect their interests. Also, most of the respondents did not appear to fully understand the process. After going through the process, most respondents said they wished they had known more about items such as the procedures involved and the probability of success before they filed their complaints.

The responses we received from whistleblower complainants clearly indicated a high level of dissatisfaction with OSC. In our view, OSC needs to explore the reasons for this dissatisfaction and work with the Subcommittee to address the problems. This survey and our previous

11.26.97 MSPB

Attachment Z 6
pg 4 of 9

B-249141

work showed clearly that education about the whistleblower protection process needs attention. Employees need to know about their right to protection from whistleblower reprisals, the four elements needed to demonstrate that reprisal has occurred, the process for seeking corrective action, and the challenges that complainants may encounter in pursuing their cases.

## Complainants Have Been Generally Dissatisfied With OSC and the Whistleblower Protection Process

The results of our survey of those individuals who sought whistleblower protection from OSC showed a general dissatisfaction with OSC and agency performance. Many respondents said they did not know about the act and that they got little or no help from their agency management in learning about it. Most respondents did not believe that OSC investigators obtained all of the information needed to investigate their claims. Over half of the respondents told us that they were still employed by the agency they reported against, and many still believed that they were experiencing reprisals. A vast majority of respondents believed that whistleblower protection was inadequate and that their agencies did not support federal whistleblower policy. Specifically

- About 81 percent of respondents gave OSC a generally low to very low rating for overall effectiveness. OSC was consistently rated low for fairness, efficiency, competency, responsiveness, and communications. OSC was rated higher for courtesy.
- About 78 percent of respondents did not believe that OSC investigators obtained all of the information needed to investigate their claims.
- About 83 percent of respondents said they received a generally unfavorable to very unfavorable resolution of their complaints from OSC. About 52 percent appealed their cases to MSPB. For those who did not appeal their cases, the primary reason cited was frustration with the process.
- About 88 percent of the respondents said that reprisals had actually taken place, while 47 percent said there was a threat of reprisals, and about 43 percent said a favorable action had not occurred. About 20 percent of the respondents said they became aware of the reprisals within 24 hours of reporting the alleged misconduct.
- More respondents had contact with OSC in writing or by telephone as opposed to meeting face-to-face. The number of contacts generally ranged from one to five per case. According to about 56 percent of the respondents, the contacts with OSC provided the information they needed to little or no extent.



11/21/97 MSPB
Attachment 26
Pg 5 of 9

Pp 5

B-349141

- While about 45 percent of respondents said that they did not give OSC permission to reveal their communications with OSC to others during the investigative process, about 59 percent of these respondents believed that OSC revealed this information during its investigation. About 32 percent of the respondents were not sure or did not remember whether they gave OSC permission to reveal this information.
- About 57 percent of the respondents said they had obtained the services of a lawyer at some time during the process. The vast majority of these respondents did so before OSC closed their cases. The majority of those who obtained a lawyer did so because they believed they needed independent legal advice to protect their interests (69.1 percent) and deal with their agencies (73.3 percent). Overall, about 76 percent of the respondents believed that OSC generally acted or primarily acted in the interests of the agency, rather than in the interests of the complainants or neutrally, while investigating the cases.
- About 59 percent of the respondents were still employed by the agencies where they had reported misconduct. These respondents reported that various reprisals were still occurring after their cases were closed by OSC and most of the time these actions were a continuation of previous reprisals and not new reprisals. Of the 41 percent of the respondents who were no longer employed, about 83 percent said they were no longer employed at the agency because they reported misconduct.
- Negative events resulting from reporting misconduct were far greater than positive actions reported by the respondents. Negative events included lessened job opportunities, mental anguish, and loss of professional credibility. Positive actions of reporting misconduct for those respondents still employed at the agencies where they reported the misconduct included recognition by peers and awards or bonuses. The positive actions, which were controlled by the agency, were generally not viewed by the respondents as a direct result of reporting misconduct.
- After reporting misconduct and filing a complaint with OSC, about 57 percent of the respondents said they either greatly supported or very greatly supported the idea that employees in their agency should report misconduct. However, about 93 percent of the respondents believed that protection against reprisal was inadequate, and about 90 percent believed that their agency had little or no support for the federal policy of protecting federal employees against reprisals for reporting misconduct.
- Although a majority of respondents said they reported the misconduct to an immediate supervisor or other agency management, over 60 percent of those still employed at the agency would not report any new misconduct to these people.

11.2h97 MSPB

AtfAchmnT z 6
Pq 6 of 9

B-249141

- Before reporting misconduct, employees sought assistance mainly from an immediate supervisor (66.3 percent) and/or other agency management (79 percent). About 90 percent found these people to be of little or no help. About 42 percent of the respondents said they had little or no knowledge of the provisions of the Whistleblower Protection Act of 1989. About 53 percent were aware that corrective action or settlement of reprisals was potentially available. Fewer were aware that disciplinary actions could be taken against employers and that stays of personnel actions could be requested.
- While at least 60 percent of the respondents said they were aware of one or more of the elements that had to be present to qualify for protection under the 1989 act, about 56 percent greatly or very greatly wished they had known more about all four elements before filing the complaint with OSC. Other factors that respondents either greatly or very greatly wished they had known more about before filing a complaint with OSC included the investigative process, the probability of success, the emotional costs, the legal process, and the financial cost.

Detailed questionnaire responses are presented in appendix II.

## Complainants Whose Cases Resulted in Corrective Action or Were More Extensively Investigated Responded More Positively

During our review, OSC provided us with a list of complainants whose cases resulted in corrective actions. Although these complainants (50 of whom responded to our survey) were more satisfied with the process, many of them still gave OSC low marks. We also noted that complainants whose cases went through OSC's investigative process and were closed without corrective actions (99 respondents) were more satisfied than those complainants whose cases were processed and closed in CEU (513 respondents). Specifically

- About 85 percent of complainants whose cases were closed in CEU rated OSC generally low to very low on overall effectiveness in handling their cases. For those complainants whose cases were closed by the Investigation Division, about 68 percent of them rated OSC similarly. About 37 percent of those with reported corrective actions rated OSC as generally low to very low.
- About 86 percent of complainants whose cases were closed in CEU believed that they had received generally unfavorable to very unfavorable resolutions of their cases, while about 73 percent of those whose cases were more extensively investigated felt the same way. For those complainants whose cases resulted in corrective actions, this percentage fell to 41.



11.24.97  m SPB

Attachment 6
Pg 7 of 9

B-249141

- About 62 percent of those complainants whose cases were closed in CEU believed that OSC provided them with little or no information they needed about their cases. About 38 percent of those whose cases were more extensively investigated felt similarly, as well as 22 percent of those complainants whose cases resulted in corrective actions.
- About 84 percent of those complainants whose cases were closed in CEU believed generally or definitely that OSC did not obtain all the information needed to investigate their cases. About 59 percent whose cases were closed in the Investigation Division felt similarly; however, 58 percent of those whose cases resulted in corrective actions believed that OSC obtained all the information needed to investigate their cases.
- About 79 percent of those complainants whose cases were closed in CEU believed that OSC generally or primarily acted in the interests of their agency while investigating their cases. For complainants whose cases were closed in the Investigation Division, about 66 percent of them felt similarly, as well as about 35 percent of those whose cases resulted in corrective actions.

## Conclusions

It is troubling that so many complainants in the whistleblower reprisal complaint process believed that OSC did not adequately represent their interests. Although the level of dissatisfaction was clearly related to the degree of success the complainants had in pursuing their cases, it is important to note that the vast majority of all complainants we surveyed indicated a high level of dissatisfaction with OSC's overall effectiveness in handling their cases.

To help ensure that the whistleblower statutes are being properly implemented, we believe it is essential to determine why whistleblower complainants feel dissatisfied with OSC's process and to develop an appropriate strategy for dealing with their concerns. On the basis of the survey results and our previous work, one element of this strategy should be to improve the education of federal employees about the extent of their rights and protections under the whistleblower statutes and the nature of the complaint process.

## Recommendation

We recommend that the Special Counsel explore the reasons for whistleblower complainants' dissatisfaction with OSC's process and work with the Subcommittee to develop an appropriate strategy for addressing these concerns.

*11.26.97 m SPB*

*ACCachment 2 6*
*pg 8 of 9*

B-249141

## Agency Comments and Our Evaluation

The Special Counsel provided written comments on a draft of this report. OSC's comments and our specific responses to them are contained in appendix III.

In general, OSC's interpretation of our survey results was that complainants were dissatisfied because they were not getting corrective action for their alleged reprisals. OSC believed that, in large part, cases brought to their attention were not meeting the requirements of the whistleblower statutes and that the level of dissatisfaction with OSC's performance will diminish if agencies better educate employees about their rights and protections under the whistleblower statutes and about OSC's role in handling reprisal complaints. OSC did not comment on our recommendation that the Special Counsel explore the reasons for whistleblower complainants' dissatisfaction with OSC's process.

We agree that there is a need to improve the education provided to employees about the extent of their rights and the nature of the complaint process, but we do not agree that other agencies should do all of the work that needs to be done. We recommended that OSC explore the reasons for whistleblower complainants' dissatisfaction because we did not think it would be appropriate to identify those reasons based on conjecture. To use conjecture rather than data based on research runs the risk of misdirecting any educational efforts that are provided. Moreover, the high level of complainant dissatisfaction identified in our survey indicated a need for OSC to take an introspective look at its process for dealing with whistleblower complainants. Although our report recognizes that other agencies have an educational role, it is important for OSC to know whether its process for dealing with whistleblower complainants is operating as intended. The importance of customer surveys in examining and improving agency operations was given renewed emphasis in the September 1993 report of the Vice President's National Performance Review.



The Washington Times

PAGE A16 / FRIDAY, JUNE 9, 1995 *

# USIA chief sparked FBI probe of agency's inspector general

By George Archibald
THE WASHINGTON TIMES

Joseph D. Duffey, director of the U.S. Information Agency, prompted an FBI investigation of the agency's inspector general by referring complaints of credit-card abuse and cover-up to the President's Council on Integrity and Efficiency (PCIE), a USIA official disclosed yesterday.

Inspector General Marian C. Bennett has been embroiled in a management dispute with Deputy Inspector General Bernard C. Dowling, USIA's former security director. Mr. Dowling complained internally last January that Mrs. Bennett had taken no disciplinary action against staff members who misused government credit cards, thousands of dollars' worth of personal purchases and cash advances.

The case was referred to William J. Esposito, chairman of the PCIE's integrity committee, who also is assistant FBI director for criminal investigation, USIA officials confirmed. A report by The PCIE integrity committee that FBI special agents have been conducting interviews in the case for several months.

Mrs. Bennett has refused to disclose details of her credit-card wrongdoing, saying the credit-card misuse has been under her own internal investigation since last September.

Mr. Dowling charges in the FBI cover-up fice of Special Counsel, which also is conducting an investigation, that Mrs. Bennett and other USIA senior officials have taken retaliatory action against him.

Mr. Duffey referred the case to the PCIE "to ensure that the broadest and fairest review would take place," USIA spokesman Marsha Cowart said yesterday.

"PCIE was created to handle cases like this. He (the USIA director) is confident that the PCIE's review will be thorough and expeditious."

Mrs. Bennett and ad-president-tially appointed inspectors general are members of the PCIE, Mr. Esposito told The Washington Times that cases involving possible criminal wrongdoing are investigated by the FBI.

The management dispute escalated closer to Mr. Duffey's office last week as Mr. Dowling suggested to return to Larry J. Carson, USIA acting security director, that senior agency officials had requested an updated personal background investigation of him as a retaliatory move.

Mr. Carson, who is personnel manager, told Mr. Carnahan denied background check "appears abuse of improper motive and an process."

In a memorandum, April 12, Mary Ellen Connell, then USIA acting deputy chief of staff, told Mr. Carnahan: "It has come to the

director's attention that a routine security update was not performed in a timely manner on a least one and possibly other senior USIA employees. He is concerned about the problem."

In a letter May 30, Mr. Carnahan verified to Mr. Dowling that he was one of the employees in whom Mr. Connell referred in her memo.

"I did write the memo, but that all I want to say," Mr. Connell said in an interview yesterday. "I don't want to comment further. I don't...

"I believe we can both acknowledge realistically that the phone screamed, called, fired office, they... and, is purely a lateral screen, core."thirty plus a means screen that. they said in a letter to Mr. Carnahan June 5.

Mr. Dowling also asked in the letter whether JoAnn Clifton, USIA's deputy director for management, and Leslie Mc Nolan, chief of USIA security services division, who had applied for the vacant security director's job, had collaborated in an effort to initiate a personal investigation of him as a retaliatory move. Both Ms. Clifton and Ms. Nolan declined to comment yesterday when reached by The Washington Times.

Mr. Dowling said yesterday he knew last December, before he was reassigned to the IG office, that he was "dead square" of his security background check

11.21.97 MSPB

ATTACHMENT 27

# USIA staff misused plastic

## No disciplinary action after probe, IG concedes

By George Archibald
THE WASHINGTON TIMES

The U.S. Information Agency's inspector general yesterday acknowledged that an unspecified number of her staff members have misused government credit cards. Ms. Bennett used credit cards for personal purchases last year and failed to pay the bills until ordered to do so.

Marian C. Bennett said in an exclusive interview with The Washington Times, she entered charged credit cards she collected last Sept. 20 before agency officials became aware that she was using government cards for personal purchases. "The matter ..."

She said she did not seek an outside, independent investigation "because I left to an incumbent upon me to take some action.

"It's not always the best use of resources to go outside.

"Because it's not involves an ongoing case. I cannot get into specifics," Ms. Bennett said.

Bernard C. Dowling, the USIA's former security director, who was IG before last ... agency directive on whistleblower protection, ... from the Office of Special Council and ... got with complaints of an internal ... cover-up by Ms. Bennett.

In letters to Ms. Bennett obtained by The Times, Mr. Dowling ... expressed his concerns about lack of criminal investigation and other senior members who made thousands of dollars of improper personal purchases on government-issued credit cards.

He said the senior ... credit card abuse approaches $5,000 in one ...

... investigator ... was said ... sources to have used his government credit card to obtain cash advances ... mated teller machines.

"You don't always know what's going on in people's personal lives, and we've got to pay his home always know" the IG said ... the investigator ... official and that no senior status in her responsibilities.

In her September, there should immediately said that each government card you know, where I did have quite as far as no card that spread to be travelling, but, if someone were taken into abuse, the IG ... asked why to ... disbursed ... been taken ... that the report IG ... so do a report the USIA Office of ... estimated then decides what action be ... yet, when ...

Ms. Bennett said the report would be proper.

USIA IG Marian C. Bennett says she is investigating members of her staff.

wig S. Roberts, a GS-14.

Citing Ms. Young's promotion by Mr. Roberts' job, Mr. Dowling complained in a Feb. 2 letter to Ms. Bennett that the "unblemished record of ... the integrity of ... "

Ms. Bennett's decision last year to ... ber of her staff on official travel for a university "trainee" that evidence, Mr. Bennett credit card on American Express cards issued to a number of employees, including some ... travel in her office who did not routinely travel as required by federal regulations, the governing issuance of the cards, the sources of ...

Some of the employees made personal purchases, including furs and other ... while on the "diversity training" every ... said. The matter became did not pay the ... when the ... American Express statements bills came ... inquiring demands for payment.

Ms. Bennett declined to report on co ... firm or deny her action. It's the day was ... factual matters — whether or whatever ... blue that day, two involve details that ... because this way ... the ongoing investigation, I am not ... part of her ... to discuss that," she said.

Ms. Bennett said she still cannot ... whether the various ways we can all Men ... of interest or pay Chase, who says ... self or Frost, ... who decided to have short office ... her, became fees.

... issues or a problem and immediately, ... an issue or a problem and come to de ... day meeting court, the discussed there is ... clients in black ... whether or somewhere, or at chance ... whether or to get outside ... igation," she said.

... take another look at it, there is what ... put down ... the reasons is why ... and sense of this ... publicity, Ms. Bennett ... begin to considering, just to conclude ... take another look at it, here's no re question ...

After Mr. Dowling's action and remained ... take an action, called ...

The Washington Times

TUESDAY, JUNE 6, 1995 / PAGE /

# FBI probes possible USIA credit-card cover-up

By George Archibald
THE WASHINGTON TIMES

*Several secretaries and other staff also "reportedly misused government American Express cards for purchases at department stores, and ignored repeated monthly bills..."*

11.21.97 MSPB
ATTACHMENT 29

# UNITED STATES INFORMATION AGENCY

**OFFICE OF THE COMPTROLLER**
North Africa, Near East and South Asia
Washington, D.C. 20547
********************************************************

FAX NUMBER: (202) 619-4322
TELEPHONE: (202) 619-4632

TO: OFFICE: USIA

DATE: 02/16/95

PERSON: Bruce M. Cooper

TIME: 01:45 PM

FAX # (202) 955-3142

FROM:    Rose Mary DEWS-MILLER, Budget Analyst, M/CBNE

PAGE 1 OF

SUBJECT: USIA/OIG Credit Card Cover-Up

Reference: Telcon 2/16/95

1) I informed IG-Marian Bennett on 9/16/94, that OIG employees were using Am Ex Govt card for personal use. Meeting was requested on 9/18/94 through her secretary Dorothy Butler. At meeting Bennett required my supervisor, Darwin Roberts; Louis Lepotatti's attendance, also Attended was her attorney Renee' DeVigne.

I showed Bennett report from AmEx and she wanted more information of the abusers. I requested all that she wanted and after she paid out memo on 9/20/44, OIG employees were pointing finger at me for uncovering evidence and there was NO ~~consent~~ for me under "Whistleblower protection" Act.

2) On 1/3/95, IG-Marian Bennett was seen in front of my residence & me at approx. 9am. My husband saw her & another lady (Renee' DeVigne) during wk of 1/9-13/95.

3) Deputy Inspector General - Bernard C. Dowling (800) 401-7931; arrived in OIG on 1/3/95.

4) Newspaper articles attached and today the Washington Post reporter, Jack Anderson was at USIA's OIG for an interview.

Thanks

11.21.97 MSPB

Attachment 30

11/2/97 MSRB

Attachment 31

# Top inspector accused of credit fraud cover-up

**By George Archibald**
THE WASHINGTON TIMES

The U.S. Information Agency's inspector general has been accused by her own deputy of covering up thousands of dollars of improper personal expenditures by IG staff on government-issued American Express cards.

Marian C. Bennett, appointed inspector general by President Clinton, was told by Deputy Inspector General Bernard C. Dowling in letters Jan. 23 and Feb. 2 that word of a personal coverup had spread to USIA employees and that the watchdog office's "reputation for integrity" was in jeopardy.

"The dollar amount of alleged credit-card abuse appears to be at least $8,000 in one instance, $400 in another," Mr. Dowling wrote in the letters, obtained by The Washington Times.

"A senior White House appointee outside the agency said Mr. Dowling told him the senior investigator used the money to pay his home mortgage.

In his Feb. 2 letter to Mr. Bennett, Mr. Dowling expressed concerns that the senior criminal investigator," who he said was "the most serious offender" in the credit card abuse also "missed two or three personal checks for cash all of which were returned for insufficient funds. One check allegedly was for about $800 and the other two were for considerably lesser amounts."

An internal office investigation confirmed the allegations, but no action was taken against the official for misusing credit cards or bouncing checks, Mr. Dowling wrote.

"No visible official disciplinary action was sought by the OIG, nor to my knowledge was the case referred to the Office of Personnel," the deputy IG wrote.

"I have been informed that the case has been complained and has been for about a month, but certainly no one with whom I have spoken is aware of any referral or other contemplated action. The alleged abuses were revealed around September 1996 or earlier.

governmentwide regulations created by the General Services Administration say government-issued American Express cards "may only be used for official travel and travel-related expenses.

away from the official duty station. The card and the account are not to be used for personal purposes.

Mr. Dowling, a 33-year investigator who headed the Agency's worldwide security operations from 1992 to 1994, questioned Mr. Bennett's failure to obtain an independent investigation of reported abuse by IG employees and noted a criminal statute that might have been violated if the "diversion" of government funds from use of the credit card fraud or unpaid bills resulted in personal misuse of government charge cards.

"To my knowledge, the completed investigations of the unauthorized use of American Express cards by a senior OIG investigator and other OIG personnel have not been referred to either the U.S. attorney (in the case of a prosecutable offense) or a Justice declination to prosecute)," Mr. Dowling wrote in the Jan. 23 letter.

Mr. Dowling did not identify officials by name, and he could not be reached for comment. His office said he was traveling but would not say where.

Ms. Bennett declined requests in writing and in two telephone conversations yesterday to respond to questions about credit card abuse and Mr. Dowling's complaints, saying she had no time to answer questions before tomorrow afternoon.

"This is complicated," she said. She acknowledged receiving Mr. Dowling's letters.

Earlier yesterday, Ms. Bennett's counsel, Reese DiVigne, said the

IG was attending a session of the President's Council on Integrity and Efficiency in a related meeting at Mr. Bennett's office yesterday at a DiVigne declined to answer any questions about credit card abuses and other reported misconduct by terms of the inspector general's senior appointees.

During the meeting, Ms. DiVigne tried to silence Danny D. Roberts, the official director of administration and investigator with a heated exchange during tions about Mr. Dowling's assertions as deputy inspector general.

In his Jan. 23 letter, Mr. Dowling said he had "spoken privately with more than half of the OIG staff," and they had expressed their own concerns about Mr. Bennett's action or about Mr. Dowling's Feb. 2 letter.

"I had come expressly to this office on Wednesday" rather as "dysfunctional," he told the inspector general.

An official familiar with the matter said Mr. Bennett's only response to Mr. Dowling's letter has been a memo she personally delivered to him Friday at noon; it demanded by 5 p.m. that day the names of all office employees with whom he had spoken.

Before being appointed inspector general, Mr. Bennett was deputy international tax counsel in the Treasury Department Office of Tax Policy. She previously served as an adviser to the executive director of the Inspector General's Office in the Energy Department.

• Sophia Digua contributed to this report.