# EXHIBIT   42

Transcript of EEOC Hearing Pages 1 - 59
Part 1 of 5

ORIGINAL

# TRANSCRIPT OF PROCEEDINGS

### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office
1400 L Street, N.W.
Washington, D.C. 20005

- - - - - - - - - - - - - - - x
                               :
ROSE MARY DEWS-MILLER,         :    EEOC Case Nos.
                               :    100-A2-7521X
          Complainant,         :    100-A2-7576X
                               :
     vs.                       :    AGENCY Case Nos.
                               :    00-19 and 96-15
COLIN L. POWELL, SECRETARY,    :
UNITED STATES                  :
DEPARTMENT OF STATE,           :
                               :
          Agency.              :
                               :
- - - - - - - - - - - - - - - x


HEARING


Pages 1 thru 291                          Washington, D.C.
                                          December 9, 2003

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003
(202) 546-6666

sah                                                                    1

SAH              EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                        Washington Field Office
                        1400 L Street, N.W.,
                        Washington, D.C.  20005


- - - - - - - - - - - - - - - x
                              :
ROSE MARY DEWS-MILLER,        :
                              :
        Complainant,          :  EEOC Case Nos.
                              :  100-A2-7521X
        v.                    :  100-A2-7576X
                              :
COLIN L. POWELL, SECRETARY,   :  AGENCY Case Nos.
UNITED STATES DEPARTMENT OF   :  00-19 and 96-15
STATE,                        :
        Agency.               :
                              :
- - - - - - - - - - - - - - - x


                        Tuesday, December 9, 2003

                        Department of State
                        Suite 7428
                        2201 C Street, N.W.
                        Washington, D.C.  20520


        The hearing in the above-entitled matter

convened, pursuant to notice, at 10:04 a.m.


BEFORE:

        MICHAEL J. PACINDA, Administrative Judge

                    MILLER REPORTING CO., INC.
                    735 - 9TH STREET, S.E.
                    WASHINGTON, D.C.  20003
                        (202) 546-6666

sah                                                                              2

APPEARANCES:

    On behalf of the Complainant:

        STEPHEN J. DUNN, ESQ.
        Suite 308
        7400 York Road
        Towson, Maryland  21204-7505
        (410) 321-8368


    On behalf of the Agency:

        MELINDA CHANDLER, ESQ.
        EVELYN ASWAD, ESQ.
        KAREN JOHNSON, ESQ.
        U.S. Department of State
        Office of Legal Counsel
        Room 5425
        2201 C Street, N.W.,
        Washington, D.C.  20520
        (202) 647-3202


    ALSO PRESENT:

        ROSE MARY DEWS-MILLER

sah                                                                              3

## C O N T E N T S

| | PAGE |
|---|---|
| Opening Argument on behalf of Complainant | 11 |
| Opening Argument on behalf of Agency | 15 |

Afternoon Session - Page 148.

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Blanche Twardowski | 20 | 29 | 46 | 51 |
| Rose Mary Dews-Miller | 54 | 111 | | |
| Darwin Roberts | 167 | 190 | | |
| Louis Leporatti | 195 | 202 | | |
| Carol Felicia Keith | 206 | 224 | | |
| Janice Brambilla | 230 | 237 | 242 | 245 |
| Jenny Mallios | 247 | 274 | 286 | 288 |

## E X H I B I T S

| AGENCY EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| No. 1 | 145 | 149 |
| No. 2 | 150 | 151 |
| No. 3 | 152 | 154 |
| No. 4 | 155 | 159 |
| No. 5 | 160 | 162 |
| No. 6 | 163 | 163 |
| No. 7 | 164 | 165 |
| No. 8 | 272 | 273 |

sah                                                                          4

1                       P R O C E E D I N G S

2               JUDGE PACINDA:   I declare this hearing now

3    open.

4               Good morning.   It's December 9, 2003.   My

5    name is Michael Pacinda.   I've been assigned by the

6    EEOC to conduct a hearing on the discrimination

7    compliant filed by Rose Mary Dews-Miller against

8    Colin Powell, Secretary, United States Department

9    of State.   The complaint is identified by EEOC

10   numbers 100-A2-7521X and 100-A2-7576X.   The case is

11   also identified by Agency numbers 00-19 and 96-15.

12              Present with me today at the hearing are

13   the following persons.   Complainant's counsel,

14   Stephen Dunn, Agency representatives Melinda

15   Chandler, Evelyn Aswad and Karen Johnson, and the

16   court reporter Susan Harris.   The Complainant

17   herself is not here yet but she will be joining us

18   for this hearing.

19              At the prehearing conference held on

20   October 28, 2002 with Judge Gunn, the parties

21   stipulated that the issues are as follows:   whether

22   Complainant was discriminated against due to

1   reprisal for prior EEO activity when she was

2   subjected to number one, continued and continuous

3   harassment by an employee in the Office of Human

4   Resources and others, who participated in creating

5   a hostile environment in personnel actions,

6   benefits, and entitlements for her after she filed

7   prior EEO complaints; number two, invasion of

8   Complainant's personal medical records obtained

9   from OWCP and then communicated to others in USIA

10  who had no right to their contents; number three,

11  withholding essential records from OWCP from

12  November 1995 to January 1997, which caused an

13  unwarranted delay in processing her claim; number

14  four, an employee's illegal and unethical

15  discussion of her medical records with other

16  unqualified persons in USIA; number five,

17  nonaccommodation under the Rehabilitation Act,

18  which requires federal agencies to develop and

19  implement plans for hiring, placement, promotion

20  and retention of persons with disabilities.

21         And the sixth issue is remanded from a

22  claim back from January 23, 1999 and that is from

sah                                                                          6

1    September 5, 1995 through November 24, 1995

2    Complainant was placed on AWOL for a work injury.

3    She reported the work injury to her immediate

4    supervisors, the rating and reviewing officers,

5    pursuant to a memorandum of understanding, Part 5-

6    A, Section 506.3(c)(1).  However, the management

7    official who placed her on AWOL was not her

8    supervisor at the time of the work injury.

9           Mr. Dunn, do you agree with the statement

10   I've just read regarding the issues before me?

11          MR. DUNN:  In regard to the 0019, that's

12   correct.

13          JUDGE PACINDA:  Okay.

14          MR. DUNN:  I don't believe you went

15   through the four issues before us arising from

16   96-15.

17          JUDGE PACINDA:  Okay.  I articulated the

18   issues as indicated in the letter of acceptance for

19   the second complaint of discrimination and my

20   understanding is that in terms of the previous

21   complaint of discrimination, that that issue that

22   I'd read was the only one that was accepted for

sah                                                                  7

1   investigation.

2           MR. DUNN:  It's my understanding--let me

3   just find the--

4           JUDGE PACINDA:  Can we go off the record

5   for a second?

6           [Discussion off the record.]

7           JUDGE PACINDA:  We're back on the record

8   after a brief break.  The Complainant Rose Mary

9   Dews-Miller, has now joined us and after a brief

10  discussion with counsel regarding the issues, I'm

11  going to read three more issues into the record

12  that are going to be decided at this hearing.

13          In terms of my numerical counting we are

14  now on the seventh issue and that is whether the

15  Complainant has been discriminated against, again

16  based on reprisal for previous EEO activity, when

17  she alleged that for the May 1, 1994 to January 24,

18  1995 performance appraisal report she received a

19  minimally successful performance rating.  The

20  rating and reviewing officers failed to discuss the

21  minimally successful rating or to explain her

22  deficiencies to her before issuing the rating

sah                                                                    8

1   pursuant to the Manual of Operations and

2   Administration, MOA Part 5A, Section 453.2(c)(1)

3   and (2) and (3).

4          The eighth issue, for the February 1, 1995

5   to July 31, 1999 performance appraisal report she

6   received a minimally successful performance rating.

7   The rating and reviewing officers failed to discuss

8   the minimally successful rating or to explain her

9   deficiencies to her before issuing the rating

10  pursuant to MOA Part 5-A, Section 453.2(c)(1) (2)

11  and (3).

12         And finally, on November 9, 1995 she was

13  denied a within-grade increase.  The rating and

14  reviewing officers failed to discuss her

15  deficiencies in performance with her that resulted

16  in the denial of the within-grade increase pursuant

17  to MOA Part 5-A, Section 453.2(c)(1), (2) and (3).

18         Mr. Dunn, is that your understanding of

19  the issues before me?

20         MR. DUNN:  Yes, with the only additional

21  comment that the issue you previously read, number

22  6, dealing with the AWOL issue, September 5, '95

sah                                                                              9

1   through November 24, '95, was read as being part of

2   0019 and I believe that's the way the progression

3   of events took it.   Because of them being dealt

4   differently in the original processing of this

5   96-15, this number 3 was carved out and later

6   inserted.

7            But those are the total number of issues

8   before you.

9            JUDGE PACINDA:   It's noted then that the

10  issue I indicated as being issue number 6 is

11  actually part of the 96-15 complaint.

12           Agency counsel, is that your understanding

13  of the issues?

14           MS. ASWAD:   Yes, Your Honor.   The only

15  thing I'd point out, I think on issue 8 you may

16  have said July 31, 1999 instead of '95.   I'm just

17  clarifying the date of the issue.

18           JUDGE PACINDA:   Thank you.

19           At the prehearing conference Judge Dunn

20  also moved on the parties' request for witnesses.

21  She approved the following witnesses for the

22  Complainant:   Complainant herself.   She also

sah                                                                    10

1   approved Balljeet Sethi, M.D., Mahesh Chandra,

2   M.D., Jenny Mallios, Jan Brambilla, Blanche

3   Twardowski, Darwin Roberts, Louis Leporatti, and

4   Carol Keith, as well as Eva Diekmann.

5        The following witnesses were approved for

6   the Agency:  Jenny Mallios, Jan Brambilla, Blanche

7   Twardowski, Darwin Roberts, Louis Leporatti, Carol

8   Keith, and Eva Diekmann.

9        It's since been brought to my attention

10  that Miss Diekmann has been dropped as a witness.

11  Also in the interim since the prehearing conference

12  Dr. Sethi has been disapproved by Judge Gunn and

13  Dr. Chandra's testimony will be taken after the

14  liability phase in this hearing in the event that a

15  finding of discrimination is made.

16       The purpose of today's hearing is to give

17  an opportunity to both parties to state their case.

18  I do not plan to strictly follow the Federal Rules

19  of Evidence.  I will generally admit evidence that

20  is relevant, material and not unduly repetitious.

21       Mr. Dunn, do you have any questions or

22  comments before we get under way?

sah                                                                              11

1           MR. DUNN:  No, Your Honor.

2           JUDGE PACINDA:  Agency counsel?

3           MS. ASWAD:  Do you have a schedule you

4    envision us following, just so we can let the

5    witnesses know from this time to this time you need

6    to be near the phone or you can have lunch?  Do you

7    have a schedule for the day?

8           JUDGE PACINDA:  I'm going to be pretty

9    lenient with that.  I imagine that the parties have

10   a little better understanding of how long will be

11   required for each witness to testify.  I'm kind of

12   willing to take breaks and take lunch as we go on.

13          So I guess no, I don't have a specific

14   schedule, other than the one you gave me in terms

15   of which witnesses will be called, in what order.

16          Do the parties intend to make opening

17   statements?

18          MR. DUNN:  I can make an opening

19   statement.

20          JUDGE PACINDA:  Okay, Mr. Dunn?

21      OPENING STATEMENT ON BEHALF OF COMPLAINANT

22          MR. DUNN:  Thank you very much, Your

sah                                                                    12

1   Honor, for the opportunity.  On behalf of Ms.

2   Dews-Miller, my client, I'd like to present to you

3   an outline of what will be the means of proving her

4   case.

5         As you've noted, there are by your

6   accounting numerous allegations, present issues

7   arising out of two independent complaints and as

8   noted, these allegations have been consolidated due

9   to the similarity of the allegations involved and

10  the parties, as well as the nature of the evidence.

11        The situation involves Ms. Dews-Miller, a

12  career employee of the Department of State,

13  formerly of the USIA, United States Information

14  Agency, which was an independent agency and

15  subsequently absorbed into the Department of State.

16  Ms. Dews-Miller on several occasions filed EEO

17  complaints that winded their way through the

18  system, the EEO complaints that were prior to the

19  two complaints before you today.  These complaints,

20  you'll hear in testimony from Ms. Dews-Miller,

21  resulted in a settlement agreement and this

22  settlement agreement provided for Ms. Dews-Miller

sah                                                                              13

1   to be given the opportunity to prove herself in

2   jobs, first in the Department of State as a

3   comptroller, working in the comptroller's office as

4   a budget analyst.

5          It was a six-month detail and you'll hear

6   specifics as to how she was to prove herself in

7   order to convert this temporary six-month

8   appointment into a permanent appointment.  And it

9   turns out that Ms. Dews-Miller was not given a

10  satisfactory evaluation and as a result of the

11  unsatisfactory evaluation you'll hear testimony

12  from Miss Dews-Miller that she was then reassigned

13  to another organization, the Office of Inspector

14  General, where she again was provided for a trial

15  period, which again resulted in nonsatisfactory

16  ratings and ultimately she was, under the terms of

17  the original settlement agreement, converted into a

18  noncareer employee and ultimately separated from

19  the federal service.

20         It's her allegation, her complaint, her

21  testimony, that the unsatisfactory evaluation she

22  received, the not fully satisfactory evaluation she

sah                                                                      14

1    received in those two temporary appointments was a

2    result of retaliation for her prior EEO activity.

3         Additionally, there will be other

4    instances of retaliation, other instances

5    demonstrating hostile work environment.  These

6    other instances will cover issues relating to

7    denial of a within-grade increase while assigned to

8    these temporary appointments.  There is another

9    instance demonstrating hostile work environment and

10   retaliation specifically relating to a workers

11   compensation claim that Ms. Dews-Miller had filed,

12   which was ultimately approved.

13        These allegations are indeed contained in

14   these two reports of investigation and the

15   testimony will bring forth the allegations as being

16   proven, showing that the Complainant was the victim

17   of a death of 1,000 cuts, so to speak, not one

18   individual instance taken by itself showing the

19   Complainant being the victim of overt

20   discrimination.  Nevertheless, with the actions of

21   management in getting back at Ms. Dews-Miller, it

22   ultimately resulted in what they sought to achieve,

sah                                                                      15

1  which was her separation.  That concludes my

2  opening.  Thank you for your attention.

3           JUDGE PACINDA:  Thank you, Mr. Dunn.

4           Ms. Aswad?

5        OPENING STATEMENT ON BEHALF OF AGENCY

6           MS. ASWAD:  Judge Pacinda, today's case is

7  based solely on a theory of reprisal.  As the

8  hearing goes on it'll become quite evident that

9  there isn't any evidence linking the various

10 personnel actions to retaliatory motive.  In fact,

11 the evidence will show quite conclusively that

12 there was a simple and legitimate reason for each

13 personnel action.

14           For example, the Complainant's employment

15 was terminated pursuant to the explicit provisions

16 of her own EEO settlement agreement.  That

17 agreement was entered into with the help of her own

18 counsel and under the supervision of an EEO

19 administrative judge.  Under the explicit terms of

20 that agreement she was to be detailed to the Office

21 of the Comptroller within the USIA for a period of

22 six months.  If she received a rating of fully

sah

16

1   successful she would remain in that office.  If she

2   did not, she would move to a second position for a

3   period of three months, and the same terms applied.

4   If she achieved a rating of fully successful she

5   would remain there.  If she did not, she would be

6   put on a temporary appointment not to exceed one

7   year.

8           In sum, she did not achieve the necessary

9   ratings.  She was put on the temporary appointment.

10  When the appointment expired her employment was

11  terminated pursuant to the terms of her own

12  settlement agreement.

13          Similarly, the Complainant claims that she

14  was improperly denied a within-grade increase in

15  the fall of 1995.  Testimony and the record

16  evidence will show the regulations at the time

17  mandated that within-grade increases not be given

18  unless an employee's most recent performance

19  evaluation was at the fully successful level.

20  Because her evaluations were not at that level, she

21  was denied a within-grade increase pursuant to the

22  terms of the regulations.

sah

1    The ratings.  You will hear Complainant's

2   supervisors from two different offices in the

3   USIA--the Office of the Comptroller, as well as the

4   Office of the Inspector General--and they will

5   testify in detail as to why they each separately

6   and independently gave her minimally successful

7   ratings.

8        Another personnel action that's complained

9   of is that she was improperly placed on absence

10  without leave for approximately three months.  You

11  will hear testimony and abundant record evidence

12  that she was placed on absence without leave

13  because she provided wholly inadequate

14  documentation of her medical problem to support

15  such an extended absence from federal service.

16       Another complaint regards privacy, that

17  her medical records were disclosed and improperly

18  communicated to others.  You will again hear

19  testimony about the care which the personnel office

20  took to safeguard these medical records and you

21  will hear undisputed testimony that these records

22  were not shared with anyone other than

1  Complainant's own representative and then only with

2  her explicit authorization.

3        Final payments.  Another example of her

4  complaints is that she was denied her final salary

5  and salary-related payments.  You'll be presented

6  with testimony and record evidence that she has not

7  received these payments simply because she has

8  failed to sign the final check-out form, which was

9  required of all employees leaving service in order

10 to account for government property and to make sure

11 all security issues have been complied with.  If

12 she had signed the check-out form she would have

13 received these payments.

14        In a nutshell, Your Honor, you will hear a

15 plethora of complaints today about various

16 personnel actions by various actors in the USIA.

17 You will hear no evidence linking any of them to

18 retaliatory motives and you'll be presented with

19 testimony and record evidence disclosing simple,

20 legitimate reasons for each and every action.

21        I'd like to note as a matter of context

22 that this case is in many ways the Complainant's

sah                                                                      19

1   third bite at the apple.  She has raised the

2   substance of many of these claims before the Office

3   of Special Counsel, in which she claimed these

4   personnel actions were taken in retaliation for

5   whistleblowing.  The Office of Special Counsel

6   investigated these claims and found them to be

7   without merit.  The appeal to the MSPB was also

8   unsuccessful.

9          These claims were also raised in the EEO

10  process by claiming that the settlement agreement,

11  which I referred to earlier, was breached.  That

12  claim was also unsuccessful in the EEO process.

13         So today, Judge Pacinda, we ask you to

14  finally put these issues to rest and issue a

15  decision favorable to the Agency.

16         JUDGE PACINDA:  Thank you.

17         Ms. Dews-Miller, because you were late

18  we've since called what was going to be the second

19  witness to testify.  Apparently she's come over

20  from another office so we're going to first hear

21  from her and then we're going to take your

22  testimony after that.

sah                                                                    20

1          Good morning.

2          MS. TWARDOWSKI:  Good morning.

3          JUDGE PACINDA:  I'm Judge Pacinda.  I'm an

4    administrative judge with the EEOC and I've been

5    assigned to preside over this complaint of

6    discrimination filed by Miss Dews-Miller.

7          You've been approved to testify actually

8    on behalf of both parties, so what's going to

9    happen is that the Agency representative will ask

10   you a series of questions first and then Ms. Dews-

11   Miller's representative will have a chance to ask

12   you questions, as well.

13         Before you testify I'm going to swear you

14   in, so can you please raise your right hand?

15         Whereupon,

16                   BLANCHE TWARDOWSKI

17   was called as a witness and, after having been

18   first duly sworn by the Administrative Judge, was

19   examined and testified as follows:

20         JUDGE PACINDA:  Your witness.

21         MS. CHANDLER:  Thank you, Your Honor.

22                   DIRECT EXAMINATION

1            BY MS. CHANDLER:

2      Q    Ms. Twardowski, would you please state

3  your full name for the record and spell it for the

4  benefit of all of us?

5      A    Blanche Elizabeth Twardowski,

6  T-w-a-r-d-o-w-s-k-i.

7      Q    Ms. Twardowski, how long have you worked

8  for the federal government?

9      A    Twenty-nine years.

10     Q    What is your current position?

11     A    I'm currently a program analyst in the

12  Bureau of Human Resources at the State Department.

13     Q    And your grade?

14     A    GS-14.

15     Q    How long have you served in your current

16  position?

17     A    Since October 1, 1999.

18     Q    And what happened October 1, 1999?

19     A    That's the date that USIA was

20  congressionally merged with the State Department.

21     Q    Before the merger what position did you

22  hold at USIA?

sah                                                                      22

1       A    Immediately at the time of the merger I

2  was the director of operations, civil service

3  operations in the Office of Personnel.

4       Q    What functions did you supervise in that

5  capacity?

6       A    Supervised a wide range of personnel

7  liaison, such as staffing, classification,

8  recruitment, employee relations, employee benefits,

9  and workers compensation.

10      Q    In that position at USIA who were your

11  first- and second-line supervisor?

12      A    Patricia Noble was my first-line

13  supervisor and Janice Brambilla was my second-line

14  supervisor, who was the director of personnel.

15      Q    Did you supervise any employees?

16      A    I supervised at the time of the merger

17  approximately 15 employees.

18      Q    Was Jenny Mallios one of the employees you

19  supervised?

20      A    Yes, she was.  She was a personnel

21  management specialist on my staff.

22      Q    In any of the two positions you have just

sah                                                                    23

1  described for us or at any of your previous

2  positions have you had a need to know about equal

3  employment opportunity and the prohibitions against

4  discrimination in the workplace?

5      A    Yes, throughout my years in the personnel

6  field I certainly have attended many classes and

7  have had opportunity to put into practice what I

8  have learned about that.

9          In addition, I had served one year--from

10 1984 to 1985 I was an investigator in USIA's Office

11 of Equal Employment Opportunity.

12     Q    How did you first come to know Ms.

13 Dews-Miller?

14     A    I first met Rose Mary when she was a

15 personnel assistant at the Voice of America.

16     Q    Could you describe your relationship with

17 her at that time?

18     A    I was a management intern and was serving

19 a series of rotational assignments and one of my

20 assignments was in the Personnel Office at VOA and

21 I met her there as a personnel assistant.  We had a

22 normal collegiate office-type relationship.

sah                                                                          24

1       Q    When you first came to know Ms.

2    Dews-Miller were you her supervisor?

3       A    No, I was there strictly in an internship

4    capacity.

5       Q    Did there ever come a time when in your

6    capacity at USIA that you made any personnel

7    decisions or otherwise became involved with Ms.

8    Dews-Miller's employment situation?

9       A    Yes, I became aware of--I never supervised

10   her.  However, I became aware of the situation

11   regarding her employment in the fall of 1995.  When

12   I returned from an extended period of absence I was

13   informed of a situation.

14      Q    What situation were you informed of?

15      A    Jenny Mallios informed me that there was

16   an issue regarding performance and that there was a

17   reassignment pending on detail to another office

18   and I became aware of the issues regarding that.

19      Q    Were you aware of a settlement agreement

20   involving Ms. Dews-Miller?

21      A    Yes.

22      Q    Were you a deciding official with regard

sah                                                                          25

1   to any aspect of that settlement agreement, a

2   management official, responsible management

3   official?

4        A    When you say deciding official are you--

5        Q    I really meant responsible--

6        A    In terms of the official use of that, a

7   deciding official in terms of that?  I wouldn't

8   characterize it as a deciding official.  I

9   certainly was a participant in the process but not

10  necessarily the deciding official.

11       Q    You testified that while at USIA you

12  supervised the workers compensation function.

13  Could you identify for us who handled the

14  day-to-day interactions with the Office of Workers

15  Compensation?

16       A    Jenny Mallios, who was on my staff as a

17  personnel management specialist, was the most

18  qualified person on our staff in terms of working

19  with the Office of Workers Compensation.  She was

20  the person who would handle all the day-to-day

21  activities.

22       Q    Did you ever have reason to handle

sah                                                                          26

1  day-to-day interactions with OWCP?

2      A    Not at that time, no.

3      Q    As Ms. Mallios's supervisor or the

4  supervisor of the OWC function, either one, did you

5  ever review the medical records that Ms.

6  Dews-Miller had submitted in support of her workers

7  compensation claim?

8      A    No, I don't recall doing that.

9      Q    Did you ever discuss with anyone the

10  medical condition that was disclosed in those

11  workers compensation records?

12      A    No.

13      Q    Do you have any reason to believe, in your

14  capacity as Ms. Mallios's supervisor, that Ms.

15  Mallios ever disclosed Ms. Dews-Miller's workers

16  compensation medical records to anyone who did not

17  have a need to know?

18      A    No, I have absolutely no reason to believe

19  that.

20      Q    To your knowledge, did Ms. Mallios

21  withhold any of Ms. Dews-Miller's workers

22  compensation documents from the Office of Workers

sah                                                                              27

1  Compensation?

2          MR. DUNN:  Objection--the basis of her

3  being able to give that opinion.

4          MS. CHANDLER:  The response to that is

5  it's based on her capacity as Ms. Mallios's

6  supervisor.

7          JUDGE PACINDA:  Overruled.  I'll let her

8  answer.

9          THE WITNESS:  No, I have absolutely no

10  reason to believe that she withheld any

11  information.  Quite to the contrary, I've always

12  found her to be a most efficient employee.

13          BY MS. CHANDLER:

14      Q    To your knowledge as Ms. Mallios's

15  supervisor, did Ms. Mallios in any way delay the

16  processing of Ms. Dews-Miller's Office of Workers

17  Compensation claim?

18      A    Again absolutely not.  From my perspective

19  she was interested in efficiently handling this

20  case, as well as all the other cases that she dealt

21  with.

22      Q    As her supervisor, how would you evaluate

1   Ms. Mallios's professional ethics?

2       A    I think she's of the highest standard, of

3   the highest caliber.  I supervised, as I said, in

4   29 years in the personnel field I've supervised

5   many, many, many dozens of people and I consider

6   her to be one of the best qualified personnel

7   specialists I've ever worked with or supervised.

8   She has a high sense of efficiency and a high

9   quality of professionalism and standards that she

10  applies to every task she undertakes.

11       So without question I endorse her

12  qualifications and her integrity.

13      Q    Did Ms. Dews-Miller ever tell you that she

14  had a disability?

15      A    No.

16      Q    Did Ms. Dews-Miller ever request from you

17  an accommodation for any disability?

18      A    No.

19      Q    To your knowledge in your capacity at

20  USIA, did she ever request an accommodation from

21  anyone else at USIA?

22      A    Not that I'm aware of, no.

sah                                                                          29

1        Q    Did you ever create, yourself, a hostile

2   work environment for Ms. Dews-Miller?

3        A    Absolutely not.

4        Q    Did you ever observe anyone else at USIA

5   creating a hostile work environment for Ms.

6   Dews-Miller?

7        A    Absolutely not.

8             MS. CHANDLER:  Your Honor, I have no

9   further questions.

10            JUDGE PACINDA:  Mr. Dunn?

11            MR. DUNN:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13            BY MR. DUNN:

14       Q    Good morning, Ms. Twardowski.

15       A    Good morning.

16       Q    You indicated you were out for a period of

17  time and it was during that time you learned of Ms.

18  Dews-Miller having an unsuccessful period at a

19  detail?

20       A    It was when I returned in August of '95,

21  yes, that I learned that there was an issue with

22  performance.

sah

1      Q    Okay.  And how long of a period were you

2   out of work?

3      A    I was out from January to August of '95.

4      Q    And what would have been your relationship

5   with Miss Dews-Miller during that time frame had

6   you been employed or working directly at the

7   Department of State?

8      A    At USIA?

9      Q    USIA.  I'm sorry, yes.

10     A    During the period of my absence?

11     Q    Yes.

12     A    If I had been at work?

13     Q    Right.

14     A    What would my relationship have been

15  with--as with any other employee, there were

16  roughly 1,500 employees, civil service employees

17  that I--

18     Q    So there was no direct work relationship

19  between the two of you.  Is that correct?

20     A    That's correct.

21     Q    And your only interaction with her during

22  that time frame had you been working would have

sah                                                                            31

1    only been in your capacity as a personnel

2    specialist?

3        A    That's correct.   It's something of a

4    hypothetical, but right.

5        Q    Were you aware of who Miss Dews-Miller's

6    supervisor was during that time frame?

7            MS. CHANDLER:   Which time frame?

8    Objection.

9            BY MR. DUNN:

10       Q    The time frame you were out of work,

11   January through August '95.

12       A    I don't know.   I don't recall.

13       Q    Do you recall where she was assigned?

14       A    I do believe she was in the Office of the

15   Inspector General.

16       Q    And upon your return to work you learned

17   that she had received a minimally successful

18   evaluation.   Is that correct?

19       A    That's correct.

20       Q    And this minimally successful evaluation

21   resulted in her being transferred to another

22   organization.   What was that organization?

sah

1      A    I believe that she was detailed to the

2   Office of the Comptroller.

3      Q    And she was to perform duties as a budget

4   analyst there?

5      A    That was my understanding, yes.

6      Q    Were you involved in the evaluation of

7   Miss Dews-Miller's qualifications for assignment as

8   a budget analyst?

9      A    Not directly, no.

10     Q    Indirectly you reviewed the qualifications

11  of Miss Dews-Miller as being sufficient to allow

12  her to be assigned as a budget analyst?

13     A    I have no recollection of reviewing her

14  qualifications for that position.

15     Q    You indicated that it was Miss Jenny

16  Mallios who was the OWCP representative during this

17  time frame?

18     A    That's right.

19     Q    And that was at USIA?

20     A    Yes.

21     Q    Had you ever been involved in processing

22  or approving the work product relating to workers

sah                                                                33

1    compensation claims?

2        A    Yes, earlier in my career when I was a

3    personnel management specialist I was responsible

4    for workers compensation cases.

5        Q    Now Miss Dews-Miller had a claim that was

6    filed with the agency, didn't she?

7        A    A workers compensation claim?

8        Q    Yes.

9        A    Yes.  My understanding is yes.

10       Q    And ultimately that workers compensation

11   claim was approved, right?

12       A    I don't have any direct knowledge.  It's

13   been a long time and I don't have any recollection.

14   I hesitate to speak to the specifics of that.

15       Q    In any event, a person with a workers

16   compensation claim, such as Miss Dews-Miller's,

17   submitted documents, medical documents and others

18   to support the claim and it would be those

19   documents received by Miss Mallios.

20           MS. CHANDLER:  Objection.  Mr. Dunn's

21   getting very close to testifying himself.  If he

22   has a question for Ms. Twardowski, she's certainly

34

1    able to answer it.

2            JUDGE PACINDA:   Like I said, I'm being a

3    little lenient here based on the fact that both

4    parties have requested this witness, so I'm going

5    to allow him to lead to a certain degree.   If you

6    do have a question, please be frank with it.

7            BY MR. DUNN:

8        Q    Miss Mallios, her job would be to receive

9    documentation relating to workers compensation

10   claims.   Isn't that correct?

11       A    That's correct.

12       Q    And the requirement of such an individual,

13   such as Miss Mallios, would be to promptly forward

14   such documentation to the appropriate Department of

15   Labor claims examiner.   Isn't that right?

16       A    That's right.

17       Q    Now what steps have you ever taken to

18   evaluate the performance of Miss Mallios in her

19   position as a workers compensation representative

20   at the agency?

21       A    I evaluated her annually, as all federal

22   employees are evaluated annually, and workers

sah                                                                        35

1    compensation responsibilities were one small

2    component of the total responsibilities that she

3    was assigned.

4        Q    What metrics would you have applied in

5    order to evaluate her performance on the workers

6    compensation front?

7        A    Metrics?  There was no specific

8    qualification or no specific evaluation factor

9    addressing workers compensation.  Workers

10   compensation was folded into a larger category of

11   employee benefits and she would have been evaluated

12   on the basis of that.  Had there been any

13   shortcomings in her performance specifically on

14   workers compensation, that would have been noted in

15   the annual performance evaluation that she received

16   from me.

17       Q    Nevertheless, in order to evaluate her

18   performance in processing workers compensation

19   claims, it would be appropriate to establish

20   satisfactory thresholds of dealing with particular

21   claims, wouldn't it?

22       A    Again I haven't worked in the operational

sah                                                                      36

1   field in many years but I believe the appropriate

2   time frames are established by the Department of

3   Labor.  They have filing requirements for the

4   specific forms that they're receiving.  So I did

5   not establish any filing responsibilities above and

6   beyond what would normally be required by the

7   Department of Labor.

8       Q    To that end, regardless of who sets the

9   standard, whether it's Department of Labor through

10  their mandates and receiving documents or the

11  agency independently setting a time frame for

12  submitting documents, to what degree did you

13  evaluate her performance under those standards?

14      A    Again had there been any shortcomings,

15  which I'm not aware of there ever being any

16  shortcomings, but had there been any shortcomings

17  or missed deadlines or missteps specifically as it

18  pertains to the Department of Labor and filing

19  those types of claims, I certainly would have noted

20  them, but none were ever noted.

21      Q    Now can you describe in general how Miss

22  Mallios's office--let me just ask a preliminary

1  question.  Was Miss Mallios the only individual

2  responsible for processing workers compensation

3  claims?

4     A    She wasn't the only person.  All personnel

5  management specialists had that component as part

6  of their portfolio.  However, because she had a

7  particular expertise in dealing with these cases,

8  it seemed as though she got a larger number of them

9  than other specialists.

10     Q    Can you describe the procedural safeguards

11  in effect within your agency for protecting

12  sensitive medical records submitted in support of

13  workers compensation claims?

14     A    There was an established medical folder as

15  part of the official personnel recordkeeping

16  system.  There was a medical folder, so any medical

17  information that was received would have been, if

18  it was passing through the office and being

19  transmitted to the Department of Labor, it would

20  have gone immediately to the appropriate office at

21  the Department of Labor.  If it was going to be

22  retained by our office it would have been retained

sah                                                                    38

1  in the medical folder that was part of the

2  safeguarded personnel record system.

3       Q   So an individual conceivably could submit

4  medical records in support of a workers

5  compensation claim and those documents, per your

6  testimony, would have been properly submitted to

7  workers comp, but additionally those documents

8  would be safeguarded and retained in a personnel

9  folder.  Isn't that correct?

10      A   That's correct.  After they have--

11      Q   That's fine.  I just wanted to clarify

12 that.

13          Now if a supervisor wished to verify an

14 individual's fitness for duty, this personnel

15 folder would be available for a supervisor,

16 wouldn't it?

17          MS. CHANDLER:  Objection.  I'm not sure

18 that I understand the question and to the extent I

19 do, I believe it calls for speculation.  We have no

20 framework here and it does not relate to Ms.

21 Dews-Miller's claim.

22          JUDGE PACINDA:  I'm going to overrule

1  that.  If she knows the answer to the question,

2  I'll let her answer it.

3         THE WITNESS:  Since it was something that

4  never--an issue that never came up, I'm not in a

5  position to answer your question.

6         BY MR. DUNN:

7     Q    Hypothetically if an individual is out on

8  workers compensation and a supervisor requests of

9  the Personnel Office to review the personnel jacket

10 containing documentation relating to that

11 individual, it would be made available.  Isn't that

12 correct?

13    A    I don't believe so.  Again you're asking a

14 hypothetical.  I've never had a situation where an

15 individual was out and a supervisor came to me and

16 said, "Can I just see that person's medical

17 folder?"  I've never disclosed a medical folder to

18 any supervisor for any reason and I can't put

19 myself in the hypothetical.  I can't imagine a

20 situation where that would have happened.

21    Q    You'd agree that a supervisor has the

22 opportunity and the right to determine whether an

sah                                                                           40

1  employee is fit to perform that individual's

2  duties; isn't that correct?

3      A    But the information that's retained in the

4  medical folder was of a historic nature most

5  probably.  I don't think it would necessarily

6  pertain to the situation at hand.

7          For instance, commonly held information in

8  the medical folder was if someone requested an

9  advance of sick leave, they had depleted their sick

10 leave and they wanted advanced sick leave, they had

11 to supply medical documentation to support a

12 request for advanced sick leave.  That

13 documentation would be held in the medical folder

14 for recordkeeping purposes but that information of

15 a historic nature would not be germane to the

16 situation that may be preventing the person from

17 coming to work here and now.

18         So no, we did not allow supervisors just

19 to sort of randomly strum through the medical

20 folders.

21     Q    I wasn't phrasing my question in terms of

22 randomly.  A supervisor with a need to know can

sah                                                                 41

1   request a person's personnel folder.  Isn't that

2   correct?

3        A    The administrative and the performance

4   folders are held differently than the medical

5   folders.  Sir, all I can say is that I know of no

6   instance--

7        Q    That's really not my question.  My

8   question is not whether you're aware of such

9   instance.  My question deals with whether a

10  supervisor has the right to request an employee's

11  personnel folders, to include their medical folder.

12       A    No.   Then I would have to say no because I

13  just have never been--

14       Q    You don't know is what you're saying?

15       A    I don't know but I strongly doubt--

16       Q    Well, that's fine.

17       A    --that that would be the case.

18       Q    Well, we're not interested in speculation

19  here.  It's your testimony that you don't know

20  whether a supervisor would have access to a

21  personnel folder upon making a request--

22       A    You say personnel folder--

1          Q     Let me finish the question, please.    It's

2     your testimony that you don't know whether a

3     supervisor would be granted access to a personnel

4     folder when presenting to the Personnel Office a

5     need to know information about the employee.    It's

6     your testimony that you don't know the answer to

7     that.

8               MS. CHANDLER:    Objection in that Mr. Dunn,

9     I believe, is assuming facts not in evidence and

10    may be conflating the personnel folder with the

11    separate medical folder that Ms. Twardowski

12    testified to earlier.

13              So perhaps if Mr. Dunn could refine his

14    question to medical folders versus personnel

15    folders, Ms. Twardowski could answer with more

16    specificity.

17              JUDGE PACINDA:    Okay.    Well, you'll also

18    have the opportunity for redirect so if there's

19    anything you feel I need to know, you're welcome to

20    tease that out afterwards.

21              I'll allow you to continue with your

22    questioning.

1          BY MR. NESTER:

2     Q    So it's your testimony you don't know

3  whether a supervisor would be granted access to a

4  personnel folder, to include medical documentation,

5  upon presenting need-to-know information about that

6  individual's employee--

7     A    I've never seen one happen and I strongly

8  doubt that it would be possible but at this point

9  in time I would have to say no, I'm not 100 percent

10 sure, but I've never seen that happen.

11    Q    And it's your testimony that the

12 documentation an individual would submit, the

13 medical documentation an individual would submit in

14 support of advanced leave, in support of workers

15 compensation, any number of other factors, that

16 medical documentation submitted to the proper

17 personnel officer would be retained in this medical

18 folder.

19    A    That's correct.  Medical documentation of

20 a historical nature would end up in that folder.

21    Q    What is your understanding regarding Miss

22 Dews-Miller being placed in an AWOL status, absent

sah                                                                          44

1   without leave status?

2        A    During what time period?

3        Q    Are you aware of any time frame during

4   which Miss Dews-Miller was placed in an absent

5   without leave status?

6        A    I believe during the fall of 1995.

7        Q    And how did you become aware of that

8   status, the AWOL status?

9        A    Jenny Mallios probably apprised me of that

10  situation.

11       Q    And what was the specific information she

12  presented to you in regard to Miss Miller being

13  carried in an AWOL status?

14       A    My recollection is that there was not

15  sufficient documentation, medical documentation, to

16  support the absence and that in lieu of that, she

17  was marked AWOL.

18       Q    Now Miss Mallios advised you or you were

19  aware of the fact that Miss Dews-Miller had an

20  approved workers compensation claim.  Isn't that

21  correct?

22       A    It's hard for me after six or seven years

1  now to piece the timing together but obviously I

2  was aware of the fact that there was a claim.  The

3  exact timing of what I knew first or when I knew

4  it, I can't really speak to.

5      Q    Now the benefits an individual receives in

6  the form of temporary total disability pay, medical

7  benefits, scheduled award benefits, a person would

8  receive those benefits under the workers

9  compensation law; isn't that correct?

10     A    Depending on the situation, yes.

11     Q    In regard to specific benefits such as

12 temporary total disability pay that an individual

13 would receive if they are out of work and

14 temporarily disabled, the individual would receive

15 that pay from the Department of Labor; isn't that

16 correct?

17     A    Well, it's always billed back to the

18 agency, so the agency's always paying for it.  So

19 you can say it's from the Department of Labor but

20 actually it's from the agency or the department's

21 coffers.

22     Q    And it comes out of the operating budget

sah                                                                46

1   of the agency itself; isn't that correct?

2        A    I don't know what budget it would come out

3   of.

4        Q    Nevertheless, the Department of Labor is

5   not a bottomless pit of money.  It obtains its

6   funding from the individual owning agency of the

7   Claimant.

8        A    I'm not familiar with the funding

9   situation at the Department of Labor.  I just know

10  that it's billed back to the agency or the

11  department.

12            MR. DUNN:  I don't have any other

13  questions.

14            JUDGE PACINDA:  Miss Chandler, any

15  redirect?

16            MS. CHANDLER:  Yes, just a few questions.

17                  REDIRECT EXAMINATION

18            BY MS. CHANDLER:

19       Q    Ms. Twardowski, were you either the rating

20  or receiving officer for Miss Mallios?

21       A    I was the rating officer.

22       Q    And for the period in question which we've

sah                                                                          47

1  been discussing this morning, do you recall what

2  rating you gave her?

3      A    Outstanding.  In fact, I think she

4  received performance awards during that period, as

5  well.  In fact, I know she did.  She received a

6  superior honor award.

7      Q    Had you been her rating and reviewing

8  official in years prior?

9      A    Yes.

10     Q    And did she also receive consistently

11 outstanding ratings?

12     A    Yes.  I don't believe I ever marked her

13 less than outstanding.

14     Q    With regard to USIA's safeguarding of

15 medical records, were you the person responsible

16 for safeguarding those medical records on a

17 day-to-day basis?

18     A    No.

19     Q    Did you supervise that function?

20     A    At times I did.  I think immediately prior

21 to consolidation I was not the file room supervisor

22 but yes, at times I did.

sah                                                                      48

1      Q    Was it your understanding that the medical

2    records were safeguarded separately from the

3    personnel folders?

4      A    Yes.

5      Q    Do you have any recollection as to how the

6    medical records were stored or safeguarded?

7      A    I just remember them being in brightly

8    colored orange folders and they were stored in

9    Lectriever machines and they were locked and

10   safeguarded and access was very tightly controlled.

11     Q    When you say locked and safeguarded, can

12   you give us any better sense as to what you mean by

13   that?

14     A    They were in a self-contained system that

15   was under lock and key.  In addition to that, the

16   outer room where the files were held was also under

17   cipher lock.  Very few people held the combination.

18   At the time that I supervised that function I had

19   the combination but I believe that I was the only

20   person--I was thinking in the supervisory chain who

21   had that combination, in addition to the three

22   people who worked in the room.

sah                                                                              49

1              So the access was very tightly held.   In

2    fact, when I was no longer the supervisor of that

3    room I remember they changed the cipher lock and I

4    remember making a joke about the fact like "Oh, you

5    know, you don't trust me to get back in again."

6              So yes, they even changed it when the

7    supervisory chain of command changed.

8        Q    Do you recall who was responsible for

9    approving or denying access to the cipher-locked

10   room which contained the medical records?

11       A    It would have probably been the director

12   of personnel.

13       Q    And that person's name was?

14       A    Janice Brambilla.

15       Q    Did Jenny Mallios have the authority to

16   approve or deny access to the cipher-locked room?

17       A    No.   Nor would she have had the

18   combination.

19             MS. CHANDLER:   Nothing further, Your

20   Honor.

21             JUDGE PACINDA:   I just wanted to ask you

22   in this cipher-locked room where the medical

sah                                                                    50

1    records were kept were any other records kept in

2    there?

3              THE WITNESS:  The personnel folders, the

4    administrative and performance folders of the

5    individuals--all of our employees, Foreign Service

6    and civil service.

7              JUDGE PACINDA:  So they were kept

8    together?  They were under the same lock and key?

9              THE WITNESS:  They were in the same room,

10   yes, but not necessarily in the same self-contained

11   unit.

12             JUDGE PACINDA:  So an employee would have

13   their personnel file perhaps in one location in

14   this room and the medical file would be in a

15   separate location?

16             THE WITNESS:  It's possible.  It's

17   possible that the medicals were held in a separate

18   unit.  I believe they were but I can't, again after

19   all these years, say with 100 percent certainty

20   that they were, that the medicals were kept in a

21   separate Lectriever.  It could have been that they

22   were merged in with the others but the entire

sah

1   folder system was under lock and key in the system,

2   as well as at the door.

3          And individual employees who came to

4   access their administrative or personnel

5   performance folders would not have had access to

6   that room.  There was, in addition to the machines

7   being locked, the door had like a split door so

8   that during hours of operation employees had to go

9   to their personnel management specialist, who in

10  turn were the only ones authorized.  There was a

11  list of authorized people who could access

12  personnel folders.

13          JUDGE PACINDA:  Thank you.

14          THE WITNESS:  And employees would not have

15  been on that list, or supervisors.

16          MR. DUNN:  I just wanted to ask one

17  follow-up question.

18          JUDGE PACINDA:  Go ahead.

19                  RECROSS-EXAMINATION

20      BY MR. DUNN:

21      Q    So it's my understanding based on your

22  familiarity with the system, based on your

sah                                                                    52

1  understanding of how Miss Mallios conducted her

2  workers compensation duties and other personnel

3  duties, that upon an individual submitting medical

4  records to support a claim, ultimately after Miss

5  Mallios sent the records off to workers comp that

6  these records would be maintained for purposes of

7  history regarding the individual.  Is that correct?

8      A    That's--yes, that's standard procedure,

9  that they would have been maintained for history.

10     Q    And additionally there wouldn't have been

11 any separate segregation of workers comp document

12 submissions versus other types of medical

13 documentation submitted in support of some routine

14 absence?

15     A    No.  In terms of the medical folders?

16     Q    Correct.

17     A    No.

18          MR. DUNN:  No other questions.

19          JUDGE PACINDA:  Okay, thank you very much

20 for your time.  I ask that you do not discuss your

21 testimony with anybody outside this room.

22          THE WITNESS:  Sure.

sah                                                                    53

1            [Witness excused.]

2            JUDGE PACINDA:  Off the record, please.

3            [Discussion off the record.]

4            JUDGE PACINDA:  Back on the record.

5            Good morning, Ms. Dews-Miller.

6            MS. DEWS-MILLER:  Good morning.

7            JUDGE PACINDA:  I'm sure you've gleaned by

8    now I'm Judge Pacinda.  I'm the administrative

9    judge employed by the EEOC assigned to preside over

10   this complaint of discrimination.

11           I've approved you to testify, obviously on

12   your own complaint, and before you testify I'm

13   going to swear you in, so if you'll please raise

14   your right hand.

15       Whereupon,

16                 ROSE MARY DEWS-MILLER

17   was called as a witness and, after having been

18   first duly sworn by the Administrative Judge, was

19   examined and testified as follows:

20           JUDGE PACINDA:  I'll ask that when you

21   testify you speak clearly so that the court

22   reporter can record everything you say and that you

1    ensure that all your responses are verbal, as

2    opposed to nods and things like that that would not

3    necessarily be reflected in the record.

4            So with that said, Mr. Dunn?

5            MR. DUNN:  Thank you, Your Honor.

6                    DIRECT EXAMINATION

7            BY MR. DUNN:

8        Q    Ms. Dews-Miller, can you give us a

9    thumbnail sketch of your civil service history?

10       A    Okay.

11       Q    Leading up to approximately 1990.

12       A    Okay.  June 1972 I was employed as a

13   clerk-typist by the United States Information

14   Agency as a GS-2 and later was reassigned and

15   promoted in the Office of Personnel at that time.

16           Thereafter I was assigned to the Office of

17   Payroll as a clerk-typist from 12/24/72 until

18   approximately '95, December of '95.

19           JUDGE PACINDA:  Excuse me.  Could I

20   interrupt briefly?  I notice the witness is reading

21   off a document.  Is this document in evidence?  Is

22   this something that's just refreshing her

sah                                                                     55

1    recollection?  I mean generally I prefer for your

2    counsel to ask you questions and you to answer from

3    memory.  Certainly you can use documents to refresh

4    your recollection but I'd prefer you to not

5    directly be reading from a document.

6              THE WITNESS:  Okay.

7              JUDGE PACINDA:  Unless I'm

8    misunderstanding something, unless this is in the

9    ROI.

10             Mr. Dunn, do you have any clarification on

11   this?

12             MR. DUNN:  Well, this is just background.

13   It'll be fine if Miss Dews-Miller gives a

14   recitation from her memory of her assignments.

15             THE WITNESS:  Okay, let me try.

16             MR. DUNN:  Just the high points.

17             JUDGE PACINDA:  Thanks.

18             THE WITNESS:  Okay, I was in the Payroll

19   Office and later assigned to the--this is December

20   of '95--later assigned to the Office of Comptroller

21   as an accounting technician, '75.  Then in '76 I

22   was assigned to the old ICS as a GS-6.  I'm not

1  sure what the title was.   It was a cashier or

2  something of that nature.

3         From there I went to the Office of

4  Personnel at the Voice of America as a personnel

5  assistant in July of '76 and later was--I worked

6  there and got my promotion to a GS-7 and went in

7  December of '82 to the Office of European Affairs

8  as a GS-6 secretary because I took a demotion to

9  try out for a Foreign Service secretary position.

10         Later I went to take the typing exam and I

11  typed 59 words instead of 60 and I didn't make it

12  to the Foreign Service assignment.

13         And later I was assigned a secretary in

14  the Office of Comptroller in 1994 in the Budget

15  Operations Division.   I worked there until 197--no,

16  '84; I'm sorry.   In 1984 to 1986 I was also a

17  secretary.

18         Then in '86 I went to the Worldnet

19  Division as a unit manager and that was a GS-8.

20  And from there I went--that would have been in '88,

21  August of '88--I went from the Television Division

22  up to the Office of African Affairs as an

1 administrative assistant, GS-7 and later was

2 promoted to administrative officer, GS-9, and I

3 stayed there from August of '88 until March of

4 1990.

5        I was later reassigned to the Office of

6 Comptroller as a GS-9, administrative officer,

7 March 1990, and promoted November of 1990 to a

8 GS-11, administrative officer in the Office of

9 Inspector General.

10       My primary duties in the Office of

11 Inspector  General as the admin officer was

12 primarily to do their budget work, some of the

13 personnel work.  It was no contracting involved

14 because I wasn't warrant as a contracting officer.

15 General administrative duties.

16       I was selected by Mr. Paul Johnston at

17 that time.  I received a rating from Mr. Johnston

18 of highly successful and I was such an asset to the

19 Office of Inspector General.  That would have been

20 from March of '90 until he left in June--what would

21 the rating period have been--somewhere in '91.

22       Shortly after Mr. Johnston left there was

sah                                                                 58

1   Darwin Roberts that came in from the Office of

2   Contracts and he became my supervisor at that point

3   and I was rated by him from I want to say May of

4   '91 to April of '92 as highly successful and he was

5   also stating in the ratings that I was an asset to

6   the Office of Inspector General.  And the reviewing

7   officer at that time was Louis Leporatti.  That's

8   '92.

9           Then in May of '92 to April of '93 I was

10  also rated by Mr. Darwin Roberts and Louis

11  Leporatti in the Office of Inspector General and at

12  that point I received a fully successful rating

13  from the Office of Inspector General but in between

14  this time there was a required EEOC, Office of

15  Civil Rights meeting in January of 1993, and at

16  that point this is when I raised the issue that the

17  Office of Inspector General had not hired any

18  minority auditors on the audit staff since 1987.

19          BY MR. DUNN:

20      Q   Now at this point you were working, Ms.

21  Dews-Miller, in the Office of Inspector General.

22  Is that right?

sah                                                                    59

1      A    Yes.

2      Q    And you raised this issue of the agency

3   not  hiring any minorities as budget analysts; is

4   that right?

5      A    Uh-uh, as auditors.

6      Q    As auditors?

7      A    As auditors.

8      Q    And that they had not hired minorities as

9   auditors in what organization?

10     A    In the Office of Inspector General on the

11  audit staff.

12     Q    And what was the approximate time frame of

13  making this revelation to the management?

14     A    I made the statement I think it was

15  January 19, 1993.

16     Q    And what happened as a result of making

17  that statement?

18     A    In this particular meeting it was in an

19  EEO meeting and in this particular meeting there

20  was present at the time about five employees from

21  the Office of Inspector General, including myself,

22  Louis J. Leporatti, John Pratt, Virgil Lopez and