# EXHIBIT   42

Transcript of EEOC Hearing Pages 60 - 120
Part 2 of 5

sah                                                                          60

1   Virginia Salogi.  And when I made the statement Mr.

2   Leporatti, he said, "No, no, that's not true.  We

3   can't hire minorities in the agency.  We have to

4   get them from outside of the agency."

5        And at that point it was a letter that

6   came from the director saying that--the director of

7   the agency--that if you had any cause or think that

8   you had been discriminated against then you could

9   also file a complaint with the agency.

10       So upon making this statement at the

11  meeting, Mr. Leporatti gets back to the office and

12  he lets everyone know that I made the statement and

13  he tells me about March or April of '93 that there

14  was no room in that Office of Inspector General for

15  me as an auditor and what I had did, talking with

16  some of the auditors in the Office of Inspector, I

17  learned that I was to submit my application to the

18  Office of Personnel Management to have it rated.

19       MS. CHANDLER:  Your Honor, I know that

20  you're engaging in acceptance of testimony but at

21  the moment the Complainant is testifying to matters

22  which have been fully settled by reason of an

sah

1  earlier EEO complaint and are not at issue here.

2          JUDGE PACINDA:  Okay, I'm going to sustain

3  that.

4          Mr. Dunn, can you ask some questions?

5          MR. DUNN:  Well, the reason she's bringing

6  out this prior EEO activity is that the individuals

7  to whom she made the statement--Roberts,

8  Leporatti--have a direct bearing on the issues in

9  this case.  It's important to know the background

10  that led to the settlement of the prior EEO case in

11  terms of who was involved in that prior EEO case,

12  giving rise to the issues we have here relating to

13  retaliation, relating to the common players between

14  the two.

15          JUDGE PACINDA:  So it's my understanding

16  that this EEO activity from January 1993 is the

17  protected activity that--

18          MR. DUNN:  One of several; that's correct.

19  And I know that you would rightly be concerned if

20  this were the only one and there were a large gap

21  in time between such protected activity and a later

22  complaint regarding retaliation, but there were a

sah                                                                    62

1    number of protected EEO complaints that were

2    submitted.

3           JUDGE PACINDA:  I understand the fact that

4    this protected activity occurred.  You've already

5    indicated who the players were.  I don't really

6    need to hear the merits about a case that's already

7    been settled.

8           MR. DUNN:  Very good.

9           JUDGE PACINDA:  The fact of it is enough.

10          MR. DUNN:  Okay.

11          BY MR. DUNN:

12      Q    Miss Dews-Miller, if you could, this

13   complaint you made was one of several EEO

14   complaints that you made prior to the EEO

15   complaints we have at hearing today.  Isn't that

16   correct?

17      A    Yes.

18      Q    Why don't you go to the next complaint you

19   made and the persons against whom you were filing

20   that complaint?

21      A    The next complaint I made would be when I

22   informed the inspector general on September 16,

sah                                                                    63

1    1994, Marian C. Bennett, that employees in the

2    Office of Inspector General were misusing their

3    credit cards and it was to my knowledge I had

4    received from American Express the itemized

5    billings of all of the employees of the Office of

6    Inspector General.

7        Q    Now you were at this point assigned in the

8    Office of Inspector General.  What were your duties

9    there?

10       A    Still the administrative officer.

11       Q    And part and parcel of that job was to

12   receive the American Express account information

13   regarding the employees at OIG; is that right?

14       A    Correct.  But what happened was this

15   wasn't all along.  It happened in August of '94

16   that they had an agency coordinator that was

17   receiving all of the agency's American Express

18   billings.  Then it was noticed that there was

19   misuse throughout the agency and then they assigned

20   the administrative officers in each division the

21   duty of monitoring the American Express billings.

22       Q    Nevertheless, you were administrative

sah                                                                          64

1    officer in the OIG; is that right?

2        A    Yes.

3        Q    And part of your duties were to receive

4    the American Express account information regarding

5    the employees at OIG.

6        A    Yes.

7        Q    And your duties were additionally to

8    review the actual expenditures on the account

9    information.

10       A    Exactly.

11       Q    And you learned through reviewing these

12   documents that there were account abuses committed

13   by employees at OIG.

14       A    Yes.

15       Q    Can you describe the nature of the account

16   abuses?   What was it?   Dealing with making

17   purchases not authorized for an employee holding

18   such an account?

19       A    Yes.

20       Q    And what steps did you take in terms of

21   revealing or disclosing the information relating to

22   this account abuse?

1      A    What I did, I went to the IG's secretary,

2   Dorothy Butler, and requested an appointment to see

3   the IG to show her this information.   This was on

4   or about the 12th of September, 1994 and I did not

5   receive an appointment until on September 16, 1994.

6           By that time I had made copies of the AMEX

7   bills, billings, and demonstrated, showed to, made

8   copies for--oh, who attended this meeting was Louis

9   Leporatti, Darwin Roberts, Marian C. Bennett, the

10  IG, and Renee DeVigne.

11          When I gave out the packet and they saw

12  that there were at least six employees in the IG's

13  office that had misused their AMEX card Mr.

14  Leporatti spoke up at this point and said, "Oh,

15  they didn't mean to do this.   This is a mistake,"

16  et cetera.

17          At the very next response the IG comes

18  out, "Well, this is the Office of Inspector General

19  and this is not to be happening in here.   What if

20  it's shown on the front page of the Washington

21  Post?"

22          Then after that I was told what I did was

1    correct, that I should have informed the IG but on

2    September 20 or September 22, somewhere along in

3    there, of '94 there were employees coming to me

4    telling me that I should not have did this, such as

5    David Bruce, who was a criminal investigator, and

6    he was one of the abusers.  I should have come to

7    the employees themselves and--

8         Q    Ultimately, Ms. Dews-Miller, you filed a

9    complaint dealing with issues arising from your

10   disclosure of the credit cared abuse.  Is that

11   right?

12        A    Yes.

13        Q    As a matter of background, this credit

14   card abuse was rampant across the entire government

15   workforce; is that right?

16        A    Yes.

17        Q    It was publicized in many papers; is that

18   right?

19        A    Mm-hmm.

20        Q    Now can you describe the nature of the

21   complaint you filed arising from factors relating

22   to your disclosing credit card abuse?

1      A    Okay.  What I did, I went to file the

2   complaint or what I thought was a complaint to the

3   Office of--well, what I did, I went through my

4   congressman, Steny Hoyer, and filed a complaint,

5   requesting that he file a complaint with the Office

6   of Special Counsel on my behalf because I had

7   disclosed this information and at this point I was

8   seeing retaliation in the Office of Inspector

9   General.

10     Q    What was the nature of the retaliation

11  that you were bringing to the front?

12     A    The nature was that my work was increased.

13  No matter what I did, I couldn't do it right, in

14  accordance to Mr. Roberts or Leporatti.  The

15  evaluation from--what was that?  That would be May

16  1, '94 till January 25 or somewhere of '95.  This

17  would have been the time period that I was still in

18  the IG's office after the disclosure of the AMEX

19  card abuse.  That was minimally successful.

20          If I requested leave, and I did request

21  sick leave from Darwin Roberts in October of '94

22  and he suggested that I had to provide him with so

1  much detail why I had to take leave and et cetera,

2  but I had sufficient leave to cover this time

3  period that I was requesting it for.

4          What else happened?

5      Q   Did he deny your leave or he made it a

6  burdensome task to request leave?

7      A   He made it a burdensome task to request

8  the leave.

9      Q   And ultimately you filed a complaint with

10 the Office of Special Counsel--is that right?--in

11 regard to the treatment you received following the

12 disclosure?

13     A   Yes.

14     Q   And this ultimately resulted in Merit

15 System Protection Board appeal, which proved

16 unsuccessful?

17     A   Right.

18     Q   And did you file any EEO complaints

19 arising from your treatment following your credit

20 card abuse disclosure?

21     A   Yes.  That is part of the complaint we're

22 here with now.

sah                                                                    69

1      Q    Now you touched upon one of the issues

2  that is present here today dealing with a minimally

3  successful evaluation from the period of May 1, '94

4  through January 24, '95.

5      A    Correct.

6      Q    Now what organization were you assigned to

7  at that point?

8      A    At that point I was still in the Office of

9  Inspector General.

10      Q    And who were your supervisors at that time

11  frame?

12      A    Darwin Roberts and Louis Leporatti.

13      Q    And it was your testimony that you were

14  rated by these individuals on two prior occasions;

15  is that right?

16      A    Let's see.  '92 and '93, yes.

17      Q    And the first rating you received was

18  fully successful and the second rating you received

19  was successful.  Is that right?

20      A    The first rating was highly successful.

21  The second rating was fully successful.  The third

22  rating was minimally successful.

sah                                                                      70

1        Q    Part of the complaint deals with the

2   failure of the individuals involved, the failure of

3   your rating individual, Mr. Roberts, to discuss

4   your rating with you.  Do you recall making that

5   part of your complaint?

6        A    Yes, I do.

7        Q    Now I'm handing Ms. Dews-Miller what's

8   included in the record of 96-15, Exhibit 53, which

9   is the Manual of Operations and Administration.

10            Do you recognize that document?

11       A    Yes.

12       Q    Now the document is not the entire Manual

13  of Operations and Administration, as is contained

14  in the record of investigation.  It is the cover

15  sheet, followed by what is marked at the bottom as

16  page 16 of 65.

17       A    Okay.

18       Q    Now you made the allegation that

19  management, your supervisors failed to discuss your

20  progress with you; isn't that correct?

21       A    Correct.

22       Q    Now what particular aspect of this

sah

1   regulation can you point to that supports your

2   contention that management failed in its duty to

3   discuss your performance to that point?

4        A    Okay, 453.2(a), "Rating officers and rated

5   employees are encouraged to review and discuss

6   throughout the appraisal period.  The rating

7   officers and rated employees are required to hold

8   at least one discussion during the appraisal

9   period, preferably at the midpoint."

10       Q    And there's a couple of sections there

11  that have asterisks or stars immediately preceding

12  them.  Do you see those?

13       A    Yes.

14       Q    Could you read the next sentence or two,

15  Miss Miller?

16       A    Okay.  "The signatures of the rated

17  employee and rating officer and the dates of their

18  discussions must be indicated on the report form at

19  the time of the discussions.  During discussions,

20  modifications of critical and noncritical

21  performance requirements and all standards may be

22  made."

sah                                                              72

1      Q    Now at any time preceding the close-out of

2  the May 1, '94 through January 24, '95 minimally

3  successful appraisal, at any point prior to the

4  close-out of that report was there a meeting

5  between you and Mr. Roberts regarding your

6  performance?

7      A    Not that I can recall.

8      Q    Now additionally, in the time frame of

9  February 1, '95 through July 31, '95 you similarly

10 received a minimally successful appraisal.

11     A    Correct.

12     Q    And this is the focus of issue number 8

13 arising from report of investigation 96-15.  Where

14 were you assigned at that point, Ms. Dews-Miller?

15     A    The Office of Comptroller as a budget

16 analyst.

17     Q    And who were your supervisors at that

18 point?

19     A    Carol Keith and Eva Diekmann.  Oh, you

20 said supervisor?

21     Q    Who were the individuals who prepared and

22 signed off on this evaluation?

sah                                                                      73

1       A    Carol Keith and Eva Diekmann.

2       Q    Now how is it you were no longer working

3   at the Office of Inspector General?  What came

4   about to have yourself or for you to be transferred

5   from the Office of Inspector General to the

6   Comptroller's Office?

7       A    The settlement agreement stated that I was

8   to receive at least a fully successfully rating and

9   with the rating in the Office of Comptroller as

10  minimally successful, I was informed in August, I

11  think August 31 or August 30 of '95, that I was to

12  report back to the Office of Inspector General for

13  90 days to obtain a rating because I didn't receive

14  the fully successful rating under the Office of

15  Comptroller.

16      Q    So you were transferred from the Office of

17  Comptroller to the Office of Inspector General.

18      A    Correct.

19      Q    And that transfer arose from your not

20  receiving a fully successful rating in the budget

21  analyst position of the Office of the Comptroller.

22      A    Correct.

1      Q    And the mechanism--can you tell us the

2    mechanism--is it all right if I lead through this?

3    I'll just lead until you say no.

4         The mechanism that resulted in you being

5    transferred from your position as budget analyst in

6    the Office of the Comptroller and being transferred

7    to the Office of Inspector General upon receiving a

8    minimally successful rating was the previously

9    entered into settlement agreement arising from your

10   EEO activity; is that right?

11     A    Yes.

12     Q    Now upon arriving at and performing your

13   duties in the Office of Inspector General February

14   1, 95 through July 31, '95--

15     A    That was the Office of Comptroller.

16     Q    Yes, the Office of Comptroller, sorry, the

17   Office of Comptroller.  Because it was a different

18   office you were supervised by and rated by

19   different individuals.

20     A    Correct.

21     Q    And you indicated it was Miss Diekmann?

22     A    Miss Diekmann and Carol Keith.

1      Q    They were your new supervisors for this

2   six-month detail.

3      A    Yes.

4      Q    And it was a six-month period of time

5   pursuant to the dictates and terms of this same

6   settlement agreement we discussed earlier.  Isn't

7   that right?

8      A    Right.

9      Q    Can you describe the nature of your duties

10  at this budget analyst position?

11     A    It was to record the budgets of the

12  various countries in the Near Eastern Division in

13  the Office of Comptroller--the expenditures, the

14  allocations and et cetera, and to keep monthly and

15  active records of the budget information there.

16     Q    You were selected for this particular type

17  of position based on your training and experience

18  up to this point in your career; isn't that right?

19     A    Correct.

20     Q    What type of education, formal education,

21  did you possess at this time?

22     A    At this time I had received 30 accounting

sah

1  hours from the Benjamin Franklin University.  I had

2  a high school diploma, of course.  I had also

3  received my associate's degree in business

4  management from P.G. Community College in May of

5  '91.  And I had worked for the agency since 1972,

6  so it's about 23 years that I had worked for the

7  agency and had been assigned to various positions

8  as payroll clerk, accounting technician and et

9  cetera within the agency and did this type of work.

10     Q    Did the agency--and at this point are you

11  talking about the Department of State or still with

12  USIA?

13     A    Still with USIA.  I have never been

14  employed by the Department of State.

15     Q    At this point at being assigned to a

16  budget analyst position had you received any formal

17  training in that field from the agency itself?

18     A    No, I had not, not for budget analyst.

19     Q    Now can you describe the guidance you

20  received in the course of this detail from your

21  supervisors?

22     A    The guidance I received was from Carol

sah

1  Keith and it was daily she showed me how to do the

2  work according to the way she wanted it done in her

3  office.  I don't know what else to say.

4      Q    Now prior to receiving notice of this

5  minimally successful appraisal had you received any

6  requests for a meeting with your supervisors to

7  discuss your duty performance?

8      A    Okay, in the Office of Comptroller I think

9  it was like February 27, '95 we did discuss the

10 performance standards but it wasn't as to what I

11 was doing.  It was just a discussion of the

12 standards because they were to discuss those within

13 30 days upon your arrival within that office or

14 that position.  And that was discussed, like I

15 said, on February 27, '95 but there was no

16 indication to me during this six-month period that

17 I was doing my work unsuccessfully or minimally

18 successful, whatever.

19         There was a point at this time Carol Keith

20 had indicated to me that I should complete my leave

21 slip because I would be remaining in that office

22 for the duration of the time and that was for the

sah

1  end of the year and et cetera.  What I did, I had a

2  vacation it was like the end of July.  I put in for

3  leave like the end of July because it was my

4  anniversary, my wedding anniversary, and I don't

5  know exactly--maybe it was a week or about six days

6  but it was something along in that period and it

7  was approved.  But then when I mentioned that I was

8  about to take off, then Carol Keith at that point

9  told me that I really couldn't take off because I

10  didn't have an approved leave slip but I said,

11  "Carol, you approved it."

12       Then they went and found out that I did

13  indeed provide this leave slip earlier and I got to

14  take my vacation because I was going out of the

15  state on vacation.

16       There are some other things, though, that

17  was in this situation, also.  Remember I was

18  telling you about the AMEX credit card abuse?

19  Well, it finally hit the paper February 15 and

20  February 16 of 1995 and at this point I was getting

21  calls that I wasn't doing my work and--well, it

22  wasn't that I wasn't doing my work; it was that in

sah

1  the Office of Inspector General that I did not

2  leave the budget work there.  But what I had did, I

3  had put the information on diskettes, taken them to

4  the Office of Comptroller with me with later,

5  hoping later, to go back and print out the

6  information that was requested by the supervisors.

7  So I didn't erase the work or anything, as stated

8  in the memos that went to the Office of

9  Comptroller.

10      Then after the February of '95 newspaper

11  articles of the IG's office, USIA's IG office,

12  there was also some information that came back in

13  June of '95, June 6, June 9, '95, still from the

14  Washington Times.

15      Then at this point when it was on or about

16  the 8th of June I got a call from Ann Young wanting

17  me to come over to the IG's office to tell her what

18  happened with the AMEX card.  So I thought about it

19  and I realized that it was an ongoing FBI

20  investigation on this AMEX card, so I called her

21  back and told her I wouldn't be coming over because

22  there was an ongoing investigation and at this

1    point I didn't think I had any information to give

2    to her.

3            So what she did--this was Ann Young at

4    that point--then later John Sinclair contacted Eva

5    Diekmann later in that month to have me to come

6    over and he was the AIG for Investigations and I

7    think that was like June 26-27 of '95 and at that

8    point I told him the story that I knew, what had

9    happened to the AMEX card. And at this point again

10   the IG was being criticized in the newspapers for

11   not disciplining the employees that had abused the

12   cards and like I said, one of them was a criminal

13   investigator, David Bruce, and GS-13 at that point.

14       Q    Just to interrupt, Ms. Dews-Miller, the

15   information regarding the AMEX card abuse that was

16   being publicized in the papers was directly related

17   to the USIA, not just other agencies?

18       A    Yes, USIA.

19       Q    And you referenced in several instances

20   the minimally successful. I'm handing you what's

21   been previously marked as Exhibit 51 contained in

22   96-15. This is your minimally successful rating

1   that you received during this time frame where you

2   were employed as a budget analyst; is that right?

3        A    Right.

4        Q    And it is completed primarily by Carol

5   Keith; is that correct?  She is your rater?

6        A    Right.

7        Q    Now you read the requirements of the

8   Manual of Operations and Administration requiring

9   specific dates to be inserted in the evaluation

10  itself.

11       A    Right.

12       Q    Where in this evaluation is it required

13  for a rater to insert the specific evaluations in

14  conformance with the regulation?

15       A    I'm looking at Exhibit 51, page 3 of 12,

16  item 1(c).

17       Q    And it's that section that the rater is

18  required to insert the specific dates where the

19  individual has had contact with the subordinate as

20  to the progress in performing duties.  Is that

21  right?

22       A    Yes.  Also I see in 1(b), also, Section

sah                                                                    82

1(b) of the same page.

    Q    Now Miss Keith did not make any specific

references as to dates she had meetings with you.

    A    She has indicated several occasions in

both sections.

    Q    Now as a result of this minimally

successful rating what contact did you have with

Miss Keith in regard to your prior EEO activity, if

any?

    A    I don't recall having any.  I mean I don't

recall.

    Q    What contact did Miss Keith have with your

prior supervisors--Mr. Roberts, Mr. Leporatti?  Did

she have any working relationship with them, to

your knowledge?

    A    I don't know.

    Q    As a result of receiving this minimally

successful appraisal, what personnel actions did

you receive?

    A    I didn't receive a personnel action at

that point.  What I did receive was--this goes back

up until December of '95, though.

sah

1    Q    Following your receipt of this performance

2  appraisal what happened?

3    A    What happened was--what did I do?  I was

4  given this and Miss Keith at this point told

5  me--given this by Miss Carol Keith and she told me

6  at this point she wasn't going to discuss it, she

7  wasn't going to change it, wasn't going to do

8  anything with this rating; this is what it is.  And

9  I was speechless because I was really, really

10  shocked.  I mean I thought I was doing the work in

11  the office but the rating indicates that I wasn't.

12        So what I did, I think I was given this on

13  or about the 16th or 17th of August, 1995.  I just

14  kept it.  I didn't make any comments.  I didn't

15  write anything just then.

16    Q    Were you reporting to work at that point?

17    A    Yes, I was at work that day.

18    Q    What happened?

19    A    And she gave it to me in the a.m. and by

20  the time I went to lunch I was really so down

21  because I just couldn't understand why would I get

22  a rating like this and when I came back--I don't

sah

1  know what day of the week that was but when I came

2  back I knew I was to be off the very next day.  I

3  think it was the 18th of August.  It may have been

4  on a Friday or whatever.

5      I think the evaluation upset me so bad

6  because I had had a prior injury.  This is where

7  the workers comp injury came into being.  I went to

8  the file room on the 10th of July, 1995 to make

9  some copies of some required budget reports--going

10 rates or something of that nature--and when I

11 went--I made the copies but when I went to set up

12 the conference table I slipped and fell in the

13 conference room and I was injured.

14     So I went back and I told Mrs. Keith about

15 this and she said, "Well, I'm not signing anything.

16 I'm not signing anything with workers comp or

17 anything of this nature."  And she said I had to

18 give it to Miss Diekmann.

19     So I prepared the information and there

20 was a witness there at that point.  What was his

21 name?  Rodney--I can't think of his last name right

22 now.  But he helped me up from the fall and--

sah                                                                    85

1        Q     Ultimately your claim was accepted by

2   workers compensation?

3        A     Right.

4        Q     And following the filing of the complaint,

5   did you miss any work?

6        A     Yes, I started missing work.   July 19,

7   1995 was one of the days I missed.   Then shortly

8   after this evaluation was given to me it really

9   just upset me and my injury just started bothering

10  me even more.

11            Also, let me backtrack.   When I went on

12  vacation July of '95 to August let's say 5th or

13  whatever of '95, I was unable to enjoy my vacation

14  because I was in the hotel room with pain

15  medication at that time from this injury.   And when

16  I came back I kept noticing my arm was really

17  bothering me as far as paining and I didn't know

18  what it was from.

19            So, like I said, I filed the information

20  with the Office of Workers Comp and the claim was

21  approved.

22        Q     Did you have to take off work arising from

sah                                                                        86

1   this injury at a later point?

2       A    Yes, I did.

3       Q    Do you recall a time frame?

4       A    Yes, it was on or about the 21st of

5   August, 1995 and I called in that morning and I

6   spoke with Miss Diekmann to request sick leave

7   because I was really feeling sick from the injury,

8   and I told her this but she placed me on sick

9   leave.  So she called me back and told me she was

10  going to place me on sick leave and that's what she

11  did.

12          So I didn't return back to work until

13  really November of '95.  But within August 21 of

14  '95 when Mrs. Diekmann placed me on sick leave for

15  the workers comp injury, then I was called by Jenny

16  Mallios on or about the 30th or 31st of August

17  stating that I was to report back to the Office of

18  Inspector General, effective 9/1/95.  And this is

19  when I told Miss Mallios at that point that I was

20  out under doctor's care and I didn't know when I

21  would be returning to work and et cetera and she

22  just said something to the effect that, "Well, I'm

sah                                                                    87

1   going to do this and I'm not going to do this for

2   you and all like this, but you're to report to the

3   Office of Inspector General because you didn't

4   receive fully successful ratings on your detail.

5   Now you're to go back to the Office of Inspector

6   General."

7       Q    Did she indicate who your supervisor would

8   be at that point?

9       A    Ann Young.

10      Q    Now ultimately because of your absence

11  during the time frame of your reassignment to OIG,

12  Miss Ann Young, ultimately Miss Young placed you in

13  an AWOL; isn't that correct?

14      A    Right.

15      Q    And how long did that AWOL status last?

16  Can you explain--

17      A    Let's see.  The AWOL started the day after

18  Labor Day of '95.

19      Q    Prior to that you'd been using leave;

20  isn't that right?

21      A    Miss Diekmann had placed me on sick leave.

22      Q    Nevertheless, you'd been using sick leave

88

1   prior to that.

2       A    That's correct.

3       Q    And it was at the conclusion of using

4   leave that you were transitioned into an AWOL

5   status.

6       A    Yes.

7       Q    And this AWOL status continued until the

8   November '95 time frame when you reported back to

9   work?

10      A    Yes.

11      Q    And can you explain what efforts you were

12  making to receive pay during this time frame?  You

13  were trying to receive benefits from workers

14  compensation?

15      A    Yes.  I submitted my documentations to--I

16  think I submitted them to the Office of Workers

17  Compensation and in turn, the Officer of Workers

18  Compensation sent them back to the agency for them

19  to complete.

20      Q    Now you're referring to an Office of

21  Workers Compensation Form CA-7 wherein you were

22  requesting to receive compensation pay?

sah                                                                    89

1       A    Yes.

2       Q    And it's your testimony that you had

3    submitted this document directly to Workers

4    Compensation?

5       A    Yes.

6       Q    And they, in turn, returned it back to

7    your employing agency for what purpose?

8       A    Because the agency was supposed to fill

9    out a portion before it went to the Office of

10   Workers Compensation but I didn't know that.

11          MS. CHANDLER:  For the record what

12   document are we referring to, if we are, in the

13   report of investigation?  It looked as if you had a

14   document in front of you you were referring to.

15          MR. DUNN:  No, I do not.

16          MS. CHANDLER:  I'm sorry.

17          BY MR. DUNN:

18       Q   Nevertheless it's your testimony, Miss

19   Miller, that you were attempting to receive

20   compensation pay from the Department of Labor

21   arising from this work-related accident.  Isn't

22   that right?

sah                                                                    90

1      A    Right.

2      Q    Upon being advised that it had to be

3   submitted through your agency, what steps did you

4   take?

5      A    In turn, the claims examiner at that point

6   returned it to the agency.  I didn't have to return

7   there.

8      Q    Okay.

9      A    On my behalf.

10     Q    Were there any further steps you took in

11  regard to securing compensation payments?

12     A    This was '95.  What did I have to do?  It

13  wasn't until December of '96, after I was

14  terminated from the agency, that I went to my

15  congressman's office and requested assistance.  At

16  this point there was a Mr. Nick Nolan that had

17  contacted the Office of Workers Compensation and

18  found out that the Office of Workers Compensation

19  had approved the injury and that I should have been

20  paid continuous of pay and et cetera by the agency.

21         At this point they sent a request in to

22  USIA requesting that they complete their portions

sah                                                                          91

1   of what should have been paid or whatever or what

2   should have been submitted to the OWCP and it was

3   told to them--I think her name was Lattier Gee or

4   something--that if they didn't submit the papers,

5   then they were going to take my information as

6   factual and pay me the compensation.

7           Then it was January of '97 I received my

8   first compensation check from the OWCP for the

9   period of I think it was October 4 to I want to say

10  something like November 24 or November 27 of 1995

11  and that was something like $4,000, I recall, and

12  that was the first time I had received any

13  compensation from the agency.

14      Q    And the cut-off--

15      A    From the OWCP.

16      Q    And the cut-off date of the compensation

17  you received would have been the day prior to you

18  returning to work?

19      A    To work.

20      Q    Now you referenced in your testimony that

21  you had to submit various documents relating to

22  your workers compensation claim.  Can you give us

sah                                                                          92

1   an idea of what documents you had to submit in

2   support of your claim of a medical nature?

3       A    Okay.  It was the doctor's reports and the

4   doctors that I was going to submitted them to

5   Workers Comp.  They didn't give them to me to send

6   to Workers Comp.  They submitted them to Workers

7   Comp themselves.

8       Q    And ultimately these documents would have

9   been--it's your understanding--give us your

10  understanding as to what, if any, documents of a

11  medical nature were returned to the agency by OWCP.

12      A    There's a letter dated on or about 11/9/95

13  from Mr. Melendez at OWCP stating that he has

14  returned my entire medical file to Jenny Mallios at

15  her request.  It's in the report of investigation

16  but I don't know what tab or whatever it is.

17          JUDGE PACINDA:  26-26?

18          MR. DUNN:  26-24, I believe, is the

19  November 9, '95 letter.

20          BY MR. DUNN:

21      Q    I'm handing you a copy, Miss Miller, of

22  Exhibit 26-24 from the report of investigation

sah

1  00-9.

2      A    Okay.

3      Q    Have you seen that letter before?

4      A    Yes.

5      Q    Who's that letter from?

6      A    This letter is from Julio Melendez, claims

7  examiner at the U.S. Department of Labor OWCP.

8      Q    And it's addressed to the USIA?

9      A    Jenny Mallios.

10     Q    And what was he indicating to Miss Mallios

11 in the content of the letter.  He was returning

12 your file.  Is that right?

13     A    Right.  "Enclosed is Form CA-7 submitted

14 and a copy of the entire medical records for your

15 records.  Please have Ms. Dews-Miller complete a

16 new form.  Also provide this office with a

17 breakdown of the time being claimed, as well as a

18 breakdown of COP paid to the employee."

19     Q    Now it's part of your allegation that

20 documents relating to your medical file were

21 improperly disclosed.

22     A    Yes.

sah

1    Q    Please give us your testimony regarding

2  the disclosure of your medical records relating to

3  your workers compensation claim.

4    A    Okay.  Well, the statement that I just

5  read, that the entire medical file was returned to

6  Mallios.  Then when I returned to work on November

7  27, 1995 I requested the approval of sick leave

8  while I was placed on AWOL from Ann Young in the

9  Office of Inspector General.  Then I gave her a

10  time frame when I needed to be off to see my

11  doctors and go for physical therapy.  At this point

12  she told me I would be off more than I would be at

13  work.

14       And on or about November 30 she handed me

15  the request that I had made to her that she was

16  going to approve the leave, so that was still the

17  AWOL.  That was part of the AWOL that she had

18  placed me on from like September of '95 to November

19  of '95.

20    Q    What happened upon your return in November

21  of '95?

22    A    I returned to work.

sah

1     Q    To--

2     A    The Office of Inspector General's office.

3     Q    And who was your supervisor there?

4     A    Ann Young.

5     Q    And what, if anything, happened upon your

6 return to work as it relates to the original

7 settlement agreement?

8     A    I was there and I went to the desk that I

9 normally used to sit at. I think I did--yeah, back

10 to the desk where I used to sit at. And Ann Young

11 told me that I needed to, well, come in and talk

12 with her and I did. I went in and talked with her

13 and at that point she had a copy of the settlement

14 agreement in her hands, looking at me, and then

15 also, like I said, I submitted the request for the

16 approval of the sick leave while I was off on

17 workers compensation.

18     So I stayed there November 27, 28, 29 and

19 30. On or about that Tuesday Ann Young informed me

20 that as they looked at it in the OIG's office, the

21 end of November would have been my 90 days in the

22 Office of Inspector General, as stated in the

1   settlement agreement and December 1 I was to report

2   to the Office of Personnel to see Jenny Mallios and

3   I would get my assignment from there.

4         I went to work on December 1, went to the

5   Office of Personnel, and I was informed that I was

6   to go to the Office of Training.  At this point I

7   had no assignment, no job, no desk, nothing, just

8   to report to the office of the Career Development

9   Center or training.  And it was just free time and

10  I had no job.

11     Q    Did they assign you any duties whatsoever?

12     A    No.

13     Q    How long did this assignment go on that

14  Miss Mallios gave you?

15     A    I had to sign in at the Office of

16  Personnel effective December 1, '95.  It went on

17  from December 1.  Then the Career Center was closed

18  for renovations near the end of February but I

19  didn't know it until I got there.

20         So I went back to the Office of Personnel

21  to find out what was I supposed to do, since I

22  didn't have a seat, I didn't have a job, I didn't

sah

1    have anything.

2            I went to see Stacy Rose-Blass in the

3    union office at this point and I was letting her

4    know that I had reported to the Career Center as I

5    was instructed by Miss Mallios but the Career

6    Center was closed, so what was I supposed to do?

7    And Miss Stacy Rose-Blass, she, in turn, called

8    down to Personnel.  I don't know if she talked with

9    Mallios or Twardowski or whomever but she told them

10   that I needed someplace to be.

11           Then I was assigned to a position--not a

12   position, though.  I was to report to Jeanne Monroe

13   in the Office of Research on or about the 4th of

14   March of '96.  I reported there and I was to assist

15   Miss Monroe in administrative duties, since I was

16   an administrative officer still.

17           I assisted her in I think it was travel or

18   something that she had me to do and all like that

19   and then near the end of the period she wanted me

20   to file all of these crates and boxes of papers to

21   file that was the work of the secretaries in her

22   office and she told me I needed to do all this.  At

sah                                                                        98

1    this point I told her, I said, "Well, Miss Monroe,

2    I have an injury in my hand that's messed up and

3    all and I can't be really just pulling these files

4    and all like this."

5            And then she was disappointed because she

6    felt that I should have did what she said in the

7    Office of Research and I was sent back to Personnel

8    to see Miss Mallios on or about May 1 of 1996.

9            Then again I was sent back to the Career

10   Center until mid-June of '96.

11       Q    What happened at that point?

12       A    I received a call from Jan Brambilla from

13   the Office of Personnel stating that I was to come

14   to see her and I said to her, "Well, I need to come

15   with you or talk to my representative before I come

16   to see you" and she was just giving me the third

17   degree because she was saying if she was the

18   director of Personnel, then whatever she said I was

19   to do; I was supposed to do it.  What if the

20   representative was out of town, or whatever.  So I

21   didn't go.  I didn't go that day.  I think this was

22   on or about June 11, 1996.

sah

1          Later I called and--oh, so after I was

2    saying I needed to talk to my representative, well,

3    I called Mr. Pratt, who again was my representative

4    at the time, to let him know, but he wasn't home.

5          Q    Did you have a meeting with Miss

6    Brambilla?

7          A    No, I didn't.

8          Q    At a certain point back in November of '95

9    you were denied a within-grade increase; is that

10    right?

11          A    Yes.

12          Q    And that was while you were working for

13    whom?

14          A    November of '95 I still should have been

15    with the Office of Inspector General.

16          Q    And who were the individuals who were

17    involved with the denial of the within-grade

18    increase?

19          A    I received notice on or about November 13,

20    1995 that my within-grade increase was denied.

21          Q    I'm handing you what's been marked as

22    Exhibit--

sah                                                                    100

1        A      December 9.

2        Q      Excuse me.   I'm handing you what's been

3    marked Exhibit 36 out of 96-15.   Do you recognize

4    that letter?

5        A      Yes.

6        Q      And this is notification to you of the

7    Office of Inspector General's negative

8    determination regarding your within-grade increase,

9    isn't it?

10       A      Yes.   And I received this after the fact.

11   The within-grade increase was effective October 29,

12   1995.   It was signed off on or about the 25th of

13   September 1995 by Ann Young and Marian C. Bennett

14   that I wasn't going to get the increase.

15       Q      Now who were your supervising officials

16   leading to the denial of the within-grade increase?

17       A      It would have been Ann Young at that

18   point.   I don't know who--let's see.   The rating

19   officer would have been Ann Young.   I don't know

20   who the reviewing officer would have been.

21       Q      And ultimately this led to the issuance of

22   a notification of personnel action, Exhibit 35 of

1    96-15, that confirmed the denial of your

2    within-grade increase.  Isn't that right?

3        A    Yes.

4        Q    And it was Miss Brambilla who signed off

5    as the director of Human Resources on this

6    notification of personnel action?

7        A    Yes.

8        Q    Now had you had any discussions with Ann

9    Young prior to her determination not to grant you a

10   within-grade increase?

11       A    No, I hadn't.

12       Q    Had she had any conferences with you in

13   regard to your duty performance prior to the

14   determination not to grant you the within-grade

15   increase?

16       A    No.

17       Q    Now part of your complaint, Ms.

18   Dews-Miller, deals with nonaccommodation of your

19   medical condition, as required under the

20   Rehabilitation Act.  Do you recall having made a

21   Rehabilitation Act complaint as part of this

22   process?

sah                                                                    102

1      A    Yes.

2      Q    Now can you describe the nature of the

3  condition that you were requesting accommodation

4  for?

5      A    Okay.  I was mainly requesting that I be

6  assigned to a desk and a chair and an office with a

7  telephone, as most employees had.

8      Q    Prior to this you'd been assigned to what

9  type of working environment?

10      A    Attending the Career Center over here.

11  Well, it's not over here.  Attending the Career

12  Center at USIA.  That was a place where you would

13  go to read books, look at tapes, examine the

14  Internet and et cetera, looking for jobs or

15  whatever.  And I wasn't assigned to that office.  I

16  mean it was for all the employees of USIA, so I was

17  just an employee attending over at the Office of

18  Career Development Center, so I didn't have a desk

19  or anything.

20          But it was in April, if I recall

21  correctly, of '96 that I had received this

22  statement from my doctor stating that I couldn't do

sah

1   a lot of the filing and et cetera because of the

2   injury that I had and--

3       Q    The injury to what part of your body?

4       A    Hands, shoulder, neck, et cetera.

5       Q    And that arose from the fall you described

6   earlier?

7       A    Yes.

8       Q    And did you make any request?

9       A    Yes.

10      Q    Did you make it known to any management

11  individual?

12      A    This was to the Office of Civil Rights,

13  Delia Johnson.  It was a request through my

14  representative at that time, Mr. Pratt, that I be

15  accommodated with a desk.

16          JUDGE PACINDA:  I just want to ask a

17  clarification question.  What kind of equipment did

18  you have?  You said that you were located in a

19  training center; is that correct?

20          THE WITNESS:  That's where I went to

21  report, yes.

22          JUDGE PACINDA:  Okay.  And at this

sah                                                                    104

1  training center where did you sit?

2         THE WITNESS:  Any available space--at a

3  computer or whatever.

4         JUDGE PACINDA:  So you had a chair, you

5  had a desk, you had access to a computer?

6         THE WITNESS:  At the Career Center, yes.

7         JUDGE PACINDA:  And you wanted as a

8  reasonable accommodation to be placed in a

9  permanent location?

10        THE WITNESS:  Right.

11        JUDGE PACINDA:  With a chair and a desk?

12        THE WITNESS:  Right.

13        JUDGE PACINDA:  Okay.

14        BY MR. DUNN:

15    Q    Now there came a point where ultimately

16  you were separated from the civil service; is that

17  right?

18    A    Yes.

19    Q    Can you describe--well, first of all, it

20  was pursuant to the terms of the settlement

21  agreement that you were transitioned into a

22  temporary appointment of one year; is that right?

sah                                                                    105

1        A    Yes.

2        Q    I just wanted to ask one other question.

3   Following the termination or the conclusion of this

4   temporary appointment you were separated.  Have you

5   received all of your pay from the USIA to date?

6        A    No.  I have not received pay for the

7   continuance of--COP, continuation of pay, as

8   requested or ordered by the Office of Workers

9   Compensation in January 1997 and again in April

10  1997 and then in August 1997.

11            Then the EEO decision of June 23, 1999

12  also supports that the continuation of pay should

13  be paid to me.  As of today, December 9, 2003, I

14  have not received any of this payment and today

15  marks seven years of termination from the agency,

16  exactly today, the 9th of December.  1996 I was

17  terminated from the former USIA.

18       Q    And just to be clear, this settlement

19  agreement, it was a prior EEO settlement agreement

20  that called for your transition into a temporary

21  period of employment; isn't that right?

22       A    If I didn't do fully successful in the

sah                                                                    106

1  positions, so yes.

2          JUDGE PACINDA:  And again that settlement

3  agreement arose from the January '93 disclosure at

4  the meeting that there weren't enough minority

5  auditors?

6          THE WITNESS:  Right, and I filed a formal

7  complaint on or about June of '93 with the agency,

8  EEO complaint.

9          BY MR. DUNN:

10    Q    Now you referenced that the Department of

11  Labor Workers Compensation Office had directed the

12  USIA to pay you the outstanding continuation of

13  pay; isn't that right?

14    A    Right.

15    Q    I direct your attention to Exhibit 26-5 of

16  0019.  Do you recall seeing that letter before and

17  if so, can you describe what it is?

18    A    Okay.  Yes, I've seen the letter before

19  and it is a letter from the Office of Workers

20  Compensation requesting that Miss Mallios at USIA,

21  "Miss Dews-Miller has advised this office that the

22  continuation of pay problem has not been resolved."

sah

1    Then he says, "Please refer to my 8/26/97 letter

2    concerning this matter.  Please investigate and

3    advise if the problem is with your Finance Office ·

4    or elsewhere."  Do I need to read anymore?

5        Q    No.  So Mr. Melendez was following up on a

6    prior direction to USIA to pay you the appropriate

7    continuation of pay.  Is that right?

8        A    Right.

9        Q    Had you ever been in contact with Miss

10   Mallios about her compliance with this direction?

11       A    Not me directly.  It would have been Mr.

12   Pratt at that point.  At that point he was the

13   representative for me.

14       Q    Now the letter that's referenced by Mr.--

15       A    The 8/26/97 letter?

16       Q    Right.  Now that's contained at page 5 of

17   7 of the same exhibit, is it not?  I'll show you

18   that letter from Department of Labor to Miss

19   Mallios.

20       A    Yes.

21       Q    What is he indicating to the agency, that

22   you're entitled to the continuation of pay?

sah

108

1    A    Mm-hmm.  "Dear Miss Mallios"--

2    Q    I don't need you to read the whole letter.

3    A    Okay.  "Miss Dews-Miller has sent

4  inquiries concerning nonreceipt of continuation of

5  pay for the period from August 21 to October 3,

6  1995.  A review of Form CA-1 shows that Miss

7  Dews-Miller did sustain a traumatic injury.  It

8  also shows that timely written notice of traumatic

9  injury was given within 30 calendar days."

10    Q    And isn't it true that Miss Mallios was

11  disregarding the direction of OWCP to pay you your

12  entitled continuation of pay based on--

13    A    Yes.

14    Q    --based on a purported failure to complete

15  out-processing documentation?

16    A    Right.

17    Q    She used that excuse as a reason by which

18  she was depriving you of your entitlement to the

19  continuation of pay.

20    A    Right.

21    Q    And I refer your attention to page 4 of 7,

22  Exhibit 26-5, an e-mail from Jenny Mallios.  If you

sah

1    could read paragraph 1 of that?

2        A    "A payment covering continuation of pay is

3    pending at the agency.  That payment, should she

4    sign and return her IA-134, clearance for final

5    salary payment, and notify them of where the check

6    should be sent, covers for the period 8/21/95 to

7    10/3/95."

8        Q    So approximately two and a half months

9    worth of continuation of pay has been withheld by

10   the agency to the present date.  Isn't that right?

11       A    Correct.

12       Q    And they purported to need an address to

13   which to send this check as one of the reasons to

14   withhold that pay; isn't that right?

15       A    Yes.

16       Q    And additionally, the filing of a

17   clearance form, an IA-134; isn't that right?

18       A    Right.

19       Q    Part of the rationale for an IA-134 is to

20   determine if you've withheld or possessed any

21   government property; isn't that right?

22       A    Yes.

sah

1    Q    And have you ever notified responsible

2    officials within USIA that you did not have any

3    government property?

4    A    What I did, when I left the agency on

5    December 9, 1996, when I left out of the building

6    that day I placed my security badge down and handed

7    it to the security guard and told him it was

8    something I had found, but it was my own pass at

9    that point.  So I turned in my security pass.  I

10   didn't have the agency security pass.

11       Prior to that, Miss Mallios had said that

12   she would walk around my IA-134 if I would only

13   sign it.  I did not sign the IA-134 because at that

14   point I felt I would have been agreeing with what

15   the agency did and I was not in agreement with what

16   the agency had done.

17   Q    Now this IA-134, it really provides for

18   some very elemental assurances by the agency in

19   regard to property and just out-processing.

20   A    Right.

21   Q    The period of time that you read that is

22   presently being withheld, the close-out date of

sah                                                              111

1    that period of time, does that coincide with the

2    close-out date of your employment?

3        A    No.

4        Q    So they're withholding pay from you which

5    did not even coincide with your last pay?

6        A    Right.

7            MR. DUNN:  No other questions.  Thank you.

8            MS. CHANDLER:  Your Honor, what's your

9    preference?

10           JUDGE PACINDA:  I'd like to finish up with

11   this witness before we break for lunch.

12           Off the record.

13           [Recess.]

14           JUDGE PACINDA:  Back on the record.

15                      CROSS-EXAMINATION

16           BY MS. CHANDLER:

17       Q    Ms. Dews-Miller, in the report of

18   investigation you allege that Mr. Roberts had

19   engaged in illegal reprisal against you by

20   including performance requirement number 5 in your

21   performance evaluation.  Is that still your

22   testimony?

sah                                                                    112

1      A    What is performance number 5?

2      Q    I refer you to Exhibit 50 of 96-15.   That

3  will have in it the performance evaluation and I'm

4  referring to performance requirement number 5.

5      A    Okay, your question again?

6      Q    I'm asking whether or not that is still an

7  element of an allegation of your complaint or

8  whether you have dropped that aspect of the

9  complaint in this proceeding.

10     A    No, I didn't drop the aspect.   Yes, it's

11  still part of the complaint.

12     Q    But this performance requirement was not

13  new to this evaluation, was it?

14     A    To me it was.

15     Q    Explain what you mean by "to me, it was."

16     A    Well, I don't recall it being in any

17  others or except--let me think now.   This was back

18  in '94-'95.   This is the rating period we're

19  looking at.

20          This training element, as I recall, it was

21  back in '92 that Mr. Roberts placed this in my

22  performance standards and at that point what I was

1    trying to tell him or show him was in order to

2    initiate training on employees of the Office of

3    Inspector General, you had to go out and contract

4    this training with outside vendors.

5        Q    Ms. Dews-Miller, I'll get to the content

6    in one moment but just focussing on timing for the

7    moment, my question to you is whether the

8    performance evaluation at Exhibit 50 represented

9    the first time that the performance element number

10   5 relating to training appeared in one of your

11   evaluations as a performance requirement.

12       A    I don't know.

13       Q    Could I turn your attention to Exhibit 48,

14   still in 96-15?  I'd like to turn your attention to

15   page 4.

16       A    Page 4 of Exhibit 48?

17       Q    Yes.  "Reviews vouchers for accuracy

18   before submitting to agency Finance Office.  Travel

19   information, travel orders, vouchers."

20       A    Yes.

21       Q    I'm sorry.  I meant performance

22   requirement number 4.  I apologize.  It's on page 6

1   of 11.   "Employee serves as the training

2   coordinator for the office."

3        A    Yes, there in that rating, also.

4        Q    And would you please identify for me the

5   date of the performance appraisal at Exhibit 48?

6        A    Rating period May 1, 1992 to April 30,

7   1993.

8        Q    And May 1, 1992, the first date of the

9   reporting period, is prior to the date you

10  initiated your first EEO complaint.  Is that

11  correct?

12       A    Yes.

13       Q    Now looking at the contents of the

14  performance requirement, which you began to testify

15  to, do you believe that this element was

16  inappropriate because you did not have contracting

17  authority?

18       A    Yes.

19       Q    But element number 5 does not require you

20  to have a contracting warrant, does it?

21       A    Let me see.  Which one are we looking at

22  now?

1      Q    We're looking at either one.  Most

2   relevant to this period would be Exhibit 50, since

3   that is the complaint you have in question, so if

4   it makes a difference to you, if your answer would

5   differ, I ask that you refer to Exhibit 50.

6      A    Your question is does it warrant

7   contracting experience?

8      Q    No, my question is whether or not the text

9   of that performance element requires you to have a

10   contracting warrant.

11      A    No, it doesn't state that I need a

12   contracting warrant.

13      Q    And, in fact, you admitted that all you

14   had to do to perform this requirement was to call

15   vendors, such as the U.S. Department of

16   Agriculture, and ask for the price of their

17   courses.  Is that right?

18      A    Let's see.  My understanding is if you

19   obligate anything for the government then you need

20   contracting--you need to be warrant to obligate the

21   government for any purchases, whether you call and

22   solicit prices or whatever.

sah                                                                    116

1      Q    But you just admitted that the text of

2   this requirement did not require you to have

3   contracting warrant authority.  In other words, Mr.

4   Roberts or the USIA in any of these evaluations was

5   not asking you to do anything illegal; is that

6   correct?

7      A    If he was asking me to coordinate and call

8   around to these places, obligating monies, yes,

9   because I didn't have a warrant.

10     Q    But that's not what this says, does it?

11     A    Let me see.  Well, it doesn't say I need a

12  warrant to do this.

13     Q    Nor does it say that you're required to

14  obligate money on the part of USIA.

15     A    It doesn't say that.

16     Q    And what really bothered you was that you

17  didn't think this function should have been

18  transferred from someone else to you in the first

19  place; isn't that right?

20     A    It was someone else's duties.

21     Q    And they were duties that you did not

22  think that you should have to do, correct?

1      A    It wasn't in my prior performance

2  standards.

3      Q    Prior to 1992.

4      A    Exactly.

5      Q    And this was the reason you refused to

6  sign your performance standards in May 1992?

7      A    Well, that's one of the reasons.

8      Q    Regarding your midyear evaluation, you

9  also allege that Mr. Roberts did not discuss your

10  performance with you at any time during the rating

11  period.  Is that a correct statement of your

12  testimony?

13      A    I don't recall discussing the evaluations

14  with Mr. Roberts.

15      Q    So you just don't remember?

16      A    I don't recall that, right.

17      Q    And is it your testimony still that his

18  alleged failure to do so constituted reprisal

19  against you for prior protected EEO activity?

20      A    Mr. Roberts was aware that I'd failed

21  these EEO complaints.

22      Q    All I'm asking you is does that continue

sah                                                                118

1    to be your testimony?

2        A    Does what?

3        Q    That Mr. Roberts's alleged failure to

4    discuss your performance with you was in reprisal

5    for your prior EEO activity.

6            MR. DUNN:  Objection.  I don't think that

7    characterizes her testimony.  In fact, I think the

8    question was asked earlier as to whether Mr.

9    Roberts had met with her and she said she couldn't

10   recall.

11           JUDGE PACINDA:  Well, she did answer that.

12   Objection overruled.  I understand the question.

13   The question is is it still part of your allegation

14   that Roberts did not discuss your performance

15   evaluations with you out of reprisal for protected

16   activity?

17           THE WITNESS:  Out of reprisal.

18           JUDGE PACINDA:  Did he retaliate against

19   you?

20           THE WITNESS:  Yes.

21           BY MS. CHANDLER:

22       Q    But isn't it true that Mr. Roberts offered

sah                                                                    119

1   to meet with you on December 21, 1994?

2       A    It's possible.

3       Q    I'd like to turn your attention to page 3

4   of the same evaluation report at Exhibit 50.

5   Exhibit 50 at the bottom, page 3 of 12.

6       A    Okay.

7       Q    I'd like to direct your attention to

8   Section 1(c) where it says, "Employee refused to

9   meet with rating officer on 12/21/94 and would not

10  reschedule another time."  Do you recall that

11  notation on your form?

12      A    Yes.

13      Q    And you agree with that, correct?

14      A    Well, this was just before Christmas leave

15  in '94 and it was approximately 3:30-4:00 p.m.  Mr.

16  Roberts wanted to meet with me at this point and we

17  had been given early dismissal and I told him that

18  I was going home at that point.

19      Q    So the notation is, in fact, correct.  You

20  refused to meet with him at least on December 21

21  because you wanted to go home.

22      A    We had been given orders that we could go

sah                                                                  120

1  home early that day.

2       Q    And isn't it also true that on December 21

3  you told him you could not meet with him because

4  you were on your way home?

5       A    I told him I was on my way home, right.

6       Q    Is it also true that you did not ask to

7  meet with Mr. Roberts at any point after December

8  21, 1994 to discuss your performance?

9       A    No, I didn't--

10           MR. DUNN:  Objection.  Relevancy.  There's

11  no obligation on the part of the recipient of an

12  evaluation to request a meeting with the

13  supervisor.  The obligation is to the contrary.

14           JUDGE PACINDA:  Overruled.  It is relevant

15  if she requested another date.  It's not saying

16  she's obligated to.  The question is did she?

17           THE WITNESS:  I did not.

18           BY MS. CHANDLER:

19       Q    Do you have any recollection of--let me

20  take that back.  Is it still your allegation that

21  your reviewing official, Mr. Leporatti, referring

22  to Exhibit 50, had an obligation to meet with you