# EXHIBIT   42

Transcript of EEOC Hearing Pages 121 - 181
Part 3 of 5

sah                                                                    121

1    during your rating period to discuss your

2    performance?  Is that still an allegation in your

3    complaint?

4         A    Not necessarily the reviewing officer.

5    Normally the rating officer.  It says the rating

6    officer and the employee.

7         Q    All right, thank you.  Is it still your

8    testimony that Mr. Roberts failed to give you a

9    year-end review?

10        A    Year-end review when?

11        Q    At the end of your rating period.

12        A    Could you explain what a year-end review

13   is?  I mean here's an evaluation here.  What is a

14   year-end review that you're referring to?

15        Q    I'm referring to any opportunity for you

16   to meet with him at the end of the rating period,

17   as opposed to during the rating period.

18        A    This rating here?

19        Q    Correct, at Exhibit 50.

20        A    Okay.  Let me think.  When did I receive

21   this rating?  This rating was received by me on or

22   about July, mid-July of '95 when I was in the

sah                                                                    122

1   Office of Comptroller.  I was not at that point

2   assigned to the Office of Inspector General.  I was

3   in the Office of the Comptroller.  This was

4   hand-carried by Dolores Bulles from Darwin Roberts

5   to me, so there was no question of should I meet

6   with him or whatever.  He didn't offer the

7   opportunity to meet with me.

8        Q    I'd like to turn your attention--

9        A    This evaluation was delivered to me.

10       Q    I'd like to turn your attention to the

11  very first page of Exhibit 50, please.

12       A    Okay.

13       Q    Do you recognize that as a memorandum from

14  Darwin Roberts to you dated July 18, 1995?

15       A    Oh, I see what it says.  Yeah, "I'm

16  available to meet with you at your convenience."

17       Q    And isn't it correct that you never took

18  Mr. Roberts up on that offer to meet with him to

19  discuss the appraisal?

20       A    No.  No, I didn't meet with him.

21       Q    And it is your testimony that Mr. Roberts

22  did have Dolores Bulles deliver your evaluation to

1  you.

2       A    Yes.

3       Q    And isn't it true that Mr. Roberts

4  indicated on a note in the envelope that you should

5  sign the evaluation and return it to him?

6       A    By July 28.  That's what's on this note.

7       Q    And is it not correct that you refused to

8  sign the performance appraisal?

9       A    No, I didn't sign the performance

10 appraisal.  I didn't refuse.  I just didn't sign

11 it.

12      Q    What's the difference?

13      A    I didn't agree with it.

14      Q    So you were unwilling to sign it.

15      A    I didn't agree with it.

16      Q    You were unwilling to sign it because you

17 disagreed with its contents.  Is that correct?

18      A    Yes.

19      Q    In fact, you couldn't find a single thing

20 in the evaluation with which you did agree, right?

21      A    I didn't say that.  I said I didn't sign

22 it because I didn't agree with the evaluation.

sah                                                                      124

1        Q    Is there anything in the evaluation you

2   did agree with?

3        A    I didn't really, really read it.  Once I

4   saw it was unsuccessful I didn't agree with it.  So

5   I don't know if I agree with anything.

6        Q    Is it not true that Mr. Roberts never said

7   anything hostile to you?

8        A    In the evaluation?

9        Q    In the evaluation or to you personally.

10       A    Not to my face, no.

11       Q    Okay.  And is it not true that the rating

12   that you received at Exhibit 50 had no effect on

13   the terms of the settlement agreement or the

14   consequences that flowed from the settlement

15   agreement?

16       A    Well, I'm not going to say that because if

17   the evaluation was from May 1, 1994 to January 24,

18   1995, why did I receive it six months later?

19       Q    That's not what I'm asking you, Ms.

20   Dews-Miller.  Apart from the questions you may have

21   regarding when you received it, my question is

22   whether or not the fact that you received a

1  minimally satisfactory rating from Mr. Roberts in

2  any way had an effect on the settlement agreement

3  or the consequences that you agreed to in the

4  settlement agreement.

5          In other words, it was not the evaluation

6  that triggered your conversion to a temporary

7  appointment for one year; is that correct?

8      A   Well, that's not quite what the agency was

9  telling me on the 5th of December, 1995.  The 5th

10 of December, 1995 there was a meeting called after

11 I came from lunch stating that I had to report to

12 the Office of Personnel.

13     Q   And I'm not talking about that time frame.

14 I'm talking about the period that was appraised,

15 May 1, '94 to January 24, 1995.

16     A   Okay, but--

17     Q   Under the terms of this settlement

18 agreement it was not this evaluation at Exhibit 50

19 that affected any of the terms under your

20 settlement agreement.

21     A   Not the settlement agreement.

22     Q   In fact, it was the subsequent evaluation

1  by Ms. Keith that affected your career at USIA

2  under the terms of the settlement agreement.   Is

3  that correct?

4      A   As far as the settlement agreement, yes.

5      Q   I'd like to now turn to the evaluation

6  that was prepared by Ms. Keith and Ms. Diekmann for

7  the period February 1, 1995 to July 31, 1995.

8          Now as contrasted with your allegations

9  against Mr. Roberts, you testified this morning

10 that Miss Keith talked to you about your work on a

11 daily basis during the rating period.   Isn't that

12 correct?

13     A   Not necessarily on a daily basis.   She

14 talked.

15     Q   Is it fair to say she talked with you

16 periodically during the performance period about

17 your work?

18     A   She talked.   I mean not necessarily about

19 my work.   She talked.

20     Q   But apart from talking about the weather

21 or the time of day, did she talk to you about your

22 assignments?

sah                                                                    127

1       A    No, just what she wanted me to do, such as

2   the going rate or whatever.

3       Q    Did she ever discuss your work with you?

4       A    Not how I was doing it, except the time

5   that I told you she said that I was going to stay

6   in the Office of Comptroller and I should put in my

7   leave slips for the remainder of the year.

8       Q    So it's your testimony that she never

9   discussed with you at any time during the rating

10  period the substance of your work?  Is that

11  correct?

12      A    Not to me.

13      Q    Did she ever tell you your work was good

14  or your work was bad?

15      A    No, not that I can recall.

16      Q    Do you recall on July 17, 2002 when you

17  sat for a deposition and I asked you a series of

18  questions?

19      A    Yes.

20      Q    Do you recall my asking you, "Did Carol

21  Keith ever discuss your work with you during the

22  performance appraisal period?" and you answered,

1   "Yes, she did."

2       A    Oh, okay.

3       Q    And do you recall my asking you, "Can you

4   describe for me those discussions?" and you

5   answered, "Well, her discussions to me was Rose

6   Mary, your work is good."

7       A    Oh, okay.

8       Q    You agree what Ms. Keith personally handed

9   you your evaluation on or about August 17, 1995?

10      A    Yes.

11      Q    And you agree that she said words to the

12  effect, "Rose Mary, if you want to discuss anything

13  with me you can."

14      A    No, it wasn't so much I can.  She said she

15  wasn't going to change anything and this is it.

16      Q    Did she ever offer to discuss the content

17  of the evaluation with you at any time?

18      A    Not that I recall.

19      Q    Again you recall sitting in a deposition

20  on July 17, 2002, right?

21      A    Okay.

22      Q    I asked you a series of questions and I

1  asked you, "You allege that the rating and

2  reviewing officers failed to discuss or explain

3  your deficiencies before issuing the rating; is

4  that a fair summary of your allegations?"  And you

5  answered, "We shared offices and at that point she

6  says, 'Rose Mary, if you want to discuss anything

7  with me, you can'" but you added, "So I didn't

8  discuss anything with her."

9       A    That was on August 17, 1995.

10      Q    But it related to the performance

11  evaluation in question; is that correct?

12      A    Yes.  This was upon receipt of this one,

13  the one you're referring to.

14      Q    Understood.  So we were talking about any

15  kind of year-end review or that sort of thing.

16      A    Okay.

17      Q    So she said, "Rose Mary, if you want to

18  discuss anything with me you can" but you never did

19  discuss it with her; is that correct?

20      A    No, I didn't.

21      Q    The job that you were asked to do that was

22  the subject of the Keith-Diekmann evaluation you

sah                                                                    130

1   testified earlier was as a budget analyst?

2       A    Yes.

3       Q    And you believe you were qualified to do

4   that job.

5       A    Yes.

6       Q    You were an administrative officer in

7   approximately 1988?

8       A    1988 I was an administrative assistant.

9   1989, April of '89, I was promoted to a GS-9,

10  administrative officer.  Then in November of 1990 I

11  was promoted to the GS-11 administrative officer in

12  the OIG's office.

13      Q    Just focussing on your budget experience

14  so that we're clear on that, in 1998 as an

15  administrative assistant you had some

16  responsibility for the budget in that office; is

17  that correct?

18      A    Yes.

19      Q    And then when you became the IG's

20  administrative officer in March of 1990 you were

21  again in charge of the IG's budget.  Is that

22  correct?

sah

1      A    Correct.

2      Q    Therefore you believe you had the proper

3   background and training to be assigned as a budget

4   analyst; is that correct?

5      A    Yes.

6      Q    Do you believe that Carol Keith ever

7   created a hostile work environment for you?

8      A    Not necessarily, no.

9      Q    And do you agree that Ms. Diekmann never

10  said anything hostile to you?

11     A    No, she didn't say anything hostile.

12     Q    And is it not also correct that she never

13  created a hostile work environment for you?

14     A    Well, let me reiterate on this one.  This

15  budget analyst position that I was detailed to in

16  the Office of Comptroller, I applied for this

17  position December of 1994.  It was a GS-11/12/13

18  budget analyst.

19     Q    Ms. Dews-Miller, if you're going to answer

20  my question on hostile work environment, that's

21  fine, but if you're answering a different question,

22  let's finish up with this one first.

sah

1      A    No, I'm about to tell you something about

2    the hostile environment--

3      Q    All right.

4      A    --that you were asking about Miss

5    Diekmann.  So what happened, since I applied for

6    this position and I was detailed as a GS-11

7    administrative officer to the Office of

8    Comptroller, I was interviewed by Miss Diekmann in

9    March of 1995 from a certificate for this

10   GS-11/12/13 budget analyst position.  Again was not

11   selected for the position but I was doing the work

12   of the position in the Office of Comptroller.

13        Then it turned around again in May of 1995

14   Miss Diekmann interviewed me a second time for the

15   same budget analyst position that I was doing but

16   again another employee was selected.

17     Q    Ms. Dews-Miller, I'm not asking you about

18   the nonselection, which was settled by a different

19   complaint.  What I'm asking you is whether or not

20   during this particular rating period, standing

21   alone, Ms. Diekmann ever created a hostile work

22   environment for you.

sah                                                                    133

1      A    I'm not going to say no to that because if

2   you look at the selections and you were sitting

3   right there on the position, sitting right there in

4   the position and you're not selected two times in

5   the same position but you're sitting there doing

6   the work, that, to me, is kind of hostile.

7      Q    Now do you recall again sitting with me on

8   July 17, 2002 where you were answering questions

9   pursuant to a deposition?

10     A    Okay.

11     Q    And do you recall my asking regarding Ms.

12  Diekmann, "Do you believe she ever created a

13  hostile work environment for you?" and you

14  answered, "No."

15     A    Okay.

16     Q    Turning now to your injury, you testified

17  that your shoulder injury occurred on or about July

18  10, 1995, correct?

19     A    Yes.

20     Q    And that you were absent from work

21  beginning from approximately August 21, '95 until

22  November 27, '95.

sah                                                                      134

1          A      There's also July 19, 1995 included in

2    that period.

3          Q      For which you were granted sick leave.

4          A      Right.

5          Q      And you filed a workers compensation claim

6    shortly after your injury.

7          A      Yes.

8          Q      And that workers compensation claim was

9    approved after you left USIA.

10         A      No, the workers compensation claim was

11   approved September 1995.

12         Q      I'm not talking about when you filed it.

13   I'm talking about when the Office of Workers

14   Compensation actually approved and ordered the

15   payment of continuation pay and then paid your

16   salary for the remainder of the period.

17         A      No, the approval of the Office of Workers

18   Comp was 9/29/95.

19         Q      I'd like to refer your attention to

20   Exhibit 26-18 in case 0019.  At this exhibit is a

21   letter dated January 27, 1997 from the U.S.

22   Department of Labor.

sah                                                                          135

1              JUDGE PACINDA:  Where are we?

2              MS. CHANDLER:  We are at Exhibit 26-18,

3    page 4 of 8.

4              JUDGE PACINDA:  Thank you.

5              BY MS. CHANDLER:

6         Q    And this is a letter from Julio Melendez,

7    claims examiner, to Ms. Mallios informing her that

8    they determined that you were entitled to

9    continuation of pay for the period claimed,

10   correct?

11        A    Yes.

12        Q    And as of November 19, 1995, by contrast,

13   you still had not been approved for your workers

14   compensation claim.  Is that correct?

15        A    Let's see.  I'm getting something confused

16   because there's a letter--

17             MR. DUNN:  Let me just object as to a

18   mischaracterization of what this letter purports to

19   me.  It's not an approval of the claim.  It's an

20   approval of a request for compensation pay.  She

21   had an approved claim.

22             BY MS. CHANDLER:

sah                                                                    136

1       Q    What was the date of the approved claim?

2       A    9/29/95.

3       Q    I'd like to turn your attention to Exhibit

4   9-5 of 0019.  This is a letter from the Department

5   of Labor to you calling into question medical

6   evidence that you have suggested and informing you

7   that the medical evidence as of November 9, 1995

8   was insufficient.  Is that correct?

9       A    Yeah, it says that.

10      Q    And it also says that "This claim, as

11  submitted, is not valid," referring to paragraph 2

12  of the same exhibit.  Is that correct?

13      A    Yes, it says that, too.

14      Q    So at least as of November 9, 1995 your

15  workers compensation claim had not been approved.

16      A    I keep getting mixed up when you say

17  workers compensation claim and approval of the

18  workers compensation because what I see is there's

19  9/29/95, there's an approval letter in the file

20  from Melinda stating that they have accepted the

21  claim and I'm getting the claim and the approval--

22      Q    Right, I understand.  I'm not asking when

sah                                                                    137

1   you submitted the claim.

2       A    No, it's not when I submitted the claim.

3   It's--

4       Q    Or when it was accepted for processing.

5       A    Okay.

6       Q    So you're not exactly sure when the

7   Department of Labor made its final determination to

8   accept your claim--

9            MR. DUNN:  Objection.  Asked and answered.

10  She's already stated--

11           MS. CHANDLER:  Okay, I'll move on, then.

12           BY MS. CHANDLER:

13      Q    Moving on to another question, you did

14  have two doctors who authorized you to return to

15  work in November 1995, correct?

16      A    Yes.

17      Q    And at that time they did not put any

18  qualifications on your return to work.  Is that

19  correct?

20      A    Not that I know of.  I'm not sure.

21      Q    Not that you can recall?

22      A    Not that I can recall.

sah                                                                        138

1      Q    Now you still had doctor's appointments,

2  correct?

3      A    Yes.

4      Q    But you still continued to work.

5      A    Physical therapy.

6      Q    And you wanted to work?

7      A    Yes.

8      Q    And your doctors had authorized you to

9  work.

10     A    Yes.

11     Q    And you never told anyone at USIA, other

12 than your testimony that you spoke to the Office of

13 Civil Rights, that you were suffering from any

14 other medical condition.  Is that correct?

15     A    Let's see.  Let me think.  There was--I

16 remember when I put the claim in with Ann Young on

17 or about November 27-28 of 1995.  She returned it

18 on November 30 when I was to exit the Office of

19 Inspector General, saying she was not going to

20 approve the claims because I would be out of the

21 office more than I was in the office.

22     Q    Did you ever tell anyone at USIA that you

sah                                                                        139

1  believed you suffered from a disability?

2       A    Yes, that would have been the Office of

3  Civil Rights.

4       Q    But you never told any of your managers or

5  supervisors that you believed you suffered from a

6  disability; is that correct?

7       A    Well, when I returned back to work I

8  really didn't have per se supervisors because I was

9  assigned four days to the Office of Inspector

10 General--

11      Q    Did you tell anyone in management at USIA

12 that you believed you suffered from a disability?

13      A    Management would be the Office of Civil

14 Rights?

15      Q    No, anyone in the personnel system?

16      A    I know it was Mallios on or about the end

17 of August 1995 when she was letting me know that I

18 was to report back to the Office of Inspector

19 General as of September 1, 1995.

20      Q    I'm not asking about your shoulder injury

21 and the workers compensation.  I'm asking when you

22 returned to work, when your doctors authorized you

sah                                                                    140

1   to return to work without restriction, after that

2   time did you tell anyone in USIA management, other

3   than pursuing something with the Civil Rights

4   Office, that you believed you had a disability?

5        A    I don't recall.

6        Q    And the only reasonable accommodation you

7   requested, you testified this morning, was that you

8   be provided with an office and with a telephone; is

9   that correct?

10        A    And a desk.

11        Q    And a desk.

12        A    Yes.

13        Q    And you were given an office and a

14   telephone and a desk.

15        A    When?

16        Q    Is that correct or is that not correct?

17        A    When?

18        Q    I'm asking you.

19        A    Yes, in August of 1995, somewhere along in

20   there, June, July, August of 1995.  I'm sorry; '96.

21        Q    '96.  Now is it also not true that you

22   never asked for any modification of your duties?

1       A    I didn't have any duties.  I was going to

2  the training center.

3       Q    To the extent that you were working in any

4  other office, whether it was OIG or anywhere else

5  you were assigned, you never asked that your

6  official duties or your performance requirements be

7  modified; is that correct?

8       A    I didn't have any performance

9  requirements.  Once I returned to work I didn't

10  have any performance requirements.  I haven't even

11  been rated since I returned to work.  The last

12  rating I received was the one July 31, 1995.

13      Q    Fair enough.  And separate and apart from

14  your performance requirements, you never asked

15  anyone for a modification of any duties to which

16  you've been assigned.

17      A    I hadn't been assigned to any positions.

18      Q    Leaving aside whether or not you've been

19  formally assigned, you never asked for any

20  modification of whatever duties you may have been

21  performing.

22      A    The only thing I can think of at this

sah

142

1    point is when I was in the Office of Research when

2    I was requested to do the filing, that's when I

3    told the supervisor, Miss Monroe, at that point

4    that I couldn't do the filing.

5        Q    And she did not make you do the filing.

6        A    No, I didn't do it.

7        Q    But you were able to work on computers.

8        A    Yes.

9        Q    And you continued to seek what you

10   believed to be a meaningful job through 1996 while

11   you were still at USIA; isn't that correct?

12       A    No, not a meaningful job.

13       Q    You did not want a meaningful job?

14       A    I didn't have a meaningful job.

15       Q    But you wanted a meaningful job.

16       A    Yes.  If you had been in the government

17   for 24 years, wouldn't you?

18       Q    Do you recall that on November 12, 1998

19   the Department of Labor found you not to have been

20   totally disabled for the period December 10, 1996

21   to March 2, 1997?

22       A    Yeah, I recall that.

sah                                                                    143

1        Q    Turning to the issue of continuation of

2    pay, you've testified this morning that you did not

3    receive continuation of pay and you admit that you

4    never completed the form for clearance for final

5    salary payment, the Form IA-134.  Is that correct?

6        A    I haven't completed the Form 134 but I

7    have received compensation from the Office of

8    Workers Compensation for the period of--

9        Q    No, I understand that you have.  I'm only

10   talking about the extent your allegation and your

11   complaint refers to failure to receive continuation

12   of pay or unused leave or final salary payment.

13       A    I haven't received my final salary payment

14   and I haven't received a continuation of pay--

15       Q    And that was because--

16       A    --that the Agency was to pay from 9/5/1995

17   to on or about October 3, 1995.

18       Q    But you were informed on numerous

19   occasions that you would have to sign this form in

20   order to get this pay, correct?

21       A    Well, yes, I was informed that I should

22   sign the form but I did not sign the form because

sah                                                                                    144

1    then I felt I would have been in agreement with

2    what the agency had did.

3        Q    Turning to your past EEO activity, I

4    believe I understand that you testified this

5    morning you'd filed an EEO compliant regarding

6    credit card abuse.  Am I correct or did I

7    misunderstand that?

8        A    I didn't say that.

9        Q    All right.  So you never filed any EEO

10   complaint--

11       A    Relating to credit cards, no.

12       Q    Relating to the credit cards.

13       A    That wasn't EEO.

14       Q    All right, thank you for that

15   clarification.

16            You did allege, however, that USIA had

17   breached the settlement agreement with you,

18   correct?

19       A    Yes.

20       Q    And the Office of Civil Rights at USIA

21   denied your allegations that they had breached the

22   settlement agreement; is that correct?

sah                                                                      145

1      A    Yes.

2      Q    I'd like to have documents Agency Exhibit

3  1 marked for identification.

4                        [Agency Exhibit No. 1 was

5                        marked for identification.]

6           BY MS. CHANDLER:

7      Q    Ms. Dews-Miller, do you need a moment to

8  review this document?

9      A    Yes, thank you.

10          [Pause.]

11     Q    Do you recognize this document as the

12  response of Hattie Baldwin, director of Civil

13  Rights at USIA, as denying your allegations of

14  breach of the settlement agreement?

15     A    Yes.

16     Q    I'd like to focus you on just a few

17  aspects of this letter.  I'm not going to go

18  through the entire letter.

19          MR. DUNN:  I'm going to object to this

20  line of questioning regarding this in terms of

21  relevancy to the present proceeding.

22          MS. CHANDLER:  Your Honor, it's relevant

sah                                                                          146

1   to the present proceeding because of the overlap of

2   issues between what Ms. Dews-Miller has already

3   pursued as a breach of settlement agreement matter

4   and allegations that she is also attempting to make

5   in the present case.  And the Agency's position as

6   a matter of law will be that at least with regard

7   to the issues I'm about to go through with her,

8   that they would be precluded from being considered

9   under the current settlement agreement as having

10  been exhausted through the breach of settlement

11  allegation process.

12          JUDGE PACINDA:  Okay, I'll hear that.

13  Objection overruled.

14          BY MS. CHANDLER:

15  Q    I'd like to focus your attention on

16  paragraph 2 on page 1.  Is it still your

17  allegation, as you testified this morning, that

18  with regard to the budget analyst job, you were not

19  given any training after you entered onto the job,

20  after you began your duties?  Is that correct?

21  A    No formal training.

22  Q    And in your letter to Ms. Baldwin at USIA

sah                                                                          147

1   Office of Civil Rights you again argued, argued for

2   the first time, I should say, "I was never offered

3   or given any training."  Is that correct?

4       A    Yes.

5       Q    And in fact, on page 2 of Ms. Baldwin's

6   response she reports the results of her

7   investigation with management officials in the

8   Office of Comptroller with regard to the extent of

9   training that they believe you did have.  Is that

10  correct?

11      A    Okay, I see the statement, lyes.

12      Q    I'd like to turn your attention to

13  paragraph 3 on page 3.  You allege that Miss Keith

14  never held any informal performance evaluation

15  meetings with you.  Is that correct?

16      A    Right.

17      Q    And on page 3 we find the results of Ms.

18  Baldwin's, director of the Office of Civil Rights,

19  the results of her investigation with regard to the

20  dialogue that you did have with your rating

21  officer, Ms. Keith, relating to your job

22  performance, characterizing it as a "constant

1  dialogue on job performance."  Do you see that

2  language?

3      A    What, during the six months?

4      Q    I'm referring to the second full paragraph

5  on page 3.  I understand you may not agree with

6  that language but I'm asking you if what I have

7  said is reflected in the letter.

8      A    It's reflected in the letter, yes.

9      Q    Okay, thank you.

10         MS. CHANDLER:  Your Honor, I don't have

11  much more to go but our cafeteria does close at 2,

12  I believe.  The question is whether you'd like me

13  to continue or take a break.

14         [Discussion off the record.]

15         JUDGE PACINDA:  We can take a break if

16  that's okay with you, Mr. Dunn, and then we'll

17  continue with the Complainant after that.  Off the

18  record.

19         [Whereupon, at 1:37 p.m., the hearing

20  recessed, to reconvene, this same day.]

sah                                                                    149

```
 1              A F T E R N O O N   S E S S I O N

 2                                          [2:25 p.m.]

 3       Whereupon,

 4                    ROSE MARY DEWS-MILLER

 5  resumed the stand and, having been previously duly

 6  sworn, was examined and testified further as

 7  follows:

 8               CROSS-EXAMINATION (Continued)

 9            JUDGE PACINDA:  Back on the record after a

10  brief lunch break.  We're continuing with

11  cross-examination.

12            Ms. Dews-Miller, I remind you you're still

13  under oath.

14            THE WITNESS:  Okay.

15            JUDGE PACINDA:  Ms. Chandler?

16            MS. CHANDLER:  Your Honor, I'd like to

17  request that the document marked as Agency Exhibit

18  1 be accepted into evidence.

19            MR. DUNN:  No objection.

20            JUDGE PACINDA:  Agency Exhibit 1 is

21  accepted into evidence.

22                            [Agency Exhibit No. 1 was
```

sah                                                                      150

1                          received into evidence.]

2          BY MS. CHANDLER:

3      Q    Ms. Dews-Miller, do you recall appealing

4   Ms. Baldwin's decision regarding your allegations

5   of breach of the settlement agreement to the Office

6   of Federal Operations Equal Employment Opportunity

7   Commission?

8      A    Yes.

9          MS. CHANDLER:   I'd like to have marked as

10  Agency Exhibit 2 a document marked Dismissal of

11  Appeal.   It's a document from the EEOC in the

12  Dews-Miller case and it's dated September 25, 1997.

13                          [Agency Exhibit No. 2 was

14                          marked for identification.]

15          BY MS. CHANDLER:

16     Q    Ms. Dews-Miller, do you need a moment to

17  look at this document?

18     A    Yes, I'll take a few moments.

19          [Pause.]

20          Okay, I'm fine.

21     Q    Your appeal of Ms. Baldwin's decision,

22  finding that the Agency had not breached the

1  settlement agreement, was dismissed by the EEOC

2  because your appeal was not timely filed.  Is that

3  correct?

4     A    Correct.

5     Q    And that's what this document shows.

6     A    Yes.

7          MS. CHANDLER:  I would like to request

8  that Agency Exhibit 2 be accepted into evidence.

9          MR. DUNN:  No objection.

10         JUDGE PACINDA:  Agency Exhibit 2 is

11 accepted into evidence.

12                         [Agency Exhibit No. 2 was

13                          received into evidence.]

14         BY MS. CHANDLER:

15    Q    Ms. Dews-Miller, you testified at length

16 this morning that you had filed one or more

17 complaints with the Office of Special Counsel.  Is

18 that correct?

19    A    Yes.

20    Q    And in those complaints you make a number

21 of allegations which are also at issue in the

22 compliant here today.  Is that correct?

152

1       A    I don't know.  I don't quite remember what

2   I filed at that time.

3            MS. CHANDLER:  I'd like to mark the

4   following document as Agency Exhibit 3.  It is a

5   memorandum from Rose Mary Dews-Miller to the Office

6   of Special Counsel dated September 25, 1996.

7                         [Agency Exhibit No. 3 was

8                         marked for identification.]

9            BY MS. CHANDLER:

10      Q    Would you like a moment to take a look at

11  the document, Ms. Dews-Miller?

12      A    This is entirely different.  This is not

13  about my complaint.  This is about the complaint

14  that I was to testify over at the Office of Special

15  Counsel on or about the 25th of September, 1996 on

16  behalf of the Agency.  This is not in reference to

17  a complaint I filed.

18      Q    But it does summarize what you believe to

19  be acts of retaliation against you for alleged

20  whistleblowing on September 16, 1994?  Let me turn

21  your attention to page 6 of 7, specifically

22  paragraph 6.

sah                                                                    153

1           In this document that you sent to the

2    Office of Special Counsel you list acts of

3    retaliation against Rose Mary Dews-Miller for

4    blowing the whistle on September 16, 1994 and these

5    include an unjust settlement agreement dated

6    January 30, 1995, the '94-'95 performance

7    evaluation by Darwin Roberts and Lou Leporatti, the

8    1995 performance evaluation by Carol Keith and Eva

9    Diekmann, being placed on AWOL by Ann Young, denial

10   of a within-grade increase, a personnel action

11   converting you to a temporary appointment not to

12   exceed one year, again your appeal to Jan Brambilla

13   of the refusal to reconsider denial of the

14   within-grade increase, and the fact that you got

15   what you characterize as nonjob assignments.

16           Then on the following page, the last

17   bullet, still in the same paragraph, personnel

18   specialist Jenny Mallios requests an obtainment of

19   my personal and private medical files from OWCP.

20           Is that an accurate summation of the

21   allegations, or at least some of them, that you

22   identify to the Office of Special Counsel that were

sah                                                                          154

1  taken in retaliation for what you believed to be

2  protected whistleblowing?

3      A    Again I'm going to have to say this is

4  nothing I did as far as submitting to the Office of

5  Special Counsel on my behalf.  It's in reference to

6  myself being called to the Office of Special

7  Counsel requesting what happened on this 9/12/96

8  meeting and I recouped some of the additional

9  information.  This is not a complaint I'm filing.

10 This is--

11     Q    No, I understand that.  I understand and I

12 hear your testimony that this is not your

13 complaint.  What I'm asking you is whether that

14 information in paragraph 6 that you presented,

15 regardless of the context in which it was

16 presented, is a fair and accurate summary of what

17 you believe to be claims of retaliation against you

18 for protected whistleblowing.

19     A    Yes.

20         MS. CHANDLER:  I'd like to request that

21 Agency Exhibit 3 be accepted into evidence.

22         JUDGE PACINDA:  Mr. Dunn?

sah                                                                              155

1          MR. DUNN:  No objection.

2          JUDGE PACINDA:  Agency Exhibit 3 is

3   accepted into evidence.

4                         [Agency Exhibit No. 3 was

5                         received into evidence.]

6          BY MS. CHANDLER:

7      Q    Now separate and apart from the status of

8   Agency Exhibit 3, you did receive two decision

9   letters from the Office of Special Counsel dated

10  October 31, 1996 and August 25, 1997.  Is that

11  correct?

12     A    I think so.  I'm not sure.

13         MS. CHANDLER:  I'd like to request that

14  the following document be marked for identification

15  as Agency Exhibit 4.  It is a letter from the

16  Office of Special Counsel to Ms. Dews-Miller dated

17  October 31, 1996.

18                         [Agency Exhibit No. 4 was

19                         marked for identification.]

20         BY MS. CHANDLER:

21     Q    Ms. Dews-Miller, do you need a moment to

22  review the document?

sah                                                              156

1       A     Okay.

2             [Pause.]

3             Okay.

4       Q     Paragraph 1 states that this letter from

5    the Office of Special Counsel to you is in response

6    to your request for assistance against officials at

7    the USIA and they summarize your allegations as

8    follows:  one, that your within-grade increase,

9    your WGI, was denied; two, you were placed in an

10   absent without leave status; and three, your duties

11   and responsibilities were significantly changed.

12   Is that correct?  That's in paragraph 1 of the

13   letter.

14      A     Okay.

15      Q     On page 2 of the letter the OSC denied

16   your request for assistance and found that the

17   officials responsible for the actions you

18   complained about were not the subject of your

19   disclosure and suffered no adverse impact.  They go

20   on to say--they being the Office of Special

21   Counsel--"Moreover, we found no statements or other

22   evidence reflecting animus against you by the

sah                                                                      157

1    officials responsible for the manners"--I assume

2    they mean matters--"you complain about because of

3    your protected activity."  Is that a fair reading

4    of the letter?

5        A    Yeah, you're reading what the letters

6    says.

7            MS. CHANDLER:  Thank you.

8            I'd like to request that Agency Exhibit 4

9    be accepted into evidence.

10           MR. DUNN:  I have an objection to this

11   line, to this document from the Office of Special

12   Counsel, and to the questioning relating to the

13   Office of Special Counsel.  The basis for the OSC

14   complaints Miss Miller outlined in her letter,

15   which is Agency Exhibit 3, are based on

16   whistleblowing retaliation.  The basis of the

17   similar retaliations contained in 96-15 are based

18   on prior EEO activity.  Yes, the retaliation

19   alleged may be quite similar in wording; however,

20   the underlying motivations of the actors against

21   Miss Miller is purported in each case to be

22   different.  The OSC is dealing with whistleblowing

sah

158

1   retaliation, denied.  The EEO complaint deals with

2   retaliation against Ms. Dews-Miller based on prior

3   EEO activity.

4           To allow the government, the Agency, to

5   continue to present document upon document showing

6   that similar OSC complaints were made begs the

7   question, the ultimate issue:  what was the

8   motivation for this alleged retaliation in the OSC

9   complaint versus the alleged retaliation in this

10  EEOC complaint?  Different motivations alleged;

11  consequently, the question, the fundamental

12  question has to be raised in regard to the OSC:

13  what's the relevance of OSC denying relief in

14  regard to retaliation when the basis for the

15  retaliation in the OSC complaint is being a

16  whistleblower and the basis for the complaint in

17  this present EEOC case is prior EEO activity?

18  That's the substance of my objection.

19          MS. CHANDLER:  The Agency's response to

20  that is severalfold.  First of all, Mr. Dunn

21  questioned Ms. Dews-Miller at considerable length

22  this morning regarding her allegations of

1   whistleblowing, the credit card abuse, who she met

2   with, who was present at the meeting, what they

3   did, what they said, and presented that as part of

4   her case in chief with respect to the case today.

5           I do agree with him.  Whistleblowing and

6   EEO activity and EEO complaint are two different

7   things.  However, I do think that there is a strong

8   degree of relevance that needs to be taken into

9   account that Ms. Dews-Miller was, in fact, using

10  both fora--the OSC and the EEO process, as well as

11  the breach of settlement agreement process--to

12  contest some of the very same issues.  I think it's

13  up to you, Your Honor, to weigh the evidence but I

14  think that it is highly relevant to the case at

15  hand today.

16          JUDGE PACINDA:  Okay.

17          Mr. Dunn, I note your objection and I will

18  accept this into evidence and I do understand the

19  difference between whistleblowing and prior EEO

20  activity.

21          MR. DUNN:  I'm sure you do.

22          JUDGE PACINDA:  And I will certainly take

sah                                                                    160

1  that into consideration when weighing this

2  evidence.

3            So I will accept what's been identified as

4  Agency Exhibit 4 into evidence.

5                          [Agency Exhibit No. 4 was

6                          received into evidence.]

7            MS. CHANDLER:  On that note I'd like to

8  request that the following document be marked for

9  identification as Agency Exhibit 5.  It is a letter

10 from the Office of Special Counsel to Ms.

11 Dews-Miller dated August 25, 1997.

12                          [Agency Exhibit No. 5 was

13                          marked for identification.]

14        [Pause.]

15        BY MS. CHANDLER:

16    Q    Are you ready to proceed, Ms. Dews-Miller?

17    A    Yes.

18    Q    This letter from the Office of Special

19 Counsel to you dated August 25, 1997 is in response

20 to your request for assistance against officials of

21 the U.S. Information Agency, specifically with

22 regard to your allegations that the agency's

1   decision to terminate your employment on December

2   9, 1996 constituted reprisal because of

3   whistleblowing.  Is that correct?

4        A    You're reading from--

5        Q    Yes, I'm reading from paragraph 1 of the

6   letter.

7        A    Yes.

8        Q    I'd like to turn your attention to page 2

9   of the letter, the first full paragraph where the

10  Office of Special Counsel gives the reasons for its

11  decision in denying your request for assistance.  I

12  will not read the entire paragraph in the interest

13  of time but note that the first sentence which

14  directly addresses your allegation says that "With

15  respect to the termination of your employment, we

16  note that during January 1995 you entered into a

17  settlement agreement with the agency under which

18  you agreed to be converted to a temporary

19  appointment not to exceed December 1996 to resolve

20  certain issues between you and the agency."  And it

21  goes on to discuss your within-grade increase and

22  your AWOL and finding no animus on the part of the

sah                                                                    162

1  USIA officials responsible for the matters you

2  complained about.

3          Is that a correct characterization of the

4  letter?

5      A    Yes, you're reading the letter.

6          MS. CHANDLER:  I'd like to request that

7  Agency Exhibit 5 be entered into evidence.

8          MR. DUNN:  Same objection.  One additional

9  point.  I'd like to object additionally in regard

10 to 5 and, by adoption, 4, that these are not final

11 decisions.  There is holding open a 16-day period

12 to consider further documentation, and so forth.

13         JUDGE PACINDA:  Thank you.  Noted.

14         Agency Exhibit 5 will be accepted into

15 evidence.

16                    [Agency Exhibit No. 5 was

17                     received into evidence.]

18         BY MS. CHANDLER:

19     Q    Ms. Dews-Miller, is it correct that your

20 request for assistance with the Office of Special

21 Counsel, specifically their denial of your request

22 for assistance, was appealed by you to the Merit

sah                                                                      163

1   Systems Protection Board?

2       A    Yes.

3           MS. CHANDLER:    I'd like to mark the

4   following document as Agency Exhibit 6.    It's a

5   decision by the Merit Systems Protection Board

6   dated May 2, 1997.

7                           [Agency Exhibit No. 6 was

8                           marked for identification.]

9           BY MS. CHANDLER:

10      Q    Ms. Dews-Miller, although you're welcome

11  to look at the entire document, I'm only going to

12  be asking you about the decision that is captured

13  in the first sentence.    But if you need more time

14  to look at the document, please let me know.

15      A    No.  Go ahead.

16      Q    Is it correct that the Merit Systems

17  Protection Board dismissed your individual right-

18  of-action appeal as untimely filed?

19      A    Yes, as stated on the paper.

20          MS. CHANDLER:    Your Honor, I request that

21  Agency Exhibit 6 be accepted into evidence.

22          MR. DUNN:    No objection.

sah                                                                    164

1              JUDGE PACINDA:  Okay, Agency 6 is

2    accepted.

3                          [Agency Exhibit No. 6 was

4                          received into evidence.]

5         MS. CHANDLER:  And finally, I'd like to

6    request that the following document be marked as

7    Agency Exhibit 7 for identification.  It is a

8    decision by the Merit Systems Protection Board

9    dated March 3, 1998.

10                         [Agency Exhibit No. 7 was

11                         marked for identification.]

12        BY MS. CHANDLER:

13        Q    Ms. Dews-Miller, let me know when you're

14   ready to proceed.

15        A    I'm ready.

16        Q    Do you recognize this as a decision by the

17   MSPB with regard to an individual right-of-action

18   appeal you filed with it?

19        A    Yes.

20        Q    I am not going to read the entire decision

21   to you or into the record but I would like to

22   direct your attention to two statements in the

1   decision.   On page 2, the last sentence, the Merit

2   Systems Protection Board found that the documentary

3   evidence of record reflects that the

4   appellant--that's you--"The appellant's separation

5   on December 9, 1996 was effected in accordance with

6   the terms of the settlement agreement that the

7   appellant and the agency entered into in January of

8   1995."

9            Is that a correct characterization of the

10  opinion?

11       A    Yes, you're it from the opinion.

12       Q    And on page 4 at the bottom of the page,

13  the very last sentence, "The MSPB finds further

14  this settlement agreement appears on its face to be

15  valid and lawful and the appellant has made no

16  allegation supported by facts which, if proven,

17  could show that the settlement agreement was

18  unlawful, involuntary or was the result of fraud or

19  mutual mistake."

20           Again is that a fair characterization of

21  that portion of their opinion?

22       A    You're reading it, yes.

sah                                                                    166

1              MS. CHANDLER:  I'd like to request that

2    Agency Exhibit 7 be entered into evidence.

3              MR. DUNN:  No objection.

4              JUDGE PACINDA:  Agency Exhibit 7 is

5    accepted into evidence.

6                        [Agency Exhibit No. 7 was

7                        received into evidence.]

8              MS. CHANDLER:  I have no further

9    questions.  Thank you.

10             JUDGE PACINDA:  Mr. Dunn, redirect?

11             MR. DUNN:  No.

12             JUDGE PACINDA:  Okay, thank you very much.

13             THE WITNESS:  You're welcome.  Thank you.

14             [Witness excused.]

15             JUDGE PACINDA:  Next witness will be--

16             MS. JOHNSON:  Darwin Roberts.

17             [Discussion off the record.]

18             JUDGE PACINDA:  Back on the record.

19             Good afternoon, Mr. Roberts.  My name is

20   Michael Pacinda.  I'm an administrative judge with

21   the EEOC.  I've been assigned to hear this

22   complaint of discrimination brought by the

sah                                                                      167

1  Complainant, Ms. Rose Mary Dews-Miller.  I've

2  approved you to testify on behalf of the Agency, as

3  well as the Complainant in this matter.  We've

4  agreed that how we're going to handle it is that

5  the Agency counsel will be asking you a series of

6  questions first and then Mr. Dunn will then follow

7  up with some questions.

8       Whereupon,

9                     DARWIN ROBERTS

10 was called as a witness and, after having been

11 first duly sworn by the Administrative Judge, was

12 examined and testified as follows:

13                 DIRECT EXAMINATION

14      BY MS. JOHNSON:

15      Q    Could you please state your full name for

16 the record?

17      A    Darwin Doyle Roberts.

18      Q    And your current employer and position?

19      A    General Services Administration,

20 information technology management specialist.

21      Q    How long have you been in this position?

22      A    Four years.

sah                                                                  168

1       Q    And how long have you worked for the

2  federal government?

3       A    Twenty-five.

4       Q    Where did you work before you worked for

5  GSA?

6       A    State Department before that, U.S.

7  Information Agency before that, DOD before that.

8  That's about it.

9       Q    Thank you.  And were you Ms. Dews-Miller's

10  supervisor for the period between 1991 and January

11  of 1995?

12       A    Yes, I was.

13       Q    And what office were you working in at the

14  time?

15       A    That was the Inspector General's Office.

16       Q    At US--

17       A    U.S. Information Agency, yes.

18       Q    And what was your position there?

19       A    I was director of admin and management.

20       Q    And what did your position entail?

21       A    Basically my staff was responsible for the

22  logistics, for supporting the other 50 members of

sah                                                                   169

1   the staff of the IG's office, providing them IT

2   support, budget, finance, travel, library support,

3   and contracting support.

4        Q    And how large was your staff?

5        A    Four.

6        Q    And what was Ms. Dews-Miller's position?

7        A    She was the admin officer.

8        Q    And what were her job duties as the admin

9   officer?

10       A    Budgeting and finance, travel coordinator,

11   travel and training coordinator, and personnel.

12       Q    I'd like to bring your attention to

13   Exhibit 50 in the brown ROI, which is OCR 96-15.

14   Do you recognize this document?

15       A    Yes, this is the appraisal documents, a

16   form that we use at U.S. Information Agency, and

17   this is Rose Mary's for the period of May 1, '94

18   through January 24, '95.

19       Q    Could you please turn to I believe it's

20   page 6, the job requirement on training.  So it's

21   page 8.  Job requirement number 5, page 8.

22       A    Okay.

sah                                                                    170

1      Q    Now you mentioned that she had the

2   training job requirement.  Did this job requirement

3   require Ms. Dews-Miller to have contracting

4   authority or a contracting warrant?

5      A    No, we had a separate purchasing agent on

6   the staff, within the office.

7      Q    And did this job requirement require her

8   to obligate funds on behalf of the agency?

9      A    When you use the term obligation, only the

10  contracting officer can actually obligate under a

11  contract.  What Rose Mary would do is look at the

12  funding citation and put the funding citation on

13  the documents.

14     Q    So what exactly did this job requirement

15  have her to on a day-to-day basis?

16     A    The main duties of the job, one was to

17  make sure all the training pamphlets were available

18  in the library for the rest of the staff to look at

19  to put together their individual development plans,

20  make sure everyone on the staff actually had an IDP

21  approved by their supervisors, and to provide the

22  AIG for audit a listing of the courses that the

1   auditors had taken to make sure they were within

2   the standards of the yellow book for auditing, in

3   which they required 80 hours of training every

4   year.

5       Q    And who was the person on your staff or in

6   your office who actually had the job requirement

7   and actually had contracting authority?

8       A    Dolores Bulles, our purchasing agent,

9   originally had this on her list of duties but then

10  it turned out that it wasn't the best idea because

11  she also was doing the contracting and as a GS-7,

12  she felt that she had to do too much work and

13  Personnel agreed with her and said I had to give it

14  over to the admin officer as a collateral duty.

15      Q    But was Miss Dolores Bulles the person who

16  actually had the contracting authority?

17      A    Yes, she's the purchasing agent.

18      Q    So she was the purchasing agent for

19  purposes of training?

20      A    For anything in the office, whether it was

21  actually going out to get auditing support, you

22  know, a CPA firm to do audit support, or for the

sah                                                                    172

1    investigators to get investigator support,

2    investigation support.

3        Q    I'm going to ask you a few questions about

4    Ms. Dews-Miller's performance now.  You've stated

5    that you were her supervisor over a couple of

6    years. What were the first ratings that you gave

7    her?

8        A    If I remember correctly they were at least

9    satisfactory and a lot of items or areas were also

10   highly successful.

11       Q    And did her performance remain constant

12   over the period that you supervised her?

13       A    Actually the performance started out on a

14   higher level than it ended up at.

15       Q    About what point did her performance

16   decline?

17       A    She had requested from me to have her

18   position upgraded when I first got there in

19   November of '91.  She wasn't the only one.  Some of

20   the others on the staff asked if I could do

21   anything to get their positions upgraded.  I went

22   over to Personnel and they did desk audits and

sah                                                                      173

1   determined that for the size of our staff and the

2   job that they were doing, they were equal to the

3   grade levels within the agency itself, so there was

4   no way that the current positions were going to be

5   upgraded.

6           Then Miss Miller asked if I could do

7   anything to get her on the audit staff because

8   those journeymen-level positions went up to 13s.

9   And I went and spoke to the AIG for audit, who at

10  that time was Dick Berman, and asked if there was

11  anything that could be done and he did offer a

12  space.  He had allotted spaces from the auditing

13  school at Fort Belvoir, which ran courses for

14  first-time auditors in IG offices and for

15  retraining auditors who needed retraining, and he

16  gave up one of his slots for Rose Mary to attend

17  the training.  It was a month-long training course

18  down at Fort Belvoir, just to give her the basics

19  of what auditing was all about within an IG

20  organization.

21          I said part of that was, Rose Mary, you

22  know, while you're gone for that month we are a

sah

1   very small staff and everybody else is going to

2   have to pick up the slack, but I do expect once you

3   return to the office that you still have to be the

4   admin officer unless you're selected to be an

5   auditor.

6        Q    Was she selected to be an auditor?

7        A    No, she was not.  I'm not sure what

8   happened.  I wasn't involved in the selection

9   process.  Mr. Berman actually did the selection

10  process.  But at that time, if I remember

11  correctly, most of the auditors who came on our

12  staff while I was in that office were new college

13  graduates and a lot of them had their CPAs already.

14       Q    Thank you, Mr. Roberts.  So after she came

15  back from this training is that when you're saying

16  that her performance declined?

17       A    Actually when she was not selected for an

18  audit position basically her attitude became more

19  negative.  I mean I understood that.  She was

20  frustrated.  She did not want to be an admin

21  officer.  She wanted to be an auditor.

22       Q    Could you give me specific examples of how

sah

175

1  her performance declined?

2      A    In the finance area, which was her strong

3  suit as the admin officer, I was starting to get

4  calls from the Finance Office at the main U.S.

5  Information Agency because although we had a

6  separate budget from the agency as an IG, it still

7  had to go through the Finance Office and the CFO

8  before it went to OMB to get approval.  And when I

9  first got to the IG's office there didn't seem to

10  be a problem with what we were providing to the

11  Finance Office as far as our annual budget papers.

12          Later on that became a problem.  They kept

13  returning the paperwork to us, saying it's not done

14  correctly.  They even brought Rose Mary over to

15  their office and went through it, sitting side by

16  side with her and going through the paperwork,

17  where it was deficient.

18      Q    So was this paperwork you're talking about

19  paperwork that Ms. Dews-Miller had submitted and

20  prepared?

21      A    Yes, yes, as our budget and finance

22  officer, yes.

sah

1          So anyway, that and also at that time the

2  IG in the office, Mr. Murphy, wanted to have

3  separate audits for the main divisions within the

4  office, which was Investigations, Inspections and

5  Audit, so that he could tell where they were

6  spending their funds on a monthly basis so that if

7  one of the entities was not spending their funds in

8  a timely manner, he would take the money away from

9  them and give it to somebody else who was spending

10 their funding in a timely manner because he didn't

11 want to end up with year-end spending problems.

12         So the AIG for audit would continually ask

13 Rose Mary for updates and was continually coming to

14 me saying we need to be more timely in giving him

15 his updates because he needed to have that number

16 before the month started so that he would know how

17 much he had left to spend that month.

18     Q    As a supervisor, Mr. Roberts, how did you

19 run your office?  Did you hold regular meetings

20 or--

21     A    Yes.  I held weekly staff meetings around

22 a table with everyone and we'd go around to each

sah                                                                      177

1    person and "What task are you doing this week?  Do

2    you need my help?  Do you need anyone else's help

3    on this staff or the agency?"  Then what were your

4    future goals as far as training and things like

5    that.  We held weekly staff meetings.

6         Q    And this was an opportunity for the people

7    on your staff to raise concerns with you or to ask

8    for help if they were having difficulties?

9         A    That was the main purpose of having that,

10   so nothing fell through the cracks.

11        Q    And was Ms. Dews-Miller at these meetings?

12        A    Yes.

13        Q    Did she participate in them?

14        A    Initially, but when her attitude changed

15   she would just sit there and stare either at the

16   ceiling or at the floor and even though I'd ask a

17   question, I'd get no response.

18        Q    Now how would you describe her performance

19   in the last half-year that you were her supervisor?

20   That would be the end of '95.

21        A    Right.  That was basically the bottom of--

22        Q    I'm sorry; the end of '94.

178

1      A    Correct.   That was the bottom of the

2  performance scale as far as Rose Mary was

3  concerned, especially in the two critical areas,

4  which was finance and budgeting.   If I remember

5  right, that's where I gave minimally successful,

6  and one of the reasons for that, at 30 September of

7  that year, '94, the IG for audit comes to me and

8  says, "Darwin, do you have enough money to award a

9  contract I need for CPA support?"   I went to Rose

10  Mary and she couldn't tell me, basically we found

11  out later because the files were never kept up to

12  date on a monthly basis.   So at any one time, at

13  any certain time there was no way to tell if we

14  were overextended as far as our funding level.

15      Q    So you were Ms. Dews-Miller's rating

16  officer; that's correct?

17      A    Correct.

18      Q    I'd like to ask you a couple of questions

19  about the final rating you did for Ms. Dews-Miller,

20  which you just referenced just now, from the May

21  '94 to January '95 period.   This is Exhibit 50,

22  page 2 in ROI OCR 96-15, so you should have it open

sah                                                                          179

1   before you.

2       A    Yes.

3       Q    Is this the final rating which you did for

4   her?

5       A    Yes, it was the final rating only

6   because--it should not have been the final rating

7   but because she left the office in January of '95,

8   Personnel asked that I give her this interim

9   rating.

10      Q    And do you remember what the overall

11  rating was in this final--

12      A    Minimally successful.

13      Q    Had you ever given her such a rating

14  before?

15      A    No.

16      Q    And why did you give her this rating this

17  time?

18      A    Well, as I previously said, this was

19  pretty much the bottom of the scale as far as her

20  performance since I had arrived in the office in

21  November of '91.

22      Q    And in the appraisal itself did you cite

1    examples of her performance?

2        A    I'm sure I did.   That was a requirement.

3        Q    I'll show it to you.

4        A    Okay, her performance requirement number

5    1, which says the employee's responsible for

6    maintaining and managing the office's financial

7    resources, she was rated minimally successful.

8    Again that brings up the hands-on assistance that

9    was required from the Office of the Comptroller

10   personnel to allow OIG submissions to OMB to go

11   through without problems.

12           And let's see.   Then performance

13   requirement number 2, which again dealt with the

14   financial plans and monitoring the execution of the

15   budget, the approved budget, she was rated

16   minimally successful.   And this again was due to

17   her failure to reconcile OIG accounts against the

18   proper agency financial reports and continually

19   tracking OIG obligations through the agency's

20   auditing and financial management system.   The OIG

21   was placed in a severe crisis mode during September

22   and October to ensure there were no violations of

sah

1  the Anti-Deficiency Act.  One procurement was even

2  cancelled to ensure there would be no violations.

3  Financial files were also not kept in a timely and

4  accurate manner.

5      Q    Thank you.  That's sufficient.

6           Now was this rating accurate and fair?

7      A    I believe it was.

8      Q    Did you ever discuss with Ms. Dews-Miller

9  her performance during this final period?

10     A    Again at our weekly staff meetings when I

11 wasn't getting responses from Rose Mary I would

12 still talk to Rose Mary after the others had left,

13 but still get no response verbally.  And when I

14 tried to have a formal meeting on her performance

15 in December of '94 she did not show up at the

16 arranged time and place and when I went to her desk

17 she said there's no reason to.

18     Q    Do you remember what the arranged time and

19 place were?

20     A    It was in December.  I think it was--I'd

21 have to look at my notes but I think it was

22 December 21 or something like that.