# EXHIBIT   42

Transcript of EEOC Hearing Pages 182 - 242
Part 4 of 5

sah                                                                      182

1      Q    Is there any document that might refresh

2   your recollection?

3      A    Probably one of my depositions.   In the

4   past I used to have a time management calendar on

5   my desk and I used to have it there.

6      Q    I'd like to call your attention to your

7   affidavit, which is Exhibit 10 in report of

8   investigation OCR 96-15.   Page 3 of 9, the top of

9   the page, the first paragraph, just take a moment

10   to review and then tell me the time and date.

11     A    Okay.   We were supposed to meet on

12   December 21 at 10:30.

13     Q    And you just testified that she'd said

14   there was no reason to meet?   Is that correct?

15     A    She didn't show up at the meeting and when

16   I went out to her work area and said, "Rose Mary,

17   we're supposed to be meeting to discuss your

18   performance," she basically said there's no reason

19   to.

20     Q    Did you meet with her then after the

21   holiday season was passed?

22     A    Again our weekly staff meeting she

sah                                                                 183

1   attended and I tried to meet with her--.I offered

2   her the opportunity when .I sent her interim

3   performance rating to her--

4       Q    We'll get to that in a moment.  Sorry to

5   interrupt but I just wondered how much longer then

6   was she in your office after this meeting didn't go

7   off?

8       A    She left in January--about a month.

9       Q    All right.  As you testified earlier, this

10  was an interim appraisal.  She left in January.

11  She left in January to go where?

12      A    To the Comptroller's Office.

13      Q    So at the time you prepared this rating

14  was Ms. Dews-Miller still working in your office or

15  not?

16      A    When I actually prepared this?

17      Q    Mm-hmm.

18      A    Let me look at the date I prepared it.

19  No, this was completed 6/30/95, June 30, '95.

20      Q    So she was not in your office at this

21  time.

22      A    No.

sah
                                                                    184

1       Q    And before I interrupted you--I apologize

2    for that--you were just about to answer the

3    question essentially of whether you met with Ms.

4    Dews-Miller for a final year-end review since your

5    mid-year evaluation in December didn't work out.

6       A    Right.

7       Q    Did you meet with her for a final

8    year-end--

9       A    No, she would not meet with me and she

10   refused to sign and Personnel said to send the

11   rating over to them.

12      Q    How did you get the rating to Ms.

13   Dews-Miller?

14      A    I had Dolores Bulles in our office

15   hand-carry it in a sealed envelope to her.  Her and

16   Rose Mary were friends in the office, so she knew

17   where she was exactly working in the agency at that

18   time.

19      Q    I'd like to call your attention to page 1

20   of Exhibit 50.  Do you recognize this document?

21      A    Yes.

22      Q    Are you the author of this document?

sah

185

1  A  Yes.

2  Q  And could you describe what it is, please?

3  A  This is the actual interim performance

4 rating being sent to Rose Mary July 18, 1995.  "I'm

5 available to meet with you at your convenience to

6 discuss the appraisal.  Please call me at"--my

7 phone number--"if you would like to meet."

8  Q  Did she ever call you?

9  A  No.

10  Q  And did you ever meet?

11  A  No.

12  Q  Thank you.  You testified that Ms. Dolores

13 Bulles carried this in an envelope that was sealed?

14  A  Mm-hmm.

15  Q  Is that what you said, to Ms. Dews-Miller?

16  A  Yes.

17  Q  Why was it in a sealed envelope?

18  A  Because it's personal information, not for

19 others to see than the employee.

20  Q  Thank you.  Now after Ms. Dews-Miller left

21 your office who took over her duties?

22  A  It was a combination of my IT

sah

1   administrator, Elaine Johns, and Dolores Bulles.

2        Q     And were the two of them able to perform

3   Ms. Dews-Miller's duties well?

4        A     Yes.

5        Q     They had no difficulties with

6        A     Well, they had some difficulty in the

7   beginning, again because the files were not up to

8   date.  So they had to go back and basically

9   reconstruct the files that should have been kept up

10  to date.

11       Q     Could you describe that a little bit?

12  What do you mean the files weren't kept up to date?

13       A     When Rose Mary left--well, as I said in

14  the interim rating, there were some cases where we

15  couldn't tell actually how much of the funds in our

16  budget had been expended and what was left to place

17  on contract.  So the files were not kept up to date

18  on a monthly basis.

19            When Rose Mary left our office in January

20  the IG asked that we do a full accounting of the

21  files and at that time when we walked into the work

22  space there were just stacks of paper on the desk.

sah

187

1     Q     I'm sorry.  Ms. Dews-Miller's work space?

2     A     Yes, I'm sorry.  Stacks of paper in the

3 cabinets in her work space.  They'd previously been

4 on her desk and she had asked to have overtime to

5 get them up to date and it took--plus, there were

6 disks flied--at that time we also had electronic

7 copies of the files that Rose Mary had to keep up

8 to date and she took those disks with her out of

9 the office and the IG asked that they be returned

10 immediately because that was IG property.

11          It took Elaine and Dolores probably the

12 good part of two to three weeks to get the files

13 straight, and we're not talking just the finance

14 files; we're talking the travel files, the training

15 files.  It's basically stacks of paper were put

16 into a cabinet and never filed or no annotations

17 made in any of the electronic files that anything

18 was done.

19     Q     Thank you.  I only have a few questions

20 left for you.  Mr. Roberts, did you create a

21 hostile work environment for Ms. Dews-Miller?

22     A     I don't believe so.

sah                                                                              188

1      Q    Did you try to help her with her career

2  goals?

3      A    I thought I did.

4      Q    Could you give me an example?

5      A    Again it was the auditing training.  Again

6  I have no problem with anybody trying to get ahead.

7  Everybody wants to try to get ahead and I

8  understood she was frustrated being an admin

9  officer, but I also told her, you know, I'm willing

10 to help as much as I can but you still have to be

11 able to do your job as the admin officer.

12     Q    Now as a general rule, do you believe as s

13 supervisor that you should praise people for doing

14 good work?

15     A    Sure.

16     Q    Would you have done so for Ms. Dews-

17 Miller?

18     A    I did in several cases on several of her

19 appraisals, like I did others on the staff.

20     Q    Could you turn back for a moment to

21 Exhibit 50, please?  This is in ROI OCR 96-15, page

22 6.  What rating did you give Ms. Dews-Miller on

sah                                                                    189

1    this--

2        A    This is the travel report task and she got

3    highly successful.

4        Q    Why did you give her this rating?

5        A    I believed she deserved it.  She found

6    some problems with the American Express travel

7    cards for the OIG staff at that time and was

8    commended by the IG for doing that.  It turned out

9    that several of our people--not on my staff--were

10   abusing their travel cards for personal use.  Then

11   it turned out that this eventually led to the IG

12   doing an audit of the entire agency and finding a

13   lot of problems, which are still ongoing, with

14   travel cards in the government.

15       Q    So you think Ms. Dews-Miller did a good

16   job here?

17       A    Yes, I do.

18       Q    Now at the time that you wrote this rating

19   were you aware of Ms. Dews-Miller's prior EEO

20   activity?

21       A    Yes, I was.

22       Q    Now when you wrote the other parts of

sah

1    this, the final performance appraisal for her in

2    which you gave her minimally successful ratings,

3    were you, in doing that, retaliating against Ms.

4    Dews-Miller for her prior EEO--

5        A    No, I wasn't.  I'd been an EEO counselor

6    in the agency for two years before coming to the IG

7    and I didn't have a problem with the EEO process.

8            MS. JOHNSON:  Thank you, Mr. Roberts.

9            Judge, I have no other questions.

10           JUDGE PACINDA:  Okay, Mr. Dunn?

11                   CROSS-EXAMINATION

12           BY MR. DUNN:

13       Q    Good afternoon, Mr. Roberts.  You

14    indicated that you were aware of Miss Dews-Miller,

15    her previous involvement in EEO activity?

16       A    Yes.

17       Q    Isn't it true that indeed one or more EEO

18    complaints filed by Miss Dews-Miller was against

19    you?

20       A    I believe only one, other than this one, I

21    think for a rating I had given her in the past,

22    that she didn't like the rating.

sah                                                                  191

1       Q    And you were named in that complaint as

2   the person taking improper, impermissible action

3   against her?

4       A    I'm not sure what it said but I'm pretty

5   sure it was against the rating I had given her.  I

6   think I'd given her a fully successful rating and

7   she thought it should have been higher.

8       Q    You indicated that you were aware of the

9   disclosure Miss Dews-Miller made to the Inspector

10  General concerning the credit card abuse.

11      A    Mm-hmm.  She brought it to me and then we

12  both went in to see the IG.

13      Q    There were a number of people in the

14  Inspector General's Office who were called to task

15  as a result of their abuse of the cards, correct?

16      A    I think it was three or four.  I'm not

17  sure of the number.

18      Q    Do you know who they were, the three or

19  four?

20      A    I believe it was the secretarial staff but

21  I'd be guessing now.  It's been a while.

22      Q    Any of the investigators?

sah

192

```
 1       A    I don't know.

 2       Q    Now in regard to her portion of the

 3  evaluation that dealt with planning and

 4  coordinating training, you were asked earlier

 5  whether she was involved in obligation of funds and

 6  you indicated that--

 7       A    She put the fund citations on the

 8  documents.

 9       Q    She would be responsible for tying the

10  fund citation to the document--

11       A    Correct.

12       Q    --purchased the service?

13       A    Correct.

14       Q    And would that be her responsibility

15  throughout her tenure at your office, to do that?

16       A    To put funding citations on the documents?

17       Q    P&R documents, purchase request documents.

18       A    Yes.

19       Q    And she would do this on more than one

20  occasion?

21       A    Yes, not only as training but also travel.

22       Q    Now she was ultimately denied the
```

sah                                                                    193

1    opportunity to be selected as an auditor.

2         A    Yes.

3         Q    Which was following her entry level

4    training that she received at Fort Belvoir?

5         A    Yes.

6         Q    Who was responsible for making that

7    decision?

8         A    The AIG for audit, Dick Berman.  He was

9    the selecting official.

10        Q    Did he request any input from you in

11   regard to Ms. Dews-Miller's qualifications?

12        A    I don't think so.  He pretty much knew her

13   qualifications.  He'd been in the office longer

14   than I had.  I'm not sure how long he had known

15   Rose Mary.

16        Q    In the office itself had you ever filed

17   any complaints, either EEO or OSC complaints,

18   regarding you yourself being nonselected?

19        A    Yes, I had.

20        Q    And that was in regard to which position?

21        A    My position, my director of admin and

22   management.

sah                                                                  194

1        Q    What was the result of that complaint that

2    you filed?

3        A    Finally the agency paid some money for the

4    discrimination.

5        Q    And this was in the same directorate as

6    where Miss Dews-Miller was--

7        A    This was after we had gone to the State

8    Department.   Our office was closed up sometime in

9    '95 and transferred over to the State Department

10   IG.

11            MR. DUNN:  I don't have any other

12   questions.

13            JUDGE PACINDA:  Miss Johnson?

14            MS. JOHNSON:  Nothing further.

15            JUDGE PACINDA:  Thank you very much, Mr.

16   Roberts.  I ask that you not discuss your testimony

17   outside this room.

18            [Witness excused.]

19            [Discussion off the record.]

20            JUDGE PACINDA:  Back on the record.

21            Good afternoon, sir.  My name is Michael

22   Pacinda.  I'm an administrative judge with the

sah                                                                195

1    Equal Employment Opportunity Commission.  I've been

2    assigned to preside over this complaint of

3    discrimination filed by Miss Dews-Miller.  I've

4    approved you to testify on behalf of the Agency in

5    this matter and also Miss Dews-Miller has requested

6    that you testify for her, as well.  We've decided

7    that how we'll handle it is that Agency counsel's

8    going to ask you a series of questions first,

9    followed by the Complainant's representative.  So

10   to that end I'll ask you to raise your right hand.

11        Whereupon,

12                     LOUIS LEPORATTI

13   was called as a witness and, after having been

14   first duly sworn by the Administrative Judge, was

15   examined and testified as follows:

16        JUDGE PACINDA:  I'd just ask that when

17   testifying you speak up clearly so that the court

18   reporter can hear your answers.

19        With that, your witness.

20        MS. JOHNSON:  Thank you, Your Honor.

21                  DIRECT EXAMINATION

22        BY MS. JOHNSON:

sah                                                                    196

1       Q    Could you please state your full name for

2  the record?

3       A    Louis John Leporatti.

4       Q    And your current employer?

5       A    Department of State.

6       Q    Your position?

7       A    Declassification officer.

8       Q    And how long have you been doing this?

9       A    About four years.

10      Q    And how long have you been in the federal

11  government?

12      A    Full-time?  Full-time about 37 years.

13      Q    And where have you worked throughout your

14  career?

15      A    I worked for the Department of Defense,

16  Grumman Aerospace Corporation, Sikorsky Aircraft,

17  General Accounting Office, House Appropriations

18  Committee, USIA, and the State Department.

19      Q    And how much managerial experience have

20  you had?

21      A    It's about 30 years.

22      Q    Now you mentioned USIA.  What was your

sah

197

1  role at USIA?

2      A    I was the executive assistant to the

3  Inspector General.

4      Q    And what did that position entail?

5      A    It entailed whatever the Inspector General

6  wanted me to do.  There was no deputy.  I served as

7  a pseudo-deputy.  I got involved in reviewing just

8  about everything that came in and went out of the

9  office.

10     Q    And was Ms. Dews-Miller in the office at

11 that time, as well?

12     A    Yes.

13     Q    What was her position there?

14     A    She handled several administrative

15 functions, like training, budget, personnel

16 actions, travel, things of that nature.

17     Q    And what was your relationship, work

18 relationship with Ms. Dews-Miller?

19     A    We did not have a day-to-day relationship

20 but on occasion we did get involved.  If her

21 supervisor was not present in the office, at that

22 point I would get involved with her if there was

sah

1    something that had to be taken care of.

2        Q    So you did sometimes go directly to Ms.

3    Dews-Miller on work-related matters?

4        A    Yes.

5        Q    And how did she respond?

6        A    What time period are we talking about?

7        Q    That's a fair question.  Let's go to the

8    beginning.  At the beginning of the time when you

9    were working together, about what year would that

10   be?

11       A    Early '90s.  I'm not exactly sure.

12   Probably '92, '93, that time period.

13           Initially I had no problems with Rose

14   Mary.  I thought she did fine.  I think my review

15   comments reflect that in the appraisals that she

16   was given.  It was just that one period that I

17   thought her performance had declined.

18       Q    And what period was this?

19       A    Whatever the last rating was that she's

20   contesting.

21       Q    May I call your attention to Exhibit 50 in

22   ROI OCR 96-15, page 2?  Is this the performance

1    appraisal, the rating that you were just referring

2    to?

3        A    Yes.

4        Q    Now when you went to Ms. Dews-Miller on

5    work-related matters you were saying that at the

6    beginning her performance was fine.  Then what

7    happened?

8        A    Her response time was slow.  I would ask

9    for things and her reaction time was just slow.  It

10   wasn't adequate, satisfactory.

11       Q    And the material that she gave you then

12   wasn't prompt but was it accurate?

13       A    When I got it the material was accurate.

14   It's just in one situation where I asked for

15   something and I did not get it and I had to go to

16   the supervisor to get it when he returned from

17   leave.

18       Q    Did the employees who had Ms.

19   Dews-Miller's position both before and after her,

20   did they have any problems doing the job?

21       A    Not that I recall.

22       Q    And you were Ms. Dews-Miller's reviewing

sah                                                                    200

```
 1  officer from 1992 to January 1995?

 2       A    Yes.

 3       Q    And who was her rating officer during that

 4  period?

 5       A    Mr. Roberts, Darwin Roberts.

 6       Q    And did you and Mr. Roberts ever have

 7  occasion to discuss Ms. Dews-Miller?

 8       A    Yes.

 9       Q    As the rating and reviewing officials.

10       A    Yes.

11       Q    Could you describe those discussions?

12       A    The discussions we had related primarily

13  to this rating period of May 1, '94 to '95. He was

14  very frustrated in his dealings with her. He said

15  she would not respond to him; she would not react

16  to him. He'd try to counsel her and she would

17  refuse to participate in the counseling process.

18       Q    Do you remember what the review was for

19  this final rating, the rating itself? I'm sorry.

20       A    Minimally sat.

21       Q    And did you agree with this rating?

22       A    Yes.
```

sah                                                                    201

1      Q    Did you think it was fair?

2      A    Yes.

3      Q    And did you have any reason to believe

4   that Mr. Roberts was biased or unfair in giving her

5   this rating?

6      A    No.

7      Q    Now when you signed this appraisal report

8   as the reviewing officer, did you know that Ms.

9   Dews-Miller had prior EEO activity?

10     A    Yes, I did.

11     Q    And did that fact that you knew that she'd

12  filed prior EEO complaints affect your review of

13  this rating in any way?

14     A    No.

15     Q    Did you ever counsel Ms. Dews-Miller about

16  this rating?

17     A    No.

18     Q    Was it your obligation to?

19     A    No.

20         MS. JOHNSON:   Thank you, Mr. Leporatti.

21  No further questions.

22         JUDGE PACINDA:   Okay, Mr. Dunn?

sah                                                                        202

1                      CROSS-EXAMINATION

2             BY MR. DUNN:

3        Q    Good afternoon, Mr. Leporatti.  How are

4   you?

5        A    How you doing?

6        Q    Good.  It's my understanding that you were

7   aware of Miss Dews-Miller's prior EEO activity?

8        A    Yes.

9        Q    And, in fact, you were named in one of her

10  EEO complaints--

11       A    Yes.

12       Q    As the person who was conducting

13  impermissible acts, according to that complaint.

14  Isn't that true?

15       A    Yes.  I'd like to add to that that I was

16  not fully aware of the details of those complaints.

17       Q    That complaint was approximately 1994?

18       A    Maybe.  I'm not sure.

19       Q    Now you're aware of Ms. Dews-Miller's

20  interest in attempting to become an auditor?

21       A    Yes, I believe so.

22       Q    And, in fact, she was given training,

sah                                                                        203

1  initial training in this field?

2      A    Yes, I believe that's correct.

3      Q    Nevertheless she was denied when she

4  applied for the position.

5      A    She was not selected; that's correct.

6      Q    Now you acted as the reviewing official in

7  regard to this appraisal that you have in front of

8  you.

9      A    Yes.

10     Q    Was that your proper role, to be a--let me

11 rephrase that.  Were you in a position within the

12 structure of the OIG to properly act as a reviewing

13 official?

14     A    Yes, I was.

15     Q    And did it take special action on anyone's

16 part to nominate you as the reviewing official?

17     A    I'm not sure what you mean by that

18 question.  You mean was I ordered to do it?  Was I

19 asked to do it?

20     Q    Yes, were you ordered to do it?

21     A    Yes, by the Inspector General, the first

22 Inspector General that was in that office, and it

sah                                                                   204

1   was a process that continued for a 12-year period.

2       Q    So the position you held was not the

3   position that normally would have been considered

4   to be the reviewing official for a person holding

5   Ms. Dews-Miller's spot.

6       A    It would have had to be Darwin Roberts,

7   supervisor.

8            MR. DUNN:  I don't have any other

9   questions.   Thank you.

10           JUDGE PACINDA:  I just have a question.

11  You had said that you were aware of the

12  Complainant's protected activity, prior EEO

13  activity?

14           THE WITNESS:  Yes, I knew that she had

15  filed only because I was--I imagine I was

16  interviewed by an investigator.

17           JUDGE PACINDA:  Okay.  Actually, that was

18  going to be my next question.  Do you recall

19  specifically what the activity was?

20           THE WITNESS:  No.

21           JUDGE PACINDA:  But it's your

22  understanding that it was just the fact that she

sah                                                                    205

1   had filed?

2           THE WITNESS:   The fact that she had filed,

3   yes.

4           JUDGE PACINDA:   Okay, thank you.   I just

5   ask that you don't discuss your testimony with

6   anyone outside the room.

7           THE WITNESS:   Sure, I understand.

8           JUDGE PACINDA:   Thank you.

9           [Witness excused.]

10          [Discussion off the record.]

11          JUDGE PACINDA:   Good afternoon, Ms. Keith.

12  I'm Michael Pacinda.   I'm an administrative judge

13  with the EEOC.   I've been assigned to preside over

14  this complaint of discrimination brought by Ms.

15  Dews-Miller and I've approved you to testify in

16  this matter on behalf of the Agency and on behalf

17  of the Complainant.   Agency counsel's going to

18  start off by asking you a set of questions and then

19  Complainant's counsel is going to follow up with

20  some questions, as well.

21          So before I have you testify I'm going to

22  swear you in, so if you'd please raise your right

1   hand.

2       Whereupon,

3                       CAROL KEITH

4   was called as a witness and, after having been

5   first duly sworn by the Administrative Judge, was

6   examined and testified as follows:

7           JUDGE PACINDA:  Thank you.  I just ask

8   that when you respond to questions to please

9   project; raise your voice so that the court

10  reporter can hear everything.

11          THE WITNESS:  Okay.

12          JUDGE PACINDA:  Thank you.  Your witness.

13                  DIRECT EXAMINATION

14      BY MS. JOHNSON:

15      Q   Could you please state your full name for

16  the record?

17      A   Carol Felicia Keith.

18      Q   And your current employer and position?

19      A   Department of State.  I'm the deputy

20  budget officer.

21      Q   When did you start with the federal

22  government?

sah

207

```
1       A    In August of 1975.

2       Q    And what was your grade and position at

3  the time?

4       A    I started as a GS-2 clerk typist.

5       Q    And what is your grade now?

6       A    GS-14.

7       Q    And where did you work before you came to

8  the State Department?

9       A    Before the consolidation I worked for

10 USIA.

11      Q    And was it at USIA that you worked with

12 Miss Rose Mary Dews-Miller?

13      A    Yes.

14      Q    And this was between February and July of

15 1995?

16      A    Yes.

17      Q    What was your position at that time?

18      A    I was the budget officer for NEA.

19      Q    And this was in the Office of the

20 Comptroller?

21      A    Yes.

22      Q    And what were your duties as budget
```

sah                                                                208

1   officer?

2        A    As the budget officer my duties was

3   basically providing support to the overseas posts,

4   compiling budget submissions to Congress and OMB,

5   requesting funding.  Basically that was it but that

6   entailed a whole lot of other ad hoc projects that

7   the Comptroller would ask of us but it was

8   basically budgeting to support the Americans

9   putting on--telling our story to the world.  We

10  were supporting that.

11       Q    Thank you.  And what was Ms. Dews-Miller's

12  position in this office?

13       A    In this office Miss Dews-Miller was the

14  number two person.  She was the assistant to me.

15       Q    And what was her grade at the time?

16       A    She was a GS-11.

17       Q    And how did she come to your office?

18       A    She was detailed.

19       Q    For a certain period?

20       A    For six months.

21       Q    Was there anything unusual about getting a

22  detail in your office?

sah

209

1      A      No.

2      Q      Did you have a position open?

3      A      Yes, I had a vacancy.

4      Q      And then you were told one day, or how did

5   it happen that you learned about it?

6      A      Okay, the position was vacant.  We were

7   concerned about advertising it and apparently a

8   candidate came available and I was told that here's

9   someone that could sit in and do the work.

10     Q      Could you please describe the lay-out of

11  your office?

12     A      My office was a room that contained two

13  individuals, two desks, basically side by side.

14     Q      And who sat at the other desk?

15     A      Ms. Dews-Miller.

16     Q      So you sat right next to each other.

17     A      Yes.

18     Q      And how did you and Ms. Dews-Miller get

19  along?

20     A      Fine.  No complaints.  It was day-to-day

21  camaraderie, talking.

22     Q      What kinds of things did you talk about?

sah

1      A    Day-to-day family, just office talk, just

2  what's going on in our lives, whatever people talk

3  about.

4      Q    And during the time that you shared an

5  office did you come to learn that Miss Dews-Miller

6  had filed a prior EEO complaint?

7      A    I knew that there was something going on

8  but the details, I did not know.

9      Q    And how did you learn that?

10     A    Miss Dews-Miller volunteered to share that

11 with me.

12     Q    And did you have any questions about it?

13     A    No, I didn't want to know.

14     Q    You didn't want to know?

15     A    I did not want to know.

16     Q    So you didn't have any questions for Miss

17 Dews-Miller about what the issues were.

18     A    No.

19     Q    Could you describe what tasks Ms.

20 Dews-Miller's job involved?

21     A    Okay.  Her tasks basically involved

22 requests from me asking her to do certain projects

1   that needed to be done in the office.  At the time

2   that she was there we were going through the

3   congressional budget and we had to submit spread

4   sheets to the Comptroller for submission to

5   Congress and it was basically taking numbers from

6   one spread sheet, putting them on another in

7   different formats.

8          Her duties also included going through the

9   mail, the cables, the incoming requests that came

10  in from the field asking for money, analyzing the

11  requests, and providing correspondence to the field

12  on whether we did or did not fund it, doing other

13  little ad hoc things, doing a contingency list

14  which made the Comptroller aware of what

15  requirements we may need from that day on through

16  the end of the fiscal year, just general office

17  stuff.

18      Q    And was this type of budget work

19  comparable to other budget work in the agency?

20      A    Yes.

21      Q    Was it typical of GS-11 budget work?

22      A    Typical?  In a sense, yes.  I mean they

sah                                                                    212

1    all did it.  All the GS-11s, 12s.  The 7s even did

2    it.  It was something we all basically did.

3        Q    And would you expect that someone who'd

4    had budget experience in another agency office

5    would have been able to do this work?

6        A    Yes.

7        Q    Now did you work closely with Miss

8    Dews-Miller?

9        A    Yes.

10       Q    Did you give her her work assignments?

11       A    Yes.

12       Q    And what kind of a job did she do on those

13   assignments?

14       A    In the beginning she was not very familiar

15   with the lay-out of completing the assignments but

16   after repetitive giving her the same type of thing

17   day in and day out, she became better at some of

18   those things.

19       Q    Now I'd like to direct your attention to

20   Exhibit 22, page 1, which is in ROI OCR 96-15.

21   Tell me, Miss Keith, do you recognize this

22   document?

sah                                                                        213

1        A    Yes.

2        Q    Are you the author of this document?

3        A    Yes.

4        Q    Could you take a moment to review it?

5   It's about four pages long, I think.

6             [Pause.]

7             It actually looks like it's two documents.

8        A    Yes, it is two separate documents.

9        Q    Could you describe what they are?

10            MR. DUNN:  Excuse me.  Which exhibit?

11            MS. JOHNSON:  22.

12            MR. DUNN:  It's in the ROI?

13            MS. JOHNSON:  Yes, it's in the first ROI,

14  the brown one.

15            MR. DUNN:  I have the exhibit that's

16  listed as 22.  It starts off, "Since coming to the

17  Budget Office"--

18            MS. JOHNSON:  Yes, that's correct.

19            BY MS. JOHNSON:

20       Q    Ms. Keith, could you please describe what

21  this is?

22       A    Okay, this particular document is a

sah                                                                    214

1   summary of the things that Rose Mary was asked to

2   do and the outcome of her attempting to do them or

3   completing them.  This was given to--right, to keep

4   a tally of her progress while she was in the

5   office.

6        Q    So you were keeping a tally then of her

7   progress?

8        A    Yes.

9        Q    And from your brief review of these could

10  you talk to me a little bit and describe what her

11  progress was like, what kinds of issues arose that

12  you noted here?

13       A    Okay.  Again the things listed on here are

14  basically day-to-day things that are done

15  repetitiously, monthly reports that have to be

16  done, and this is charting her progress.  On here

17  there are quite a few things that Miss Dews-Miller

18  is not familiar with so that they're completed in a

19  completed fashion.

20       Q    Well, as you noted these issues, did you

21  give Ms. Dews-Miller feedback on them?

22       A    Yes, I did.

sah                                                                      215

1      Q    And what form was that feedback in?  Was

2  it written, oral?

3      A    It was both.  If I asked her to do a

4  particular project, when she presented it to me I

5  would mark it up, advising her of the things that

6  needed to be changed.  If she was there when I was

7  going through the document, we did a lot of

8  discussing of what was wrong with the document.  So

9  it was both.

10     Q    I'd like to direct your attention to

11 Exhibit 23, page 1 of the same ROI.  Do you

12 recognize this document?

13     A    Yes.

14     Q    Could you explain, what this is?

15     A    Okay, this document is basically after

16 Rose Mary reviewed a going rate, which is a budget

17 for the post, this was my feedback to her telling

18 her the things that were not done properly.

19     Q    Would you say this was typical of the kind

20 of feedback that you would give her?

21     A    Yes.

22     Q    And how often did you provide feedback?

sah                                                                      216

1          A    As often as she gave me projects that she

2     was turning in.

3          Q    And what was Miss Dews-Miller's reaction

4     to the feedback that you gave her?

5          A    She listened.  If it was something that

6     maybe she did not understand, there would be

7     instances where maybe she would ask a question.

8     She asked for clarification.

9          Q    You mentioned earlier that on some of

10    these repetitious issues that her work improved.

11    Is that correct?

12         A    That is correct.

13         Q    Did it ever improve to the level that you

14    would expect for a GS-11?

15         A    No.

16         Q    And how much supervision did Ms.

17    Dews-Miller require?

18         A    Quite a bit on a daily basis.  Basically I

19    wasn't comfortable giving her something to do

20    without going over it before it left the office.

21    So basically everything that she did I had to

22    monitor it because if it wasn't correct, they're

sah                                                                    217

1   going to bring it back and I'm going to be the one

2   that has to answer, you know, to my superiors.

3          So it was basically constant, not in the

4   sense that every little thing that she did required

5   scrutinizing by me but for the most part, every

6   project that was presented to her, it did need me

7   going over to fix it or make sure that I asked her

8   questions and she understood what she was

9   presenting to me and what she presented to me

10  provided the requirement that was being made by the

11  Comptroller.

12     Q    And did she have the skills that you

13  thought were necessary for this job?

14     A    Did she have the skills?  I would like to

15  say if she had the skills, displaying them was

16  something else.

17     Q    What do you mean by that?  You didn't see

18  it?

19     A    No.  It was not displayed to me that she

20  was necessarily gung-ho about it.  She wasn't

21  enthused about it.  She would do it, yes, but I

22  believe that she could have had the skills but then

sah                                                                          218

1   when you're asked to do something and it's not

2   coming forth in the product that you produce, does

3   that say you have them or you have them and you're

4   not displaying them?

5          So my thing is she could have had the

6   skills but she did not display them in the output.

7      Q    Is that making a comment about her

8   attitude when you mentioned the word gung-ho?

9      A    No.  Her attitude was fine.  It's just

10  that sometimes to me you can tell when an

11  individual is hungry for something.  The

12  get-up-and-go, the drive to--okay, "I did it wrong?

13  I'm going to fix it" and whatever instead of

14  "Okay."  To me, there's a difference in a person

15  the way they display things.

16     Q    So your characterization of Ms.

17  Dews-Miller was that she wasn't hungry in that

18  sense?  When she did something wrong she did not

19  work hard to fix it?  Is that what you're saying?

20     A    Work hard?  I think she applied herself.

21  But in the government you see individuals who are

22  go-getters and you see those that are just

sah                                                                            219

1   complacent.

2       Q    And what kind of individual was Ms.

3   Dews-Miller?

4       A    Ms. Dews-Miller was a complacent, relaxed

5   individual.

6       Q    And was she good at organizing herself?

7       A    No.  If she was told what items needed to

8   be done and in what order, yes, she could organize

9   them then.  But if she was presented four or five

10  different things to do, she was not able to pick

11  out which things needed to be done first.

12      Q    Thank you.  Now you were her rating

13  officer; is that right?

14      A    Yes.

15      Q    What rating did you give Ms. Dews-Miller?

16      A    Minimally successful.

17      Q    Could you look at tab 51 of ROI 96-15?  Is

18  this the rating that you gave Ms. Dews-Miller?

19      A    Yes.

20      Q    Could you please tell us why you gave her

21  a minimally successful rating?

22      A    Well, as it states in the performance

sah                                                                          220

1   requirements here there are certain things that an

2   individual must be doing and in Miss Dews-Miller's

3   day-to-day operations, they were not being done in

4   an excellent or outstanding manner.

5          And as a GS-11, a lot of the things that

6   Miss Dews-Miller did was clerical stuff.  It was

7   stuff that we had a clerk to do.  The analysis that

8   she was supposed to be performing should have been

9   based on my knowledge of the of the levels that

10  individual operate coming up through the system,

11  should have been more producing, having more meat

12  to the presentation.

13     Q    So your testimony then is that she wasn't

14  meeting the requirements at the level above

15  minimally successful?

16     A    Right, for a GS-11, yes.

17     Q    Could you please turn to page 3 of that

18  tab?  It's page 3 of the ROI.  At the bottom of

19  that page there's a description of fully successful

20  performance.  Could you read that out, please?

21     A    Performance which clearly and consistently

22  meets the fully successful standard in terms of

sah                                                                      221

1    such factors as quality, quantity, timeliness and

2    extent of supervision required.

3         Q    And did Ms. Dews-Miller meet the standard?

4         A    No.

5         Q    And that's why you gave her the minimally

6    successful standard?

7         A    Yes.

8         Q    Now Ms. Keith, do you believe that your

9    rating of Ms. Dews-Miller was accurate and fair?

10        A    Yes.

11        Q    And did you give Ms. Dews-Miller a copy of

12   the rating?

13        A    Yes.

14        Q    Could you describe the circumstances?

15        A    Okay.  One day we were sitting in the

16   office and I gave the rating to Rose Mary and told

17   her that here was her rating, that she could look

18   over it, if she needed to discuss it--if there were

19   some things that she didn't agree with, that she

20   could bring them to me and we could discuss them.

21            So I gave it to her and I went back to my

22   desk and I went on with my daily duties.

sah                                                                    222

1      Q    And this offer to discuss with her that

2   you just testified to, did she ever take you up on

3   this offer to discuss the rating?

4      A    No.

5      Q    And did Ms. Dews-Miller ever sign the

6   rating?

7      A    Not to my knowledge.

8      Q    And did she ever contact you in any way

9   about this rating?

10     A    No.

11     Q    Did you see Ms. Dews-Miller after the day

12  that you gave her this rating?

13     A    If I recall correctly, no, I didn't see

14  her anymore after that.

15     Q    So you gave her the rating and then she

16  never came back to the office?

17     A    Well, she stayed in the office.  You know,

18  with were working.  I figured you give someone

19  their rating, they don't have to stop what they're

20  doing right now and right then.  You know, you take

21  your time, you read it, you get your thoughts

22  together.  If you have something you want to say

sah                                                                          223

1    you can come back later.

2              We went about our day, our usual routine,

3    and it became--it was made aware to me--well, Ms.

4    Dews-Miller was doing her stuff, her work, and for

5    some reason she didn't come back to the office and

6    I later found out that she had injured herself.

7        Q    Now Miss Keith, did the fact that Ms.

8    Dews-Miller had mentioned to you casually in

9    conversation at some point when you were in the

10   office together that she had filed a prior EEO

11   complaint, did this have any effect on the rating

12   that you gave Ms. Dews-Miller?

13       A    No.

14       Q    And Miss Keith, did you ever see any

15   rating of Ms. Dews-Miller from the period before

16   she joined your office?

17       A    No.

18       Q    And were you instructed by anyone to give

19   Ms. Dews-Miller a minimally successful rating or

20   any particular rating?

21       A    No.

22       Q    Now at the time that you gave her this

sah                                                                      224

1   rating did you have any reason to believe that Ms.

2   Dews-Miller might face any consequences from

3   getting such a rating?

4        A    No.

5             MS. JOHNSON:   Thank you, Ms. Keith.

6             Judge, I have no further questions.

7             JUDGE PACINDA:   Okay, Mr. Dunn?

8                     CROSS-EXAMINATION

9             BY MR. DUNN:

10       Q    Good afternoon, Miss Keith.

11       A    Good afternoon.

12       Q    You indicated you were aware or became

13   aware that Ms. Dews-Miller had filed a previous EEO

14   complaint?

15       A    In a fashion, yes.

16       Q    What was the nature of the EEO complaint

17   that you learned she had filed previously?

18       A    Ms. Dews-Miller was out on leave one day

19   and I received a phone call from someone and they

20   told me that Ms. Dews-Miller had taken some

21   documents from the office, which at that time I

22   told them I didn't know anything about it.  I told

sah

225

1    them that I would leave a message and have her call

2    them when she returns to the office.  I put the

3    message on Ms. Dews-Miller's desk.

4            When she came in, when she saw who or what

5    the message was about, she began to volunteer

6    information to me about it and at that time I

7    didn't want to know and I told her that I did not

8    want to know.

9        Q    What was the juxtaposition of her

10   volunteering this information in relation to you

11   completing this appraisal?

12       A    Excuse me?  What was--

13       Q    What was the timing you learned of prior

14   EEO activity from Miss Dews-Miller?

15       A    One had nothing to do with the other.

16       Q    I understand.  You learned of prior EEO

17   activity because Miss Dews-Miller began to disclose

18   it to you.

19       A    Right.

20       Q    You also were the rater on her appraisal.

21       A    Correct.

22       Q    When, in relation to completing this

sah

226

1  appraisal, when was it that she began to tell you

2  about this prior EEO activity?

3      A    It was prior to the appraisal, sometime

4  during her tenure in the office when she

5  volunteered to tell me the information.

6      Q    Now were you aware that Miss Dews-Miller

7  was assigned to your office as a result of a

8  settlement agreement in a prior EEO activity?

9      A    No.

10     Q    If you take a look at--I don't know if you

11 have the appraisal in front of you.  It's Exhibit

12 51, page 3.  In the middle of this page, section

13 1(c), it indicates, "I certify that:  number 1, my

14 rating officer and I discussed my performance on

15 the following date during the rating period" and

16 there's no date inserted there.

17         Did you ever meet with Miss Dews-

18 Miller--let me finish the question--did you ever

19 meet midpoint of the rating period with Miss

20 Dews-Miller to fully evaluate her duty performance

21 to that stage?

22     A    Midway?  It was a constant.

sah                                                                    227

1        Q    Based on your testimony previously, you

2   indicated that you would be giving Miss Dews-Miller

3   feedback in regard to her completing various

4   projects.  What I'm asking is in regard to an

5   encompassing review of her duty performance in the

6   form of a formal counseling session, sitting down

7   with the individual and going through all of the

8   expected levels of performance.  Did you do that?

9        A    Formally?  Is that in writing?  Is

10  that--how formal?

11       Q    Did you ever sit down with Miss

12  Dews-Miller and go through her areas of duties, as

13  specified in this appraisal?

14       A    Yes, I did.

15       Q    Midpoint of her assignment to your office.

16       A    Not necessarily midpoint but on a daily

17  basis we discussed--

18       Q    So every day on a daily basis you would go

19  through each of the critical items, critical

20  elements that she was required to perform.

21       A    If we were doing something that was in

22  this performance requirement, yes, we discussed it

sah

228

1  frequently, quite frequently.

2      Q    Was there ever a session you had with Miss

3  Dews-Miller that took the entire critical elements

4  one after the other and you as the supervisor went

5  through your evaluation of her duty performance?

6  Was that accomplished midpoint of her assignment

7  with your office?

8      A    Not in--

9      Q    You're aware that is a requirement under

10  the regulation, the Manual of Operations and

11  Administration?

12      A    If I'm constantly giving you feedback,

13  you're there for six months--

14      Q    I just was asking you whether you were

15  aware that it's required that a supervisor hold a

16  midpoint review with the individual in regard to

17  the supervisor's appraisal of their overall duty

18  performance.  Are you aware of that?

19      A    I was aware that yes, we were to review

20  with them their performance and I did do that.

21          MR. DUNN:  I don't have any other

22  questions.

sah

1          MS. JOHNSON:  No further questions.

2          JUDGE PACINDA:  Okay, thank you.  Miss

3   Keith, thank you for your time.  I ask that you

4   don't discuss your testimony with anyone outside

5   the room.

6          THE WITNESS:  You're welcome.

7          [Witness excused.]

8          [Discussion off the record.]

9          JUDGE PACINDA:  Good afternoon, Miss

10  Brambilla.  My name is Michael Pacinda.  I'm an

11  administrative judge with the EEOC.  I've been

12  assigned to preside over this complaint of

13  discrimination filed by Miss Dews-Miller and you've

14  been approved to testify on behalf of the Agency,

15  as well as the Complainant.  Agency counsel's going

16  to begin by asking you a series of questions and

17  the Complainant's counsel will be allowed to follow

18  up with some questions of his own.

19          So before I have you testify I'm going to

20  swear you in.

21      Whereupon,

22                    JANICE BRAMBILLA

sah

230

1   was called as a witness and, after having been

2   first duly sworn by the Administrative Judge, was

3   examined and testified as follows:

4           JUDGE PACINDA:   Your witness.

5           MS. CHANDLER:   Thank you.

6                   DIRECT EXAMINATION

7           BY MS. CHANDLER:

8       Q   Ms. Brambilla, would you state your full

9   name for the record and spell your last name?

10      A   Janice Helen Brambilla, B-r-a-m-b-i-l-l-a.

11      Q   Thank you.  How long have you worked in

12  the federal government, Miss Brambilla?

13      A   Approximately 30 years.

14      Q   What is your current position?

15      A   Senior advisor to the Undersecretary of

16  State for Public Diplomacy and Public Affairs.

17      Q   That's a mouthful.  What do those duties

18  entail?

19      A   I'm responsible for handling most

20  management issues, primarily the budget for public

21  diplomacy.

22      Q   How long have you held that position?

sah

231

1    A    Since two years ago, October of 2001.

2    Q    And what is the significance of that date?

3    A    It was approximately two years after there

4 was a merger of the former USIA and the State

5 Department.

6    Q    Did you work at USIA prior to the State

7 Department?

8    A    Yes.

9    Q    What was your position at USIA?

10   A    The last position I held was director of

11 human resources.

12   Q    How long had you held that position at

13 USIA?

14   A    From December of '94 to October of '99.

15   Q    And was that your only personnel

16 experience or had you had prior personnel

17 experience?

18   A    I had prior personnel experience.

19   Q    Very briefly, could you tell us what that

20 was?

21   A    I started in 1973 at the Smithsonian

22 Institution in their Personnel Office and in

sah

232

1  October of 1981 I went to work at the Voice of

2  America as the chief of recruitment and placement.

3  And then in 1991--no, that's not

4  right--1987--excuse me--I was appointed as the

5  director of personnel at the Voice of America and

6  then went into the former position, director of

7  human resources at USIA.

8      Q    As director of resources, human resources

9  at USIA, who did you report to?

10     A    Henry Howard, the associate director for

11 management.

12     Q    And did you have a second-line supervisor?

13     A    Yes, there was Joanne Clifton and then

14 there was John Baker, but most of my

15 responsibilities I reported directly to Mr. Howard.

16     Q    Did you supervise any staff, employees, at

17 USIA while you were director of human resources?

18     A    Yes.

19     Q    Approximately how many people did you

20 supervise?

21     A    Sixty-five.

22     Q    As director of human resources, can you

sah

1    tell us what functions came within the purview of

2    your job, generally?

3        A    Training, civil service and foreign

4    service personnel, labor relations, policy

5    and--what am I forgetting?  I'm forgetting one, but

6    those are the major ones.

7        Q    But generally you were responsible for the

8    entire personnel function at USIA?

9        A    Yes.

10       Q    In your role as director of human

11   resources at USIA, did you have any reason to make

12   any decisions with regard to Ms. Rose Mary

13   Dews-Miller?

14       A    Yes.

15       Q    Could you describe what those were?

16       A    It had to do with denial of her

17   within-grade.

18       Q    How did that come to your attention?

19       A    The staff in the civil service section of

20   personnel brought it to my attention.

21       Q    And what action did you take?

22       A    I made the decision on the denial of the

sah                                                                    234

1    within-grade.

2        Q    Ms. Brambilla, I'm going to turn your

3    attention to Exhibit 9-4 out of case number 0019,

4    pages 3 of 4 and 4 of 4.  If you'd take a moment to

5    familiarize yourself with that document.

6            [Pause.]

7            Is this a true and accurate copy of the

8    letter that you sent to Ms. Dews-Miller?

9        A    Yes.

10       Q    In the letter what reasons do you give Ms.

11   Dews-Miller for denying an appeal of her

12   within-grade increase?

13       A    She had two performance appraisals that

14   were both minimally successful and there was no

15   indication that her performance had improved.

16       Q    And is that stated in your letter?

17       A    Yes.

18       Q    What was the basis for your conclusion

19   that she was not entitled to a within-grade

20   increase based on that rationale?

21       A    Her performance rating, the two

22   performance ratings she had, because they were

sah

1   rated below the fully successful level, the agency

2   policy was to deny the within-grade.

3      Q    Was agency policy reflected in a written

4   document or in agency regulations?

5      A    Yes.

6      Q    I'd like to turn your attention to Exhibit

7   54 in investigation 96-15.  Are these the

8   regulations that you were just referring to that

9   governed the granting of within-grade increases at

10  the U.S. Information Agency?

11     A    Yes.

12     Q    And did these regulations contain the

13  basis for your denial of Ms. Dews-Miller's appeal

14  of the denial of her within-grade increase?

15     A    Yes.

16     Q    And are you able to identify for us what

17  section of the regulations are pertinent to your

18  denial of her appeal?

19     A    Yes, 235.8.

20     Q    And what aspect of 235.8 in your opinion

21  disqualified Ms. Dews-Miller for a within-grade

22  increase?

sah

1     A    Point A where it says "A negative

2  determination will be made when a supervisor

3  determines that an employee's performance is not at

4  an acceptable level of competence.  This may occur,

5  for example, when the most recent rating of record

6  is at the minimally successful level and has not

7  improved."

8     Q    Thank you.  When you denied Ms.

9  Dews-Miller's appeal were you aware that she had

10 engaged in prior EEO activity?

11    A    I don't recall.

12    Q    Had you known, would that have played any

13 role whatsoever in your decision to deny her

14 appeal?

15    A    No.

16    Q    And why is that?

17    A    Because the appeal had to do with the fact

18 that her supervisors had denied--excuse me--had

19 rated her at the minimally successful level and the

20 appeal was made in accordance with the agency

21 policy, as stated in the MOU; I made the decision.

22         MS. CHANDLER:  Thank you.  No further

sah                                                                237

1    questions.

2                JUDGE PACINDA:  Mr. Dunn?

3                MR. DUNN:  Thank you.

4                         CROSS-EXAMINATION

5                BY MR. DUNN:

6       Q    Good afternoon, Ms. Brambilla.  You

7    indicate the basis upon which you came to the

8    conclusion it was appropriate to deny the appeal

9    was under 235.8(1)?

10      A    Yes.

11      Q    That states, as you indicated, that the

12   most recent rating of record was a minimally

13   successful.  Additionally, it goes on with a

14   qualifier: "and if the duty performance has not

15   improved."

16           What steps did you take, if any, to

17   ascertain the improvement of the duty performance

18   following the most recent minimally successful?

19      A    Well, there's no more recent performance

20   appraisal for Miss Dews-Miller.

21      Q    I understand that.

22      A    That I had.

1    Q    I understand that but that's not what the

2   regulation indicates.   If it said and you also must

3   refer to another second or subsequent appraisal,

4   then it wouldn't make sense.   It seems to indicate

5   to me, and I'm sure you'd agree as a long-time

6   personnelist, that it's incumbent upon you in

7   reviewing an appeal that you make inquiry with her

8   supervisors as to any improvement in performance

9   since the close-out of the appraisal period.   Isn't

10  that true?

11   A    I would have, before I make any decision

12  in a personnel action, be satisfied in my mind that

13  I asked all the questions I needed to and I

14  obtained any information I needed to before I made

15  the decision, no matter what the personnel action

16  was.

17   Q    And what was the extent of your contact

18  with Miss Keith as to any improvement?

19   A    Oh, I don't recall.

20   Q    Is it possible there wasn't any following

21  the denial of the within-grade?

22   A    I don't recall the contact I may have had

sah                                                                     239

1    with her.

2        Q    Now the function of workers compensation,

3    to what degree do you supervise the ongoing

4    processing?  Let me rephrase the question.  I'm

5    sure you yourself don't get involved in processing

6    workers compensation claims.  Nevertheless, the

7    personnel people that do the processing fall under

8    your function.  Isn't that correct?

9        A    Yes.

10       Q    Now to what extent do you get involved in

11   evaluating the performance of the individuals who

12   are responsible for processing workers compensation

13   claims?

14       A    It would depend on who the person was.

15       Q    How many people did you have that were

16   responsible for that function?

17       A    I don't recall the exact number.

18       Q    Was Jenny Mallios one of them?

19       A    I'm sorry but I just don't recall her

20   specific responsibilities in that area.

21       Q    The accumulation of medical records in

22   regard to workers compensation claims, typically an

sah

1  individual would submit medical records in support

2  of a workers compensation claim, correct?

3      A    I'm not an expert, sir, in this area,

4  workers compensation claims, so I don't want to get

5  into the specifics.  I just don't know the

6  specifics one would have in order to file one.

7      Q    Now if the personnel responsible for

8  receiving medical documentation in support of a

9  workers compensation claim received medical

10 documentation, you would agree that such medical

11 documentation should be segregated from and kept

12 apart from normally maintained personnel files and

13 medical folders.  Isn't that true?

14         MS. CHANDLER:  Objection.  Are you asking

15 a hypothetical or are you asking what happened

16 actually with the case at USIA?

17         BY MR. DUNN:

18     Q    I'm just asking in general, that it's

19 proper to segregate workers compensation medical

20 documentation submitted for that sole purpose of

21 workers compensation; isn't that the case?

22     A    I'm sorry; I don't understand the

sah

1  question.

2  JUDGE PACINDA:  Just a second.  Did his

3  rephrasing of the question satisfy you?

4  MS. CHANDLER:  No, it didn't.

5  JUDGE PACINDA:  Okay.  Well, I'm going to

6  overrule the objection and can you ask her a

7  question that she can understand?  It doesn't seem

8  that she understands the question.  Maybe break it

9  down a little bit.

10  BY MR. DUNN:

11  Q  If a person wants to avail themselves of

12  workers compensation benefits, frequently they have

13  to submit medical documentation in support of their

14  case.  That medical documentation would be

15  submitted to the appropriate injury compensation

16  officer at the employing installation--

17  JUDGE PACINDA:  And Ms. Brambilla, I just

18  ask that you respond vocally, rather than nodding.

19  THE WITNESS:  Sorry.

20  BY MR. DUNN:

21  Q  So the individual would submit medical

22  documentation in support of their claim.  You

sah

1  understand that?

2      A    If that's required.

3      Q    Now the injury compensation officer at

4  your facility, are you aware whether medical

5  documents received are incorporated in the overall

6  personnel documentation maintained by your

7  organization?

8      A    If medical records are received from an

9  employee, depending on what they are and what

10 they're for, they would, to my satisfaction, be

11 properly stored.  Where and what, to answer a

12 general question like that it's difficult to do,

13 but I am confident to say that any medical records

14 that we had on any employee were properly stored.

15      MR. DUNN:  I don't have any other

16 questions.

17      MS. CHANDLER:  I have just a few

18 additional questions.

19               REDIRECT EXAMINATION

20      BY MS. CHANDLER:

21      Q    Returning to the question of denial of a

22 within-grade increase and whether or not Ms.