# EXHIBIT    42

Transcript of EEOC Hearing Pages 243 - 291
Part 5 of 5

sah

1  Dews-Miller had evidenced any improvement in her

2  performance, if the employee was not on duty, was

3  not at work, would you have any basis upon which to

4  conclude that she had improved her performance?

5      A    No.

6      Q    In your letter to Ms. Dews-Miller do you

7  take into account whether or not she was on duty

8  during the period in question, which would enable

9  to you to determine whether her performance had

10  improved?

11     A    Yes.

12     Q    And what did you say?  What did you

13  conclude?

14     A    There was no more--she was absent from

15  work from August 18, 1995 to midday November 27,

16  1995.

17     Q    And then what did you conclude?

18     A    I concluded that as a result of the two

19  minimally successful ratings that were in her file

20  was the basis upon which to deny the within-grade.

21     Q    With regard to the storage of medical

22  records, was that your direct responsibility as

sah                                                                    244

1    director of human resources?

2        A    No.

3        Q    Do you recall whose responsibility it was

4    for maintaining the records storage facility at

5    USIA?

6        A    Pat Noble was the head of civil service

7    personnel and that department or that area of

8    responsibility fell under her.

9        Q    And did you supervise Ms. Noble?

10       A    Yes.

11       Q    Did you have any reason to believe she was

12   anything less than meticulous in her maintenance of

13   medical records?

14       A    She was absolutely meticulous in

15   maintaining every record.

16       Q    Do you have any reason to believe that Ms.

17   Dews-Miller's medical records were disclosed to

18   anyone in the agency who did not have a very

19   specific need to know?

20       A    No.

21           MS. CHANDLER:   No further questions.

22           JUDGE PACINDA:   Mr. Dunn?

sah

RECROSS-EXAMINATION

BY MR. DUNN:

Q    In answering that question are you aware whether it would be proper to release workers compensation-related medical documents to an inquiring supervisor who was making such inquiry having nothing to do with workers compensation? Are you aware as to whether such a release would be proper?

A    Medical records are very sensitive protected files that we would maintain and a decision to share medical information with any employee, any supervisor, any manager, would have to be made in compliance with whatever the statutory or regulations were to protect that information.

Q    So that's the general answer but are you aware as to what circumstances would warrant such release?

A    I can't answer that.  I can't give you a specific answer because I don't know.  I just don't know.

sah                                                                    246

1              MR. DUNN:  No further questions.

2              MS. CHANDLER:  No further questions.

3              JUDGE PACINDA:  I ask that you don't

4    discuss your testimony with anyone outside the

5    room.

6              [Witness excused.]

7              [Discussion off the record.]

8              JUDGE PACINDA:  Good afternoon, Ms.

9    Mallios.  I am Michael Pacinda.  I'm an

10   administrative judge with the Equal Employment

11   Opportunity Commission.  I've been assigned to hear

12   this complaint of discrimination brought by Miss

13   Dews-Miller.

14             You've been approved to testify as a

15   witness in this case.  You've been approved to

16   testify on behalf of the Agency, as well as on

17   behalf of the Complainant.  We're going to start

18   out with Agency counsel asking you a series of

19   questions first, followed by Complainant's counsel.

20             Before I have you testify I'm going to

21   swear you in.

22             Whereupon,

sah                                                                        247

1                          JENNY MALLIOS

2   was called as a witness and, after having been

3   first duly sworn by the Administrative Judge, was

4   examined and testified as follows:

5          JUDGE PACINDA:   I ask that when you

6   respond to questions you speak up clearly so the

7   court reporter can hear your responses, and also

8   that you respond verbally, as opposed to nodding.

9          Your witness.

10         MS. ASWAD:   Thank you.

11                       DIRECT EXAMINATION

12         BY MS. ASWAD:

13     Q    Could you please state your name for the

14  record?

15     A    Jenny Mallios.

16     Q    And where do you currently work?

17     A    The Office of Civil Service Personnel,

18  Executive Resources and Performance Management, at

19  the Department of State.

20     Q    And what is your position?

21     A    Chief of the division.

22     Q    And what responsibilities does that

1  entail?

2      A    Senior Executive Service employment,

3  political appointee entrance on duty, general

4  schedule performance appraisal, Senior Executive

5  Service performance appraisal.

6      Q    Thank you.  What position did you hold at

7  the USIA from 1995 until it merged into the State

8  Department?

9      A    Personnel management specialist.

10     Q    What kind of responsibilities did that

11 position entail?

12     A    Announcing vacancies, classifying

13 positions, which means determining the GS grade of

14 a position, for a period of time adverse actions,

15 disciplinary actions, recruitment, the whole realm

16 of personnel officer duties.

17     Q    When you were in that position at the USIA

18 were you the personnel officer that serviced the

19 Office of the Inspector General at the USIA?

20     A    Yes.

21     Q    And did you handle the personnel actions

22 for Ms. Dews-Miller?

sah                                                                      249

1       A    Yes.

2       Q    Why was her employment terminated with the

3   USIA?

4       A    It was the result of a 1995 settlement

5   agreement.

6       Q    Is the agreement you're referring to,

7   Exhibit 9-1 of the gray ROI?  I'll ask you to turn

8   to that.

9       A    You said 9-1?

10      Q    9-1.

11      A    Yes.

12      Q    Okay.  Could you tell us is that agreement

13  signed by Ms. Dews-Miller?

14      A    Yes, it is.

15      Q    Is it assigned by her attorney Bruce

16  Cooper?

17      A    Yes.

18      Q    Do you recall if it was entered into with

19  the assistance of an administrative judge of the

20  EEOC?

21      A    Yes.  Teitelman I think was his name.

22      Q    Thank you.  Do you recall if this

sah                                                                    250

1    agreement settled all of her prior EEO complaints

2    against the department, the USIA?

3        A    That's my recollection, yes.

4        Q    Is that confirmed by paragraph 9 in the

5    agreement?

6        A    Confirmed by paragraph 9, yes.

7        Q    So this agreement you testified was

8    entered into in 1995.  From the signatures would

9    you say January of 1995?

10       A    The last person appears to have signed it

11   on the 31st of January, so yes, I'd say January of

12   1995.

13       Q    Thank you.  Could you walk us through the

14   terms of this settlement agreement?  What was

15   supposed to happen under this agreement?

16       A    Ms. Dews-Miller was to receive an

17   opportunity outside of the Office of the Inspector

18   General for a period of six months and--let me help

19   myself by refreshing my memory--during that period

20   of six months she was to be given informal reviews

21   and if at the end of the six months she was to be

22   rated fully successful or better, then she could

sah

251

1    stay in the Office of the Comptroller.  If she did

2    not receive a rating of fully successful or better

3    than she would return to OIG or I would attempt to

4    find a placement for her elsewhere.

5        Q    And under the agreement if the six-month

6    detail to the Office of the Comptroller didn't work

7    out, what happened then?  Was it three months in

8    the second position?

9        A    Then she would either be moved to a

10   position that I could find for her or she would

11   return to OIG for a period of three months.

12   Then--should I continue here?

13       Q    Sure.

14       A    If during that three months she was found

15   to be performing fully successful, then she would

16   be permanently retained in the Inspector General's

17   Office.  If not, then she would be placed on an

18   appointment not to exceed one year, during which

19   time she could receive out-placement assistance,

20   and at the end of that year would be terminated.

21       Q    Okay, thank you.  So was she detailed to

22   the Office of the Comptroller in accordance with

sah                                                                    252

1    the terms of the settlement?

2         A    Yes.

3         Q    What rating did she receive there?

4         A    Minimally successful.

5         Q    Did that terminate her detail to the

6    Office of the Comptroller?

7         A    It did.

8         Q    Do you recall when this rating was

9    received by Miss Dews-Miller?

10        A    I would say August of 1995.  And I'll bet

11   there's something in here that would help me

12   remember that.

13        Q    Maybe looking at a prior affidavit would

14   help you recall the exact date.

15        A    I'm sure it would.

16        Q    I'd like to direct your attention to the

17   brown ROI, which is 96-15.  It's Exhibit 4.  Excuse

18   me; it's Exhibit 13 at page 4.  If you could look

19   at the third full paragraph?

20        A    The Complainant received the MC appraisal

21   on Thursday, August 17, 1995.

22        Q    Thank you.  Do you recall what happened

sah                                                                      253

1   after that rating was communicated to Ms.

2   Dews-Miller?

3        A    Well, my recollection was that she was

4   scheduled, previously approved to be absent the

5   following day and then Monday following, having

6   received that rating, she called in sick, saying

7   that her work-related injury, which occurred over a

8   month later, had--

9        Q    Do you mean a month later or a month

10  earlier

11       A    I'm sorry; a month earlier, in July.

12       Q    Do you recall the date in July when that

13  injury happened?

14       A    I think it was July 10.

15       Q    Thank you.  So did you communicate to Ms.

16  Dews-Miller that her detail at the Office of the

17  Comptroller had been terminated because of the

18  rating and that she now was to move on to the OIG?

19       A    That took place a week or two later.

20       Q    I'd like to direct your attention to the

21  gray ROI, Exhibit 9-2, page 1.

22       A    That took place on August 31, 1995, a week

sah                                                                      254

1   or two later.

2        Q    And is this a letter letting her know that

3   her detail had now terminated and she would be in

4   the Office of Inspector General with Ann Young as

5   her supervisor?

6        A    Yes, it is.

7        Q    Did she show up for work during this

8   three-month position at the OIG?

9        A    During the three-month position?  She

10  showed up several days prior to the end of the

11  three months.

12       Q    During that time when she didn't show up

13  until a few days prior to the end of the three

14  months, was she placed on absence without leave?

15       A    Yes.

16       Q    Why was she placed on absence without

17  leave?

18       A    Failure to submit documentation supporting

19  her absence.

20       Q    I'd like you to take a moment to review

21  Exhibit 9-3 of the gray ROI and ask you if this is

22  the type of documentation she submitted to support

sah                                                                    255

1   three months of absence from federal service.

2        A    Could you repeat that question?

3        Q    Maybe I could break it down.  Page 1 of

4   Exhibit 9-3 in the gray ROI, what was this

5   document?

6        A    This was a document that she sent to the

7   second-level supervisor of her detail and it's

8   requesting or it's stating that she has been

9   experiencing complications with her July

10  injury--this is dated August 26--and she was

11  requesting the use of continuation of pay for an

12  indefinite period beginning August 21.

13       Q    Okay.  So this was a request for

14  continuation of pay not supported by medical

15  documentation.

16       A    Not supported by any medical

17  documentation.

18       Q    Is that why you denied this request?

19       A    Well--

20       Q    Or why this request was denied?

21       A    It was never formally denied, so to speak.

22  We were waiting for medical documentation to

sah                                                                        256

1    support the appropriate coding on the time card.

2        Q    I see.  Could you turn to page 2, please?

3    Could you tell us why this doctor's certificate was

4    insufficient to prove continuation of pay was

5    merited?

6        A    The little sticky note here says that

7    here's a copy of the doctor's certificate for a

8    work-related injury.  The certificate reads, "The

9    above patient was under my professional care from

10   August 29 to present and was totally incapacitated

11   during this time.  Patient will be reevaluated on

12   October 2, 1995."

13          There's nothing here that indicates that

14   there was a connection to the injury.

15       Q    The work-related injury?

16       A    The work-related injury.  This could have

17   been a car accident.  Who knows?  I have no way of

18   assessing from this document whether or not she was

19   injured at work.  There needs to be a connection to

20   the accident and a diagnosis and some sort of

21   indication that the doctor believes that this was

22   related to work, and why it's related to work.

sah                                                                      257

1       Q     Thank you.  Could you turn to page 3,

2   please?  When was this document sent to you?

3   What's the date at the bottom?

4       A     Well, it was sent to Delia Johnson and Pat

5   Noble October 20.  It's difficult to say when I got

6   it but I do remember seeing this a long time ago.

7       Q     So this is about six weeks into the

8   three-month detail?

9       A     Yes.

10      Q     And who is Stacy, the person who

11  apparently wrote this note?

12      A     It's Stacy Rose-Blass.  She was the

13  then-AFGE Local 1812 president and AFGE 1812 was

14  the union at the U.S. Information Agency.

15      Q     Why was this certificate on page 3 not

16  sufficient?

17      A     There's no diagnosis.  There is no

18  prognosis.  We can't tell from this whether she

19  could ever be able to return to work.  We can't

20  tell what happened.  There's no data here on which

21  to form an opinion that this is connected to work.

22  It says "due to a work-related injury she's been

sah                                                                      258

1    under our care" but what was the injury and what is

2    the disability that prevents her from coming back

3    to a sedentary position?

4        Q    Were attempts made to let Ms. Dews-Miller

5    know about the types of information she needed to

6    provide in order to comply, to get continuation of

7    pay?

8        A    Yes.

9        Q    I'd like to direct your attention to

10   Exhibit 32 of the brown ROI.  What is this note?

11       A    That's a typical routing slip addressed to

12   Rose Mary Dews-Miller from Ann Young, who was the

13   supervisor in the Inspector General's Office

14   beginning September 1, 1995.

15       Q    And what does she say in the remarks

16   section?

17       A    "The attached is provided for your

18   guidance on the physician certificate."

19       Q    And could you take a moment to review page

20   3 of that exhibit under doctor's note and just

21   review the first and second paragraphs?

22       A    One of my former bosses wrote this book.

sah                                                                    259

1          [Pause.]

2          Okay.

3     Q    Thank you.  Does this state accurately

4 what was the USIA's policy at the time with regard

5 to leave?

6     A    Yes.

7     Q    So it's accurate to say that the policy

8 was to require a valid medical conclusion that the

9 employee was precluded from performing the duties

10 of the position?

11    A    Yes.

12    Q    And that when an employee tried to submit

13 general statements such as "under my care," "was

14 examined" or "unable to work," the supervisor had

15 explicit authority to require more detailed

16 information.

17    A    Yes.

18    Q    And that it was the employee's

19 responsibility, not the manager's, to obtain and

20 submit this documentation?

21    A    That's correct.

22    Q    Thank you.  Let's get back to our

sah                                                                      260

1    chronology of events.  You've testified that the

2    Complainant returned to work a few days short of

3    the three-month stint at the OIG.

4         A    That's right.

5         Q    Was she given the opportunity at that

6    point to commence another three-month stint at the

7    OIG or to move on to her temporary appointment not

8    to exceed one year?

9         A    Yes, she was, and she elected the latter.

10        Q    She elected to begin her temporary

11   appointment not to exceed one year?

12        A    That's correct.

13        Q    Could I direct your attention to the gray

14   ROI, Exhibit 9-3, page 7?

15        A    That's my name.

16        Q    I'd ask you to take a moment to review

17   this document.

18        A    I remember this.

19        Q    Is this the document in which you informed

20   Stacy, the union rep, of this choice for Miss

21   Dews-Miller?

22        A    Yes.

sah

1    Q    Thank you very much.  Was she then

2  converted to a temporary appointment not to exceed

3  one year, in accordance with her decision?

4    A    Her decision actually was made known was

5  December 5 and yes, it was just after that that her

6  appointment was converted to a temporary

7  appointment not to exceed one year.

8    Q    After the temporary appointment expired

9  was she then separated pursuant to the terms of the

10 settlement agreement?

11   A    Yes.

12   Q    I'd like to turn to the issue of final

13 payments now.  Did she submit the appropriate

14 separation documents before departing federal

15 service?

16   A    No, despite repeated requests.

17   Q    What did she not submit?

18   A    The clearance for final salary payment,

19 which was Form IA-134, as well as a security form,

20 whose number I can't remember.

21   Q    And what do these forms require an

22 employee to do before departing federal service?

sah                                                                    262

1        A   The security form requires that you turn

2   in your ID badge to an appropriate official in the

3   Office of Security and the IA-134 clearance for

4   final salary payment requires that you pay back any

5   travel advances that you may have received, return

6   any library books that you may have out, return any

7   office equipment--laptop computers, cell phones,

8   the like--and it was a preprinted list of offices

9   that you have to visit in order to receive the

10  clearance to return all property so that you could

11  then receive your final payment.

12       Q   I'd like to direct your attention to

13  Exhibit 9-9 of the gray ROI.  Could you take a

14  moment just to review briefly the regulation?

15           [Pause.]

16       A   Okay.

17       Q   Is this the regulation that required all

18  employees of the USIA to fill out such final

19  clearance forms before receiving their final salary

20  payments?

21       A   Yes, it is.

22       Q   Did you make any attempts, other than your

sah                                                                    263

1    initial attempt, to get her to sign this form?

2        A    Other than my initial attempt?

3        Q    Did you tell her a first time you have to

4    fill this out?

5        A    I tried contacting her about a week in

6    advance of her separation to get this process

7    moving and received no response, certified an

8    e-mail, received no response.  Offered my

9    assistance, help, received no response.  I

10   understand that she left her ID card with the

11   security guard on her way out on the last day.

12       Q    Did you offer to walk the sheet around the

13   building and get the necessary signatures if only

14   she would sign it?

15       A    Yes.

16       Q    Thank you.

17            I'd like to move on to the issue of the

18   within-grade increase.  Do you know if Miss

19   Dews-Miller was denied a within-grade increase in

20   the fall of 1995?

21       A    Yes, she was.

22       Q    Do you recall why she was denied this

sah                                                                    264

1   within-grade increase?

2        A    Because the rating of record of her

3   performance was minimally successful and

4   regulations preclude a within-grade increase if a

5   rating falls below fully successful.

6        Q    Okay.  I'd like to direct your attention

7   to  Exhibit 24 of the gray ROI.  Are these

8   regulations at Exhibit 24 the regulations that

9   would have denied Ms. Dews-Miller a within-grade

10  increase because she did not receive a fully

11  successful rating?

12       A    Yes.

13       Q    Do you recall what exactly the ratings

14  were based on?  Where was she when she received the

15  minimally successful ratings?

16       A    Six months of that period was in the

17  Inspector General's Office and six months of that

18  period was in the Office of the Comptroller, her

19  detail office.

20       Q    Miss Mallios, were you retaliating against

21  Miss Dews-Miller for her prior EEO activity when

22  her employment was converted to a temporary

sah                                                                    265

1  appointment?

2      A    I was following the steps in the

3  settlement agreement.  I was not retaliating.

4      Q    What about when her employment was

5  terminated?

6      A    I again was adhering to the steps in the

7  settlement agreement.

8      Q    What about when her final salary and

9  associated payments were denied?  Were you

10  retaliating against her?

11      A    No, I was following the regulations we

12  just referred to.

13      Q    What about when she was placed on absence

14  without leave in the fall of 1995?  Were you

15  retaliating against her?

16      A    No, and neither was her supervisor, who

17  placed her on absence without leave.

18      Q    What about when she was denied a

19  within-grade increase in the fall of 1995?

20      A    Following the regulations in Exhibit 24.

21      Q    In any other personnel action you may have

22  been involved with with regard to Miss Dews-Miller

sah

1  did you retaliate because of her prior EEO

2  activity?

3    A    No.

4    Q    I'd like to turn to the issue of medical

5  records.  Did OWCP ever send you Miss Dews-Miller's

6  medical records?

7    A    Yes.

8    Q    How were the records kept?  Where were

9  they kept?

10    A    An employee generally has two personnel

11  folders.  One is for administrative documents; the

12  other one is for performance documents.

13  Occasionally if somebody has an injury, a work-

14  related injury, a third file could be created if

15  any medical documents happened to surface.  It's

16  bright blue, very bright blue, so as not to be

17  confused with any of the others.

18          Whenever I received what I received from

19  the Office of Workers Compensation, which was, I

20  recall, a fairly thick stack of medical

21  documentation, I placed it in the blue folder and

22  gave it to the attendant at the file room, locked

sah                                                                      267

1  file room, and it was stored in there.

2      Q    Did you have the key to this file room?

3      A    No.

4      Q    Did you have to make a special request in

5  order to access this file?

6      A    Yes.  Not just the medical files but also

7  the regular performance folder, the regular

8  administrative folder.  All folders had to be

9  requested.

10     Q    Did you discuss the substance of Miss

11 Dews-Miller's medical records with anyone?

12     A    The substance of them?  I'm not even

13 certain that I understood the substance of them.  I

14 may have discussed the general nature of the injury

15 with my supervisor or my supervisor's supervisor,

16 Pat Noble, but no.

17     Q    Thank you.  Did you provide a copy of

18 these records to anyone?

19     A    Ms. Dews-Miller had a representative at

20 the time named John Pratt and she asked in writing

21 that a copy of her medical documentation be

22 provided to him and that was done.

sah                                                                          268

1      Q    I'd like to direct your attention to

2  Exhibit 26-9 in the gray ROI.  Would you just flip

3  through that?

4      A    Okay.

5      Q    Do these documents reflect when you sent

6  the medical file to her representative?

7      A    Yes.  When I sent them?  Did I not go far

8  enough?  One moment.  When he requested them.

9      Q    Did you ensure that she signed a release

10 before you sent these documents to her

11 representative?

12     A    Yes, I did.

13     Q    That's all I have on that.

14          To your knowledge, did anyone else at the

15 USIA review these records?

16     A    Not that I'm aware of.

17     Q    I'd like to move on to the topic of the

18 OWCP claim.  Were you involved in processing Miss

19 Dews-Miller's application with the Department of

20 Labor for workers comp benefits?

21     A    Yes.

22     Q    Did you at any time withhold or delay the

sah                                                                    269

1   processing of her claim?

2       A    Certainly not purposefully.

3       Q    Would you say you responded to any

4   requests regarding this within a week?

5       A    I believe so.

6       Q    May I ask you to turn to Exhibit 26-33 in

7   the gray ROI?

8       A    Okay.

9       Q    Is the first page a letter from you to the

10  claims examiner for Miss Dews-Miller?

11      A    Yes.

12      Q    What are you submitting in this document?

13      A    Her claim for a work-related injury, as

14  well as a hospital bill.

15      Q    What's the date on the letter?

16      A    The date on the letter is July 27.

17      Q    Would you turn to--

18      A    1995.

19      Q    Could you read in the corner the notation

20  when this document was given to you?

21      A    Hand-carried to Personnel July 20, 1995.

22      Q    Who's the signature or the initials?

sah                                                                    270

1      A    RMDM, so it must be Miss Dews-Miller.

2      Q    So is that within a week that you

3  responded to that request?

4      A    Yes.

5      Q    Could I ask you to look at Exhibit 9-5 in

6  the ROI?

7      A    Okay.

8      Q    If I could ask you to take a look at this

9  letter for just a moment?

10     A    Okay.

11     Q    What's the date on this letter?

12     A    November 9, 1995.

13     Q    So is this about two months into when her

14  three-month OIG stint was taking place?

15     A    Yes.

16     Q    And is this letter the Department of Labor

17  informing Miss Dews-Miller that her claim, as

18  submitted, was not valid?

19     A    Yes.

20     Q    And that a new Form CA-7 needed to be

21  completed?

22     A    Yes.

sah

1     Q    The notation on the right-hand side of the

2    letter, it says a new CA-7 was mailed to Rose Mary

3    11/14.  Is that your initialing underneath that?

4     A    That's my handwriting, yes, and my

5    initials.

6     Q    And is that within five days of when the

7    letter was sent, dated?

8     A    I may well have received it the date I

9    mailed out that form.  It's hard to say.

10     Q    Thank you.  I'm not going to make you go

11    through each document, this whole second ROI as a

12    testimony to your work product in this case.  I'd

13    like you just to flip to one document and that's

14    26-18 in the gray ROI, page 4.

15     A    26-18, page 4.  Okay.

16     Q    Have you had a chance to look at it?

17     A    Okay.

18     Q    What's the date on this letter?

19     A    January 27, 1997.

20     Q    Is this after Ms. Dews-Miller's employment

21    was terminated with the agency?

22     A    Yes.  That occurred in December of '96, I

sah                                                                                      272

1    believe.

2        Q    Is this when the Department of Labor

3    informed the USIA, I guess, that she was being

4    approved for workers comp?

5        A    Yes.

6        Q    So that the USIA was not notified until

7    after her employment was over that her workers comp

8    claim had been accepted?

9        A    That's correct.

10       Q    Thank you.

11            I'd like to move on to the accommodation

12    issue.  To your knowledge, did Miss Dews-Miller

13    ever request an accommodation for a medical

14    condition?

15       A    No.

16            MS. ASWAD:  My last piece of business is

17    just a housekeeping one.  As Mr. Dunn noted,

18    Exhibit 53 only has odd-numbered pages and we'd

19    like to submit a full copy of that regulation into

20    the  record.  So I'd like to have marked as the

21    next--are we on 8?--Agency exhibit.

22                           [Agency Exhibit No. 8 was

sah                                                                                                 273

1                              marked for identification.]

2          BY MS. ASWAD:

3      Q    Miss Mallios, I'd like you to review these

4   regulations and let us know if they're a complete

5   set of the performance appraisal regulations for

6   civil service employees at that time.

7      A    There's a lot of exhibits here.

8          It looks complete to me.

9      Q    Thank you.  Do you recall under these

10  regulations must a reviewing official counsel an

11  employee regarding his or her performance at any

12  point during the rating period?

13     A    A reviewing official?  No.

14         MS. ASWAD:  No further questions, Your

15  Honor.

16         JUDGE PACINDA:  Mr. Dunn?

17         MS. ASWAD:  Oh, sorry.  Could I move to

18  have that accepted into evidence?

19         JUDGE PACINDA:  Yes, thank you.  Agency

20  Exhibit 8 is accepted into evidence.

21                              [Agency Exhibit No. 8 was

22                              received into evidence.]

sah                                                                    274

1          MR. DUNN:  As a substitute for the

2   previous--

3          JUDGE PACINDA:  To supplement my version

4   of the ROI, at the very least.

5                    CROSS-EXAMINATION

6          BY MR. DUNN:

7      Q    Good afternoon, Miss Mallios.

8      A    Good afternoon.

9      Q    You were obviously aware of Miss

10  Dews-Miller having engaged in EEO activity, having

11  received the responsibility to make sure the

12  personnel actions were closely followed.

13     A    Yes.

14     Q    And you had to take many steps to make

15  sure that not only the settlement be drafted in

16  accordance with regulations but also once it was

17  completed, that the appropriate steps were in full

18  conformance with that agreement.  Isn't that right?

19     A    I had no role in drafting this settlement.

20  I did follow the terms of the agreement, as relayed

21  to me by Carol Epstein.

22     Q    Now the assignments Miss Dews-Miller was

1  to receive firstly was a six-month trial period in

2  the IG's office; is that right?

3      A    Six-month trial period in the Office of

4  the Comptroller.

5      Q    Comptroller's Office.  And if less than

6  fully successful, a following six months in the IG

7  office.

8      A    Three months in the IG office.

9      Q    It was a trial period?

10      A    That's right.

11      Q    Let's not get wrapped up in details.

12          And then if unsuccessful, to be followed

13  by a one-year temporary appointment.

14      A    That's correct.

15      Q    Transitioning from career status to

16  temporary status.

17      A    To a temporary appointment not to exceed

18  one year.

19      Q    Now what was your role in contacting the

20  supervisors of these trial periods Ms. Dews-Miller

21  was undertaking?

22      A    The role in contacting them?  I relayed to

1   Eva Diekmann that the supervisor of the detail,

2   whose name I believe is Carol Keith, needed to

3   conduct informal performance reviews--I think it

4   was every six weeks--and then at the end of the

5   trial period a rating would need to be written

6   assessing her performance.

7        Q    And how frequently did you come in contact

8   with either of those two ladies to make sure that

9   the evaluations were taking place?

10       A    I spoke with Eva once to give her the

11  instruction.  I don't ever recall speaking with

12  Carol.  Carol was Eva's employee.  Eva spoke with

13  Carol.

14       Q    I see.  Now the regulation seems to

15  indicate that it's incumbent upon the rater to

16  specify on the evaluation, appraisal, the specific

17  date where the midpoint counseling took place, when

18  it took place.  Are you aware of that?

19       A    Yes, but I'm also aware of the terms of

20  the settlement agreement, which said informal

21  reviews every six weeks.

22       Q    I understand that but you also have the

1   additional requirement specified in regulation that

2   the supervisor is to conduct such review and

3   additionally, to specify the date of the midpoint

4   review on the appraisal and that didn't take place,

5   did it?

6        A    You'd have to ask Eva Diekmann or Carol

7   Keith that question.

8        Q    Or if I showed you the appraisal itself

9   would you be able to tell if the rater specified a

10  date on the form?

11       A    If there's no date--

12       Q    I'm showing the witness Exhibit 51 of

13  96-15.  It's the appraisal signed by Carol Keith.

14  I just point your attention to the section

15  requiring a date be inserted regarding counseling

16  as to the employee's duty performance.

17       A    It says several occasions performance

18  review discussions were held.

19       Q    Yes, I understand that.  Is that in

20  conformance with the regulation, specifically the

21  Manual of Operations and Administration?  I'm not

22  trying to blind-side you.  Let me point your

1    attention to the specific terminology of the

2    regulation.    The regulation itself is Exhibit 53,

3    page 16 of 65.    Here;s a copy of it here.    On the

4    left-hand side I took a pen and marked the section.

5          Now isn't it--just tell me when you've had

6    a chance to review it.

7        A    Okay.

8        Q    That's not the whole regulation.

9        A    Right.

10       Q    That is the section that deals with the

11   requirement.

12          [Pause.]

13       A    Okay.    In a rating year a progress review

14   midyear is required.    This covered six months, this

15   appraisal.

16       Q    Have you had a chance to review the

17   section I was bringing your attention to, 453.2?

18       A    Mm-hmm.

19       Q    Periodic progress review.

20       A    Right.

21       Q    Now that section indicates several lines

22   down, "The signatures of the rated employee and the

sah                                                                          279

1   rating officer and the dates of their discussions

2   must be indicated on the report form at the time of

3   the discussions." That would apply to this

4   evaluation of Miss Dews-Miller, correct?

5       A    There's a bit of a gray area here.

6       Q    What part of "must be recorded" is gray?

7   You don't have to answer that. That was

8   obviously--let me move on to another point.

9       A    I was looking at the regulations on

10  interim performance appraisals.

11          MS. ASWAD:  Judge, can we ask her to

12  answer the question, as she was going to?

13          JUDGE PACINDA:  What's the question?

14          MR. DUNN:  I withdraw the question.

15          JUDGE PACINDA:  The question's withdrawn.

16  You'll have a chance to redirect if you need to.

17          BY MR. DUNN:

18      Q    In the supervisor's battlefield guide for

19  granting leave that your friend wrote, I suppose--

20      A    It's the jungle book, we call it.

21      Q    Is this with the picture of the giraffe?

22      A    Yes, a little juvenile.

sah                                                                      280

1       Q    Now I'd like to draw your attention to the

2  section you were referring to before.  This is

3  Exhibit 32, page 3 of 4, Exhibit 32 of 95-15.

4       A    Okay.

5       Q    And additionally--well firstly, it does

6  say, when it's referring to the medical

7  documentation expected, that "This documentation

8  must be prepared by a physician or practitioner,"

9  and Miss Dews-Miller did supply that documentation.

10 And it goes on to say "and must support a valid

11 medical conclusion that the employee will be

12 precluded from performing the duties of the

13 position."  Didn't Miss Dews-Miller's documentation

14 establish that she would be precluded from

15 performing her duties, that she was disabled,

16 totally disabled?  Isn't that correct?

17      A    I didn't see it that way.  I looked

18 instead at--sometimes employees try to submit very

19 general statements from a physician stating that

20 the employee was under my care, was examined,

21 unable to work on particular days.  You have the

22 authority to request more detailed information.

1   It's the employee's responsibility, not yours, to

2   obtain--

3        Q    I appreciate your reading all that but was

4   there any request for further documentation, to

5   your knowledge?

6        A    Was there any request?  Made by her

7   supervisor?

8        Q    Correct.  Do you know?

9        A    By her supervisor?  I don't know.  You'd

10  need to ask her supervisor.

11       Q    Now you're a fan of this leave

12  explanation, aren't you?  I refer your attention

13  to--

14       A    It's in English.

15       Q    Right.  Exhibit 9-3, page 3 of 7 of the

16  0019.  If you could just read that short little

17  paragraph of the doctor.

18       A    "Due to a work-related injury on 7/10/95,

19  Ms. Miller has been under our care since 8/29/95.

20  I have advised Ms. Miller not to return to work.

21  She is disabled for work currently from 8/29

22  through 11/20/95.  She will be reevaluated on

sah                                                                 282

1  November 20, 1995."

2       Q    Okay.  Thank you.

3       A    You're welcome.

4       Q    You have a nice reading voice.

5            Now the doctor establishes that she has a

6  work injury and he's been treating her for that,

7  correct?

8       A    A work-related injury and he has been

9  treating her for that.  That's the statement that's

10  made there but we still have no idea--

11      Q    Let's take his statement.  The doctor

12  states that she has a work injury and he's been

13  treating her for that.

14      A    Mm-hmm.

15      Q    And he further indicates she's not to

16  return to work and furthermore he goes on to state

17  that she's disabled from performing work.  Is that

18  correct?

19      A    That's what he stated.

20      Q    Now you were questioned earlier with

21  regard to the agency, USIA, not paying Miss

22  Dews-Miller her pay.  Were you referring to the

sah                                                                    283

1    continuation of pay that was approved, directed by

2    OWCP to be paid to her?

3        A    It was not just continuation of pay.  It

4    was unpaid annual leave and I believe a day or more

5    of salary.

6        Q    So it fell into several different

7    categories, this lump sum of money that was due to

8    her.

9        A    Yes.

10       Q    Now the regulation indicates that the

11   final salary is to be withheld pending the

12   completion of this document, this out-processing

13   document.  Isn't that correct?

14       A    The final salary.  The form is called

15   clearance for final salary payment.

16       Q    I understand what the form is called.  The

17   regulation indicates that an employee who's

18   separated from the employment of the USIA will not

19   receive the final salary until the form is

20   completed.

21       A    I would need to look that up.  It was not

22   my office that adjudicated that payment.  It's the

sah                                                                  284

1  Office of the Comptroller.

2     Q    Nevertheless you were responsible for

3  obtaining the--you were the point of contact for

4  receiving this completed form.

5     A    For providing the data to the employee,

6  yes, and then forwarding it to the Office of the

7  Comptroller for final payment.

8     Q    Now this final salary, that was only a

9  couple of days worth of final salary that she was

10 owed of these different categories of money.

11       Now this continuation of pay that she was

12 due and owing--you have to say yes.

13    A    Yes.

14    Q    This continuation of pay that she was due

15 and owing, that represented payment to Miss

16 Dews-Miller in regard to a period of time well

17 prior to the two weeks before her separating from

18 the civil service, correct?

19    A    We learned of medical documentation giving

20 her the right to that continuation of pay after she

21 was off the rolls.

22    Q    I understand that.  Nevertheless, the

sah                                                                    285

1    continuation of pay represents a period of time

2    well prior to the two-week pay period immediately

3    surrounding her separation date.

4         A    Oh, yes.  The continuation--

5         Q    So you would agree that that continuation

6    of pay that's still due and owing to her is not

7    final salary and yet the agency continues to

8    withhold.

9         A    I can't agree that this is my decision to

10   make.  I can't agree that she met her

11   responsibility as an employee to follow the

12   separation procedures.  Any monies that are owed to

13   an individual when they separate are held until

14   that clearance form is completed.

15        Q    That's not what the regulation says, Miss

16   Mallios.  I think you'll agree the regulation

17   doesn't say any monies; it says final salary.

18   Isn't that correct?

19        A    I don't know.  I need to look at it.

20             MR. DUNN:  I don't have any more

21   questions.

22             JUDGE PACINDA:  Any redirect, Ms. Aswad?

sah                                                                              286

```
 1              MS. ASWAD:  I think there is, if I could
 2  have a moment to confer with co-counsel.
 3              JUDGE PACINDA:  Okay.
 4              [Discussion off the record.]
 5              JUDGE PACINDA:  Back on the record.
 6                      REDIRECT EXAMINATION
 7              BY MS. ASWAD:
 8      Q    Just a few questions, Miss Mallios.  I'd
 9  like to direct your attention to Exhibit 9-3, page
10  3.
11      A    Yes.
12      Q    This is a document Mr. Dunn questioned you
13  about?
14      A    Yes.
15      Q    Does that document say anything about what
16  the work-related injury is?
17      A    No.
18      Q    Would a supervisor know if this condition
19  that she's being treated for was, in fact, related
20  to the work-related injury?
21      A    No.
22      Q    Does it explain why she could not perform
```

sah

287

1   a sedentary desk job?

2       A    No.

3       Q    Thank you.  With regard to the final

4   salary payments and the need to fill out the final

5   clearance form, did the USIA interpret final salary

6   payment to include annual leave payment?

7       A    Oh, yes.

8       Q    Did it interpret final salary payment to

9   include continuation of pay payments?

10      A    Yes, any monies due.

11      Q    Thank you.  The last question is Mr. Dunn

12  questioned you about a gray area that I believe you

13  were going to testify to regarding--a gray area

14  regarding midpoint evaluations when you're dealing

15  with an interim evaluation versus a full-year

16  evaluation.  Could you share with us what you were

17  attempting to testify to?

18      A    This particular rating covered a period

19  from February 1, '95 to July 31, '95.  Therefore

20  it's an interim rating and it's also a rating

21  that's prepared as a matter of recording a detail.

22  I was looking in the regulations to see if I could

sah                                                                    288

1   find anything that said a performance discussion

2   must occur midway through the rating period and I

3   wasn't finding that under interim performance

4   appraisals.   That's my reference to a gray area.

5              MS. ASWAD:   Thank you.   Nothing further.

6              JUDGE PACINDA:   Mr. Dunn?

7                      RECROSS-EXAMINATION

8          BY MR. DUNN:

9      Q    When questioned in regard to Exhibit 9-3,

10  page 3, the doctor's note there, you were

11  questioned by Miss Aswad as to whether there would

12  be any way that you would be able to determine

13  whether his evaluation was in regard to the

14  specific work-related injury suffered by Miss

15  Dews-Miller.   Doesn't his reference to the

16  work-related injury originating on 7/10/95 pretty

17  much nail that down?

18     A    There's nothing here that connects the

19  work-related injury to an absence of two months.

20             MR. DUNN:   I don't think that was the

21  nature of her inquiry but we'll leave it at that.

22  I don't have any other questions.

sah                                                                    289

1          MS. ASWAD:  No more questions.

2          JUDGE PACINDA:  Thank you very much.  I

3    ask that you don't discuss your testimony with

4    anyone after leaving the room.

5          [Witness excused.]

6          [Discussion off the record.]

7          JUDGE PACINDA:  We'll go back on the

8    record.  That concludes the hearing, the oral

9    testimony at this point.  I've discussed with the

10   parties how closing arguments were going to be

11   submitted.  It's been determined that closing

12   briefs in this matter will be submitted to my

13   office no later than January 15, 2004.

14          With that said, Mr. Dunn, is there

15   anything else you'd like to add or put on the

16   record?  Any comments?

17         MR. DUNN:  No, I don't have anything.

18         JUDGE PACINDA:  Agency counsel?

19         MS. ASWAD:  Judge, do you a have a page

20   limit usually for your briefs and may we suggest 20

21   as a page limit?

22         JUDGE PACINDA:  I do, yes, and I'd prefer

sah

290

1    15.   I think you could wrap it up in 15 pages

2    double-spaced should more than adequately cover it.

3              MS. ASWAD:   Thank you.

4              JUDGE PACINDA:   Anything else?

5              MS. ASWAD:   No.

6              MR. DUNN:   No.

7              JUDGE PACINDA:   With that said I declare

8    this hearing now closed.   Thank you.

9              [Whereupon, at 5:47 p.m., the hearing

10   concluded.]

# CERTIFICATE

I, SUSAN A. HARRIS, the Official Court Reporter for Miller Reporting Company, Inc., hereby certify that I recorded the foregoing proceedings;  that the proceedings have been reduced to typewriting by me, or under my direction and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

SUSAN A. HARRIS