## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROSE M. DEWS-MILLER, | * | |
| Plaintiff, | * | |
| v. | * | CASE NO. 06-1764 (GK) |
| CONDOLEEZZA RICE,<br>Secretary of State, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**************************************************************************

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S
### MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff Rose M. Dews-Miller, by her undersigned attorney, submits this Memorandum in Opposition to the Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.

### INTRODUCTION

The Plaintiff, Rose M. Dews-Miller, entered into a settlement agreement with the Defendant, the Department of State, in settlement of her Title VII claims against the Agency. Since entering into the settlement agreement, the Agency has retaliated against Ms. Dews-Miller for engaging in EEO and whistleblowing activity, has breached the settlement agreement in several respects, has violated Ms. Dews-Miller's rights under the Civil Service Reform Act in several respects, and ultimately unlawfully terminated Ms. Dews-Miller without according her due process rights. The Agency, knowing that it has wronged Ms. Dews-Miller and trampled on her statutory and constitutional rights, seeks to avoid responsibility for its shameful conduct by seeking to dismiss Ms. Dews-Miller's claims without addressing the issues on the merits and without the benefit of discovery. As the following will show, the claims asserted by Ms. Dews-Miller are viable and actionable, there are several disputes of material facts, and this case must be resolved by a jury. Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, must be denied.

## STATEMENT OF FACTS IN DISPUTE

Ms. Dews-Miller, disputes nearly all of the alleged facts asserted in the Defendant's Statement of Material Facts Not in Dispute, which is attached hereto and will be referred to, as appropriate, in this Memorandum.  As the following will show, summary judgment is not warranted, and at a minimum, should not be considered until the conclusion of discovery.

## ARGUMENT

## I. THE PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE DOCTRINES OF RES JUDICATA OR COLLATERAL ESTOPPEL

In its decision, the Merit System Protection Board ("MSPB") dismissed Ms. Dews-Miller's appeal for lack of subject matter jurisdiction.  *See Rosemary Dews-Miller v. USIA*, 194 F. 3d 1330 (Fed. Cir. 1999).  *See* Exhibit 1.  When Ms. Dews-Miller filed her claim with the MSPB asserting that she had been terminated in reprisal for her whistleblowing activities, the MSPB ruled that it lacked subject matter jurisdiction, which was affirmed by the Federal Circuit. *Id.*  The Defendant posits that *res judicata* and collateral estoppel preclude this Court from entertaining Counts I-III, V-IX, XI-XXII of Ms. Dews-Miller's complaint.  However, the Defendant concedes that in order for either of these defenses to apply, there must have been "a valid final adjudication of a claim" or "an issue of fact or law, actually litigated and resolved by a valid judgment that binds the parties in a subsequent action…." The Defendant has not represented to this Court nor can it legally contend that decisions of the MSPB or Federal Circuit was a "final judgment on the merits" or that the issues regarding Ms. Dews-Miller's termination being linked to her whistleblowing activities were "actually litigated."  The District of Columbia Circuit has held that a dismissal for lack of jurisdiction is not an adjudication on the merits. *Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1248 (1999).  *See also* Charles A. Wright and Arthur R. Miller, 5A, *Federal Practice and Procedure* §1350 at 225 (2d ed. 1990); *Lupo v. Voinovich*, 858 F. Supp. 699 (1994); Rule 41(b) of the Federal Rules of Civil Procedure. Accordingly, because the Agency cannot satisfy the most important element for the

application of *res judicata* or collateral estoppel, i.e., that the judgment asserted must have been a final judgment on the merits, the decisions of the MSPB and Federal Circuit cannot be relied upon for the application of *res judicata* or collateral estoppel here. *See Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1248 (1999).

Even if one were to argue that the MSPB and Federal Circuit addressed the issue of the termination of Ms. Dews-Miller in reprisal for engaging in whistleblowing activity, neither the MSPB nor the Federal Circuit decisions addressed the other issues presented in this case, i.e., whether the Agency engaged in reprisal against Ms. Dews-Miller by terminating her for engaging in EEO activity, and reprisal for engaging in EEO and whistleblowing activity by the conduct as alleged in Counts II through XXII (Count I),[1] failure to comply with the procedural prerequisites for performance appraisal period May 1, 1994 through January 24, 1995 in violation of the Civil Service Reform Act ("CSRA") (Count II), failure to comply with procedural prerequisites for performance appraisal period February 1, 1995 through July 31, 1995 in violation of the CSRA (Count III), violation of Ms. Dews-Miller's constitutional rights (Count IV), failure to provide notice of proposed adverse action - termination– in violation of the CSRA (Count V), failure to provide notice of denial of within grade increase in violation of the CSRA (Count VI), failure to provide notice of proposed adverse action - appointment with OIG– in violation of the CSRA (Count VII), failure to provide notice of proposed adverse action - career appointment to a temporary appointment– in violation of the CSRA (Count VIII), failure to provide notice of proposed adverse action - placing Ms. Dews-Miller on AWOL - in violation of the CSRA (Count IX), failure to comply with EEOC decision (Count X), and breaches of the settlement agreement Counts XI through XXII). Accordingly, neither *res judicata* nor collateral estoppel applies to these claims.

---

[1] While proceeding before the MSPB and Federal Circuit, Ms. Dews-Miller was proceeding *pro se*. She should not be penalized for her inability to adequately articulate her case. Also, no oral argument was had before the MSPB or Federal Circuit.

In its Motion, the Agency argues that *res judicata* or collateral estoppel bars Ms. Dews-Miller's claims because she could have raised the issues that are the subject of this case before the MSPB and the Federal Circuit, but failed to do so. The Agency is wrong. All of the above claims make up, *inter alia*, Ms. Dews-Miller's claim of reprisal for engaging in EEO activity, and were in the EEO process at the same time of the March 3, 1998 MSPB and March 10, 1999 Federal Circuit decisions. The Agency issued a Final Agency Decision ("FAD") with respect to the EEO reprisal claims on March 6, 1998. Ms. Dews-Miller appealed that decision on April 8, 1998, and the EEOC Office of Operations issued an order reversing the Agency's FAD on June 23, 1999. *See* Exhibit 2. In that decision, the EEOC not only reversed the Agency's FAD, but also ordered the Agency to process Ms. Dews-Miller's EEO reprisal claims in this case. That process was not completed until October 30, 2000 when the Agency finally issued a Report of Investigation regarding Ms. Dews-Miller's EEO reprisal claims. *See* Exhibit 3. This case is the next sequential step, after the EEOC hearings that were held, in the EEO process. Accordingly, this case could not have been asserted or addressed by the MSPB and Federal Circuit.

The Eastern District Missouri was faced with a similar situation in *Walton v. USDA*, 2007 WL 1246845 (E.D. Mo. April 30, 2007), and held that a prior MSPB and Federal Circuit dismissal of the Plaintiff's whistleblowing claim did not bar the Plaintiff's Title VII and CSRA claims. In *Walton*, the Plaintiff claimed that he was the victim of reprisal for engaging in whistleblowing activities. The MSPB denied the Plaintiff's petition for relief and the Federal Circuit affirmed the decision. *See Walton v. USDA*, 230 F. 3d 1383 (Fed. Cir., Feb. 16, 2000). *See also Walton v. USDA*, 2007 WL 1246845 at p. 2 (E.D. Mo. April 30, 2007). The Plaintiff in *Walton,* like Ms. Dews-Miller here, thereafter filed a lawsuit in which he alleged that some of the same conduct he relied upon for his claim of reprisal for engaging in whistleblowing activities, also constituted reprisal for engaging in EEO activity and violated CSRA. The USDA, like the Agency here, argued that the doctrine of *res judicata* barred the Plaintiff's claims of reprisal for engaging in EEO activity and violation of CSRA due to the MSPB's and

4

Federal Circuit's dismissal of the Plaintiff's claim of reprisal for engaging in whistleblowing activity even if the claims were not asserted by the Plaintiff.  *Id.* at 13.

The Court in *Walton,* however,  held that the doctrine of *res judicata* did not bar the Plaintiff's claim of reprisal for engaging in EEO activity and violation of  CSRA because the facts giving rise to those claims were not addressed by the MSPB and Federal Circuit.  In so holding, the Court in *Walton* held that because the Federal Circuit did not specifically address the claims asserted by the Plaintiff, the doctrine of *res judicata* "does not bar this claim here. Nor is the Court persuaded that *res judicata* bars other claims asserted by the Plaintiff, as the Federal Circuit addressed only Plaintiff's whistleblowing claims set out above-and not any other discrimination claims."  *Id*. at 14.  The same analysis applies here.

As the foregoing shows, the doctrines of *res judicata* and collateral estoppel do not bar Ms. Dews-Miller's claims asserted in this action as they were not asserted before the MSPB because the claims were appropriately being processed within the statutory scheme for federal employees asserting claims of retaliation for engaging in EEO activity.  Additionally, the claims asserted in this case were not addressed by the MSPB or the Federal Circuit.  Moreover, the ruling of the MSPB that was affirmed by the Federal Circuit was on jurisdictional grounds and not on the merits.  Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

## II.  THIS COURT HAS JURISDICTION OVER THE PLAINTIFF'S CLAIM OF REPRISAL FOR ENGAGING IN WHISTLEBLOWING ACTIVITY

The Agency argues that this Court does not have subject matter jurisdiction over Ms. Dews-Miller's claim of reprisal for engaging in whistleblowing activity because only the Federal Circuit has jurisdiction over the claim and because it has already disposed of that claim.  Again, the Agency is wrong.  As explained earlier, the Federal Circuit reviewed the MSPB's finding that it did not have jurisdiction.  It did not address the merits of the case or any of the issues that Ms. Dews-Miller asserts here except for *dicta* with respect the issue of whether Ms. Dews-Miller was terminated in reprisal for engaging in whistleblowing activity.  The Agency's argument in

this regard is nothing but another attempt to argue that Ms. Dews-Miller's claims are barred by the doctrines of *res judicata* and collateral estoppel. As demonstrated *supra*, Ms. Dews-Miller's claims of reprisal for engaging in whistleblowing activity are not barred by the doctrines of *res judicata* and collateral estoppel.

Moreover, Ms. Dews-Miller also asserts that the same conduct was also in reprisal for engaging in EEO activity.[2] Ms. Dews-Miller therefore has the option of filing the WPA claim directly in the district court as she has done here or pursue the administrative process before the MSPB. *Quinn v. West*, 140 F. Supp. 725, 734 (W.D. Tex. 2001). *See also McAdams v. Reno*, 64 F. 3d 1137, 1141 (8th Cir. 1995). In fact, the statutory provisions of the WPA and its legislative history indicate a "clear Congressional preference for combining various aspects of a single agency determination under one review proceeding, both in the administrative and judicial channels." *Christo v. Merit System Protection Board*, 667 F. 2d 882, 883 (10th Cir. 1981). To force Ms. Dews-Miller to bifurcate her case and return to the MSPB for further consideration of her retaliation claims "would frustrate the principles of judicial economy and serve no useful purpose." *Quinn, supra*, 140 F. Supp. at 725; *Woodman v. Runyon*, 132 F. 3d 1330, 1342 (10th Cir. 1997). Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

## III. THIS COURT HAS JURISDICTION OVER COUNTS II, III AND V-IX FOR VIOLATIONS OF CSRA BECAUSE THE PLAINTIFF HAS EXHAUSTED THE REQUIREMENTS FOR SUIT UNDER THE ACT.

The Agency claims that Ms. Dews-Miller's claim is not properly in this Court because she did not litigate these claims before the MSPB, and therefore, she cannot litigate her claims here because she allegedly did not exhaust the requirements for suit under the CSRA. Although a federal employee is typically required to file CSRA claims with the MSPB, Ms. Dews-Miller was not required to do so in this case because she met the exhaustion requirement when she

---

[2] It is undisputed that Ms. Dews-Miller engaged in prior EEO activity which resulted in, *inter alia*, the settlement agreement that was breached by the Agency.

exhausted the requirements for suit for her claim of reprisal for engaging in EEO activity.

As stated previously, the Agency's violations of CSRA also make up Ms. Dews-Miller's claim of reprisal for engaging in EEO activity. As explained in Section VI *infra*, Ms. Dews-Miller has exhausted the administrative process to litigate her reprisal for engaging in EEO activity and other Title VII claims in this Court. Accordingly, because Ms. Dews-Miller's CSRA claims rely upon the same facts as her claim of reprisal for engaging in EEO activity, she has likewise met the exhaustion requirement for her CSRA claims. As demonstrated in Section II, a plaintiff whose claims under the WPA or CSRA and reprisal for engaging in EEO activity are the same, has the option of which forum to litigate her claims. In such an instance, like in this case, the plaintiff need only exhaust her claims in the forum she has chosen before filing a civil action. *See McAdams, supra*, 64 F. 3d at 1142 (quoting *Tolbert v. United States*, 916 F. 2d 245, 248 (5th Cir. 1990)). Hence, because Ms. Dews-Miller has met the exhaustion requirement when she exhausted the requirements for suit for her claim of reprisal for engaging in EEO activity and other Title VII claims, she has likewise met the exhaustion requirement for her CSRA claims. Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

## IV. COUNT IV ASSERTS A VALID CONSTITUTIONAL CLAIM.

The Agency asserts that it did not violate Ms. Dews-Miller property rights in her continued employment because she was allegedly dismissed pursuant to the terms of settlement agreement. The Agency misunderstands Ms. Dews-Miller's claim.[3] The issue presented by Ms. Dews-Miller is not that simple. Ms. Dews-Miller claims that the Agency did not provide

---

[3] The Agency incorrectly argues that Ms. Dews-Miller's Title VII and CSRA claims provide the exclusive remedy for the Agency's violation of her constitutional rights. Although Ms. Dews-Miller relies upon the same facts, she is permitted to assert claims in the alternative. Moreover, the Agency admits that such a claim exists. The Agency argues that a plaintiff must prove that the termination seriously damaged her reputation in the community and made it impossible and/or extremely difficult to obtain new employment and admits that Ms. Dews-Miller alleges same in her complaint. The Agency then argues that Ms. Dews-Miller has not alleged a claim for violation of her due process rights. The Agency's argument is illogical.

advance notice with respect to her termination, and that as a result, she was not provided an opportunity to challenge her proposed termination. The Agency fails to understand that even though the settlement agreement permitted the Agency to terminate Ms. Dews-Miller, the ability to terminate Ms. Dews-Miller was limited. For example, Ms. Dews-Miller could not be terminated under the settlement agreement unless the Agency properly rated her as less than "fully successful" in the detail and the three (3) month probationary position. Ms. Dews-Miller maintains that the Agency's rating of her performance was retaliatory in nature and was not an accurate and objective rating of her performance. She was also not given an opportunity to challenge same. If the Agency failed to fairly and objectively rate Ms. Dews-Miller's work performance, it did not have the right under the settlement agreement to terminate her. The Agency therefore would have been required to accord due process to Ms. Dews-Miller prior to terminating her, which it admits it did not do. Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

## V. THE COURT HAS ANCILLARY JURISDICTION OVER COUNTS XI-XXII FOR BREACH OF THE SETTLEMENT AGREEMENT EVEN THOUGH THEY SEEK DAMAGES IN EXCESS OF $10,000.

The Agency correctly points out that in most cases, the Court of Federal Claims has exclusive jurisdiction over breach of contract claims against the United States for damages in excess of $10,000. The Agency, however, fails to also point out that the District of Columbia Circuit has recognized that in a case in which the Plaintiff relies upon the same facts for breach of a settlement agreement and reprisal for engaging in EEO activity, the district court may exercise ancillary jurisdiction over the breach of contract claim even though the breach of contract claim seeks damages in excess of $10,000. *See Rochman v. Gonzales*, 438 F. 3d 1211, 1215 (D.C. Cir. 2006)(the district may determine that it has ancillary jurisdiction over a breach of contract claim even though the Court of Federal Claims generally has exclusive jurisdiction over breach of contract claims against the United States for damages in excess of $10,000). *See also Shaffer v. Veneman*, 325 F. 3d 370, 373 (D.C. Cir. 2003)(recognizing that the district court

may exercise ancillary jurisdiction over a breach of contract claim against the United States for damages in excess of $10,000 if the Title VII and breach of contract claims are "factually interdependent").

A district court may exercise ancillary jurisdiction over a breach of contract claim against the United States for damages in excess of $10,000 (1) "to permit disposition by a single court of claims that are, in varying respects and degrees, interdependent," and (2) "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.*(quoting *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 379-80, 114 S. Ct. 1673, 1676 (1994). This case fits squarely within the mold for the exercise of ancillary jurisdiction over Ms. Dews-Miller's breach of contract claim against the Agency. As stated previously, Ms. Dews-Miller relies upon the same facts for her reprisal for engaging in prior EEO activity (over which this Court clearly has jurisdiction) and her breach of contract claims. Accordingly, the reprisal for engaging in prior EEO activity and breach of contract claims are "interdependent." Given that the claims are "interdependent," the exercise of ancillary jurisdiction over the breach of contract claims is appropriate to enable this Court to function successfully, to manage its proceedings, vindicate its authority, and effectuate its decrees. This Court therefore has ancillary jurisdiction over Ms. Dews-Miller's breach of contract claims against the Agency. Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

## VI.  THE PLAINTIFF'S TITLE VII CLAIMS WERE EXHAUSTED AND ARE VIABLE THEREBY PRECLUDING THE ENTRY OF SUMMARY JUDGMENT

## A.  The Plaintiff properly exhausted her Title VII Claims.

The Defendant's contention that the Plaintiff improperly exhausted her claims is without merit. As the Defendant has properly stated, the Plaintiff's claims under Title VII arise from the retaliation and reprisal to which the Plaintiff was subjected by the Defendant after she engaged in protected EEO activity. As for properly exhausting her claims, it is clear that the Plaintiff began meeting with an EEO Counselor in November 1995 and that she filed an EEO

Complaint against the Defendant on March 28, 1996. Def. Ex. 6. The substance of the Plaintiff's March 1996 EEO complaint was the "minimally successful" performance evaluation she received for her May 1994 to January 1995 evaluation from Darwin Roberts and the "minimally successful" performance evaluation she received for her February 1995 to August 1995 evaluation from Carol Keith. The March 1996 EEO Complaint also complained of the Defendant's denial of the Plaintiff's Within Grade Increase, and the Defendant's improper placement of the Plaintiff on Absent Without Leave (AWOL) status from September 1995 through November 1995. *Id.* The Defendant responded to the Plaintiff's March 1996 complaint and stated that the complaint had been forwarded to the Equal Employment Opportunity Commission (EEOC) for resolution. Def. Ex. 9. Therefore, the Plaintiff complied with the requirements of 29 C.F.R. § 1614. The Defendant's contention that the Plaintiff did not satisfy Title VII exhaustion requirements is completely and wholly without merit.

**B. Counts V, VII, and VIII should not be dismissed.**

Despite the Defendant's contention to the contrary, the Plaintiff's claim regarding her termination (Count V), her termination from the Office of Inspector General (OIG) (Count VII) and her conversion from a career appointment to a temporary appointment (Count VIII) are all "like or reasonably related to the allegations of the charge and growing out of such allegations" as she filed with the EEOC. *See Park V. Howard University*, 315 U.S. App. D.C. 196, 71 F.3d 904, (1995) citing *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Therefore, there is a reasonable relationship between the allegations in the Plaintiff's EEO charge; namely, the "minimally successful" evaluations as these evaluations were the Defendant's purported justifications for terminating the Plaintiff pursuant to the January 1995 settlement agreement and the claims in the Plaintiff's complaint regarding her termination, termination of her appointment with OIG, and the conversion of her career appointment to a temporary appointment.

**C.  Plaintiff did properly exhaust her claims as to Count X.**

On January 27, 1997, the Defendant Agency was advised by the U.S. Department of Labor, Office of Workers Compensation Programs (OWCP) that the Plaintiff's on the job injury claim was supported by medical documentation and that the Plaintiff was entitled to be paid for her time in connection with her on the job injury.  *See* Exhibit 5, Letter from OWCP to Jeni Mallios of U.S. Department of State.  To date, the Defendant has failed to produce documentation that it complied with the instruction of OWCP.  The Plaintiff contends that the Defendant has failed to pay her for her time in connection with her on the job injury.

**D.  Plaintiff did not fail to satisfy Title VII's exhaustion requirements with respect to her breach of settlement agreement claims (Counts XI – XXII).**

Once the Plaintiff realized that the Agency had absolutely no intention on complying with the January 1995 Settlement Agreement, she properly sent a letter to the Agency advising the Agency that it was in breach of the Settlement Agreement.  *See* Def. Ex. 2.  The Defendant Agency responded that it had complied with the terms of the Settlement Agreement.  *See* Def. Ex. 3.  Due to the longest furlough in the history of the Federal Government beginning in December 1995 and ending in January 1996 and a subsequent blizzard in January 1996, the Plaintiff's appeal of the Agency's decision that it had not breached the Settlement Agreement was deemed untimely.  The Plaintiff petitioned for reconsideration of the ruling of the EEOC but her petition was denied.  Notwithstanding same, it is the Plaintiff's contention that although the breach of settlement agreement was not entertained by the EEOC as a separate charge, the breach of settlement agreement was nevertheless addressed by the EEOC as it arose out of the same nucleus of facts that gave rise to the Plaintiff's EEO complaint regarding her "minimally successful" evaluations which the evaluator's knew would likely result in termination from the Agency.  Furthermore, the issue of the breach of the settlement agreement was brought before the Merit Systems Protection Board (MSPB) although they found that they did not have subject matter

jurisdiction and that finding was affirmed by the United States Court of Appeals for the Federal Circuit. *See* Exhibit 1. Accordingly, the Plaintiff properly exhausted her claims with respect to her claims of breach of settlement agreement.

**E. Counts II and III do not fail on the merits.**

The Defendant's failure to follow the procedures outlined in 5 U.S.C. §§ 4302(b) and MOA, Part V-A, §453.2(c)(1)-(3) was in reprisal for the Plaintiff's prior EEO activity in violation of the anti-retaliation provisions of Title VII. Again, the Plaintiff vehemently disputes the Defendant's assertion that she did not exhaust her administrative remedies with respect to Counts II and III of her complaint. As discussed previously, the Plaintiff met with an EEO counselor and subsequently filed an EEO complaint against the Agency in 1996 regarding the evaluations that were forwarded to the EEOC. *See* Def. Ex. 6. The failure of the Defendant's supervisor, Darwin Roberts, to counsel the Plaintiff regarding the "minimally successful" ratings she received was a "materially adverse" action as Mr. Roberts was aware of the Settlement Agreement and that pursuant to the Agreement, if the Plaintiff did not obtain at least a "fully successful" rating, dire consequences would result. *See* Def. Ex. 43, Affidavit of Darwin Roberts. The conduct of Darwin Roberts would have well dissuaded a reasonable worker from making or supporting a charge of discrimination as a result of EEO complaints and whistleblowing activity. The retaliatory animus of this "minimally successful" rating is quite evident with respect to each rating.

In the case of the evaluation from May 1994 to January 1995, Darwin Roberts, who was aware of the Plaintiff's protected disclosure regarding the credit cards, rated the Plaintiff "minimally successful" although he had been her supervisor for the previous two years and had never rated the Plaintiff less than "fully successful." *See* Complaint ¶12. After the Plaintiff made the disclosure to the Inspector General in September 1994, all of a sudden, she is denied sick leave by Mr. Roberts and the quality of her work is "minimally successful." *See* Complaint ¶17; Statement of Material Facts in Dispute, ¶2. Furthermore, Darwin

Roberts attempted to do a mid-year review, one month before the end of the rating period and Mr. Roberts only attempted to meet with the Plaintiff on a day before the Christmas holiday before the Office was being dismissed early.  *See* Statement of Material Facts in Dispute, ¶12. These facts demonstrate that Mr. Roberts really did not want to meet with the Plaintiff and therefore did not properly counsel the Plaintiff prior to rating her performance "minimally successful."

Furthermore, it is the Plaintiff's contention that the evaluation by Darwin Roberts may not be used to justify the Agency's termination of her federal employment pursuant to the Settlement Agreement as the Roberts evaluation was completed prior to the effective date of the Settlement Agreement.  *See* Statement of Material Facts in Dispute, ¶10.  The evaluation of Roberts was for the period of May 1994 to January 1995.  *Id*. at 10.  The Settlement Agreement did not become effective until February 1, 1995.  *Id*. at 10.  Therefore, any reliance on the evaluation of Darwin Roberts as justification for terminating the Plaintiff's employment is clearly erroneous and misplaced.

The retaliatory animus connected to the rating by Carol Keith is also clearly demonstrated.  Carol Keith affirms in her affidavit that she is not a supervisor, nevertheless, she completed the Plaintiff's performance evaluation.  *See* Def. Ex. 46, Affidavit of Carol Keith.  Furthermore, Ms. Keith did not discuss the Plaintiff's performance prior to the "minimally successful" rating.  *See* Statement of Material Facts in Dispute, ¶13.

Finally, as is the case with the evaluation completed by Darwin Roberts, it is the Plaintiff's contention that Ms. Keith's evaluation of the Plaintiff may not be used to justify the Agency's termination of the Plaintiff's federal employment pursuant to the Settlement Agreement as Ms. Keith did not have the authority to evaluate the Plaintiff.  *See* Statement of Material Facts in Dispute, ¶12.  The Civil Service Commission requires the preparation of notifications of personnel actions primarily to provide basic documentation of an individual's federal employment, to notify the employee of the personnel action, and to provide basic

13

records which will permit agencies and the Commission:

> (1) To determine the status and rights of employees as well as their eligibilities for promotion, transfer, re-employment, and other personnel actions.
>
> (2) To show whether personnel actions authorized or ordered have been effected, and whether actions effected have been authorized.
>
> (3) To expedite the payment of retirement refunds and annuities to persons separated from the service.

*National Treasury Employees Union et al v. Reagan*, 214 U.S. App. D.C. 62, 663 F.2d 239 (1981).

The Defendant never prepared a Notification of Personnel Action, SF-50, "detailing" the Plaintiff into the position in the Office of the Comptroller. Without the proper notification of personnel action, the Plaintiff was still appointed to the position of Administrative Officer in the Office of Inspector General and therefore, Carol Keith of the Office of the Comptroller had absolutely no authority to complete a performance evaluation on the Plaintiff. *See* Statement of Material Facts in Dispute, ¶12. The Plaintiff's appointment in the Office of the Inspector General, did not end until April 1996. Nevertheless, Ms. Keith completed a Performance evaluation that erroneously indicated that the Plaintiff's position title was that of a Budget Analyst GS-11. *See* Exhibit 4. Pursuant to the Settlement Agreement, the Defendant was to "detail" the Plaintiff into the position of Budget Analyst, GS-560 11/4. According to the Office of Personnel Management, in order to authorize a "detail," such action has to be documented with an SF-50. *See* Pl. Ex. 6. Thus, Ms. Keith did not have the authority to evaluate the Plaintiff, and therefore, the evaluation by Ms. Keith does not justify the termination of Plaintiff's employment pursuant to the Settlement Agreement.

The Plaintiff asserts that the Defendant's contention that it is entitled to summary judgment with respect to Counts II and III is erroneous and that the Defendant has failed to establish that Darwin Roberts actually counseled Plaintiff and provided her with feedback.

14

*See* Statement of Material Facts in Dispute, ¶12.  Defendant represents that Roberts attempted to meet with Plaintiff but there is not evidence that Roberts ever met with the Plaintiff regarding her performance.  As for the Keith evaluation, that evaluation is of no relevance as it was performed by someone who did not have the authority to evaluate the Plaintiff.  *See* Statement of Material Facts in Dispute, ¶14.  Furthermore, it is the Plaintiff's contention that Keith never met with her to discuss the evaluation prior to Keith performing the evaluation.  Neither supervisor addressed, before the rating, the quality of the Plaintiff's work prior to completing "minimally successful" ratings for Plaintiff.

**F.  No Notice Prior to Denial of Within-Grade Increase**

The Plaintiff contends that the Defendant's denial of her Within-Grade Increase was retaliatory under Title VII and was clearly erroneous.  For the reasons stated above, the evaluation of Carol Keith should not have been considered by the Defendant in its decision to deny the Plaintiff her Within-Grade Increase.  Further, the MOA 235.6 clearly states that if an employee is out on worker's compensation injury, there is a presumption that the employee would have performed satisfactorily and the employee is therefore eligible for her Within Grade Increase.  Def. Ex. 57.  It has been established that Plaintiff was on leave beginning on August 21, 1995 for an injury she sustained on the job.  Complaint ¶27.  Therefore, her performance was to be deemed satisfactory and she should have been granted her Within Grade Increase.  The Agency's decision to deny the Within Grade Increase was a retaliatory act.

**G.  Agency's Placement of Plaintiff on AWOL status**

The Plaintiff contends that the Defendant's placement of her on Absent Without Leave (AWOL) was a "materially adverse" act that was retaliatory under Title VII and clearly erroneous.   The Defendant asserts that the Plaintiff failed to submit medical documentation that she had sustained an on the job injury.  *See* Statement of Material Facts in Dispute, ¶9.  However, in the same testimony, the Defendant asserts that based on the Plaintiff's

15

submissions, a [Personnel Management Specialist] had no way of assessing whether the Plaintiff was injured at work. The statement is inherently contradictory; at one juncture, the Defendant contends that the Plaintiff failed to submit medical documentation and in the same statement, the Defendant contends that what the Plaintiff submitted was insufficient. Either the Plaintiff submitted the medical documentation or she did not and it is the Plaintiff's contention that she did submit the proper medical documentation. The Plaintiff further contends that it was inappropriate for the Defendant's Personnel Management Specials to determine whether the Plaintiff's submissions were sufficient. That determination should have been made by a medical doctor. This fact is also demonstrated by the OWCP's letter to the Defendant again advising the Agency that the Plaintiff's injury was supported by medical documentation. *See* Exhibit 5. As the foregoing shows, there are numerous disputes of material fact in this case. Accordingly, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

**CONCLUSION**

For the foregoing reasons, the Agency's Motion to Dismiss, or in the Alternative, for Summary Judgment, should be denied.

/S/
_____
CHARLES G. BYRD, JR.
Bar No. MD04388
Alston & Byrd
2518 Maryland Avenue
Baltimore, Maryland 21218
410-235-7811

Attorney for Plaintiff
Rose M. Dews-Miller

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROSE M. DEWS-MILLER,        *

      Plaintiff,            *

v.                          *     CASE NO. 06-1764 (GK)

CONDOLEEZZA RICE,        *
Secretary of State,
                       *

      Defendant.         *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE

1.     No Comment.

2.     The June 4, 1993 EEO complaint did not allege retaliation for reporting misuse of credit

cards by the Office of Inspector General (OIG).   Rather, the 1993 EEO complaint alleged

discrimination based on sex and age and retaliation for non-selection of the auditor

position under J. Richard Berman and Ann Young.  See Comp. ¶13.  My performance

rating of "fully successful" for May 1, 1992 to April 30, 1993 was the basis of my

September 7, 1993 EEO complaint.   My October 21, 1994 EEO complaint was based on

the May 1, 1993 to April 30, 1994 "fully successful" rating I received from Darwin

Roberts and reviewed by L.Leporatti and Robert's denial of my request for sick leave in

October 1994.

3.     I seriously dispute Defendant's characterization of the Settlement Agreement as a "Last

Chance" Settlement Agreement.  Such characterization implies that I had been previously

disciplined by my employer and such was not the case.  In a Good Faith effort to resolve

my pending EEO complaints, I entered into the Settlement Agreement in exchange for a detail into the Office of Comptroller (OC). However, despite the Agency's "promise", I was not detailed into the position of Budget Analyst in the OC with a Notification of Personnel Action (SF-50). By failing to detail me pursuant to the Settlement Agreement, Defendant breached the Settlement Agreement. Furthermore, I dispute Defendant's representation that the Administrative Judge supervised the Settlement Agreement. I clearly recall Administrative Judge Tietleman stating that he wanted nothing to do with the Settlement Agreement. My attorney did not explain the Settlement Agreement to me, he just told me to sign it. As discussed, earlier Administrative Law Judge did not approve the Settlement Agreement. If he approved the Agreement, arguably he would have also signed the Agreement.

4.    As discussed previously, I dispute Defendant's characterization that the Settlement Agreement was a "Last Chance" Settlement Agreement. I dispute that the Settlement Agreement afforded me training. The Settlement Agreement only provides that I receive training if recommended by the OC. See Def.Exh.1 ¶2. Although, I was never offered any training by the OC, I was nevertheless rated "minimally successful"by Carol Keith of the OC.

5.    Again, I was not detailed with a Notification of Personnel Action (SF-50) out of the Office of Inspector General (OIG) into the Budget Analyst position in the Office of Comptroller as provided by the Settlement Agreement. See Def. Exh. 1¶1. During the time that I worked in the OC, I was officially appointed to the position of Administrative Officer in the OIG. The Agency's failure to detail me pursuant to the Settlement Agreement, demonstrates breach of the Settlement Agreement. Further, the Agreement

was procedurally defective and thus invalid because it provided that I would have the duties of vacancy announcement #PDM-40-95 as opposed to an official position description.

6.    The Settlement Agreement did provide for Defendant's statement, but again, I dispute that I was detailed into the position of Budget Analyst in the OC. Therefore, the OC had no authority to perform an evaluation because during the time I was in the OC, I was an Administrative Officer assigned to the OIG. As a matter of fact, the OC interviewed applicants and made selections for the Budget Analyst position while I was working in the OC.

7.    I genuinely dispute that the OIG rated me once I returned to their Office. According to the Settlement Agreement, there should have been a six week evaluation during mid-September 1995 and a three month evaluation at the end of November 1995. The OIG did not perform either evaluation. The last evaluation I received from the OIG was from Darwin Roberts for the rating period ending January 24, 1995. Therefore, the Agency breached the Settlement Agreement yet again.

8.    I dispute that the Settlement Agreement precluded the filing of any future claims.

9.    I dispute that I was required to report to OC from September 5, 1994 to November 24, 1995. As evidenced by my SF-50, during September 5, 1994 to November 24, 1995, I was assigned to the OIG as an Administrative Officer. I was not present at work from August 21, 1995 to November 24, 1995 because I sustained an on the job injury deemed such by the Office of Workers Compensation Programs (OWCP). I further dispute that I failed to submit medical documentation that I sustained an on the job injury. The fact that

3

I submitted medical documentation is supported by Jeni Mallios' testimony that "based on Plaintiff's submissions..." Ex. 42, at pgs. 254, 256-7. To the contrary, I submitted doctor's certificates whenever they were requested by the Agency. Furthermore, Jeni Mallios was a Personnel Management Specialist for the OIG and Ms. Mallios was not qualified to determine if my medical documentation was sufficient. Finally, the OWCP instructed the Defendant Agency that my injury was compensable as an on the job injury and the Agency was responsible for paying me for my time. See Pl. Exh. ____.

10.    I dispute Defendant's statement that I did not receive a fully successful rating as required by the January 1995 settlement agreement in any of the offices that I was assigned. The performance evaluation for the period of May 1, 1994 to January 24, 1995 completed by Darwin Roberts was completed prior to the effective date of the Settlement Agreement, February 1, 1995. See Def. Exh. 1¶1. Therefore the May 1, 1994 to January 24, 1995 evaluation is not relevant for purposes of the Settlement Agreement.

11.    I dispute the "minimally successful" rating from Darwin Roberts as Mr. Roberts did not meet with me before completing the rating to discuss my alleged deficiencies and advising me of how he would assist me in improving my performance. See Complaint ¶28. Further, in the Fall of 1994, Mr. Roberts told me that if I kept doing the quality of work I was doing, my previous rating for the period of May 1, 1993 to April 30, 1994 of "fully successful" would improve. Please note that the next level beyond "fully successful" is "highly successful" and the highest level is "outstanding." Also, Mr. Roberts praised me for doing a good job with the budget submission for the OIG. Therefore, I believe I received the rating of "minimally successful" as retaliation for filing

4

EEO complaints and for disclosing the credit card abuse of OIG employees.

12.    Mr. Roberts requested to meet with me on the day of an early dismissal for the Christmas

holiday.  See Def. Exh. 42, EEOC hearing on Dec. 9, 2003, pg. 120.  I dispute that it was

my responsibility to reschedule another time as Mr. Roberts was the supervisor and

scheduling the meeting to discuss my performance was his responsibility.  Mr. Roberts

did praise me for doing good work during the rating period.  I dispute that I refused to

meet with Mr. Roberts to discuss the completed interim rating ending January 24, 1995.

Mr. Roberts had the completed evaluation delivered to me on July 20, 1995, nearly six (6)

months after the rating period ended.  Attached to the evaluation was a cover

memorandum indicating that Mr. Roberts was available to meet with me to discuss the

appraisal if I would like.  Therefore, Defendant's statement that I refused to meet with

Mr. Roberts is misleading and incorrect.

12.    I acknowledge that I received a "minimally successful" rating for the period February 1,

1995 to July 31, 1995 from Carol Keith of the OC.  However, I dispute that Ms. Keith

was authorized to complete my performance evaluation as I was never detailed to the

Budget Analyst position in the OC.  During the rating period of February 1, 1995 to July

31, 1995, I was assigned as an Administrative Officer in the OIG and therefore, Ms. Keith

had no authority to perform my evaluation for the subject time period.

13.    I dispute that Carol Keith of the OC was my rating official during the period of February

1, 1995 to July 31, 1995 as I was never detailed to the OC.  Therefore, I was appointed to

the position of Administrative Officer in the OIG during the subject rating period.  I also

dispute that Ms. Keith offered to speak with me about the rating and that I declined the

5

offer. Rather, after Ms. Keith gave me the "minimally successful" rating, she told me to "look it over and sign it." Ms. Keith also stated that she could tell that I was not happy with the performance evaluation and that "she would not change anything." Finally, Ms. Keith stated after giving me the evaluation, "You can take this evaluation and file a grievance, whatever you want, I DO NOT CARE because, again, I am not changing a thing." See Def. Exh. 45, Plaintiff's Affidavit, p. 7. Further, I dispute Defendant's representation of my testimony regarding the EEOC hearing on December 9, 2003. When I was asked at the hearing whether I agreed that Ms. Keith said "Rose Mary, if you want to discuss anything with me you can." My response was "No, it wasn't so much I can. She said she wasn't going to change anything and this is it." See Def. Ex. 42, transcript of December 9, 2003 EEOC hearing at 127-8. At no time prior to giving me a "minimally successful" rating did Ms. Keith discuss with me my performance other than to state that I was doing good work. Id. at 128. Also, Carol Keith testified that she offered to discuss the rating when she gave me the evaluation. Def. Ex. 46. However, the personnel regulations require that the discussion occur prior to the evaluation.

14.    I dispute that Carol Keith had the authority to evaluate me as she was an OC employee and I was an Administrative Officer in the OIG.

15.    I dispute the fact that the Defendant did not provide a complete copy of the MOA as Defendant has only provided the odd number pages between pages 1 and 65. Def. Ex. 49.

16.    The personnel regulations require that if a rating official is going to rate an employee "minimally successful", the rating official must provide the employee with notice of the alleged deficiencies, offer the employee with assistance to resolve the alleged deficiencies

6

and provided the employee with an opportunity to correct the alleged deficiencies.  See

Comp ¶28.

17.     As discussed previously, the evaluation of Darwin Roberts is not to be considered in

relation to the Settlement Agreement as the rating period for that evaluation ended

(January 24, 1995) before the Settlement Agreement became effective on February 1,

1995.  Notwithstanding, Mr. Roberts praised me for the quality of work that I did during

the rating period therefore, I believe the "minimally successful" rating was retaliation for

the disclosures I made regarding credit card abuse in the OIG and my EEO activity.  As

for the evaluation of Carol Keith, as previously discussed, that evaluation should not be

considered in connection with the Settlement Agreement because Ms. Keith lacked the

authority to rate my performance.  During the period of February 1, 1995 to July 31,

1995, Ms. Keith was employed with the OC and I was employed in a completely separate

office as an Administrative Officer with the OIG.

18.     After the effective date of the Settlement Agreement on February 1, 1995, the first

Notification of Personnel Action that the Defendant Agency USIA processed was the SF-

50 converting my career appointment of twenty-three (23) years to a temporary

appointment not to exceed one year.  Although the action was initiated in December

1995, the SF-50 was not processed until January 18, 1996 and I did not receive it until

February 1, 1996.  Despite the procedural requirements, I was not provided with notice of

this adverse personnel action.  See Complaint ¶34.  Although a Notification of Personnel

Action was required to begin my detail to the OC and to terminate my detail in the OC, I

did not receive any such actions.

7

19.   I acknowledge receipt of the letter from the Defendant USIA Office of Personnel.

20.   I acknowledge that I was denied a within grade increase. I further assert that Defendant
      USIA did not comply with personnel procedural requirements in denying my within grade
      increase. Defendant USIA was to evaluate my performance after one year to determine
      whether my performance was acceptable so that I could receive a within grade at that
      time. The Defendant failed to evaluate my performance after one year.

21.   The Within Grade Increase provisions indicate that being on workers compensation
      constitutes a presumption that the employee has performed satisfactorily. If the employee
      submits a request for reconsideration, the Agency has 30 days to respond and if the
      Agency is unable to respond within the 30 days, it is the responsibility of the Agency to
      notify the employee that it will not be able to respond in 30 days.

22.   I dispute that I was assigned to several offices within the USIA prior to being terminated
      in December 1996. As previously discussed, my appointment with the OIG did not end
      until April 1996 when the USIA OIG was transferred to the U.S. Department of State.
      After which, I was appointed to the Office of General Counsel until December 1996. For
      the reasons previously discussed, namely the absence of a SF-50, I was never transferred
      to the Office of the Comptroller. I also assert that Defendant Agency did not give me
      notice prior to terminating my employment.

23.   Subsequent to the January 1995 Settlement Agreement, I filed a complaint with the Merit
      Systems Protection Board (MSPB) who ruled that it lacked subject matter jurisdiction.
      The MSPB decision was appealed to the United States Court of Appeals that affirmed
      that the MSPB did not have subject matter jurisdiction. I also filed an EEO charge in

8

March 1996 against the Defendant Agency.

24.    I acknowledge that I complained to the Defendant Agency that it had breached the

Settlement Agreement and the Agency responded by asserting that it had complied with

the terms of the Settlement Agreement.

25.    No comment.

26.    I dispute that I had more than one hearing before the EEOC.  The only hearing I had

before the EEOC was the hearing on December 9, 2003.  A EEOC hearing was scheduled

in 2002 but the Administrative Judge did not appear.

27.    No comment.

28.    No comment.

29.    No comment.

30.    No comment.

31.    I responded to the EEOC's Right to Sue Letter by filing a complaint in the United States

District Court for the District of Columbia.

32.    No comment.

33.    When the Office of Special Counsel (OSC) denied my request for reconsideration, it did

not advise me that I had a certain period of time in which to file with the Merit Systems

Protection Board.  See Def. Exh. 24.

34.    No comment.

35.    The MSPB dismissed my Individual Right of Action based on their ruling that they did

not have subject matter jurisdiction.

9

I declare under the penalty of perjury that the foregoing is true and correct to the best of my information and belief.


_December 10, 2007_                     _Rose M. Dews-Miller_
Date                                           Rose M. Dews-Miller

# EXHIBIT 1

Westlaw.

194 F.3d 1330

194 F.3d 1330, 1999 WL 129642 (C.A.Fed.)
(Cite as: 194 F.3d 1330, 194 F.3d 1330 (Table))

Page 1

H
Miller v. U.S. Information Agency
C.A.Fed.,1999.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a "
Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTAF
Rule 47.6 for rules regarding the citation of
unpublished opinions.)
     United States Court of Appeals, Federal Circuit.
     Rose Mary DEWS-MILLER, Petitioner,
                         v.
     UNITED STATES INFORMATION AGENCY,
                   Respondent.
                   No. 99-3005.

                 March 10, 1999.

Before RICH, RADER, and GAJARSA, Circuit
Judges.

PER CURIAM.
*1 Rose Mary Dews-Miller appeals from a decision
of the Merit Systems Protection Board (MSPB or
Board), No. DC-1221-98-0147-W-1, dismissing her
Individual Right of Action (IRA) appeal for lack of
subject matter jurisdiction. We *affirm*.

In June 1993 Ms. Dews-Miller filed a complaint
with the Equal Employment Opportunity
Commission (EEOC), alleging that she was not
promoted from administrative officer to an auditor
position within the United States Information
Agency (USIA) Office of Inspector General (OIG)
because of racial and gender discrimination. In
September 1993 and October 1994, after receiving
several "minimally successful" performance ratings,
Ms. Dews-Miller filed two additional EEOC
complaints, alleging discrimination against her

based on her race, gender, and her previously-filed
EEOC complaints.

In January 1995 Ms. Dews-Miller and USIA
entered into a settlement agreement in which she
agreed to withdraw all of her EEOC complaints. In
return, Ms. Dews-Miller was to be detailed to the
Office of the Comptroller (O/C) as a Budget
Analyst. If her performance was rated at least "
fully successful" after six months, the detail would
be made permanent. Under the agreement, if Ms.
Dews-Miller's performance rating was less than
fully successful, the agreement provided for her to
be placed in an appropriate position, outside OIG if
possible, with three months' probation. The
agreement stated that if Ms. Dews-Miller was
placed in OIG and received a rating of at least fully
successful at the end of the three-month
probationary period, she would be retained, but that
if she received a lower rating, she agreed to be
transferred to a temporary position and resign
within one year. Ms. Dews-Miller was represented
by counsel during the settlement negotiation.

Ms. Dews-Miller was detailed to O/C from
February 1995 through August 1995. At the end of
this detail, Ms. Dews-Miller was rated by O/C as "
minimally      successful."      Consequently,      Ms.
Dews-Miller's assignment was not made permanent
and she was offered a three-month probationary
position at OIG, scheduled to begin in September
1995.

Ms. Dews-Miller did not report to the probationary
assignment until the last week of the three-month
probationary period (although Ms. Dews-Miller
asserted that she had been absent due to an injury,
OIG considered her to have been absent without
leave). When she reported for work, Ms.
Dews-Miller requested that she be placed in the
one-year temporary position described in the
settlement agreement. USIA agreed, and Ms.
Dews-Miller was placed in the temporary position
in December 1995. One year later, the temporary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 F.3d 1330, 1999 WL 129642 (C.A.Fed.)
(Cite as: 194 F.3d 1330, 194 F.3d 1330 (Table))

position expired and, when Ms. Dews-Miller did not voluntarily resign, her employment was terminated.

Another incident occurred during this period of time that Ms. Dews-Miller asserts is relevant to her IRA appeal. In September 1994 Ms. Dews-Miller reported what she considered to be abuses of OIG American Express (AMEX) travel cards by OIG staff to OIG management. In December 1995, when she began working in the one-year temporary position, Ms. Dews-Miller initiated a whistleblower complaint, alleging that she had been denied a within-grade increase (WGI), had been placed in absent without leave (AWOL) status, and had suffered a significant change in her duties and responsibilities (i.e., placed in the temporary position) in retaliation for her AMEX disclosure. When the temporary position expired and Ms. Dews-Miller was terminated, she alleged that this termination was another act of retaliation. The Office of Special Counsel (OSC) investigated and concluded that Ms. Dews-Miller's complaints were without merit, stating that there was no connection between Ms. Dews-Miller's asserted whistleblowing report and the complained-of actions. OSC stated that the officials responsible for the actions about which Ms. Dews-Miller complained were neither the subject of nor affected by her AMEX abuse allegation, and that there was no evidence reflecting animus against Ms. Dews-Miller by the officials responsible for the actions.

*2 After OSC closed its whistleblower investigation in August 1997, Ms. Dews-Miller appealed her termination to the MSPB.[FN1] The administrative judge noted that Ms. Dews-Miller's termination appeared to be in accordance with the settlement agreement and issued an order to show cause as to why Ms. Dews-Miller's appeal should not be dismissed for lack of jurisdiction. In response, Ms. Dews-Miller asserted that USIA had breached the agreement and that the agreement was invalid.

>      FN1. In her IRA appeal, Ms. Dews-Miller did not argue that the OSC's conclusions concerning her WGI- and AWOL-based allegations were incorrect.

The administrative judge ruled that the MSPB lacks jurisdiction to hear Ms. Dews-Miller's IRA appeal, because she failed to show that USIA had taken a " personnel action" with regard to her employment, as defined in 5 U.S.C. § 2302(a)(2), in retaliation for her asserted whistleblowing activity. The administrative judge determined that the "action" taken against Ms. Dews-Miller was solely the result of the agency's compliance with the terms of the settlement agreement, and that the agreement was valid.

The administrative judge's decision became final following the full Board's denial of Ms. Dews-Miller's petition for review. Ms. Dews-Miller appeals.

We must affirm the Board's decision to dismiss Ms. Dews-Miller's appeal unless she establishes that the decision is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having been followed; or (3) unsupported by substantial evidence. *Serrao v. Merit Sys. Protection Bd.,* 95 F.3d 1569, 1573 (Fed.Cir.1996) (quoting 5 U.S.C. § 703(c) (1994)). The jurisdiction of the Board is limited to those matters specifically entrusted to it by statute or regulation. *See id.*A petitioner has the burden of establishing MSPB jurisdiction by a preponderance of the evidence. *See id.*Whether the Board has jurisdiction is a question of law that we review *de novo.See id.*

To establish the Board's jurisdiction over her IRA appeal, Ms. Dews-Miller had to show by a preponderance of the evidence that (1) she engaged in whistleblowing activity by making a "protected disclosure" as defined in 5 U.S.C. § 2302(b)(8); (2) the agency took or threatened to take a "personnel action" against her as defined in 5 U.S.C. § 2302(a)(2)(A); (3) she sought corrective action from OSC; and (4) she exhausted corrective action proceedings before OSC. *See id.* at 1574 (citing *Mintzmyer v. Department of Interior,* 84 F.3d 419, 422 (Fed.Cir.1996)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

194 F.3d 1330                                                                Page 3

194 F.3d 1330, 1999 WL 129642 (C.A.Fed.)
**(Cite as: 194 F.3d 1330, 194 F.3d 1330 (Table))**

On appeal, Ms. Dews-Miller argues that the MSPB has jurisdiction to hear her IRA appeal because she was terminated as a reprisal for her asserted whistleblowing activities. We are not persuaded. As we discuss below, the administrative judge was correct in concluding that Ms. Dews-Miller was terminated pursuant to a valid settlement agreement. We first discuss the validity of the settlement agreement.

*3 The party challenging the validity of a settlement agreement bears the heavy burden of showing that a party to the agreement fraudulently induced her to enter the agreement or that there was a mutual mistake under which both parties acted. *Harris v. Department of Veterans Affairs,* 142 F.3d 1463, 1468 (Fed.Cir.1998). Ms. Dews-Miller has not met this burden.

Ms. Dews-Miller was represented by counsel during the settlement negotiations. She alleges that her attorney "sacrificed Petitioner in order to 'win' cases in which he was 'representing' other OIG employees in their complaints...." For proof of this alleged unethical behavior, Ms. Dews-Miller points to a clause in the agreement stating that she agrees not to seek reimbursement of attorney fees that she incurred.

The administrative judge found that "the appellant impugned the ethics of the attorney who represented her at the time of the settlement" but that "the settlement agreement appears on its face to be valid and lawful, and the appellant has made no allegations supported by facts which, if proven, could show that the settlement agreement was unlawful, involuntary, or was the result of fraud or mutual mistake."We agree. Even if Ms. Dews-Miller's allegations concerning her attorney are taken as true, they do not indicate that USIA fraudulently induced her to enter the agreement. Consequently, we conclude that the settlement agreement is valid.[FN2]

> FN2. Ms. Dews-Miller has also not alleged any facts that would, if true, indicate that the agreement is illegal on it face, that she did not voluntarily enter the agreement, or

that the parties entered the agreement by a mutual mistake.

We come to the issue of whether Ms. Dews-Miller was terminated as a reprisal for her asserted whistleblowing activities or as a consequence of her entering the settlement agreement. The administrative judge concluded that Ms. Dews-Miller was terminated pursuant to the settlement agreement. We agree.

Ms. Dews-Miller does not dispute that she voluntarily worked on the six-month O/C detail, or that the "minimally successful" rating she received at the conclusion of the detail was improper. Under the settlement agreement, she was to be placed in a three-month probationary position within USIA if her O/C performance rating was less than "fully successful." Therefore, her placement in the three-month probationary position in OIG was proper.

Ms. Dews-Miller was entitled to receive a performance rating at the conclusion of the probationary period. Ms. Dews-Miller neither disputes that she requested that she be assigned to the temporary position nor that this request constitutes a waiver of her right to that performance rating. Once USIA agreed to this request and assigned Ms. Dews-Miller to the temporary position, she was obligated under the terms of the settlement agreement to resign "not later than the end of that temporary position," which is stated in the agreement "not to exceed one year" in length. Therefore, when Ms. Dews-Miller refused to resign after one year in the temporary position, it was she, not USIA, who was in breach of the agreement, and USIA was justified in terminating her.

*4 Given the undisputed facts, we conclude that Ms. Dews-Miller was terminated in compliance with the terms of the settlement agreement, and not in reprisal for her asserted whistleblowing activities. Because this termination is not a "personnel action" as defined in the relevant statute, the MSPB did not have jurisdiction to hear Ms. Dews-Miller's IRA appeal. The administrative judge therefore properly dismissed her IRA appeal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 19848
Washington, D.C. 20036          *rcvd 6·26·99*

Rose M. Dews-Miller           )
          Appellant,          )
                              )
              v.              )         Appeal No. 01983674
                              )         Agency No. OCR-9615
Joseph D. Duffey,             )
Director,                     )
United States Information     )
Agency,                       )
          Agency.             )
_____)

### DECISION

#### INTRODUCTION

Appellant filed an appeal with this Commission from a final agency decision (FAD) concerning her complaint of unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. The final agency decision was dated March 6, 1998. The appeal was postmarked on April 8, 1998. The timely[1] appeal, therefore, is accepted in accordance with EEOC Order No. 960.001, as amended.

#### ISSUES PRESENTED

The issues are whether the agency properly dismissed an allegation of appellant's complaint for mootness, and also whether the agency properly denied EEO Counseling for other allegations, separate from appellant's complaint, for asserting the same claim as the allegation in appellant's complaint.

#### BACKGROUND

In her formal complaint, dated March 28, 1996, appellant alleged discrimination on the basis of reprisal (prior EEO complaints). In one of her allegations, appellant asserted that the agency discriminated against her when she was placed on Absence Without Leave (AWOL)(Allegation 3). In the FAD, the agency partially dismissed appellant's complaint. Specifically, the agency dismissed Allegation 3 for mootness. The agency stated that appellant alleged that:

_____

[1] The agency did not supply a copy of a certified mail return receipt or any other material capable of establishing the date appellant received the FAD. Since the agency failed to submit evidence of the date of receipt, the Commission presumes that appellant's appeal was filed within thirty (30) days of receipt of the agency's final decision. See 29 C.F.R. §1614.402(a).

PAGE 13 OF 25

2                          01983674
                           OCR-9615

From September 5, 1995 through November 24, 1995, [she was]
placed on [AWOL] for a work injury. [She] reported the work
injury to [her] immediate supervisors (Rating and Reviewing
Officers), pursuant to MOA, Part V-A, Section 506.3(c)(1).
However, the Management Official who placed [her] on AWOL was
not [her] supervisor at the time of the work injury.

The agency dismissed this allegation as moot because: 1) there was
no reasonable expectation that the alleged violations would recur;
and 2) the agency eradicated the effects of the alleged violation
because it issued appellant a disability check covering her wages
from October 4, 1995 to November 26, 1995 and a payment was
pending, awaiting a form from appellant, for her wages from August
21, 1995 through October 3, 1995.

In the FAD, the agency also denied EEO Counseling for separate
allegations (Allegations A through F) brought by the appellant.
According to the agency, appellant requested EEO counseling, by
letters dated November 6, 1997 and by faxed messages dated December
12, 1997 and February 27, 1998, for the same work injury claim as
discussed in Allegation 3. The FAD concluded, therefore, that
Allegations A through F stated the same claim as Allegation 3,
which was processed in accordance with EEOC Regulations, and,
therefore, denied appellant's request for counseling on Allegations
A through F. This appeal followed.

Appellant's November 6, 1997 letter, as contained in the record,
requests EEO counseling on the following matters:

   a) continued and continuous harassment by [A-1, an
   employee in the Office of Human Resources,] and
   others, who participated in creating a "hostile
   environment" in any personnel action, benefit, and
   entitlement for [her]self after filing prior EEO
   complaints (Allegation A); b) invasion of [her]
   personal medical records obtained from the Office
   of Worker's Compensation Programs (OWCP) and then
   communicated to others in USIA who had no right to
   their contents (Allegation B); c) withholding
   essential records from OWCP from November 1995 to
   January 1997, which caused an unwarranted delay in
   the processing of [her] claim (Allegation C); d)
   failure of A-1 to correct [her] earnings and leave
   statements to reflect C.O.P. instead of A.W.O.L.
   (Allegation D); e) [A-1]'s illegal and unethical
   discussion of [her] medical files with other
   unqualified persons in USIA (Allegation E); f)

3                          C19Ā3674
                           OCR-9615

[Her] non-accumulation[2] under the Rehabilitation Act
of  1973,...which  requires  federal  agencies  to
develop  and  implement  plans  for  the  hiring,
placement, promotion and retention of persons with
disabilities (Allegation F).

## ANALYSIS AND FINDINGS

EEOC Regulation 29 C.F.R. §1614.107(e) allows for the dismissal of
a complaint or allegations therein when the issues raised are moot.
To determine whether the issues raised in appellant's complaint
are, in fact, moot, it must be ascertained: (1) if it can be said
with assurance that there is no reasonable expectation that the
alleged violation will recur; and (2) if interim relief or events
have completely and irrevocably eradicated the effects of the
alleged discrimination.  When such circumstances exist, no relief
is available and no need for a determination of the rights of the
parties is presented.  See Hill v. United States Postal Service,
EEOC Request No. 05960289 (January 16, 1997)(citing County of Los
Angeles v. Davis, 440 U.S. 625, 631 (1979)).

We disagree with the agency's conclusion that Allegation 3 is moot.
The agency reimbursed appellant for wages lost during the period
that she was placed on AWOL.  They have not, however, completely
and irrevocably eradicated the effects of the discrimination
because they have not shown that the AWOL has been expunged from
her records.  We find, therefore, that appellant's Allegation 3 is
not moot.

EEOC Regulation 29 C.F.R. §1614.107(a) provides that the agency
shall dismiss a complaint or a portion of a complaint that states
the same claim that is pending before or has been decided by the
agency or Commission.

We find that the agency improperly denied appellant the counseling
that she requested in her November 6, 1997 letter.  All employees
of an agency have a right to counseling when they feel that they
have been discriminated against.  The agency, at the pre-counseling
stage, may not dismiss a matter on which an employee seeks
counseling on the grounds that it states the same claim as a matter
pending before the agency.  EEOC Regulation 1614.107(a) does not
contemplate such a determination by the agency until after a formal
complaint has been filed.  In the instant case, the agency was

---

[2]  Appellant  provides  no  explanation  of  this  term  in  her
letter,  nor  can  an  explanation  of  the  phrase  be  found  in  the
record.

4                    01983674
                     OCR-9615

incorrect to deny counseling on the matters raised by appellant's letter.³

CONCLUSION

It is the decision of the Commission to REVERSE the FAD and to REMAND appellant's complaint in accordance with this decision and the applicable regulations. For timeliness purposes, the date that the November 6, 1997 letter was received by the agency should be considered the date that appellant initially sought counseling on Allegations A through F.

ORDER (E1092)

The agency is ORDERED to provide appellant with EEO Counseling for Allegations A, B, C, E and F. The agency shall allow appellant to file a formal complaint on the aforementioned allegations after they have been counseled. In accordance with 29 C.F.R. §1614.107, the agency shall issue a final agency decision if it determines that any of the allegations warrant dismissal.

The agency is ORDERED to process the Allegation 3 in accordance with 29 C.F.R. §1614.108. The agency shall acknowledge to the appellant that it has received the remanded allegation within thirty (30) calendar days of the date this decision becomes final. The agency shall issue to appellant a copy of the investigative file and also shall notify appellant of the appropriate rights within one hundred fifty (150) calendar days of the date this decision becomes final, unless the matter is otherwise resolved prior to that time. If the appellant requests a final decision without a hearing, the agency shall issue a final decision within sixty (60) days of receipt of appellant's request.

A copy of the agency's letter of acknowledgment to appellant and a copy of the notice that transmits the investigative file and notice of rights must be sent to the Compliance Officer as referenced below.

IMPLEMENTATION OF THE COMMISSION'S DECISION (K0595)

Compliance with the Commission's corrective action is mandatory. The agency shall submit its compliance report within thirty (30) calendar days of the completion of all ordered corrective action. The report shall be submitted to the Compliance Officer, Office of Federal Operations, Equal Employment Opportunity Commission, P.O.

---

³ We do note, however, that Allegation D relates to Allegation 3 and therefore would be covered under the complaint issued herein.

5                          01983674
                           OCR-9615

Box 19848, Washington, D.C.  20036.  The agency's report must
contain supporting documentation, and the agency must send a copy
of all submissions to the appellant.  If the agency does not comply
with the Commission's order, the appellant may petition the
Commission for enforcement of the order.  29 C.F.R. § 1614.503 (a).
The appellant also has the right to file a civil action to enforce
compliance with the Commission's order prior to or following an
administrative petition for enforcement.  See 29 C.F.R. §§ 1614.408,
1614.409, and 1614.503 (g).  Alternatively, the appellant has the
right to file a civil action on the underlying complaint in
accordance with the paragraph below entitled "Right to File A Civil
Action."  29 C.F.R. §§ 1614.408 and 1614.409.  A civil action for
enforcement or a civil action on the underlying complaint is
subject to the deadline stated in 42 U.S.C. §2000e-16(c)(Supp. V
1993).  If the appellant files a civil action, the administrative
processing of the complaint, including any petition for
enforcement, will be terminated.  See 29 C.F.R. § 1614.410.

### STATEMENT OF RIGHTS - ON APPEAL

#### RECONSIDERATION (M0795)

The Commission may, in its discretion, reconsider the decision in
this case if the appellant or the agency submits a written request
containing arguments or evidence which tend to establish that:

    1.   New and material evidence is available that was not
         readily available when the previous decision was
         issued; or

    2.   The previous decision involved an erroneous
         interpretation of law, regulation or material fact,
         or misapplication of established policy; or

    3.   The decision is of such exceptional nature as to
         have substantial precedential implications.

Requests to reconsider, with supporting arguments or evidence, MUST
BE FILED WITHIN THIRTY (30) CALENDAR DAYS of the date you receive
this decision, or WITHIN TWENTY (20) CALENDAR DAYS of the date you
receive a timely request to reconsider filed by another party.  Any
argument in opposition to the request to reconsider or cross re-
quest to reconsider MUST be submitted to the Commission and to the
requesting party WITHIN TWENTY (20) CALENDAR DAYS of the date you
receive the request to reconsider.  See 29 C.F.R. §1614.407.  All
requests and arguments must bear proof of postmark and be submitted
to the Director, Office of Federal Operations, Equal Employment
Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036.  In
the absence of a legible postmark, the request to reconsider shall
be deemed filed on the date it is received by the Commission.

6                    01983674
                     OCR-9615

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely.  If extenuating circumstances have prevented the timely filing of a request for reconsideration, a written statement setting forth the circumstances which caused the delay and any supporting documentation must be submitted with your request for reconsideration.  The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances.  See 29 C.F.R. §1614.604(c).

## RIGHT TO FILE A CIVIL ACTION (R0993)

This is a decision requiring the agency to continue its administrative processing of your complaint.  However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court.  It is the position of the Commission that you have the right to file a civil action in an appropriate United States District Court WITHIN NINETY (90) CALENDAR DAYS from the date that you receive this decision.  You should be aware, however, that courts in some jurisdictions have interpreted the Civil Rights Act of 1991 in a manner suggesting that a civil action must be filed WITHIN THIRTY (30) CALENDAR DAYS from the date that you receive this decision.  To ensure that your civil action is considered timely, you are advised to file it WITHIN THIRTY (30) CALENDAR DAYS from the date that you receive this decision or to consult an attorney concerning the applicable time period in the jurisdiction in which your action would be filed.  In the alternative, you may file a civil action AFTER ONE HUNDRED AND EIGHTY (180) CALENDAR DAYS of the date you filed your complaint with the agency, or filed your appeal with the Commission.  If you file a civil action, YOU MUST NAME AS THE DEFENDANT IN THE COMPLAINT THE PERSON WHO IS THE OFFICIAL AGENCY HEAD OR DEPARTMENT HEAD, IDENTIFYING THAT PERSON BY HIS OR HER FULL NAME AND OFFICIAL TITLE.  Failure to do so may result in the dismissal of your case in court.  "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.  Filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z1092)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security.  See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§791, 794(c).  The grant or denial of the request is within the sole discretion of the Court.  Filing a

7                        01983674
                         OCR-9615

request for an attorney does not extend your time in which to file
a civil action. Both the request and the civil action must be
filed within the time limits as stated in the paragraph above
("Right to File A Civil Action").

FOR THE COMMISSION:

JUN 2 3 1999

_____

Date

_____
Carlton M. Hadden, Acting Director
Office of Federal Operations

19  25

# EXHIBIT 3

# U.S. DEPARTMENT OF STATE

## REPORT OF INVESTIGATION

| | | |
|---|---|---|
| **TITLE:** | **CASE:** | **DATE:** |
| **DEWS-MILLER**, Rose Mary | 00-19 | August 31, 2001 |
| Former USIA Administrative | | |
| Officer, GS-13, | | |
| US Information Agency | **CONTRACTOR:** | |
| Post Office Box 863 | *Southwind* | |
| Clinton, MD 20735-0863 | | |
| | **INVESTIGATOR:** | |
| v. | Ruth A. Pierce | |
| US Department of State | **TYPE OF INVESTIGATION:** | |
| Washington, DC | Complaint of discrimination | |
| | based on reprisal. | |

## I.  Claim

Complainant alleges discrimination on the basis of reprisal for prior EEO activity when she was subjected to:

1)  Continued and continuous harassment by an employee in the Office of Human Resources and others who participated in creating a "hostile environment" in any personnel action, benefit or entitlement for her after filing prior EEO complaints;

2)  Invasion of her personal records obtained from OWCP and then communicated to others in USIA who had no right to their contents;

3)  Withholding of essential records from OWCP from November 1995 to January 1997 which caused an unwarranted delay in processing her claim;

4)  An employee's illegal and unethical discussion of her medical files with other unqualified persons in USIA and

5)    Her non-accommodation under the Rehabilitation Act of 1973
(P.L. 93-112, as amended), which requires Federal agencies to
develop and implement plans for the hiring, placement,
promotion and retention of persons with disabilities (Allegation
F).

**Remanded claim from June 23, 1999**

6)    That due to reprisal, (previous EEO activity), Complainant was
discriminated against when:

From September 5, 1995 through November 24, 1995, she was
placed on AWOL for a work injury. She reported the work
injury to her immediate supervisors, (Rating and reviewing
officers) pursuant to MOA, Part V-1, Section 506.3(c)(1).
However the Management Official who placed her on AWOL
was not her supervisor at the time of the work injury.

## II.    Summary

The United States Information Agency (USIA) Office of Inspector
General (OIG) (Exhibit 5) formerly employed complainant as an
Administrative Officer, GS-11. As the result of a settlement agreement
of two complaints Complainant filed against USIA on June 4 and
September 7, 1993, Complainant and the agency agreed would be
detailed from the OIG to the Office of the Comptroller (M/C) as a
Budget Analyst GS-11 for a period of six months. If at the end of six
months, Complainant attained a rating of at least fully successful, she
would be retained in M/C in the same or comparable position.
However, if her performance at the end of six months were not fully
successful, the Office of Personnel would attempt to place
Complainant in an appropriate position in a non-OIG unit with three
months probation or if no such position were available, OIG would
retain Complainant in a three-month probationary period. If
Complainant returned to OIG but did not earn a rating of at least fully
successful at the end of the three-month period, she would be
transferred to a temporary position not to exceed (NTE) one year, at

which time Complainant agreed to resign from USIA. The parties
signed the settlement agreement in January 1995. (Exhibit 9-1)
On August 26, 1995, Complainant requested Continuation of Pay for
an indefinite period of time resulting from complications of what she
described as a work related injury suffered on July 10, 1995.
Complainant was asked to provide medical documentation to support
her request. While Complainant subsequently did provide some
documentation, it did not provide a diagnosis and prognosis, and
additional documentation was sought. Complainant was placed in
AWOL status. (Exhibit 9-3)

In an August 31, 1995, letter, the agency formally advised Complainant
that, as she had failed to achieve an overall appraisal rating of fully
successful, her detail to M/C had ended, and she was to return to the
position of Administrative Officer, OIG. The Office of Personnel
offered assistance to Complainant in finding another position (Exhibit
9-2). On December 10, 1995, Complainant's appointment was
converted to a temporary appointment NTE December 9, 1996 (Exhibit
19). She was given a temporary appointment to OGC on April 28, 1996
(Exhibit 21). Her temporary appointment expired on December 9,
1996, and her employment terminated (Exhibit 22).

Complainant filed a formal complaint on March 28, 1996, docket
number OCR 96-15. She also requested EEO counseling in letters
dated November 6, 1997 and faxed messages dated December 12, 1997
and February 27, 1998. The agency issued a Final Agency Decision
(FAD) on March 6, 1998, Claim 3 (same as Claim 6 above) was
dismissed as moot. The FAD also denied counseling on a matter
considered the same as a claim that had been accepted for processing
in a July 31, 1996, agency letter of acceptance (Exhibit 10).
Complainant appealed the decision to the EEOC, and in a June 23,
1999, decision, the EEOC disagreed with the dismissal for mootness of
the claim on the basis that, while the agency had demonstrated
Complainant had been paid for the time charged to AWOL, it had not
demonstrated the AWOL charge had been expunged from
Complainant's records. That claim appears as Claim 6 in this ROI.
See Exhibit 1, beginning at page 13.

By letter dated September 30, 1999, the agency notified Complainant's
representative that Complainant's time cards had been amended

00-19                              3                    **Personnel Sensitive**

changing the AWOL to COP for the period August 21 to October 3, 1995 (Exhibit 14). The amended time cards are shown in Exhibit 26-17.

EEOC further ordered the agency to provide counseling to Complainant on the additional claims she sought to raise to counseling, as an agency may not deny counseling on the grounds that a claim states the same claim as a matter pending before the agency. Rather, such a determination is made after a formal complaint has been filed. Id.

An investigation of the accepted claims was conducted in 1996, and on January 19, 1999, the agency issued a FAD on the claims that had been investigated, with a finding of no retaliation (Exhibit 11).

Complainant entered EEO counseling on November 7, 1997 and received additional counseling on April 25, 2000 based on a remand from EEOC. (Exhibit 2) Resolution was not achieved, and the Notice of The Right to File (NTRF) was provided on August 11, 2000 (Exhibit 2). Complainant filed a formal complaint on August 23, 200, which she amended on October 30, 2000 (Exhibit 1).

On January 26, 2001 (Exhibit 3), the U.S. Department of State, which had absorbed the former USIA and thereby assumed responsibility for processing of USIA EEO complaints, accepted for investigation the following claims of reprisal for prior EEO activity:

1)    Continued and continuous harassment by an employee in the Office of Human Resources and others who participated in creating a "hostile environment" in any personnel action, benefit or entitlement for her after filing prior EEO complaints (Allegation A);

2)    Invasion of her personal records obtained from OWCP and then communicated to others in USIA who had no right to their contents (Allegation B);

3)    Withholding of essential records from OWCP from November 1995 to January 1997 which caused an unwarranted delay in processing her claim (Allegation C);

4)    An employee's illegal and unethical discussion of her medical files with other unqualified persons in USIA (Allegation E); and

5)    Her non-accommodation under the Rehabilitation Act of 1973 (P.L. 93-112, as amended), which requires Federal agencies to develop and implement plans for the hiring, placement, promotion and retention of persons with disabilities (Allegation F).

**Remanded claim from June 23, 1999**

6)    From September 5, 1995 through November 24, 1995, she was placed on AWOL for a work injury. She reported the work injury to her immediate supervisors, (Rating and reviewing officers) pursuant to MOA, Part V-1, Section 506.3(c)(1). However the Management Official who placed her on AWOL was not her supervisor at the time of the work injury.

**Claim 1.   Continued and continuous harassment by employees in the Office of Human Resources and others who participated in creating a "hostile environment" in any personnel action, benefit, and entitlement for her after filing prior EEO complaints (Allegation A);**

Complainant refers to a document at Exhibit 5-1 that she states outlines the alleged acts of harassment she perceives were committed against her by OHR employees and others (Exhibit 5). Complainant claims the harassment activity resulted from "whistle blowing" activity on her part in September 16, 1994 when she reported OIG employees' misuse of American Express Cards issued by the Government. She states she raised her concerns to managers in USIA as well as officials outside USIA but nothing resulted. She says she has evidence to support her position, but it was too much to copy; therefore, she did not provide it to the investigator.

Exhibit 5-1, Page 12, contains entries pertaining to Jenny Mallios, Office of Personnel, OHR. The entries dated 8/31-9/16/95 refer to inquiries Ms. Mallios made of Complainant as to when she would return to work and informing her she was to report back to the OIG on

her return.  Page 12 also contains a 9/6/95 entry regarding a conversation with Ann Young, former Assistant Inspector General regarding Complainant's return to OIG and the intent to charge Complainant with AWOL unless she provided medical documentation. Page 13 of the document contains entries indicating Complainant provided Ms. Mallios and Ms. Young with copies of her doctors' certificates.  An entry on that page dated 9/28/95 indicates Complainant's first knowledge of having been placed on AWOL.

Exhibit 5-1, page 13 shows an entry dated 10/29/95 referring to the denial of Complainant's within grade increase, which she says occurred without prior written notification. Page 14 of the document contains an entry dated 11/28/95 showing Complainant filed a reconsideration request for the within grade denial.  She received a denial of the reconsideration from Janice Brambilla, Director of Personnel on 4/2/96.  She notes she filed an EEO complaint on 3/26/96, five days prior to the denial. (Exhibit 5-1)

Exhibit 5-1, page 15 has a series of entries outlining activity pertaining to Complainant's return to OIG or placement to another location based on a January 27, 1995 EEO settlement agreement. (See also Exhibit 9-1) Those involved in the discussions included Ann Young, Jenny Mallios, Delia Johnson, former Deputy Director Civil Rights, USIA and Blanche Twardowski, Ms Mallios' supervisor.  An entry dated 12/5/95 shows that Complainant agreed to an assignment outside OIG, and an entry dated 2/26/96 shows Complainant's receipt of a personnel action dated 12/10/95 converting her to a temporary appointment not to exceed 12/9/96. (See also Exhibit 19)

Exhibit 5-1, page 16 of the document shows an entry dated 4/27/96 effecting the termination of Complainant's appointment in OIG.  See also Exhibit 21.  Page 19 of the document shows an entry dated 12/9/96 indicating Ms. Mallios contacting Complainant to come to the personnel office for the separation process since her temporary appointment expired that day. (See also Exhibit 22)

Janice Brambilla, former Director of Human Resources at USIA, states she is unaware if any hostile environment created by the HR staff and does not recall any problems Complainant had with members of the staff. (Exhibit 6)

Blanche Twardowski, former Chief, Civil Service Operations, GS-14, OHR, USIA, served as Jenny Mallios' first line supervisor. She recalls Ms. Mallios mentioning there were some performance issues involving Complainant. She was also aware of a settlement agreement, and that at some point, Complainant had problems with her wrist. She states no reprisal was involved in actions concerning Complainant. (Exhibit 7)

Delia Johnson served as former Deputy Director for Civil Rights in USIA. She states she is unaware of any hostile environment created on the part of employees in OHR. (Exhibit 8)

Jenny Mallios (official spelling is Jenny but often uses Jeni or Jenni) was a Personnel Management Specialist, GS-13 at USIA and serves in that capacity at State Department. She states served as the Personnel Officer for the OIG at USIA. The personnel actions she recalls involving the Complainant include her conversion to a temporary appointment from a career appointment as a result of the settlement agreement signed on January 27, 1995. The agreement essentially specified if Complainant's performance while on detail did not meet "Fully Successful" standards, she would return to OIG for a probationary period of three months and, if still not successful in her performance, would accept a temporary appointment while looking for another position. (Exhibits 9 and 9-1)

Ms. Mallios was also aware Complainant was denied a within grade increase as a result of a performance rating of record of "Minimally Successful." Complainant's reconsideration request was denied · because Agency regulations preclude receipt of a within grade increase with a rating of "Minimally Successful." (See Exhibits 9, 9-4, 18 and 24) Ms. Mallios also recalls Complainant being placed on AWOL as a result of failure to provide adequate medical documentation as requested by the agency (Exhibits 9, 9-3, 23, and 26-21).

In the Agency's Final Decision on OCR 96-15, (Exhibit 11, page 12), Ms. Ann Young is quoted as stating the "Minimally Successful annual rating precluded a WGI under the Agency regulations." See also Exhibit 24. It states an employee's performance of the duties and responsibilities of his or her assigned position must be at an acceptable

level of competence; the most recent rating of record must be at least "Fully Successful." (Exhibit 24, page 3)

The medical documentation provided by Complainant to support her absence is contained in Exhibit 9-3. They are doctor's office forms entitled "Disability Certificate) and are dated September 6, 1995, and October 16, 1995. A letter dated November 30, 1995, from the then Assistant Inspector General for Management Anne T. Young asks Complainant to provide an original narrative statement from her physician that includes a diagnosis, a treatment history, a treatment plan, and a prognosis. The exhibit also contains a note from Ms. Mallios to Complainant's advisor regarding AWOL. The note states in part, "OIG has indicated that they plan to propose disciplinary action for the September-November AWOL. Continuing AWOL could jeopardize (Complainant's) position even more. Blanche (Twardowski) offered that (Complainant) could use annual leave to cover her absence this morning, but (Complainant) declined and instead opted for AWOL. Her absences remain unsubstantiated by medical documentation."

In regard to Complainant's allegations of harassment as relates to her separation from employment, the settlement agreement Complainant entered into with the agency states she would be placed in a temporary appointment NTE one year, at the end of which – if she had not found a position outside OIG – her employment would end. See Exhibit 9-1.

Complainant was provided with the opportunity to rebut management's position but elected not to do so (Exhibit 5-15).

**Invasion of her personal medical records obtained from OWCP and then communicated to others in USIA who had no right to their contents    (Allegation B):**

Complainant states she believes Jenny Mallios is the employee who communicated the contents of her medical records. However, Complainant does not identify to whom Ms Mallios allegedly communicated this information. She states she was harmed by the communication because it resulted in various forms of reprisal, harassment and illegal actions. (Exhibit 5)

In a supporting document Complainant provided showing a sequence of events, she shows an entry in Exhibit 5-1, page 13 dated 11/9/95 where she believes "Mallios disclosed my private and personal medical records to Ann Young and others in USIA."

Responding for Management, Blanche Twardowski states she was aware Complainant had filed a worker's compensation claim but never saw her records or discussed them with Ms. Mallios. (Exhibit 7)

Neither Janice Brambilla nor Delia Johnson recalls any communication regarding Complainant's medical records. (Exhibits 6 and 8)

Jenny Mallios states she never discussed Complainant's <u>medical records</u> with anyone.  She states she may have discussed Complainant's <u>situation</u> with Ms Twardowski and others in her chain of command, but not the medical records.  Ms Mallios states Complainant's medical files were maintained in USIA's locked file room to which Ms Mallios did not have the combination, nor could she access the file without requesting it.   She provided the records to Complainant's representative, John Pratt, at his request. (Exhibits 9 and 9-4)

Complainant was provided the opportunity to rebut statements by Management but did not do so.


**Withholding of essential records from OWCP from November 1995 to   January 1997, which caused an unwarranted delay in processing her claim (Allegation C);**

Complainant claims Ms Mallios withheld the forms that would provide leave information pertaining to her July 10, 1995 work injury. Complainant states that she provided all documentation required of her on a timely manner.  The evidence that she believes supports this allegation are letters from OWCP dated September 29, 1995 and November 9, 1995. (Exhibits 5, 26-26 and 26-29)

Both letters are from the OWCP Claims Examiner to Complainant. The September 29, 1995, is a form letter accepting Complainant's claim

for right shoulder strain and neck strain. The letter asks Complainant to provide a detailed narrative medical report from her attending physician that includes a history of injury, findings and results of all tests and x-rays, diagnosis, clinical course of treatment, prognosis, period and extend of disability and an opinion on the relationship of any continuing disability to the accepted injury.

The November 9, 1995, letter notifies Complainant that her CA-7 claims form was prepared incorrectly and was therefore not valid. The letter contains a handwritten annotation by Ms Mallios that a new CA-7 was sent Complainant on November 14. The letter itself goes on to advise Complainant that she is to complete only the front of the CA-7 form. The letter also addresses the fact that Complainant provided medical documentation regarding physical conditions other than that for which the claim was accepted. Further, the medical documentation provided by Complainant does not adequately support her claim and asks that she provide clarifying information.

The record also contains a November 9, 1995, letter from the OWCP Claims Examiner to Ms Mallios regarding Complainant's case (Exhibit 26-24). Complainant was sent a copy of the letter. The letter followed a telephone conversation between the Examiner and Ms Mallios. The letter notes Complainant filled out the front and back of the initial CA-7 form and told the Examiner she did so because she had been placed on AWOL because of her injury and was refused Continuation of Pay (COP). Further, there was no indication HR had refused to complete the form. The letter also advised Complainant she was to submit copies of all her medical documentation through the agency, because unless the agency completes the claim form it is invalid. Enclosed with the letter was a copy of Complainant's medical records as submitted to OWCP for inclusion in the agency file on Complainant's OWCP claim.

Ms. Mallios states she always tried to provide information to OWCP within 2 days after she received it (Exhibit 9). She further states the Complainant and her representative provided incorrect and incomplete claims, which delayed the process. Ms. Mallios has provided copies of correspondence with OWCP that she believes show her responsiveness and Complainant's failure to provide timely and correct information. (Exhibit 9-5) Complainant's OWCP records are contained in Exhibit 26-1 through 26-36.

Blanche Twardowski states Ms. Mallios was the most efficient case manager on the staff in handling OWCP actions so she believes Complainant's allegation is without merit. (Exhibit 7)

Complainant was provided the opportunity to rebut statements by Management but did not do so.

**An employee's illegal and unethical discussion of her medical files with other unqualified persons in USIA (Allegation E);**

Complainant claims Ms Mallios held discussions about her medical files but is unaware of with whom (Exhibit 5). She states a letter Ms. Mallios sent to OWCP on September 21, 1995 (Exhibit 26-30), and a letter from OWCP to Ms. Mallios on November 9, 1995 (Exhibit 9-5) support her claim.

The September 21, 1995, letter to OWCP provides a bill for medical services for Complainant and addresses the matter of COP. The letter states, "Initially, Ms. Dews Miller's injury was not thought to be disabling. She had returned to full duty for approximately a month after seeking medical attention in July. Suddenly, she claimed a relapse, and has been absent since August 21. She requested indefinite continuation of pay to cover her absences beginning August 21. Despite my (and her supervisor's) request for supporting medical documentation, none has been provided. Therefore, continuation of pay has not been granted." Exhibit 26-30.

Exhibit 26-24 contains the November 9, 1995, letter from the OWCP Claims Examiner to Ms Mallios. It refers to a telephone conversation between him and Ms Mallios regarding Complainant's claim.

Responding on Management's behalf, Ms. Mallios reiterates she never discussed Complainant's medical records with anyone (Exhibit 9).

Complainant was provided the opportunity to rebut statements by Management but did not do so.

**Her non-accommodation under the Rehabilitation Act of 1973 (P.L. 93-112, as amended), which requires federal agencies to develop and implement plans for the hiring, placement, promotion and retention of persons with disabilities (Allegation F):**

Complainant states the disabling condition requiring accommodation began July 10, 1995 when she suffered her work injury. She says she was not sure how to provide medical evidence showing her condition or evidence of her request for accommodation. She refers to a document she submitted with her response that supports the denial of her accommodation. See Exhibit 5-1.

Exhibit 5-1, page 11, has a July 10, 1995, entry indicating Complainant fell in the conference room. In Exhibit 5-1, page 14, is an entry dated 11/28/95 referring to a doctor's certificate describing work limitations and physical therapy needs that required the Complainant to take leave. Another entry dated 11/30/95 shows that Ann Young denied the leave request of 11/28/95. Page 16 of the document reflects an entry dated 3/4/96 where Complainant states she could not lift or bend because of her work injury and an entry dated 5/1/96 referring to her inability to do the work required. There is no entry clearly identifiable as involving a request for reasonable accommodation. While there are references to failure to receive COP and denial of requested leave, there is no specific statement connecting these with an actual request for reasonable accommodation, per se.

Management's response includes a statement from Blanche Twardowski that Complainant never said she had a disability and never asked for accommodation. (Exhibit 7)  Delia Johnson does not recall refusal of any accommodations for the Complainant. (Exhibit 8)

Complainant was provided the opportunity to rebut statements by Management but did not do so.

**Remanded claim of June 23, 1999:**

**That due to reprisal (previous EEO activity), she was discriminated against when: From September 5, 1995 through November 24, 1995, she was placed on AWOL for a work injury. She reported the work injury to her immediate supervisors (Rating and Reviewing**

Officers), pursuant to MOA, Part V-1, Section 506.3(c)(1).  However,
the Management Official who placed her on AWOL was not her
supervisor at the time of the work injury.

Complained states Ann Young and Jenny Mallios were the individuals
who placed her on AWOL.  She has not been reimbursed for the
AWOL, nor have her records been changed. (Exhibit 5)

Ms. Mallios states Complainant had called in sick on August 25, 1995
due to her work related injury of July 10, 1995.  Complainant's
supervisor for the detail in the Comptroller's offices approved the
requested sick leave.  Complainant's detail to the Comptroller's office
terminated on August 31, 1995, and she was to return to work to the
OIG.  The Complainant did not return to work, and Ann Young,
Assistant Inspector General, placed her on AWOL.  Ms. Mallios states
this was done because Complainant did not provide sufficient medical
documentation to support her absence. (Exhibit 9)

Exhibit 9-3 shows a handwritten request from Complainant for COP
due to complications from the July 10, 1995, on the job injury.  The
request contains a handwritten annotation the writer had explained to
Complainant the agency had no information to use as a basis to record
her absence as COP, so the supervisor will let the sick leave stand until
there was a medical report to convert to COP.  At that time, the time
cards would be changed.  Complainant provided a Disability
Certificate  dated September 6, 1995, that states, "This is to certify that
the above patient was under my professional care from August 29,
1995 to present inclusive and was totally incapacitated during this
time.  Patient will be re-evaluated on October 2, 1995."                .

Complainant subsequently provided an October 16, 1995, Certificate of
Professional Care that states, "Due to a work related injury on
7/10/95, Ms. Miller has been under our care since 8/29/95.  I have
advised Ms. Miller not to return to work, she is disabled for work,
currently from 8/29 – 11/20/95.  She will be re-evaluated on
November 20, 1995."

Exhibit 9-3 also contains an email from Ms Mallios regarding
Complainant's AWOL.  Ms Mallios sought to have Complainant asked
to provide a sick leave request or leave without pay request with

medical documentation. The email indicates Ms Mallio's position "under my care" is not sufficient information to give a supervisor confidence that leave should be approved for three or four months.

The record shows Complainant was subsequently paid for the AWOL time period (Exhibit 10). The record also shows the records were corrected to replace the AWOL with COP (Exhibit 26-17)

Correspondence regarding the AWOL actions is included at Exhibit 9-3.

Ms. Mallios states Complainant stayed off from work until November 27, 1995 without providing the requested medical documentation (Exhibit 9). As part of the separation process, an employee is required to complete several documents including Form IA-134, Clearance for Final Salary Payment. The form is required to ensure final salary payments due are not made until assurances are made that employees have paid all indebtedness and returned property (Exhibit 9-9). Ms. Mallios requested the form from the Complainant on December 9, 1996 when she was separated and on several occasions since then. (Exhibits 9, 9-8 and 9-9) It has not been provided.

On July 1999, Delia Johnson advised Blanche Twardowski to expunge the AWOL from the Complainant's records. On September 30, 1999 Janice Brambilla advised Complainant's representative the Complainant's file contains time cards adjusting the AWOL to COP for the period August 21, 1995 through October 3, 1995. She also advised that payment for the COP and other payments could not be made until the Complainant submitted the IA-134 Clearance for Final Salary Payment. (Exhibit 14)

Complainant was provided the opportunity to rebut statements by Management but did not do so.

The EEO Counselor's Report states Complainant "seeks as remedial relief, $300,000 in compensatory damages for each remanded issue...," but when asked by the EEO Investigator what she sought in relief, Complainant response was "to be determined." (Exhibit 2, page 6 and Exhibit 5, page 5)

## III.    Description of the Complaint:

| | |
|---|---|
| Nature of action, decision, or condition giving rise to complaint: | Harassment |
| Date of alleged discrimination: | 1995-1997 |
| Identity of responding management officials: | Janice Brambilla Former Director, HR - USIA |
| | Blanche Twardowski, Former Chief, Civil Service Operations Branch, USIA |
| | Delia Johnson, Former Deputy Director, Office of Civil Rights USIA |
| | Jenny Mallios, Former Personnel Management Specialist, USIA |

## IV.    Description of Investigation:

| | |
|---|---|
| Place of Investigation: | Clinton, MD Washington, DC |
| Dates of Investigation: | July 16 - August 31, 2001. |

## V.    Timeliness Requirements

| | |
|---|---|
| Date of Act or Event | 1995- 11/6/1997 |
| Counselor Contact (45 days) | November 7, 1997 |
| Date of  NTRF | August 11, 2000 |

| Filing Date (15 days) | August 23, 2000, |
| | October 30, 2000 amended |

## VI.   List of Exhibits:

### Volume I

01   Formal complaint of discrimination and attachments dated, August 23, 2000 and amended October 30, 2000.

02   EEO Counselor's Report and Attachments dated September 28, 2000,

03   Letter of Acceptance dated January 26, 2001; Letter of Authority to dated June 28, 2001

04   Organizational Relationship of Witnesses

05   Affidavit of **ROSE MARY DEWS-MILLER**, (Complainant, -prior participation), former Administrative Officer, GS-11, Office of Inspector General, (OIG), USIA, Washington, DC dated August 7, 2001.

    05-01  Sequence of Events from December 1987 to March 2000

    05-02  Copy of Amended Complaint dated October 30, 2000

    05-03  Decision on Appeal, OCR-96-15, 019836574, dated June 23, 1999.

    05-04  Letter dated October 13, 2000, from Deputy Director, OEEOCR, USIA, regarding signatory authority of representative.

    05-05  Letter dated August 23, 2000, from Complainant's representative to OEEOCR, Department of State.

    05-06  Designation of representative.

    05-07  New brief, "U.S. Offers $508 Million in Sex-Bias Case."

05-08   Testimony of Blacks in Government official before Committee on Government Reform, March 29, 2000.

05-09   Complainant's chart on her Performance Evaluation Ratings July 1984 to December 9, 1996.

05-10   Complainant's chart on the processing of her complaint OCR-96-15.

05-11   Certificate of Service.

05-12   Letter from Complainant to her representative forwarding a copy of her statement.

05-13   Amendment to Complainant's statement with attachments.

05-14   EEOC Decision Appeal No. 01992980 (OCR-96-15R), dated July 19, 2001.

05-15   Complainant's decision not to provide rebuttal.

5-16    Letters from Complainant's representative (John Pratt).

06      Affidavit of **JANICE BRAMBILLA**, (Management Official- prior participation), Director of Human Resources, SES, USIA, Washington, DC dated August 6, 2001.

07      Affidavit of **BLANCHE TWARDOWSKI**, (Management Official- prior participation), former Chief, Civil Service Operations Branch, GS-14, USIA, Washington, DC dated July 30, 2001

08      Affidavit of **DELIA JOHNSON**, (Management Official - prior participation), former Deputy Director, Civil Rights, USIA, Washington, DC dated August 1, 2001.

09      Affidavit of **JENNY MALLIOS**, (Management Official - prior participation), former Personnel Management Specialist, GS-13, OHR, USIA, Washington, DC dated August 7, 2001 and attachments.

09-01  Settlement Agreement for Complainant dated January 27, 1995

09-02  Letter to Complainant re Termination of Detail dated 8/31/95

09-03  Communications re Complainant's AWOL

09-04  Correspondence re Denial of Within-Grade Increase

09-05  Correspondence re OWCP and Medical Information

09-06  Letter to John Pratt transmitting Complainant's Medical File dated June 30, 1998

09-07  Time cards to Change Complainant's AWOL to COP for 8/21/95 - 10/3/95

09-08  Communication to Complainant re Salary Clearance Forms

09-09  Agency Policy on Separation Process

10  Final Agency Decision on OCR 96-15 Issue 3 dated March 6, 1998

11  Final Agency Decision on OCR 96-15 Issues 1,2 and 4 dated January 9, 1999

12  Letter to EEOC to former USIA re Appeal Compliance dated June 24, 1999

13  Memo to Blanche Twardowski from Delia Johnson re AWOL to COP Revision dated July 16, 1999

14  Letter to John Pratt from Janice Brambilla Requesting Salary Clearance Forms dated September 30, 1999

15  Correspondence to State Department EEOCR from Complainant

16  Correspondence re Recusal of Hattie Baldwin

17  SF-50 for Pay Adjustment dated January 8, 1995

18     SF-50 Denial of Within Grade Increase dated October 29, 1995

19     SF-50 Conversion to Temporary Appointment NTE December 9, 1996

20     SF-50 for Pay Adjustment dated January 7, 1996

21     SF-50 Temporary Appointment to OGC dated April 28, 1996

22     SF-50 Termination Effective December 9, 1996

23     Agency Policy on AWOL

24     Agency Policy on Within Grade Requirements

25     Agency Policy on Temporary Appointments and Terminations

Volume II

26     Copy of Complainant's Medical File from Federal Records Center

26-01   Cover page for Complainant's medical folder.

26-02   Record of payments to Complainant for March 3 to June 17, 1997.

26-03   March 12, 1998 letter from Mallios to DOL Claim Examiner Melendez, regarding reason for delay.

26-04   Continuation of pay claim dated February 23, 1998.

26-05   March 6, 1998 letter from Melendez to Mallios, with attachments.

26-06   Letter dated November 12, 1998, regarding Complainant's OWCP claim.

26-07   Letter dated August 6, 1997, stating forms must be signed before final payment of moneys can be made.

26-08   Complainant's representative's communication re the record and Mallio's rebuttal.

26-09   Complainant's Employee Medical Folder and 1998 documentation regarding representative's requests.

26-10   Letter March 20, 1998, Melendez to Complainant.

26-11   Complainant's medical documentation.

26-12   October 1997 communications.

26-13   June and August 1997 communications and forms.

26-14   Notification of Personnel Action, Termination of Temporary Appointment (Expiration), December 9, 1996.

26-15   Forms, November 3, 1995 and December 30, 1996.

26-16   Complainant's pay records, September and October 1995.

26-17   Memorandum dated May 7, 1997, and amended time and attendance records for 1995.

26-18   Communications, variously dated January and May.

26-19   January 24 correspondence and forms, November 1996 and January 1997.

26-20   November 13, 1995, "Current Medical Record."

26-21   April 26, 1996 memorandum from Complainant to Jean Monroe and handwritten response indicating Complainant needs to provide medical documentation.

26-22   December 4, 1995, note regarding Complainant's absences (AWOL)

26-23   November 30, 1995 denial of requested sick leave and request for additional medical information.

# EXHIBIT 4

**Information Agency**

**PERFORMANCE APPRAISAL REPORT**

*Wage System and*
*GS 1 - 15 Personnel*
*Senior Level*

**USIA**

| | |
|---|---|
| ☐ | Annual rating |
| ☐ | Interim - Departure - Employee |
| ☐ | Interim - Departure of Rater |
| ☐ | Interim - Change of Duties |
| ☐ | Rating of Record - WGI Determination |
| ☒ | Interim - Completion of Detail or Temporary Promotion |
| ☐ | Interim - Other: _____ |
| | (Specify Reason) |

## SECTION I. GENERAL PERSONNEL INFORMATION

| Name of Rated Employee | SSN | Performance Appraisal Period |
|---|---|---|
| Rose Mary Dews-Miller | 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 | February 1, 1995 - July 31, 1995 |

| Title, Grade, and Pay System | Organizational Symbol |
|---|---|
| Budget Analyst GS-11 | M/CBA |

| Name and Title of Rating Officer | Name and Title of Reviewing Officer |
|---|---|
| Carol Keith, M/CBA | Eva M. Diekmann, M/CB |

| Date Report Submitted to Personnel Office (M/P, B/PL, or B/CMP) | Is This Position Supervisory? ☐ Yes ☒ No |
|---|---|
| | |

## GENERAL INFORMATION

Rated Employees, Rating and Reviewing Officers should read MOA V-A 450 for policies and detailed instructions. Questions should be directed to the appropriate personnel office (M/PDM, M/PDP, B/PL or B/CP).

### AT THE BEGINNING OF THE RATING PERIOD

--Normally within 30 days of the beginning of the rating period, the Rating Officer, in joint participation with the Rated Employee must determine at least two critical and any non-critical requirements of the position, establish a performance standard for the Fully Successful level for each requirement, and clearly and concisely state them in Section II-A.

--If an employee has significant supervisory responsibilities, at least one critical requirement must address these responsibilities.

--Performance requirements and standards must be reviewed, signed and dated at the beginning of the rating period by the Rating and Reviewing Officers and the Rated Employee in Section I-A.

--If a new Rating Officer arrives during the appraisal period, requirements and standards will be established on a new form IA-1272 between the Rated Employee and Rating Officer with proper signatures and dates, even if the requirements and standards do not change.

### DURING THE RATING PERIOD

The Rating Officer must discuss performance with the Rated Employee at least once, preferably mid-way through the rating period, and is encouraged to do so more frequently. At the time of the discussion(s), the Rating Officer should sign and date Section I-B and the Rated Employee should sign Section I-C.

--Any modifications to the requirements and/or standards must be documented by the Rating Officer in Section I-B, approved by the Reviewing Officer in Section I-B, and certified by the Rated Employee in Section I-C.

### AT THE END OF THE RATING PERIOD

The Rating Officer initiates the appraisal process by soliciting the Rated Employee's comments on his/her performance (including specific accomplishments during the appraisal period). The Rating Officer and Rated Employee should discuss the employee's accomplishments and deficiencies with respect to each performance requirement and its standard.

The Rating Officer prepares the appraisal in Section II and III.

--The Rating Officer signs and dates the form and submits the appraisal for higher level review and approval to the Reviewing Officer.

--The Reviewing Officer indicates concurrence in the Rating Officer's summary rating in Section IV, Part A, prepares the narrative review in Section IV, Part B, and signs and dates the form. If there is no higher level official who can serve as Reviewing Officer, that fact and the reason must be indicated in Section IV.

--The summary rating must be reviewed and approved by a person at a higher level in the organization than the Rating Officer before communication to the Rated Employee. If there is no Reviewing Officer, a higher level approval is required in Section V in addition to the pool manager if the pool manager is other than the Associate/Office/Service Director (or another official in the chain of command).

--The Reviewing Officer (or other higher level reviewer) forwards the performance appraisal to the performance award pool manager for approval of the summary rating and signature in Section V before communication to the Rated Employee.

--For an Outstanding or Unsuccessful summary rating, approval by the Associate/Office/Service Director is required in Section V before communication to the Rated Employee.

--The performance appraisal is returned to the Rating Officer for discussion with the Rated Employee.

--The Rated Employee may add comments in Section VI, if desired. The Rated Employee should have a reasonable amount of time, normally three working days, to review the completed appraisal. Supervisors should read and consider the Rated Employee's comments. The performance appraisal must be reviewed and approved again in accordance with procedures above if the summary rating is changed for any reason.

--Narrative justification is normally to be contained within the space provided on the appraisal form, but is limited to no more than one additional page overall. There is no limitation on the comments provided by the Rated Employee.

--The Rating Officer will forward the completed performance appraisal to the appropriate Office of Personnel for filing.

--See MOA V-A 450 for information on interim ratings.

1272
(4)

beginning of rat...g p.   1.)

We certify that the performance requirements in Section II, pages ___1___ through ___4___ , and accompanying performance standards were established on _2/27/95_ , after discussion between us, and that each of us has received a copy of them.

| _Carol Reid_ 2/27/95 | _Rose M. Dews Miller_ 2/27/ |
|---|---|
| Signature of Rating Officer          Date | Signature of Rated Employee          Date |

I certify that performance requirements and standards are consistent with applicable guidelines and the expectatio of higher-level management.

_____   _2/27/95_
Signature of Reviewing Officer          Date

---

**SECTION I-B** (To be completed by Rating and Reviewing Officers during the rating period.)

I certify that performance review discussions with the Rated Employee were held on    _several occasio_
                                                                                                    Date(s)

I certify that if any modifications to the requirements and/or standards were made on _____, such changes are reflected in the revised standards/requirements which are attached to the performance plan a the Rated Employee was provided a copy of the revisions.

_Carol Reid_   _7/3/95_
Signature of Rating Officer          Date

I certify that I have reviewed and approved any modifications.

_____
Signature of Reviewing Officer          Date

---

**SECTION I-C** (To be completed by Rated Employee upon completion of performance review discussions during th rating period.)

Yes   No      I certify that :
☐      ☐      1. My Rating Officer and I discussed my performance on the following dates during the rating period: _Several occasions need dates_

☐      ☐      2. If applicable, any modifications and additions to the requirements and standards in Section II were discussed with me.

_____
                    Signature of Rated Employee          Date

---

**LEVELS OF ACHIEVEMENT** - The following levels must be used to rate an employee's performance on each individual requirement in Section II-B.

**Outstanding** - Performance of rare high quality which clearly and consistently far exceeds the Fully Successful standard to an outstanding degree in terms of such factors as quality, quantity, timeliness, and the extent of supervision required, or exceeds the Highly Successful standard if one is provided.

**Highly Successful** - Performance of unusually good quality which clearly and consistently exceeds the Fully Successful standard to a significant degree in terms of such factors as quality, quantity, timeliness, and extent of supervision required, or meets the Highly Successful standard if one is provided.

**Fully Successful** - Performance which clearly and consistently meets the Fully Successful standard in terms of such factors as quality, quantity, timeliness and extent of supervision required.

**Minimally Successful** - Performance of poor quality which falls noticably below the Fully Successful standard for such factors as quality, quantity, timeliness, and/or extent of supervision required, or meets the Minimally Successful standard if one is provided.

**Unsuccessful** - Performance of very poor quality which is unacceptable and falls well below the Fully Successful standard in terms of such factors as quality, quantity, timeliness, and /or extent of supervision required, or falls sho of the Minimally Successful standard if one is provided.

Name of Rated Employee _Rose de_ _Dews-Miller_____    Ser  II: Page ___1___ of ___4___

## SECTION II. EVALUATION OF INDIVIDUAL PERFORMANCE REQUIREMENTS

Performance Requirement Number __1_____    (Note: Use a separate page for each performance requirement)

A.  (Complete this item at the beginning of rating period)

**Performance Requirement :**

Compiles preliminary resource data required for preparation of individual post GOE going rate submissions. Reviews data with ABO prior to sending this information to the field. Upon receipt of field submissions, assists in review, adjusting post estimates, as needed, in order to determine proper funding levels for ongoing programs. Also assists in review of post administrative support (DAS) going rates or field budget estimates which establish annual reimbursement levels to Department of State.

Is this a critical requirement ?            Yes __✓___    No _____

**Fully Successful Performance Standard (other standards optional):**

Incumbent exhibits adequate grasp of budgeting principles and required calculations to assist in adjusting field estimates as needed. After clearance is obtained by ABO, employee can recommend appropriate remedial action.

B.  (Complete this item normally within 30 days after end of rating period)

Evaluation of performance on this requirement: Level of Achievement (Check one)

_____ Outstanding      _____ Highly      _____ Fully      _✓_ Minimally      _____ Unsuccessful
                              Successful           Successful           Successful

Describe specific reasons, citing examples, for this rating:

Practically every aspect of budgeting principles was new to Ms. Dews-Miller. While her unfamiliarity with the materials (such as country data cables, PAO resource sheets, etc.) is understandable, it is my impression that she does not seem to have the aptitude for budget work. Rose Mary struggled with the basic understanding of budget terms and procedures and how they apply to each phase of the overall process. Due to the lack of grasping the budgeting principles, Rose Mary was very limited in recommending any appropriate remedial action.  .

Name of Rated Employee  Rose Mai  Dews-Miller _____    Sec a II: Page ___2___ of ___4___

## SECTION II. EVALUATION OF INDIVIDUAL PERFORMANCE REQUIREMENTS

Performance Requirement Number  2_____    (Note: Use a separate page for each performance requirement)

A. (Complete this Item at the beginning of rating period)

   **Performance Requirement :**

   Assists in formulation of OMB and Congressional Budget Estimates and preparation of supporting justification materials.

Is this a critical requirement ?           Yes ___✓___   No _____

**Fully Successful Performance Standard (other standards optional):**

   Contribution to development of budget and supporting jusitification materials are complete and timely. Completed work is reviewed and cleared by ABO prior to release of material. Material presented should not have any major omissions of data and no more than three minor calculation errors. Additionally, material must be completed within deadlines established by ABO in order to comply to the budget cycle.

B. (Complete this item normally within 30 days after end of rating period)

   Evaluation of performance on this requirement: Level of Achievement (Check one)

   ____ Outstanding    ____ Highly      ____ Fully        ✓ Minimally     ____ Unsuccessful
                            Successful        Successful        Successful

**Describe specific reasons, citing examples, for this rating:**

   Ms. Dews-Miller came into the office after the majority of the Congressional Budget estimates had been prepared and submitted. Not being familiar with budget formulation limited her participation in the preparation of supporting justification materials. However, she was given several relatively simple tasks that would assist me in providing the required supporting justification materials. She was asked to formulate several documents using samples to guide her. This process consisted of transferring budget estimate numbers from one sheet onto another back-up sheet in a different format. These tasks took much longer than they should have, and required a great deal of my time to advise Ms. Dews-Miller and to edit her work..

Name of Rated Employee  <u>Rose Mary</u> <u>aws-Miller</u>                          Secti   il: Page ___3___  of __4__

## SECTION II. EVALUATION OF INDIVIDUAL PERFORMANCE REQUIREMENTS

Performance Requirement Number _3_____         (Note: Use a separate page for each performance requirement)

A.  (Complete this Item at the beginning of rating period)

**Performance Requirement :**

Assists in operational execution of overall area financial plan.  This requires:  review  and evaluation of post requests for changes in funding or  employment levels; monthly status of funds analyses; and preparation and updating of contingency lists.  Employee also participates in development of materials required for periodic Agency financial reviews and ad hoc reprogramming analyses.  Assists in the training and development of incumbent budget clerk.

Is this a critical requirement ?                    Yes __✓__      No _____

**Fully  Successful Performance Standard (other standards optional):**

Post funding requests are carefully reviewed and adjusted as necessary, with guidance from ABO on complex budget execution matters.  Cables to the field are generally clear, error free and concise.  Material provided to ABO pertaining to all phases of the operational budget execution are usually dependable, error free and completed within deadlines established.

B.  (Complete this item normally within 30 days after end of rating period)

**Evaluation of performance on this requirement: Level of Achievement (Check one)**

_____ Outstanding      _____ Highly        _____ Fully          __✓__ Minimally       _____ Unsuccessful
                              Successful         Successful           Successful

**Describe specific reasons, citing examples, for this rating:**

Rose Mary's performance on the operational execution of the financial operation was very limited because most of her time had to be devoted to learning the basics of budget execution.  She was able to do the monthly status of funds analyses, and the posting of GOE transfers to the control book.   The monthly contingency list was presented to me on the date due to the Division Chief rather than the prior day (due date to me for review).  Additionally, the CL excluded the required exchange rate data.   Routine budget action cables requesting adjustments to funding levels were not properly researched and no action was taken.  Also, unless the cable was in a standard format, Rose Mary had difficulty determining what action was needed, or even if the action was for M/CBA or another office in the Agency.

Name of Rated Employee  Rose Mar  Dews-Miller _____   Se.  n II: Page ___4___ of __4__

## SECTION II. EVALUATION OF INDIVIDUAL PERFORMANCE REQUIREMENTS

Performance Requirement Number __4_____    (Note: Use a separate page for each performance requirement)

A.  (Complete this Item at the beginning of rating period)

**Performance Requirement :**

In the absence of the ABO, serves as advisor to the Area Director and other Senior Management officials on area financial matters.

Is this a critical requirement ?                    Yes _____    No __✓__

**Fully Successful Performance Standard (other standards optional):**

Contact with officials are primarily for the purpose of coordinating changes in the Area's budget and programs. Employee gives briefings on the status of funds, exchanges technical information, and provides routine budget data. Recommendations of a controversial or precedent-setting nature are cleared by the supervisor prior to discussion with higher level officials.

B.  (Complete this item normally within 30 days after end of rating period)

Evaluation of performance on this requirement: Level of Achievement (Check one)

_____ Outstanding       _____ Highly          _____ Fully            _____ Minimally        _____ Unsuccessful
                              Successful            Successful            Successful

**Describe specific reasons, citing examples, for this rating:**

Because of Ms. Dews-Miller's limited grasp of budget policy and procedures, Rose Mary was unable to perform this requirement.

Name of Rated Employee _Rose di_ _Dews-Miller_ _____ St  n II: Page _____ of _____

## SECTION II. EVALUATION OF INDIVIDUAL PERFORMANCE REQUIREMENTS

Performance Requirement Number _____   (Note: Use a separate page for each performance requirement)

A. (Complete this Item at the beginning of rating period)

   **Performance Requirement :**

Is this a critical requirement ?          Yes _____   No _____

**Fully  Successful Performance Standard** (other standards optional):

B.  (Complete this item normally within 30 days after end of rating period)
    Evaluation of performance on this requirement: Level of Achievement (Check one)

_____ Outstanding      _____ Highly        _____ Fully        _____ Minimally      _____ Unsuccessful
                                Successful           Successful           Successful

Describe specific reasons, citing examples, for this rating:

Name of Rated Employee    Rose M__y    vs-Miller

## SECTION III. OVERALL SUMMARY RATING

A.  After completing Section II, the Rating Officer must assign one of the overall summary ratings listed below (modifications or substitutions are not permitted). The summary rating is based primarily upon the Rated Employee's performance of critical requirements and may not be reduced more than one level below the summary rating derived from critical requirements because of performance on noncritical requirements.

### Summary Levels of Achievement (Check One):

_____ **Outstanding** - All critical requirements must have been rated Outstanding and no more than two noncritical requirements may be rated as low as Highly Successful.

_____ **Highly Successful** - All critical requirements must have been rated at least Highly Successful and all noncritical requirements at least Fully Successful. A Highly Successful summary rating may still be appropriate if performance on one, but not more than one, critical requirement is rated Fully Successful, provided performance on other critical requirements is rated at least Highly Successful and the Rater concludes that (1) the requirement was *relatively* less important than other critical requirements and (2) required only a small portion of the time of the employee and (3) that performance on that requirement was offset by performance on two or more other critical requirements.

_____ **Fully Successful** - Performance on all critical requirements must have been rated at least Fully Successful and performance on not more than one noncritical requirement rated as low as Minimally Successful. In exceptional cases, a summary rating of Fully Successful still may be appropriate if performance on one, but not more than one, critical requirement is rated Minimally Successful, provided the Rater concludes that (1) the requirement was *significantly* less important than other critical requirements and (2) required only a small portion (less than 10 - 15%) of the time of the employee and (3) that performance on the requirement was offset by at least Fully Successful ratings on two other more critical requirements, or by at least a Highly Successful rating if there was only one other critical requirement.

_____ **Minimally Successful** - Except as noted above under Fully Successful, a summary rating of Minimally Successful is appropriate if the employee's performance has been rated as Minimally Successful on one or more critical or two or more noncritical requirements (see Section 453.2c of MOA V-A).

_____ **Unsuccessful** - A summary rating of Unsuccessful is required if the employee's performance on one or more critical requirements has been rated as Unsuccessful.

**Optional comments:** The Rating Officer may add any comments not covered elsewhere in the report to explain the overall rating chosen. A narrative justification must be provided for an overall summary rating of Outstanding or Unsuccessful.

Rose Mary needs to organize and prioritize work projects so that she can meet deadlines. Rose Mary and I had various conversations on time management — speed, accuracy as well as being able to work on several things at one time is required in many instances. She tends to let things sit for several days without finalizing them. When deadlines were set, she in almost every instance presented projects to me at the last minute of the last hour. The inability to meet deadlines with a useable product has forced me to take over her tasks at the midnight hour.

She needs a great deal of one on one supervision to comply with instructions and to meet deadlines and commitments. She can do simple drafting, but her writing often lacks clarity. Ms Dews-Miller needs to pay attention to detail. After six months, she is still trying to grasp the basic concept of budget execution and formulation. She is familiar with the key budget terms (mandatory, discretionary, full-year, GOE, DSA, ceilings, program reductions, etc) but over time it became clear that she did not and still does not fully understand how these terms are applied to the daily budget activities.

Signature of the Rating Officer                          Date    8/14/95

Name of Rated Employee Rose Mary Dews-Miller

## SECTION IV. REVIEWING OFFICER'S STATEMENT

Reviewing Officers must have served a sufficient time (normally 90 days) in their position to have adequate basis for completing this statement. If there can be no Reviewing Officer, the reasons should be explained in IV-B below.

### A.   Overall Rating

The Reviewing Officer must check one of the statements below.  If there is a difference between the rating given by the Rating Officer and that given by the Reviewing Officer, the latter will prevail.  In such cases, the Reviewing Officer must explain this difference of opinion through specific references to ratings in Section II and III and must discuss this Section in draft with the Rating Officer.  It must also be discussed with the Rated Employee following any required approvals.

_____✓_____   I concur in the Overall Summary Rating assigned in Section III or

_____   I do not concur in the Overall Summary Rating assigned in Section III and assign the following Overall Summary Rating instead (Check one):

_____ Outstanding    _____ Highly Successful    _____ Fully Successful    _____ Minimally Successful    _____ Unsuccessful

### B.   Reviewing Officer's comments

Comment on: (1) extent of knowledge of the specific responsibilities and assignments the Rated  Employee was expected to perform ; (2) whether the performance requirements and standards are reasonable  and fair in relation to other similar positions; (3) how well the Rated Employee carried out his/her responsibilities; and (4) whether the nature of the working  relationship between the Rated Employee and Rating  Officer has a significant impact on performance or the performance appraisal process and whether the Rated Employee received adequate guidance.

In my present position I have considerable contact with Ms. Dews-Miller and believe that the performance requirements and standards are fair and reasonable to other similar positions.

Ms. Dews-Miller is a very pleasant employee who is willing to do what she can.  In my observation of Rose Mary's performance these past six months, I sense that she lacks the facility for budget work.  Rose Mary had budget background when she came to work in M/CBA.  I was surprised to learn that she seemed to know the definition of the budget terms, but did not know how these terms apply to the daily budget process.  She still is learning.

A lot of one-on-one training was provided during this time period.  I do not believe that she possesses the knowledge required for a GS-11 budget analyst.  In six months, a person with some budget background should . be able to perform routine operational tasks with nominal supervision.  Rose Mary requires detailed instructions and supervision.  Still lacking is an understanding of the complete budget process and how each task relates to it.  Over the rating period, I expected that regular monthly budget exercises would be performed faster, once her knowledge of the tasks was more seasoned.  I hoped that knowledge and experience would enable Rose Mary to graduate to a new level.  While some knowledge has been gained, it is minimal for the level needed to meet the demands of the position and this office.

Ms. Dews-Miller and Ms. Keith have a professional and businesslike working relationship.  Adequate guidance and training was provided.

_____          _____8/14/95_____

Signature of Reviewing Officer                                      Date

Name of Rated Employee Rose Ann. Dews-Miller

## SECTION V.    FORM FOR PMS REVIEWS AND APPROVALS

A.    Approval of Summary Rating by Higher-Level Reviewer/Awards Pool manager (all ratings):    (To be completed by the Agency official in charge of managing the performance award pool prior to discussion of the rating with the rated employee.)

The overall Summary Rating assigned is:

_____ Outstanding    _____ Highly    _____ Fully    __X__ Minimally    _____ Unsuccessful
                            Successful            Successful                Successful

_____λ_____ APPROVED

_____
Signature of Higher-Level Reviewer
(Optional unless there is no Reviewing Officer)

_____X_____ APPROVED

_____
Signature of Pool Manager

B.    Approval of "Outstanding" or "Unsuccessful" Summary Rating.  Must clearly meet the definition for levels of achievement on page 2 of this form.

_____ APPROVED

_____ DISAPPROVED    I assign a summry rating of _____
                                    in lieu of the summary rating in A above.

_____        _____
Signature of Associate /Office/Service Director            Date

10

Name of Rated Employee  Rose  .ry Dews-Miller

## SECTION VI.  RATED EMPLOYEE'S COMMENTS

The Rated Employee may use this  space to provide  additional  comments and insights into his/her performance during the rating period. These optional comments should not be construed automatically as a rebuttal of the performance appraisal.  Additional pages may be added if necessary.  The Rated Employee should sign below to indicate he or she has read the appraisal and received a copy of it.  The Rated Employee's signature does not indicate agreement with the appraisal.

The original performance appraisal was given to Rose Mary Dews-Miller on August 17, 1995 by Carol Keith for review, discussion and signature.

Due to an injury sustained Rose Mary has been on sick leave since August 21, 1995.  The Reviewing Officer contacted Rose Mary on August 28, 1995 requesting the appraisal be signed and returned by August 31, 1995.

**Signature of Rated Employee**                          **Date**

11

# EXHIBIT 5

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
800 N CAPITOL ST NW RM 800
WASHINGTON DC 20211

January 27, 1997

File Number:   250470961
Date of Injury: 07/10/1995
Employee:   ROSE DEWS-MILLER

UNITED STATES INFORMATION AGCY
M PDM  ROOM 518
ATTN MS Jeni Mallios
301 4TH STREET SW RM 518
WASHINGTON, DC 20547

Dear Ms. Mallios:

Reference is made to Ms. Rose M. Dews-Miller's compensation case and our January 24, 1997 telephone conversation concerning the employer's completed version of form CA-7.

The case file was reviewed to determine whether the time claimed on form CA-7 was supported by medical documentation. After reviewing the case, we find that Ms. Dews-Miller is entitled to the period claimed. Your records do need to be change, however, to reflect the correct period of continuation of pay, (COP), to which Ms. Dews-Miller is entitled. We understand that the reason why it was not paid was that your office had not received any medical documentation establishing a work related disability. This office will process the period claimed from 10/04/95 to 11/25/95. The agency's records should be changed to reflect the period of COP as - 7/19/95 only, and from 08/21/95 to 10/03/95 (44 calendar days).

If your office has any questions, feel free to contact this office.

Sincerely,

Julio C. Melendez
Claims Examiner

cc:

ROSE M. DEWS-MILLER
8507 WOODYARD RD
CLINTON, MD 20735

# EXHIBIT 6

**Job Aid**

**When to Process a Promotion; Change to Lower Grade, Level or Band; Reassignment; Position Change; or Detail (continued)**

| R U L E | If | And | Then the Action is a |
|---|---|---|---|
| 8 | Employee moves from one position under the General Schedule to another position at a lower grade under the General Schedule | Does not begin or continue a period of grade retention as a result of the action | Change to lower grade, level or band |
| 9 | Employee moves to a lower graded position under the same wage grade schedule | | |
| 10 | Employee moves to a lower rate of basic pay under the same type of ungraded wage schedule | | |
| 11 | Employee moves to a position at a lower rate of basic pay in a different pay-method category | | |
| 12 | Employee is temporarily assigned to a different position for a specified period and will return to regular duties at the end of the assignment | | Detail |
| 13 | Employee moves into your agency when employee's function is transferred from another agency to your agency | Employee's position title, series and grade do not change | Mass Transfer (See instructions in Chapter 21 of this **Guide**.) |
| 14 | Employee moves within your agency when the function employee performs is moved from one organization or activity in your agency to another | | Realignment (See instructions in Chapter 21 of this **Guide**.) |
| 15 | A new occupational series or a new series and position title are assigned to employee's position | No other change occurs in employee's position (that is, no change occurs in employee's grade and in employee's duties and responsibilities). | Change in Data Element (See Chapter 28 of this **Guide** for instructions.) |

**Table 14-A. Documentation of Details**

| R U L E | If Detail is | And | Then |
|---|---|---|---|
| 1 | To State or local government, or other eligible organizations under the authority of the Intergovernmental Personnel Act (IPA)<br><br>(See Note 3 of this table) | a) Action is a detail; or<br><br>b) Detail is extended; or<br><br>c) Detail is terminated | Document with an SF 50: Legal Auth NYM/Reg. 334.101<br><br>a) Nature of Action 730/Detail NTE(Date); or<br><br>b) Nature of Action 731/Ext Detail NTE (Date); or<br><br>c) Nature of Action 732/Term of Detail NTE (Date) |
| 2 | To an international organization | | Document with an SF 52 showing the organization and position to which detailed, the effective date of the detail, and the not-to-exceed date. |
| 3 | To a position that is identical to the employee's current position or is of the same grade, series, and basic duties as the employee's current position | | No documentation is required. |
| 4 | For more than 30 but less than 120 days to a different position (i.e., to one that is not described in rule 2 of this table) | Is to a higher grade position | Document with an SF 52 showing the organization and position to which detailed, the effective date of the detail, and its not-to-exceed date. (see Note 1 of this table) |
| 5 | | Is to a position with promotion potential | |
| 6 | | Is to a position at the same or a lower grade which does not have promotion potential | No documentation is required. |
| 7 | For 120 days or more | | Document with an SF 52 showing the organization and position to which detailed, the effective date of the detail, and its not-to-exceed date. (see Note 2 of this table) |

NOTES: 1. If a detail that was originally made for 30 days or less (and thus was not documented with an SF 52) extends beyond 30 days, prepare an SF 52 showing as the effective date the date on which the detail actually began.

2. If a detail that was originally made for less than 120 days (and thus was not documented with an SF 52) extends to 120 days or more, prepare an SF 52 showing as the effective date the date on which the detail actually began.

3. File the SF-50 on the right side of the OPF. Do not submit this information in your agency's Central Personnel Data File (CPDF) submission.

**Page 14-14 is blank.**